IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JODI C. MAHDAVI,

      Plaintiff,

v.                                              Civil Action No. 1:14-cv-0648

NEXTGEAR CAPITAL, INC.,

and

P.A.R. SERVICES, INC.

      Defendants.

## MEMORANDUM IN SUPPORT OF
## NEXTGEAR'S MOTION FOR SUMMARY JUDGMENT

    NextGear Capital, Inc. respectfully moves for summary judgment on all counts of Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 56. NextGear lawfully repossessed the subject BMW pursuant to its perfected security interest. The purported transfer of title to Mrs. Mahdavi was completed by fraud. Mrs. Mahdavi's husband was the general manager of the auto dealer that transferred the car and was responsible for the application of title and the receipt of sale proceeds – he was acting on both sides of the transaction as seller and purchaser. Mr. Mahdavi has asserted his Fifth Amendment rights and spousal privilege with regard to all questions concerning the BMW and the transfer of title, and Mrs. Mahdavi has failed to meet her burden to defeat NextGear's interest.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

**A.     NextGear possesses title and has a valid perfected security interest in the BMW.**

NextGear financed the purchase of the BMW by Beltway Auto Brokers, LLC ("Beltway Auto") a used vehicle dealer, through its floor-plan financing agreement. *See* September 30, 2013 Demand Promissory Note and Loan and Security Agreement, **Exhibit 1**. In the floor-plan financing arrangement, NextGear gave Beltway Auto a revolving line of credit of $1,400,000, which Beltway Auto used to purchase much of its used car inventory. *Id*; Affidavit of Lisa Long ("Long Aff."), **Exhibit 2**, ¶ 2-3.[1] Each loan advance is made against a specific piece of collateral. Long Aff. (Ex. 2), ¶ 4. As each item of collateral is sold by the dealer to a third party, the loan advance for that specific piece of collateral is repaid. *Id.* NextGear holds title to financed vehicles until it receives full repayment of the loan from Beltway Auto after a bona fide sale to a third party. *Id.* NextGear keeps the titles of vehicles securing its loan in its title vault in Carmel, Indiana. *See* November 17, 2014 Transcript of Deposition of David Freeman ("Freeman Dep."), **Exhibit 3**, at 55:9-16.

At Beltway Auto, the financing and sales of vehicles was handled by Navid "Alex" Mahdavi, Mrs. Mahdavi's husband. Mr. Mahdavi was the general manager of the lot and managed NextGear's inventory of financed vehicles. Long Aff. (Ex. 2), ¶ 2. He communicated frequently with NextGear's account manager, David Freeman, and was NextGear's primary contact for Beltway Auto. Freeman Dep. (Ex. 3) at 25:6-10. His duties included informing Mr. Freeman of sales of vehicles and paying proceeds of the sales to NextGear. When a financed vehicle was sold, Mr. Mahdavi was supposed to send funds to NextGear within 48 hours. *Id.* at

---

[1]     Ms. Long's affidavit was previously attached to NextGear's opposition to Mrs. Mahdavi's Motion for Preliminary Injunction. *See* Doc. No. 10-1.

57:9-15. After receiving funds, NextGear would send the title to Beltway Auto for transfer to the purchaser. *Id.* at 58:14-19.

NextGear still possesses the original, valid title to the BMW. Freeman Dep. (Ex. 3) at 55:9-13. A copy of the title is attached as **Exhibit 4**. The BMW was financed by Beltway Auto in early April 2014, and was one of sixty vehicles Beltway Auto was supposed to hold as security for NextGear's loan at that time. *Id.*; Long Aff. (Ex. 2), ¶ 4.[2] NextGear has a perfected security interest in the BMW as part of Beltway Auto's inventory. *See* UCC Financing Documents, Floored Vehicle History Report, and Receivable Statement, attached as **Exhibit 5**.[3]

**B.   Mr. Mahdavi and Beltway Auto defraud NextGear.**

In early April 2014, NextGear learned of extensive fraud at Beltway Auto. Mr. Mahdavi has asserted his Fifth Amendment rights and has refused to testify regarding any aspect of the fraud or the sale of the BMW. *See* Navid Mahdavi's Answers to NextGear's Written Deposition Questions ("Alex Mahdavi Answers"), attached as **Exhibit 6**.

On Friday, April 11, 2014, NextGear employee David Freeman went to Beltway Auto and verified that the inventory of vehicles was there. Freeman Dep. (Ex. 3) at 50:17-21. On Monday, April 14, 2014, Mr. Freeman called Alex Mahdavi for a routine discussion regarding the financing. Freeman Dep. (Ex. 3) at 21:2-5. Mr. Mahdavi did not inform him of any

---

[2]   On April 1, 2014, Beltway Auto used NextGear's financing to add three motor vehicles to its inventory. Long Aff. (Ex. 2), ¶ 5. On April 2, 2014, Beltway Auto requested that NextGear increase the line of credit by $100,000 (from $1,400,000 to $1,500,000) for 30 days. *Id.* On the same day and immediately after obtaining the additional credit, Beltway Auto obtained floor plan financing through NextGear for another five motor vehicles, including the subject BMW. *Id.*

[3]   The loan documents and UCC financing statement establish a perfected interest in Beltway Auto's financed inventory and a receivable report identifying the BMW at issue in this case as part of the collateral.

problems at the lot. *Id.* at116:16-19. After that call, Mr. Freeman learned that Beltway Auto was having trouble with another creditor. *Id.* at 22:10-12.[4]

The next morning, on April 15, 2014, Mr. Freeman traveled to Beltway Auto. Freeman Dep. (Ex. 3) at 22:12-23:1. There, Mr. Freeman discovered that nearly 50 vehicles were missing. *Id.* at 36:5-6. Mr. Freeman met with Alex Mahdavi over the course of a few hours on April 15, 2014 to discuss the missing inventory. *Id.* at 35:2-12. Mr. Mahdavi informed Mr. Freeman for the first time that twenty vehicles had been sold, an unusually high number. *Id.* at 84:12-16. Mr. Mahdavi provided unsigned copies of the sales orders, claiming the original agreements had been taken in a break-in. *Id.* at 112:17-22. Mr. Mahdavi could not account for the other missing vehicles. *Id.* at 24:22-25:1. Mr. Mahdavi did not mention any sale of the BMW or its location. *Id.* at 43:10-17.

In the aftermath of NextGear's discovery, NextGear learned that Beltway Auto's fraudulent scheme had involved obtaining duplicate titles from the Maryland Vehicle Administration and then selling cars without informing or paying NextGear. *See* Freeman Dep. (Ex. 3) at 27:18 – 28:3; Long Aff. (Ex. 2), ¶ 7. Although NextGear possessed original titles to these vehicles, Beltway Auto sold them to third party purchasers and obtained duplicate titles from the Maryland Motor Vehicle Administration. *Id.* Beltway Auto's principal, Khazeyer Molavi, admitted that he had multiple, unidentified people remove unsold vehicles from Beltway Auto's lot because he feared Beltway Auto's creditors, including NextGear, would repossess them. Long Aff. (Ex. 2), ¶ 6.

---

[4] Beltway Auto also had been extended credit by Manheim, an auto auction company. Freeman Dep. (Ex. 3) at 22:4-8. NextGear learned that Beltway Auto may have been in default with Manheim. *Id.*

On April 18, 2014, NextGear informed Beltway Auto of an Event of Default under the applicable loan documents and demanded immediate possession of the collateral.  Long Aff. ¶ 8.  NextGear attempted to locate the missing vehicles by searching property owned by affiliates of Beltway Auto and the company's owners and manager.  *Id.*, ¶ 10; Freeman Dep. (Ex. 3) at 37:13-20.

NextGear located three missing vehicles in Mr. Mahdavi's driveway.  Freeman Dep. (Ex. 3) at 38:19-39:6.  One was the BMW.  *Id.*  At the time of the repossession, NextGear was unaware of any purported sale of the BMW.  *Id.* at 43:10-17.  Mr. Mahdavi had not mentioned it to David Freeman during the April 15, 2014 interview at the dealership.  *Id.*  No copy of the purchase agreement had been provided to NextGear.  *Id.* at 45:10-16.  No proceeds of the sale were paid to NextGear.  *Id.* at 117:17-18.

NextGear engaged P.A.R. Services, Inc. to repossess the vehicles.  Freeman Dep. (Ex. 3) at 91:5-9.  By the time P.A.R. Services got to Mr. Mahdavi's house, only the BMW was there.  *Id.* at 40:17-19.  The vehicle was repossessed by P.A.R. Services.  *Id.* at 91:5-9.

The fraud committed against NextGear is similar to Mr. Mahdavi's previous criminal scheme, which was docketed in this court in *United States v. Navid Mahdavi*, Case No. 1:08-CR-00426-GBL.  A copy of the agreed statement of facts is attached hereto as **Exhibit 7**.  In 2008 and 2009, Mr. Mahdavi conspired to defraud lenders by obtaining multiple loans on his real property.  *Id.*, ¶ 6-8.  To accomplish this fraud, Mr. Mahdavi "created fraudulent tax returns and bank statements." *Id.*, ¶ 8.  Mr. Mahdavi submitted fraudulent HUD-1s and other supporting documents to the creditors, and conspired to alter his tax return.  *Id.*, ¶ 10-11.  For that scheme, Mr. Mahdavi was charged by the United States with conspiracy to commit bank fraud under 18

U.S.C. § 371, pleaded guilty, and was sentenced to one year and one day in prison. *See* Case No. 1:08-cr-00426-GBL, Doc. No. 17.

**C.     Mr. Mahdavi, not Plaintiff, arranged and controlled the purchase of the BMW.**

After the repossession, NextGear learned for the first time that Mrs. Mahdavi claimed to have purchased the vehicle from Beltway Auto.

Throughout discovery, Mrs. Mahdavi provided no details regarding the purchase. She claims she was the one who decided to purchase the vehicle, but she did not work out the details of the purchase:

> Q:   And at that time did you decide to purchase the vehicle?
>
> A:   Yes.
>
> Q:   And what were the terms of purchase to be?
>
> A:   The terms?
>
> Q:   Did you work out how you were going to purchase the vehicle from Beltway Auto?
>
> A:   At that time, no.

*See* November 12, 2014 Transcript of Deposition of Jodi C. Mahdavi ("Mahdavi Dep."), **Exhibit 8**, at 21:14-22. *See also id.* at 28:11-14 ("Q: Did you talk to anyone at NextGear while you were going through the process of purchasing this vehicle? A: No.").

She did not take any steps to arrange for the financing of the vehicle purchase with Pentagon Federal Credit Union.

> Q:   Did you speak when you were – before purchasing the vehicle, did you speak with anyone at PenFed regarding the financing?
>
> A:   No.

Mahdavi Dep. (Ex. 8) at 28:19-22.

Mrs. Mahdavi did not participate in filling out the application for title:

> Q:   Do you recall filling out an application for title?
>
> A:   No.
>
> Q:   Would that have been handled at Beltway Auto?
>
> A:   Yes.
>
> Q:   And was that your husband who handled that?
>
> A:   I don't know.

*Id.* at 28:3-10.

Mrs. Mahdavi delegated the handling of her purchase to her husband, who kept her in the dark:

> Q:   Do you recall if your husband told you anything about where the BMW came from or how it was purchased?
>
> A:   No.
>
> \*\*\*
>
> A:   Are you asking before, when I purchased the car?
>
> Q:   Yes.
>
> A:   He didn't -- he never said anything.

Mahdavi Dep. (Ex. 8) at 29:4-14.

Mrs. Mahdavi did not even visit Beltway Auto to view or purchase the BMW. Mahdavi Dep. (Ex. 8), at 20:2-14. She saw a BMW 650i on the road and told her husband she wanted one, and then he "brought it home for [her] to see." *Id.* at 20:17-18.

Mrs. Mahdavi deferred to her husband on questions concerning the transaction. Her husband, however, refused to testify for fear of incriminating himself. *See* Alex Mahdavi

Answers, Exhibit 6.  He asserted Fifth Amendment rights to over seventy questions regarding the basic details of the transaction.  *Id.*  The issues on which Mr. Mahdavi fears criminal prosecution include the process for obtaining title, the handling of the sale proceeds, his communications with his wife, and his timing of the purchase as it relates to the fraud at Beltway Auto.

Neither Mr. nor Mrs. Mahdavi has explained where the purchase money for the BMW ended up.  As explained above, Mr. Mahdavi was responsible for handling the financing and processing of money for purchases of vehicles.  The funding for the BMW came from Pentagon Federal Credit Union on April 16, 2013, the day after NextGear's discovery of the fraud and meeting with Mr. Mahdavi.  That day, Pentagon Federal issued a check in the amount of $64,941.70, which apparently was cashed.  *See* Copy of April 16, 2013 check, **Exhibit 11**.  Mr. Mahdavi has refused to explain what he did with the money and whether he received any portion of it.  *See* Alex Mahdavi Answers (Ex. 6), *passim*.

**D.  Mrs. Mahdavi used a non-residential address on the application for title.**

Mrs. Mahdavi did confirm her involvement in one suspicious circumstance of the transaction: the use of a shell Maryland address.

The Certificate of Title, attached as **Exhibit 9**, was issued to Mrs. Mahdavi at an address at 4726 D St. Barnabas Road, Temple Hills, MD 20748.  At deposition, Mrs. Mahdavi testified that this address was a "client office" she visited "every couple months."[5]  Mahdavi Dep. (Ex. 8) at 30:16-20.  She does not regularly check mail at that address.  *Id.* at 31:10-12.  Public records searches show that this is the address of an auto wholesaler that Mrs. Mahdavi used to own,

---

[5] This testimony directly contradicted Mrs. Mahdavi's earlier testimony that she did not have multiple clients or multiple office locations.  Mahdavi Dep. (Ex. 8) at 6:10-15.  ("Q: So do you work for multiple clients? / A: No. / Q: Do you work at multiple locations? A:  No. / Q: And where is your office located? / A: Washington, D.C.").

which Mrs. Mahdavi failed to disclose at deposition. *See* UCC and Charter Search for "Ultimate Auto Wholesalers," attached as **Exhibit 10**.

Mrs. Mahdavi claims that the title was sent to the Temple Hills address, but she intended to use the address of 9913 Montauk Avenue for the vehicle. The Montauk Avenue address is the address of a home renovation Mrs. Mahdavi is completing. Mahdavi Dep. (Ex. 8) at 32:13-15. She claimed that she and her husband were intending to create a Maryland corporation and to use the BMW sedan as a company car for the construction company. However, no company exists to this day:

> A: We'd use the car as a company car.
>
> Q: And does the company have a name?
>
> A: I'm still speaking with the CPA, my tax CPA, to figure out which type of company I need to file.
>
> Q: At what stage was this company formation in April of 2014?
>
> A: Well, Montauk Avenue is still under construction, so we were in the middle of the project.

Mahdavi Dep. (Ex. 8) at 32:3-12. Mrs. Mahdavi confirmed that no actual company had been formed at that address, and that there was no plan to transfer title of the BMW to the company. *Id.* at 9-21. She also confirmed that she intended to flip the property to an end user on completion of the construction. *Id.* at 39:2-6. (Q: " . . .[I]is it planned that that will be some sort of office or that will be a construction project you sell to a residential purchaser? / A: Sell.").

## STANDARD OF REVIEW

NextGear is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).  The Court must assess the evidence in the light most favorable to the party opposing the motion.  *E.g., Chabornnages de France v. Smith*, 597 F.2d 406 (4th Cir.1979).  However, the opposing party must submit "affirmative evidence" showing a dispute of material facts.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–67 (1986); *Adickes v. S.H. Kress & Co*. 398 U.S. 144, 160 (1970).  An opposing party "may not rest upon the mere allegation or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986).

## ARGUMENT

Mrs. Mahdavi cannot defeat NextGear's valid interest in the vehicle because she is not a purchaser in the ordinary course.  Mrs. Mahdavi's husband, the general manager of the dealer and convicted felon, arranged for the purchase during a time of rampant fraud at Beltway Auto, concealed the purchase from NextGear, and has pleaded the Fifth Amendment on all details regarding the transaction.  Mrs. Mahdavi's claim (if she has one) is against Beltway Auto and/or her husband for failing to convey proper title to her, not against NextGear.

### I. Mrs. Mahdavi was not a buyer in the ordinary course under Virginia's Uniform Commercial Code.

Mrs. Mahdavi's purchase cannot defeat NextGear's valid interest because Mrs. Mahdavi is not a good faith purchaser.  NextGear's valid security interest survives a sale and is effective against subsequent purchasers unless the sale was "in the ordinary course of business."  Va. Code Ann. § 8.1A-201.  Mrs. Mahdavi bears the burden of showing that her purchase was in the ordinary course of business.  *In re Gary Aircraft Corp*., 681 F.2d 365, 373 (5th Cir.1982) (1983); *In re Air Vermont, Inc*., 44 B.R. 433, 437 (D.Vt.1984) ; *U.S. For & on Behalf of Mar. Admin. v. Cont'l Illinois Nat. Bank & Trust Co. of Chicago*, 889 F.2d 1248, 1253 (2d Cir. 1989).

The ordinary course of business standard is objective and is determinable as a matter of law. Virginia's UCC defines a sale in the ordinary course as one that "comports with the usual or customary practices" of sales of that kind. *Id.* In used vehicle sales, the standard requires that the purchase follow the standard process of an arms-length transfer.

Other courts, considering similar facts, have held that a vehicle sale was not completed in the ordinary course of business. For example, in *Genesee Regional v. Palumbo*, a wife who purchased a vehicle from her husband's company claimed she was a bona fide purchaser to defeat the valid interest of the floor-plan financer. 799 N.Y.S.2d at 887-888. The wife dealt only with her spouse, the owner and director of the company. *Id.* She lived with her husband and owned other vehicles from her husband's company. *Id.* When she purportedly purchased the vehicle, the proceeds were not paid to the lienholder. *Id.* The wife could not get title in New York without supporting documentation, so she submitted an application to the State of Maryland to receive a certificate of title in her name. *Id.* The financer sought a declaration of superior title against the wife, who claimed she was a good faith purchaser. *Id.*

The *Genesee* court held the wife was not a purchaser in the ordinary course. The court found that "the most relevant fact is that [the husband] admits that the necessary title document held by the lender . . . had never been turned over to [the dealer], or the buyer, or filed, and was still in the lender's possession." *Genesee Regional*, 799 N.Y.S.2d at 888. The *Genesee* court further relied on the wife's registration of the vehicle in Maryland (which was not her state of residence). *Id.*

A Pennsylvania court held that a used vehicle purchase was not in the ordinary course of business where (i) the sale was conducted offsite and (ii) the buyer failed to make any inquiry into the previous owners or documentation of the vehicle. *Al Maroone Ford, Inc. v. Manheim*

*Auto Auction, Inc.*, 208 A.2d 290, 293 (Pa. Super. 1965).  The court observed: "the facts that the car was a substantially new car, purchased for resale many miles away from the place of business of the sellers, by an auctioneer who has had experience with foreign security interests in automobiles, without any inquiry, so far as the agreed facts show, as to existence of any such interest, all tell against the contention that the appellee was a buyer in ordinary course."  *Id.*

Other courts rejecting "buyer in the ordinary course" claims have relied on unusual facts regarding the location of sale and the address listed on the title.  A sale that occurs offsite from the dealer's lot may not be a sale in the ordinary course of business.  *Rhode Island Hosp. Trust Co. v. Leo's Used Car Exch., Inc.*, 314 F. Supp. 254 (D. Mass. 1970) (sale not in the ordinary course of business when it occurred away from dealer's place of business); *Al Maroone Ford, Inc. v. Manheim Auto Auction, Inc.*, 208 A.2d 290, 293 (Pa. Super. 1965) (same).  Courts have held that the listing of a non-residential address on the title weighs against the purchase being in the ordinary course.  *First Nat. Bank & Trust Co. of El Dorado v. Ford Motor Credit Co.*, 646 P.2d 1057, 1062 (Kan. 1982) (evidence that address on title was not the home address of purported purchaser supported finding that purchase was not valid).  Finally, it is relevant if the buyer registers the vehicle in state other than their state of residence.  *See Genesee Regional*, 799 N.Y.S.2d at 891.

Mrs. Mahdavi is not a buyer in the ordinary course of business because the sale of the BMW comport with the usual or customary practices of used auto sales.  The transaction was completely distinct from a usual, arms-length used vehicle sale in which the purchaser goes to the dealership, completes paperwork, and purchases the vehicle.  Instead, Mrs. Mahdavi "purchased" the vehicle without ever visiting the dealership and without any knowledge of the paperwork, financing application, title application, or other basic details of the sale.  Mahdavi

Dep. (Ex. 8) at 21:14-22, 28:3-22, 29:4-14.  Moreover, Mrs. Mahdavi "purchased" the vehicle from her husband's company, with her husband acting on her behalf and controlling the processes for obtaining title, paying creditors, and arranging for financing.  Freeman Dep. (Ex. 3) at 42:3-4, 117:1-11.  Neither Mrs. Mahdavi nor Mr. Mahdavi can confirm that the proceeds of the sale went to the dealership and not Mr. Mahdavi.  *See* Alex Mahdavi Answers (Ex. 6).  They jointly decided to use a Maryland shell address, rather than their home address, in order to facilitate the purchase.  Mrs. Mahdavi's purchase was nothing like a typical, arms-length used car purchase.

Mrs. Mahdavi was at best willfully blind to the details and suspicious circumstances of the purchase of her BMW.  To demonstrate the extent of her willful blindness of her husband's activities, she even denied knowledge at her deposition of whether her husband was even employed.  Mahdavi Dep. (Ex. 8) at 13:22-14:1 ("Q: Is he currently working? / A: I don't know").  A purchaser cannot achieve good faith purchaser status in this way.  *See Will Investments, Inc. v. Young*, 317 S.W.3d 157, 167 (Mo. Ct. App. 2010) ("A person cannot be willfully blind to the circumstances of the transaction and obtain good faith purchaser status."). *Cf. Graham v. White-Phillips Co.,* 296 U.S. 27, 32, 56 S.Ct. 21, 23 (1935) (holding that one who is willfully blind to notice of defect in title is not acting in good faith under holder in due course statute).

## II.     Mr. Mahdavi's assertion of the Fifth Amendment is fatal to Plaintiff's claim.

At summary judgment, Mrs. Mahdavi must show affirmative evidence to demonstrate a triable issue.  Mrs. Mahdavi, however, has deferred to her husband to provide all basic details of the transaction, the handling of the money, and the process for obtaining title.  Her husband has

refused to testify due to a fear of criminal prosecution. Without any explanation of the highly irregular circumstances, Mrs. Mahdavi's claim fails.

Courts hold parties accountable for nonparty assertions of the Fifth Amendment where the nonparty is inextricably involved in the party's claim. *See United States v. Dist. Council of New York City & Vicinity of United Bhd. of Carpenters & Joiners of Am.*, 832 F. Supp. 644, 652 (S.D.N.Y. 1993) (negative inference based on nonparty's assertion of Fifth Amendment rights is appropriate if party and nonparty "bear a sufficiently close relationship"); *LiButti v. United States,* 107 F.3d 110, 122, (2d Cir.1997) (invocation of Fifth Amendment by nonparty witness supports inference if there is a relationship of loyalty with a party); *Fed. Deposit Ins. Corp. v. Fid. & Deposit Co.,* 45 F.3d 969, 978 (5th Cir.1995) (adverse inference can be drawn from any relevant invocation of the Fifth Amendment by a nonparty witness).

"A district court has discretion in its response to a party's invocation of the Fifth." *See Wehling v. Columbia Broadcasting System,* 608 F.2d 1084, 1089 (5th Cir.1979) (If invocation of privilege prejudiced the other party, the district court "would be free to fashion whatever remedy is required to prevent unfairness."); *United States v. $506,641.00 in U.S. Currency,* 1996 WL 78364, *3 (N.D.Ill.1996) ("[A] court has discretion in determining the appropriate means of dealing with a claimant's invocation of the privilege."). Policy concerns favor remedies for a plaintiff's assertion of the Fifth Amendment:

> The plaintiff who retreats under the cloak of the Fifth Amendment cannot hope to gain an unequal advantage against the party he has chosen to sue. To hold otherwise would, in terms of the customary metaphor, enable plaintiff to use his Fifth Amendment shield as a sword.

*Microsoft Corp. v. Silver Star Micro, Inc.*, No. 1:06-CV-1350-WSD, 2008 WL 115006, at *3 (N.D. Ga. Jan. 9, 2008) (quoting *Wehling v. Columbia Broad. Sys.*, 608 F.2d 1084, 1087 (5th Cir. 1979).

Assertion of Fifth Amendment privileges may lead to summary judgment where it is used to conceal material facts. *See* Wright, Miller, and Kane, Federal Practice & Procedure (3d Ed.), § 2018 at 288 ("In some cases if a party claims the privilege and does not give his or her own evidence there will be nothing to support his or her view of the case and an adverse finding or even a directed verdict or grant of summary judgment will be proper."); *SEC v. Colello,* 139 F.3d 674, 677–78 (9th Cir.1998) (proper for Court to apply negative inference at summary judgment stage); *SEC v. Lyttle*, 538 F.3d 601, 604 (7th Cir.2008); *Padilla v. City of Chicago*, 932 F. Supp. 2d 907, 919 (N.D. Ill. 2013) (Fifth Amendment assertion drove "another nail into their evidentiary coffin by eliminating any arguable contention that [the alleged wrongful acts did not occur]"); *United States v. One Parcel of Real Property,* 780 F. Supp. 715, 722 (D.Or.1991) (striking counterclaim and affirmative defense in their entirety because of defendant's use of the privilege); *SEC v. Benson,* 657 F.Supp. 1122, 1129 (S.D.N.Y.1987) (granting summary judgment against the silent party). [6] One court has explained that a negative inference can be appropriate at summary judgment because the courts are "required to draw only *reasonable* inferences in favor of a nonmovant." *Padilla*, 932 F. Supp. 2d at 919.[7] The assertion of the Fifth Amendment removes any reasonable inference of proper action because it is predicated on a legitimate threat of criminal prosecution. *Id.*

---

[6] In contrast, some courts have said that summary judgment was not an appropriate remedy for a party's assertion of Fifth Amendment rights. *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber,* 407 F.3d 34, 55 (2d. Cir. 2005)).

[7] Some courts have also held that burden shifting to the party asserting the Fifth Amendment is an appropriate remedy. *See Colello*, 139 F.3d at 677; Robert Heidt, *The Conjurer's Circle—The Fifth Amendment Privilege in Civil Cases,* 91 Yale L. J. 1062, 1126–32 (1982) (recommending burden-shifting and barring testimony as appropriate responses to invocation of the Fifth Amendment).

Summary judgment is especially appropriate when the adverse inference is supported by evidence presented in discovery. *See Hoover v. Knight,* 678 F.2d 578, 582 (5th Cir.1982) (direct evidence in addition to negative inference confirmed appellee's involvement) *TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC*, 945 F. Supp. 2d 1331, 1339 (M.D. Fla. 2013) ("a party seeking summary judgment produces additional direct evidence above and beyond any negative inference to be drawn by the invocation of the Fifth Amendment, entry of summary judgment is appropriate")

"Courts repeatedly have held that an adverse evidentiary inference may be drawn against a party who refuses to testify . . . [and] summary judgment may be appropriate if supported by independent evidence." *Microsoft Corp. v. Silver Star Micro, Inc.*, 2008 WL 115006, at *3 (N.D. Ga. Jan. 9, 2008) (citing *Baxter v. Palmigiano,* 425 U.S. 308, 317-18 (1976); *Avirgan v. Hull,* 932 F.2d 1572, 1580 (11th Cir.1991); *S.E.C. v. Scherm,* 854 F.Supp. 900, 904-05 (N.D.Ga.1993). In these cases, the courts granting summary judgment "rel[y] principally on th[e] independent factual record," and support their finding with the adverse inference. *Microsoft*, 2008 WL 115006 at *3. The assertion of the Fifth Amendment is fatal because it prevents the party from "refut[ing] any allegations of undisputed fact offered" by the moving party. *Id.*

Here, Mr. Mahdavi's Fifth Amendment assertion supports a grant of summary judgment because there is independent evidence of wrongdoing that coincides with the inference from Mr. Mahdavi's fear of criminal prosecution. NextGear has submitted deposition, affidavit and documentary evidence that Mr. Mahdavi was involved on both sides of the transaction, and that the transaction occurred as part of a fraudulent scheme to take NextGear's collateral.

Without Mr. Mahdavi's testimony on basic facts, Mrs. Mahdavi cannot prove her purchase was legitimate. Mr. Mahdavi's involvement in his wife's purchase of the vehicle was encompassing. He completed the paperwork, located the car, financed the purchase, and controlled the flow of funds and communications with NextGear. When those facts were shielded by the privilege, and an adverse inference of improper activity is put in their place, the jury will be unable to conclude that Mrs. Mahdavi's purchase was ordinary and proper. There is no reasonable inference to be drawn at this stage that Mrs. Mahdavi's title was obtained legally or in "the ordinary course of business." By asserting the Fifth, Plaintiff's husband is conceding that "honest answers would tend to subject the answerer to criminal liability."

For example, Mr. Mahdavi has refused to explain where Pentagon Federal's money went. If the money did not go to Beltway Auto, the purchase is not for value nor is it in the ordinary course, and Mrs. Mahdavi's claim fails. Mr. Mahdavi also concealed facts concerning the process for application of title – critical information necessary to examine Mrs. Mahdavi's interest. Title obtained by fraud or forgery may be invalid. *Genesee Reg'l Bank v. Palumbo*, 799 N.Y.S.2d 883, 890-91 (Super. Ct. N.Y. 2005) (wife's title was void in purchase from husband's company because of fraud in submission to state agencies).

The adverse inference should be imputed against Mrs. Mahdavi. Despite being a CPA and having experience in the auto wholesaling business, Mrs. Mahdavi delegated the handling of the purchase of the BMW to her husband, a known felon, and failed to inquire at all into the circumstances of the purchase. She did not, and could not have, reasonably relied on a belief that Beltway Auto owned the vehicle and extinguished prior liens because the car just showed up in her driveway.

The purpose of the UCC's protections for "buyers in the ordinary course" is to protect innocent purchasers who could not have discovered the problems with title.  There is no similar policy concern in this case.  If Mrs. Mahdavi wished to avoid this result, she could have purchased the car from someone other than her husband, an admitted fraudster and a convicted felon.  She could have participated in the purchase or demanded basic facts regarding the transaction.  By failing to do so, she assumed the risk that she would bear the loss of her husband's fraud and refusal to testify.  The *Genesee* Court, considering similar facts, recognized that the purchasing wife's interests were adequately protected by her claims against her husband's company:

> If [the purchasing wife] was duped by her husband into believing she would obtain good title she would have a cause of action against the dealer for breach of contract and warranty of title. . . and a defense against the retail installment contract assignment by the dealer to [the floorplan financer].

*Genesee Regional*, 799 N.Y.S.2d at 892.

### III.     Mrs. Mahdavi has failed to show any intentional wrongful act by NextGear.

At a minimum, Count III must be dismissed.  Mrs. Mahdavi's is not entitled to damages beyond the value of the vehicle under a theory of intentional tort.  NextGear had no knowledge of the purported purchase of the vehicle because Mr. Mahdavi concealed it.

Under Virginia law, "trespass to chattels occurs when one party intentionally uses or intermeddles with personal property in rightful possession of another without authorization." *America Online, Inc. v. IMS,* 24 F.Supp.2d 548, 550 (E.D.Va.1998) (*citing Vines v. Branch,* 244 Va. 185, 190, 418 S.E.2d 890, 894 (1992) ("Where a person has illegally seized the personal property of another and converted it to his own use, the owner may bring an action in trespass . . . ").  Similarly, conversion "is the intentional exercise of dominion or control over another's property that so seriously interferes with the right of another to control it that the actor may justly

be required to pay the full value of the property." *In re Twin B. Auto Parts, Inc.*, 271 B.R. 71, 82 (Bankr. E.D. Va. 2001)

In repossession cases, intentional tort claims fail where the repossesser does not engage in use of force, threats, violence, breaking and entering, or fraud. *See Wallace v. Chrysler Credit Corp.*, 743 F. Supp. 1228, 1233 (W.D. Va. 1990). *Wallace* applied Virginia law and held that a repossession of a truck in the middle of the evening "was calculated to avoid a breach of the peace because the prospect of a confrontation with the plaintiff was less at 2 a.m. than it would have been in the daylight hours or in the early evening." *Id.* at *1233. The court observed: "It has been held in almost all jurisdictions that the use of stealth in a self-help repossession is not a breach of the peace." *Id.* Where the creditor has a legitimate right to repossess the car, no tort lies. *Id.* (granting a motion to dismiss); *accord Collins*, 454 S.W.2d 469, 473 (Tex. Civ. App. 1970) ("The repossession was not a trespass or conversion. . . . All testimony shows that Ford thought it had a right to take the car.").

It is undisputed that neither Beltway Auto nor Mr. Mahdavi provided NextGear notice of the sale. Mr. Mahdavi's job responsibilities included informing NextGear of such a sale. NextGear did not learn of the purported purchase until after the repossession. NextGear had no knowledge of the purported interest in the vehicle, and had a valid interest of its own. There is no evidence that the repossession itself was conducted in a violent, threatening, or fraudulent manner. Thus, neither intentional tort alleged by Mrs. Mahdavi can go forward, and NextGear respectfully asks for summary judgment in its favor on Count III.

## CONCLUSION

For the foregoing reasons, NextGear Capital, Inc. requests that the Court grant summary judgment to NextGear on all of Plaintiff's claims.

        Respectfully Submitted,

        NextGear Capital, Inc.

        By  /s/  James D. Bragdon
        James D. Bragdon (VSB #83681)
        jbragdon@gejlaw.com
        David G. Sommer
          *Admitted pro hac vice*
        dsommer@gejlaw.com
        Gallagher Evelius & Jones LLP
        218 N. Charles St., Ste. 400
        Baltimore, MD 21201
        Telephone (410) 951-1416
        Fax (410) 468-2786

        Ashley W. Winsky (VSB #79224)
        awinsky@mcguirewoods.com
        McGuireWoods LLP
        Court Square Building
        310 Fourth Street N.E., Suite 300
        Charlottesville, VA 22902-1288
        434-980-2207 (Direct Line)
        434-980-2269 (Fax)

        *Counsel for NextGear Capital, Inc.*