1

```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
                  (Alexandria Division)
-------------------------------:
JODI C. MAHDAVI,                :
                                :
              Plaintiff,        :
                                :
         vs.                    : Case No.
                                : 1:14-cv-0648
NEXTGEAR CAPITAL, INC.          :
                                :
and                             :
                                :
P.A.R. SERVICES, INC.,          :
                                :
              Defendants.       :
-------------------------------:
                                Arlington, Virginia

                       Wednesday, November 12, 2014

Deposition of:

                    JODI C. MAHDAVI

called for oral examination by counsel for

Defendant, pursuant to notice, at the law offices

of Levine, Daniels & Allnutt, 5311 Lee Highway,

Arlington, Virginia, before Christy McGee, CSR, of

Capital Reporting Company, a Notary Public in and

for the Commonwealth of Virginia, beginning at

10:00 a.m., when were present on behalf of the

respective parties:
```

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

2

1    A P P E A R A N C E S
2  On behalf of Plaintiff:
3        JONATHAN E. LEVINE, ESQUIRE
         Levine, Daniels & Allnutt, PLLC
4        Heritage Square, 5311 Lee Highway
         Arlington, Virginia 22207
5        (703) 525-2668
6  On behalf of Defendant, NextGear:
7        JAMES BRAGDON, ESQUIRE
         Gallagher, Evelius & Jones, LLP
8        218 North Charles Street, Suite 400
         Baltimore, Maryland 21201
9        (410) 347-1275
10 On behalf of Defendant, P.A.R.:
11       JAMES N. MARKELS, ESQUIRE
         Jackson & Campbell
12       1120 Twentieth Street, N.W., South Tower
         Washington, D.C. 20036-3437
13       (202) 457-1610
14
15                * * * * *
16
17
18
19
20
21
22

3

1        C O N T E N T S
2
3  EXAMINATION BY:                    PAGE
4     Counsel for Defendant, NextGear      4
5     Counsel for Defendant, P.A.R.    59/90
6     Counsel for Plaintiff         89
7
8
9  MAHDAVI DEPOSITION EXHIBITS:      *      PAGE
10   1   Answers to P.A.R.          8
11   2   Answers to NextGear        8
12   3   Document Production        8
13
14
15
16
17
18   (* Exhibits retained by Counsel, Mr. Bragdon.)
19
20
21
22

4

1        P R O C E E D I N G S
2  WHEREUPON,
3        JODI C. MAHDAVI
4  called as a witness, and having been first duly
5  sworn, was examined and testified as follows:
6     EXAMINATION BY COUNSEL FOR DEFENDANT,
   NextGear
7  BY MR. BRAGDON:
8     Q   Hi, Ms. Mahdavi.  My name is James
9  Bragdon and I represent NextGear.  Have you had
10 your deposition taken before?
11    A   No.
12    Q   Okay.  I'll give you some general rules,
13 and I'm sure Mr. Levine has laid out how this is
14 going to go, but I'll be asking you questions about
15 the claim that you've brought against NextGear.  If
16 you have -- we don't want to you speculate on any
17 answers, so if you don't know, I don't know is a
18 fine answer.  If you do answer a question, it's
19 going to come across that you do understand the
20 question and that you know the answer to the
21 question.  If you don't understand a question, just
22 please ask me to clarify.  Otherwise, again, it

5

1  will -- if you don't ask for clarification, it will
2  appear as though you did understand the question.
3  If you need a break at any time, please let me
4  know.  And for the court reporter's sake, let's let
5  each other both -- I'll try to let you finish your
6  answers if you let my finish my questions.  Does
7  all that sound fair?
8     A   Uh-huh.
9        MR. MARKELS:  Just one other thing,
10 uh-huhs and so on, we have a court reporter here
11 who's going to be taking down the audio and making
12 a transcript.  We'll need you to vocalize answers,
13 so yes and no.  Headshakes, nods, that sort of
14 thing doesn't help us.  So if you could instead of
15 uh-huhs just say yes or no, that will be better for
16 the court reporter to take down what your answer
17 is.
18       THE WITNESS:  Okay.
19 BY MR. BRAGDON:
20    Q   Are you on any medications today that
21 would prohibit you from giving full and truthful
22 answers?

## Capital Reporting Company
### Mahdavi, Jodi C. 11-12-2014

**6**

1  A   No.
2  Q   Are you currently employed?
3  A   Yes.
4  Q   And what is your job?
5  A   Accounting.
6  Q   And where do you work?
7  A   Palm Management Corporation.
8  Q   And is that a staffing agency?
9  A   No, it's a management company.
10 Q   So do you work for multiple clients?
11 A   No.
12 Q   Do you work at multiple locations?
13 A   No.
14 Q   And where is your office located?
15 A   Washington, D.C.
16 Q   And what's the address of your employer?
17 A   1730 Rhode Island Avenue.
18 Q   Can you describe briefly what your job
19 responsibilities are?
20   A   I review financial statements and I
21 supervise a staff of accountants.
22 Q   And can you briefly describe your

**7**

1  educational background?
2  A   I have a CPA.
3  Q   And where was your -- do you have an
4  undergrad degree?
5  A   Uh-huh.
6  Q   And where was that from?
7  A   George Mason.
8  Q   And what was your major in undergrad?
9  A   Business.
10 Q   And what is your home address?
11 A   915 Fairway Drive, Vienna, Virginia.
12 Q   And other than that, do you own any other
13 properties?
14 A   Yes.
15 Q   How many approximately do you own or have
16 an interest in, I should say?
17 A   Approximately ten.
18 Q   And are those residential properties?
19 A   Yes.
20 Q   And are they located -- I guess, what
21 states are they located in?
22 A   Virginia and Maryland.

**8**

1     MR. BRAGDON:  I'm going to mark your
2  Answers to Interrogatories as Exhibits 1 and 2.
3      (Mahdavi Deposition Exhibit Numbers 1 and
4      2 were marked for identification.)
5  BY MR. BRAGDON:
6  Q   Can you just generally review these
7  documents and take your time and verify whether
8  these are your answers to NextGear, which I think
9  is marked as 2, and your supplemental answer to
10 P.A.R. Services, which I think is marked as 1.
11    MR. BRAGDON:  Can you mark this as 3?
12    (Mahdavi Deposition Exhibit Number 3
13    was marked for identification.)
14 BY MR. BRAGDON:
15 Q   Do they appear to be accurate copies of
16 the interrogatories you reviewed and signed?
17 A   Yes.
18 Q   Is there anything specific that comes to
19 mind on review of changes you would make or
20 additions you would make?
21 A   No.
22 Q   Is it correct -- were you involved in the

**9**

1  responses to the request for production of
2  documents as well?
3  A   Yes.
4  Q   Can you describe what you did to look for
5  responsive documents?  Where did you go to look for
6  the documents you produced?
7  A   I asked my husband for some.
8  Q   And did you have any personal files that
9  you had documents in?
10 A   Bank statements.
11 Q   Did you review any of your e-mail
12 communications?
13 A   I didn't have any e-mail communications.
14 Q   Do you use e-mail?
15 A   Yes.
16 Q   And do you have a work and personal
17 account?
18 A   I don't have a personal account.  I have
19 a work e-mail.
20 Q   And what is the -- that's called Palm
21 Communication or what's name of your company again?
22 A   The Palm.

10

1   Q   Palm.  Palm Management?
2   A   Uh-huh.
3   Q   What's the domain name of those e-mails?
4   A   The Palm.
5   Q   Have you -- what's your general practice
6   for storing e-mails through your work e-mail
7   account?
8   A   I don't keep personal e-mails on my work
9   e-mail.
10  Q   And so you don't have any personal e-mail
11  account?
12  A   I don't have a personal e-mail account,
13  no.
14  Q   So it's correct that -- do you correspond
15  with your husband with your work e-mail?
16  A   I do, yes.
17  Q   Do you correspond with friends and family
18  members through your work account?
19  A   I do.
20  Q   Is it like an Outlook account?
21  A   It is Outlook.
22  Q   Do you -- I guess your e-mail is kept and

11

1   stored on the work computer; is that correct?
2   A   Uh-huh.
3   Q   Does it also come to your phone?
4   A   Yes.
5   Q   Do you delete e-mails after reading them?
6   A   Sometimes.
7   Q   Have you continued your -- do you store
8   e-mails after reading them sometimes?
9   A   Not usually.
10  Q   Do you keep separate folders or do you
11  just keep your e-mails in your inbox?
12  A   Just in my inbox.
13  Q   Have you continued to delete e-mails over
14  the last six months or have you stopped deleting
15  them?
16  A   I delete some.
17  Q   Is there a practice you have for deciding
18  which e-mails to delete and which ones to keep?
19  A   If it's work-related, I'll keep it.  I
20  mean, if I don't need it, I don't keep it, no.
21  Q   Is it fair to say that most of the
22  e-mails you have with friends and family or your

12

1   husband, you would delete those?
2   A   Yes.
3   Q   And has that continued while this
4   litigation has been pending?
5   A   Yes.
6   Q   Have you ever e-mailed anyone about
7   anything related to this litigation?
8   A   No.
9   Q   Do you keep a calendar?
10  A   No.
11  Q   Do you use Outlook calendar?
12  A   No.
13  Q   Do you have any method for keeping track
14  of personal appointments or professional
15  appointments?
16  A   I have a paper calendar on my desk.
17  Q   And do you use that paper calendar to
18  keep track of what your work appointments are?
19  A   I don't really have work appointments.
20  Q   Okay.  So do you keep track of, I guess,
21  social or personal appointments on the work
22  calendar?

13

1   A   Uh-huh.
2       MR. LEVINE:  Try to, for the court
3   reporter, give yes or no.
4       THE WITNESS:  Oh, I'm sorry.  Yes.
5   BY MR. BRAGDON:
6   Q   And then do you text message with friends
7   and family?
8   A   Yes.
9   Q   Do you send -- is that a frequent way of
10  communicating with your friends and family?
11  A   Yes.
12  Q   And do you use text messages to discuss
13  your schedule or where you are for the day?
14  A   Yes.
15  Q   Ms. Mahdavi, are you married to Navid
16  Alex Mahdavi?
17  A   Yes.
18  Q   When were you married to him?
19  A   September 2005.
20  Q   Does he live with you in Vienna?
21  A   Yes.
22  Q   Is he currently working?

**14**

1    A   I don't know.
2    Q   Was he working at Beltway Auto before?
3    A   Yes.
4    Q   And do you know what his job
5 responsibilities there were?
6    A   Responsibilities, no.
7    Q   Did you know what his job title was?
8    A   Manager.
9    Q   Did you have even a general understanding
10 of what he did at Beltway Auto?
11   A   Sold cars.
12   Q   And do you know when he started working
13 at Beltway Auto?
14   A   January of 2010.
15   Q   What was your husband's previous job
16 before working at Beltway Auto?
17      MR. LEVINE:  Objection, relevance.
18 BY MR. BRAGDON:
19   Q   You can answer unless he tells you not
20 to.  He's preserving -- if there's an objection to
21 my question, he'll make a record.
22   A   He worked for another auto company in

**15**

1 Maryland, Auto Source.
2    Q   And do you know his dates of employment
3 there?
4    A   No.
5    Q   Since you were married, have you ever
6 lived apart from Mr. Mahdavi?
7    A   Yes.
8    Q   Has he ever lived -- Mr. Mahdavi was
9 incarcerated for a period of time in 2008 and 2009;
10 is that correct?
11   A   Yes.
12   Q   Other than that, have you ever lived
13 apart from him?
14   A   No.
15   Q   Do you know what Mr. Mahdavi's salary was
16 at BW Auto?
17   A   No.
18   Q   And you knew the principals or the owners
19 of BW Auto; is that correct?
20   A   The -- no.
21   Q   Who were your husband's bosses?
22   A   Mr. Molavi.

**16**

1    Q   And do you Ms. Nozary as well?
2    A   I know of her, yes.
3    Q   Had you ever met them before?
4    A   Yes.
5    Q   And when was that?
6    A   On several occasions maybe a year prior.
7    Q   A year ago from around now?
8    A   Uh-huh.
9    Q   Do they live in Virginia?
10   A   Yes.
11   Q   And I think I saw in your interrogatories
12 that their daughter babysitted for you from time to
13 time?
14   A   Yes.
15   Q   Did you spend time with Mr. Molavi and
16 Ms. Nozary socially?
17   A   No.
18   Q   Do you recall how Mr. Mahdavi came to be
19 employed by Beltway Auto?
20   A   No.
21   Q   Did he know Mr. Molavi or Ms. Nozary
22 before being hired?

**17**

1    A   Not that I'm aware of.
2    Q   Other than for the incarceration in 2008,
3 2009, does Mr. Mahdavi have any criminal
4 convictions you're aware of?
5    A   No.
6    Q   And we ask this of every deponent, but do
7 you have any criminal convictions other than minor
8 traffic violations?
9    A   No.
10   Q   And have you ever been involved in
11 another -- a civil lawsuit?
12   A   Civil?
13   Q   Other than this case?
14   A   Is that the tenant?
15   Q   Okay.  So you've been involved in some
16 landlord/tenant actions?
17   A   Yes.
18   Q   And those are for the properties you own?
19   A   Yes.
20   Q   The ten properties you own, do you know
21 how many are in Maryland and how many are in
22 Virginia?

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

18

1    MR. LEVINE:  Objection, relevance.
2    THE WITNESS:  I have one in Maryland.
3    The others are in Virginia.
4    BY MR. BRAGDON:
5    Q   Do you know the address of the one in
6    Maryland?
7    A   9913 Montauk Avenue.
8    Q   And are you the owner of these or do you
9    own them jointly with your husband?
10   A   I own them.
11   Q   And can you -- were they all purchased
12   after the year 2000?
13   A   I think so.  I don't know for sure.
14   Q   And how did you purchase these
15   properties?
16   A   With loans.
17   Q   Did you purchase any of them before being
18   married to Mr. Mahdavi?
19   A   I think two.  It may have been more.  It
20   may have been four before we were married.
21   Q   Let's talk a little about the BMW.
22   Before you purchased the BMW, what type of car were

19

1    you driving?
2    A   GLK.
3    Q   And where had you purchased that vehicle
4    from?
5    A   BW.
6    Q   And you had financed that purchase; is
7    that correct?
8    A   Yes.
9    Q   And that's through PenFed as well?
10   A   Yes.
11   Q   Pentagon Federal.  Do you know
12   approximately when you purchased that vehicle?
13   A   2012, I think.
14   Q   And there was a loan amount still
15   outstanding on that car; is that correct?
16   A   Yes.
17   Q   So do you recall when you first decided
18   to look for a new vehicle?
19   A   Somewhere around the beginning of the
20   year, 2014.
21   Q   And how did you decide on the -- the BMW
22   6i; is that correct?

20

1    A   Uh-huh.
2    Q   How did you decide on that vehicle?
3    A   I saw that it was in a four-door and I
4    liked it and told my husband.
5    Q   And where did you see it?
6    A   I saw it on the road.
7    Q   And do you recall when you first saw and
8    identified that as a car you would be interested
9    in?
10   A   Somewhere around the 1st of the year.
11   Q   And did he tell you at that time he would
12   try to locate one through BW Auto?
13   A   He just said he would keep an eye out for
14   one.
15   Q   And do you recall the first time he told
16   you that he found one?
17   A   He didn't tell me he found one.  He
18   brought it home for me to see.
19   Q   And that was on March -- was that
20   March 11, 2014?
21   A   No, it was sometime in the beginning of
22   March.

21

1    Q   And he just brought it home one night?
2    A   Uh-huh, yes.
3    Q   And did you test-drive it at that time?
4    A   Yes.
5    Q   Do you recall what day of the week he
6    brought it home?
7    A   It was a Friday.
8    Q   And that's the same white BMW that's at
9    issue in this case?
10   A   Yes.
11   Q   And did you drive it over that weekend
12   test-drive it, I guess?
13   A   Yes, I did.
14   Q   And at that time did you decide to
15   purchase the vehicle?
16   A   Yes.
17   Q   And what were the terms of purchase to
18   be?
19   A   The terms?
20   Q   Did you work out how you were going to
21   purchase the vehicle from BW Auto?
22   A   At that time, no.

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

22

1    Q    Did you make any payments at that time?
2    A    No.
3    Q    Did you sign a contract at that time?
4    A    No.
5    Q    Do you recall when you first did sign a
6    contract?
7    A    I did a deposit on the 11th, a transfer
8    to deposit on the 11th.  I think the contract was
9    on the 16th.
10   Q    Sure.  And I'm not trying to quiz you or
11   anything, so you should feel free to look at the --
12   A    I think it was the 16th.
13   Q    The 16th of --
14   A    March.
15   Q    -- March?
16   A    And I transferred the deposit on the
17   11th, which was after he brought the car home.
18   Q    Well, I'll say, Ms. Mahdavi, don't feel
19   any pressure if you don't remember an exact date
20   because we'll go through these documents.
21   A    Okay.
22   Q    I shall say, if you do want to go through

23

1    them at any time today, you should feel free to do
2    that if you think it will help you answer a
3    question.  And do you recall signing a contract to
4    purchase around that time in March?
5    A    Yes.
6    Q    Do you recall signing any other
7    documents, other than the contract to purchase, in
8    March?
9    A    No.
10   Q    And was the deposit you made the $23,000
11   deposit?
12   A    Yes.
13   Q    And that came from one of your accounts?
14   A    Yes.
15   Q    And which account was that, if you can
16   recall?
17   A    The Bank of America.
18   Q    And was that approximately all of the
19   money you had in that Bank of America account at
20   that time?
21   A    Yes.
22   Q    Was that money you had been saving up for

24

1    a car purchase?
2    A    It was just a savings that I had.
3    Q    And was that savings funded by your
4    salary and your rental properties?
5    A    It was just my savings.
6    Q    So what were the sources of your savings
7    at that time?
8    A    I don't -- I don't -- just whatever
9    savings I had, I would put in that account.  I
10   don't recall where specifically they --
11   Q    Sure.  So I guess the general question
12   I'm asking is, when you're building up your savings
13   account, what were the sources of income for that
14   money?
15   A    It would be, you know -- I don't
16   really -- I don't think I'm following.  Whatever
17   savings that I would have I would put in that
18   account, so it would be whatever savings I would
19   have from my employment.
20   Q    Right.  So it would be -- the source of
21   that savings would be your salary?
22   A    And my --

25

1    Q    And rental properties?
2    A    Yes.
3    Q    Other than salary and rental properties,
4    was there anywhere else that you got money for your
5    savings account?
6    A    Not that I recall.
7    Q    Did Mr. Mahdavi ever give you money for
8    your savings?
9    A    No.
10   Q    And is it true that from the time
11   Mr. Mahdavi brought the vehicle home in early March
12   that it remained on the property, at your house, in
13   your possession?
14   A    No, he drove it back and forth to work.
15   Q    Did he drive it back and forth every day
16   to work?
17   A    Not every day.  I mean, he drives a
18   different car every day.
19   Q    From the lot?
20   A    Uh-huh.
21   Q    And so often it would be the BMW?
22   A    Often.

## Capital Reporting Company
### Mahdavi, Jodi C. 11-12-2014

26

1    Q   When was the first time -- did he drive
2  it back the Monday after that first weekend in
3  March when you first test-drove it?
4    A   The Monday, I honestly can't recall.
5    Q   Now, after you signed the contract in
6  March and made the deposit, did you keep the
7  vehicle at that time?
8    A   No.
9    Q   And what was -- I guess, what was the
10 plan for when you were going to complete the
11 purchase of the vehicle?
12   A   The plan?  Well, I was in the process of
13 refinancing rental properties, so that's why my
14 husband had me do the down payment.
15   Q   So the idea was that you'd make a down
16 payment in March and then complete the purchase at
17 some later time?
18   A   Yes.
19   Q   And you said this was the way your
20 husband proposed to structure the deal?
21   A   Yes.
22   Q   So do you recall the first time that you

27

1  had the vehicle as your vehicle?
2    A   I want to say it was April some --
3  mid-April.
4    Q   And was that after you completed
5  financing that you started using the vehicle as
6  your vehicle?
7    A   Yes.
8    Q   Now, when you were filling out paperwork
9  for the financing for the purchase of the vehicle,
10 was that paperwork you obtained through your
11 husband?
12   A   Yes, he did the paperwork.
13   Q   So, for example -- and we can go through
14 them if it helps, but if there's typewritten
15 information on a form, was that something he would
16 have typewritten?
17   A   Yes.
18   Q   And is it fair to say that he brought the
19 paperwork home for you to sign?
20   A   Yes.
21   Q   Did you complete all the paperwork
22 regarding the purchase of the vehicle before

28

1  starting to use the vehicle as your own?
2    A   I think so.
3    Q   Do you recall filling out an application
4  for title?
5    A   No.
6    Q   Would that have been handled at BW Auto?
7    A   Yes.
8    Q   And was that your husband who handled
9  that?
10   A   I don't know.
11   Q   Did you talk to anyone at NextGear while
12 you were going through the process of purchasing
13 this vehicle?
14   A   No.
15   Q   Did your husband tell you anything about
16 who else was involved in the purchase of your
17 vehicle?
18   A   No.
19   Q   Did you speak when you were -- before
20 purchasing the vehicle, did you speak with anyone
21 at PenFed regarding the financing?
22   A   No.

29

1    Q   Did your husband handle that aspect of
2  the purchase?
3    A   Yes.
4    Q   Do you recall if your husband told you
5  anything about where the BMW came from or how it
6  was purchased?
7    A   No.
8    Q   And is that that he didn't -- I didn't
9  ask the question well, but is that that he didn't
10 tell you anything or that you don't recall?
11   A   Are you asking before, when I purchased
12 the car?
13   Q   Yes.
14   A   He didn't -- he never said anything.
15   Q   We have Exhibit 3 before you, which is
16 the documents you produced.  Can you just -- you
17 can take your time if you want, but can you flip
18 through these documents and just say generally
19 whether these appear to be all the documents you
20 produced in response?
21   A   Yes.
22   Q   On the first page -- and I'll refer to

## Capital Reporting Company
### Mahdavi, Jodi C. 11-12-2014

30

1   them by the page numbers that are printed in the
2   lower right-hand corner, Mahdavi 001.
3       A   Oh, okay.
4       Q   Was this title that you had for the car
5   after the purchase?
6       A   Yes, this is what came in the mail.
7       Q   And did you say earlier you didn't recall
8   filling out an application for this title; is that
9   correct?
10      A   Yes.
11      Q   And what's the address -- I know you
12  answered this in your interrogatories, but what was
13  this address, the Temple Hills address?
14      A   This is the address at -- I have an
15  office here.
16      Q   And that's -- is that a client office?
17      A   Yes.
18      Q   And how frequently are you at that
19  office?
20      A   Every couple months.
21      Q   Is that where this was sent to, this
22  Certificate of Title?

31

1       A   I think so.  The -- this is the address
2   that Maryland has on file, so that's why the title
3   went there.
4       Q   And do you know why that address was used
5   rather than your home address?
6       A   Because I was registering the vehicle in
7   Maryland at the Montauk Avenue address, but they
8   didn't have that address on file so the title got
9   sent to this address.
10      Q   And do you regularly check your mail at
11  that address?
12      A   No.
13      Q   So I guess the next time you went to the
14  office you picked it up in the mail?
15      A   No, they sent it to me.
16      Q   And, do you know, why was -- did you make
17  the decision to register the car in Maryland?
18      A   Yes.
19      Q   And why is that?
20      A   Because we were forming a company in
21  Maryland.  I am forming a company in Maryland.
22      Q   And what company is that?

32

1       A   A construction company.
2       Q   And so you decided that, I guess, it's --
3       A   We'd use the car as a company car.
4       Q   And does the company have a name?
5       A   I'm still speaking with the CPA, my tax
6   CPA, to figure out which type of company I need to
7   file.
8       Q   At what stage was this company formation
9   in April of 2014?
10      A   Well, Montauk Avenue is still under
11  construction, so we were in the middle of the
12  project.
13      Q   So is the Montauk -- so Montauk Avenue is
14  a -- is it a residential home?
15      A   I tore it down.
16      Q   And you're rebuilding a new home?
17      A   Uh-huh.
18      Q   So there's no residence there right now;
19  is that correct?
20      A   No.
21      Q   And what was the status of that project
22  in April of 2014?

33

1       A   It had been torn down.
2       Q   And so when you say you were forming a
3   company, was it a company to handle this one
4   residential property?
5       A   This is the first one.
6       Q   And that was going to be a Maryland
7   company?
8       A   Uh-huh, yes.
9       Q   And did the company have an address in
10  Maryland at that time?
11      A   The Montauk Avenue was going to be the
12  address.
13      Q   And is that in a -- is that in a
14  neighborhood type setting?
15      A   Yes.
16      Q   Was there a mailbox at that property at
17  that time?
18      A   Yes, there's a mailbox there.
19      Q   Do you receive mail there?
20      A   It gets forwarded.
21      Q   So mail sent to that address gets
22  forwarded to your Vienna address?

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

34

1   A  Yes.
2   Q  And up until April 2014, is it correct
3  that no actual company had been formed with regards
4  to the Montauk Avenue property?
5   A  Not yet.
6   Q  And so it still hasn't been formed; is
7  that correct?
8   A  It's in the process.
9   Q  So were you making -- were you paying for
10  the work on Montauk Avenue from personal funds?
11      MR. LEVINE:  Objection, relevance.
12      THE WITNESS:  Yeah.
13  BY MR. BRAGDON:
14   Q  And so are you saying that the eventual
15  plan was that the car would be owned by the company
16  or that you would use it for business purposes?
17   A  Use it for business purposes.
18   Q  Did you plan on transferring title of the
19  car to the company?
20   A  I hadn't thought the whole process
21  through yet.  It was more of a -- I was still
22  speaking to the CPA who does my taxes to figure out

35

1  what the best approach was.
2   Q  So did you make the choice then to use
3  this Maryland address as your address for the BMW
4  Certificate of Title?
5   A  Yes.
6   Q  Were you concerned that by using the
7  Maryland address that you -- were you concerned
8  about using an address that you didn't regularly
9  check mail on?
10   A  No.
11   Q  Did anyone else -- did your husband
12  participate in you making the decision to register
13  the car in Maryland?
14   A  Yes.
15   Q  And were there any -- how did you make
16  that decision with him?
17   A  Other than the fact that we were talking
18  about the new company, that's it.
19   Q  And so at some point did you discuss the
20  need to have -- if you were going to register the
21  car in Maryland to have a Maryland address?
22   A  Is that a question?

36

1   Q  Sorry.  Yes.  Did you discuss with him
2  the need to have a Maryland address if you were
3  going to register the car in Maryland?
4   A  Well, the point was to use the car with
5  the new company and the company was a Maryland
6  company, so the address being a Maryland address
7  was because the company was going to be a Maryland
8  company.  It really wasn't the other way around.
9   Q  Right.  Well, you had to have a Maryland
10  address to register the car in Maryland; is that
11  correct?
12   A  Yes.
13   Q  And is that why -- so that's why you used
14  your client's address -- the work address at your
15  client's office?
16   A  This address?
17   Q  Yes.
18   A  No, that's just the address that Maryland
19  had on file for me.  That's why the title got sent
20  there.  I didn't give Maryland that address.
21  That's just the address they had on file.
22   Q  Do you know what address you did give

37

1  Maryland?
2   A  The Montauk Avenue.
3   Q  Now, you didn't fill out the form for the
4  title application?
5   A  Exactly, I had not done that yet.
6   Q  Did you eventually fill out a form for
7  title?
8   A  I don't know if my husband did that.
9   Q  So do you know what address was on that
10  form?
11   A  I don't know.
12   Q  And do you know how Maryland would have
13  had that address on file already before the
14  purchase of the BMW?
15      MR. LEVINE:  Objection, calls for
16  speculation.
17      THE WITNESS:  I think we had -- I had a
18  car there registered before.
19  BY MR. BRAGDON:
20   Q  And do you -- was that the car, the one
21  you referred to earlier that you had?
22   A  The GLK.

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

38

1    Q   The GLK, yes.
2    A   I think it was originally registered
3    there.  It is registered in Virginia now.
4    Q   Do you still have that vehicle?
5    A   Yes.
6    Q   Is that the vehicle you're currently
7    driving?
8    A   I have it, yes.
9    Q   So if you can flip to Page 15 of your
10   production.  The address on -- this is an insurance
11   policy document; is that correct?
12   A   Yes.
13   Q   Is that a document that you had or that
14   you got from your husband?
15   A   This I had.
16   Q   And so you -- the Montauk Avenue, you
17   also chose to have the car insured at that address
18   as well?
19   A   Yes, that's the same address.
20   Q   When the construction was completed at
21   Montauk Avenue, was it your intent to sell that as
22   a residential property?

39

1    A   It's not complete.
2    Q   I guess my question is, is it planned
3    that that will be some sort of office or that will
4    be a construction project you sell to a residential
5    purchaser?
6    A   Sell.
7    Q   Is it fair to say that you didn't plan on
8    living at Montauk Avenue after it was completed?
9    A   At this point in time, no.
10   Q   Can you turn to Page 19?  This is the
11   Purchase Agreement that you signed for the BMW; is
12   that correct?
13   A   Yes.
14   Q   At the time you signed this agreement,
15   you understood there was an unpaid balance of
16   $64,000; is that correct?
17   A   Yes.
18   Q   And was it your understanding that you
19   would have obtained that amount through financing
20   through some sort of lender?
21   A   Yes.
22   Q   For when you go to work, what car do you

40

1    drive currently?
2    A   I actually carpool with someone from
3    work.
4    Q   Is that someone who lives close to you?
5    A   Yes.
6    Q   Do you alternate driving or do they drive
7    every day?
8    A   She drives most of the time.
9    Q   When you drive, what vehicle do you use?
10   A   It depends.  The GLK.
11   Q   And what other -- so the GLK, what make
12   is that?
13   A   Mercedes.
14   Q   And what year is the GLK, if you know,
15   the year of the model?
16   A   It's 2011.
17   Q   Are there other vehicles that you use
18   since the repossession of the BMW?
19   A   I have my sister's car.
20   Q   Do you sometimes use your sister's car
21   for the carpool or for errands?
22   A   Yes.

41

1    Q   Are there any other vehicles that you
2    use?
3    A   No.
4    Q   And what's the make of your sister's car?
5    A   A Porsche.
6    Q   Have you ever -- have you rented a
7    vehicle since your BMW was repossessed?
8    A   No.
9    Q   And is it fair to say that because it's
10   your sister that it's an informal arrangement where
11   she has allowed you to borrow it?
12   A   Yes.
13   Q   Can you turn to Mahdavi 22, please?  And
14   can you confirm when you get there that this is the
15   account statement for the account you paid the
16   deposit for the BMW?
17   A   Yes.
18   Q   Do you recall -- can you estimate what
19   the balance was on the account at the end of 2013?
20   A   Probably roughly 25,000, I would assume.
21   Q   Is it fair to say -- in this account over
22   the year before the purchase, was this something

# Capital Reporting Company
## Mahdavi, Jodi C. 11-12-2014

---

42

1  that had built up in a very -- that the variations
2  were slight as you took money out and put money in
3  or was it an account that there were large changes
4  or variations in it?
5      A  No, it pretty much stayed the same.
6      Q  Were there any -- so there -- is it fair
7  to say there wouldn't have been any large transfer
8  into the account in early 2014 before purchase of
9  the vehicle?
10     A  2014?  I'd have to go back and look.
11     Q  Were there any other conversations you
12  had that we haven't already discussed before
13  purchase of the vehicle about the BMW with your
14  husband that you can recall?
15     A  No.
16     Q  Is it fair to say that you didn't get
17  into the details of how the purchase was going to
18  happen?
19     A  No.
20     Q  Is that not fair to say?  I'm sorry.  I
21  asked the question in probably a bad way.  Did you
22  get into the details before the purchase with your

---

43

1  husband?
2      A  No, not at all.
3      Q  Has the amount -- the outstanding amount
4  on the loan for the GLK with PenFed, has that been
5  paid off?
6      A  No.
7      Q  Are you still paying that amount?
8      A  Yes.
9      Q  Did you receive a trade-in credit for
10  purchase of the BMW?
11     A  I was supposed to on the agreement.  So
12  technically I've paid -- how do you say it?  Yes, I
13  was supposed to get a trade-in allowance on the
14  deal, but I didn't get it.  We took the car back.
15     Q  The GLK?
16     A  Right.
17     Q  So was the amount -- so the original plan
18  was that you would get a trade-in credit and trade
19  the car in?
20     A  Yes.
21     Q  And then that plan changed at some point
22  before the purchase was finalized?

---

44

1      A  No, they didn't -- they didn't pay off
2  the GLK, so my husband brought the car back home.
3      Q  Okay.  So Beltway didn't pay off the GLK?
4      A  Right.
5      Q  And when did you learn that Beltway
6  hadn't done that?
7      A  It was -- it was later.  It was sometime
8  later in May.
9      Q  And do you recall what your husband told
10  you about that?
11     A  He just brought -- I -- he brought the
12  car back home.
13         MR. BRAGDON:  Give me one minute.  I'm
14  flipping through these documents.  Do you want to
15  take a short break?
16         MR. LEVINE:  Do you want to take a break?
17         THE WITNESS:  It doesn't matter.
18         MR. BRAGDON:  Do you mind if I do?
19         MR. LEVINE:  No, go right ahead.
20         (Brief pause.)
21  BY MR. BRAGDON:
22     Q  Ms. Mahdavi, I want to talk a little bit

---

45

1  about the night of the repossession of the BMW.
2      A  Uh-huh.
3      Q  Was it a Monday night?
4      A  Yes.
5      Q  Who was at home?
6      A  I was at home with my kids.
7      Q  Was your husband at home?
8      A  No.
9      Q  Do you know where he was?
10     A  I don't know.
11     Q  And I know you described this in your
12  interrogatories, but can you describe briefly what
13  happened or what you observed that night?
14     A  It was the middle of the night.  The
15  doorbell rang.  The guy said, Give me the keys to
16  the white BMW.  I went outside.  There were two
17  guys.  He said he was there for Dave.  I don't know
18  who Dave is.  He said, Give me the keys to the BMW.
19  I called my husband.  He said, No, don't give him
20  the keys.  He goes, That's your car.  He's like,
21  Call the police.  I told the guy I was calling the
22  police, and he already had the car hooked up to the

---

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

46

1 tow truck. When I went to call the police, the guy
2 left. I told him to leave, and then when I called
3 the police -- when I told him I was calling the
4 police, they left.
5      Q   And he left with the vehicle?
6      A   Uh-huh, yes. He didn't tell me his name.
7 He didn't give me a business card. He didn't -- he
8 didn't say anything. All he said was, I'm there
9 for Dave.
10     Q   And when you talked to your husband that
11 night, did he say anything else about why the car
12 might be being repossessed?
13     A   No, the only thing he said is, No. He
14 said, That's your car. He said, Tell him to leave,
15 that you're calling the police.
16     Q   Had your husband up to that point told
17 you anything about any issues at BW Auto?
18     A   No.
19     Q   And after that did your husband tell you
20 anything more about what was going on at BW Auto?
21     A   The only thing he told me was that the
22 car was taken because of BW.

47

1      Q   Did he give you any details about what
2 was going on at BW with you?
3      A   No.
4      Q   Has he ever said anything to you about
5 Mr. Molavi or Ms. Nozary about what -- about any
6 actions they have taken at BW Auto?
7      A   No.
8      Q   Did your husband come home after that
9 incident?
10     A   After I called him?
11     Q   Yeah, that night.
12     A   Yes.
13     Q   He got there after -- did he get there
14 after the repossession, P.A.R. had left?
15     A   Yes.
16     Q   Did your husband continue reporting to
17 work after that.
18     A   I don't know.
19     Q   Do you know the last time your husband
20 went to BW Auto to work?
21     A   I have no idea.
22     Q   Has your husband told you anything about

48

1 issues at BW involving duplicate titles being
2 obtained?
3      A   No.
4      Q   Are there any conversations you've had
5 with your husband after repossession of the vehicle
6 about BW Auto that you can recall?
7      A   About BW?
8      Q   Auto.
9      A   Only regarding my case.
10     Q   Has he told you anything about the
11 Maryland litigation?
12     A   No.
13     Q   And what has he told you about this case?
14     A   Just that -- told me about this case? I
15 mean, we've talked about, I mean, I bought a car,
16 you guys took my car, it's been six months, I want
17 my car back.
18     Q   Can we talk a little bit about the
19 property that you have alleged was in the car at
20 the time it was repossessed? Is it your contention
21 there was a Cartier watch in the car?
22     A   Yes.

49

1      Q   When did you get the watch?
2      A   It was my husband's watch.
3      Q   Was it a watch that you wore?
4      A   Yes.
5      Q   Can you describe it generally?
6      A   It was a Cartier Pasha with diamonds
7 around the bezel.
8      Q   And --
9          MR. MARKELS: Around the what?
10         THE WITNESS: Around the bezel, around
11 the edge.
12         MR. MARKELS: I didn't know there was a
13 technical term for that.
14 BY MR. BRAGDON:
15     Q   And do you know when your husband got
16 that watch?
17     A   I don't know.
18     Q   And when did you start wearing it?
19     A   I've been wearing it the last ten years
20 on and off.
21     Q   Do you know how much it cost?
22     A   No.

## Capital Reporting Company
### Mahdavi, Jodi C. 11-12-2014

50

1    Q    Was it ever appraised?
2    A    Yes.
3    Q    Was that for insurance purposes?
4    A    Yes.
5    Q    Do you have a copy of that appraisal?
6    A    The appraisal, no.  The insurance doesn't
7  have it anymore.
8    Q    Do you have a copy of an insurance
9  statement where the appraisal is listed?
10   A    Yes.
11   Q    Did you wear it every day?
12   A    No.
13   Q    How often did you wear it?
14   A    Maybe once every couple weeks.
15   Q    And where did you keep it in between
16  wearing it?
17   A    In my closet.
18   Q    Were you wearing it the Monday that the
19  BMW was repossessed?
20   A    Yes.
21   Q    Did you wear it to work that day?
22   A    Yes.

51

1    Q    And you said that you went to the gym
2  after work?
3    A    Yes.
4    Q    And you kept the watch in the car while
5  you were in the gym?
6    A    Yes.
7    Q    Did you put the watch back on after
8  leaving the gym?
9    A    No.
10   Q    And where did you keep it in the car?
11   A    In the center console.
12   Q    Do you know why you left the watch or you
13  have alleged you left the watch in the car
14  overnight?
15   A    Why I left it in that night?  I just -- I
16  took it off because I go to the gym.  I take
17  boxing.  The gym I go to doesn't have a locker
18  room, so I left it in the car.  When I got home, I
19  must have left it in the car.  I didn't think about
20  grabbing it.  I didn't think my car was going to be
21  taken from my driveway.
22   Q    Is it fair to say that it wasn't your

52

1  regular practice to leave it in the car, though?
2    A    I mean, I'm sure I've left it in my car
3  before, yes.  Is it my regular practice?  I
4  couldn't say that that's my regular practice.
5    Q    You also say you left a gym bag in the
6  car, in the BMW?
7    A    Uh-huh.
8    Q    Would that have had your gym clothes in
9  it?
10   A    It just had an extra set of gym clothes.
11   Q    So you didn't -- is it that since there's
12  no locker room, did you change after the workout or
13  did you just have --
14   A    I just always kept an extra gym bag in
15  the car.
16   Q    And what were the -- what was in that gym
17  bag?
18   A    I just always kept a pair of tennis
19  shoes, pants, sports bra, shirt, and a sweatshirt.
20   Q    And you also said there was rent money in
21  the car?
22   A    Yes.

53

1    Q    And that was cash?
2    A    Yes.
3    Q    Were there any checks?
4    A    No.
5    Q    Do you know who paid that rent money that
6  was in the car?
7    A    The tenants that pay cash.  I can get --
8  you mean, you want the tenant's names?
9    Q    Are there certain tenants that you have
10  that pay cash?
11   A    Yes.
12   Q    And others that pay by check?
13   A    Yes.
14   Q    And so the tenants who pay by cash, do
15  you collect it from them personally?
16   A    The property manager that I have in
17  Winchester collects the cash.
18   Q    And how much rent money was in the car
19  when it was repossessed?
20   A    I think it was 2,375.
21   Q    And was that one month's rent from
22  multiple tenants?

# Capital Reporting Company
## Mahdavi, Jodi C. 11-12-2014

54

1    A   Yes.
2    Q   Do you know, which tenants were they?
3   You can just say their last name.
4    A   I'd have to go back and look and see
5   which ones they are.
6    Q   Is that rent for three properties or two
7   properties?
8    A   I think it was two.
9    Q   And when did you pick up that cash?
10   A   It was the weekend before.
11   Q   And what was your usual practice for
12  handling cash rent payments?
13   A   She collects it, and then when I see her,
14  she gives it to me and then I take it to the bank.
15   Q   And what bank do you go to?
16   A   SunTrust.
17   Q   And do you know when that weekend before
18  the repossession you met with the property manager?
19   A   That Sunday.
20   Q   And what's her name?
21   A   Mitzi Davis.
22   Q   And where did you meet with her?

55

1    A   At her house.
2    Q   Is that in Virginia?
3    A   Winchester, Virginia.
4    Q   And what day -- was it normal that you'd
5   be picking up the rent from her in the middle of
6   the month?
7    A   Most of the tenants don't pay until the
8   10th.
9    Q   Would you normally keep the rent money in
10  the car, in your car?
11   A   Normally?  I don't know if I'd say
12  normally.  She gave it to me.  I had it in the car.
13   Q   Well, let me ask you this, do you have a
14  safe in your home?
15   A   Yes, but I don't put rent money in my
16  safe at home.
17   Q   Do you keep jewelry in the safe or
18  valuable documents or what do you keep in the safe?
19   A   To be honest with you, I have $2 bills in
20  my safe at home right now.
21   Q   I guess, was it common that you would
22  have rent money in the car overnight?

56

1    A   Common, no.
2    Q   What vehicle did you drive here today?
3    A   The Porsche.
4    Q   I guess, what other damages have you
5   incurred as a result of the repossession?  I
6   think -- let me take that back.
7        Was there any other property that I
8   haven't mentioned that was in the car?
9    A   The car seat.
10   Q   So, actually, there was the car seat that
11  you mentioned, phone chargers.  Was there anything
12  else other than that?
13   A   And boxing gloves.  I think that was it.
14   Q   So what other damages are you alleging
15  that the repossession caused you, monetary damages?
16   A   Monetary damages?  The fact that I'm
17  paying for another car.  I'm paying for a car that
18  I don't have.  I'm paying legal fees.  I'm taking
19  time off work.
20   Q   And is PenFed continuing to require you
21  to make payments on the car?
22   A   I have made payments.  I have had some

57

1   payments deferred.  I'm paying car insurance.
2    Q   Has there been any negative action on
3   your credit in the last year that you know of?
4    A   My credit score has dropped.
5    Q   And why is that?
6    A   Because of the balance.
7    Q   To your knowledge, has PenFed declared a
8   default of any of your loans with them?
9    A   No.
10   Q   And just to be clear, you're not paying
11  your sister to use her car?
12   A   No.
13   Q   And is she paying for any other car or
14  does she have another car she can use?
15   A   She has another car.
16   Q   And do you know how many car payments
17  have been deferred?
18   A   Three, I think.
19   Q   Have those been three consecutive
20  payments?
21   A   No.
22   Q   Are you expecting to make a car payment

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

58

1  for the month of -- for the next month?
2      A   I don't know yet.
3      Q   Is it just the bank tells you every month
4  whether they need you to pay or not?
5      A   I haven't heard back yet.
6      Q   And when you did hear -- of course don't
7  tell me anything that your attorney told you, but
8  when you did hear that you were going to have
9  payments deferred, was it someone other than your
10 attorney who told you that?
11     A   No.
12     Q   Were there any other conversations you
13 had prior to the repossession -- I'll say prior to
14 the purchase of the vehicle with your husband about
15 the procedure for purchasing the car that we
16 haven't talked about today?
17     A   No.
18         MR. BRAGDON:  I'll go over my notes.  I
19 may not have very many more questions for you.  I
20 think it will make sense to let Mr. Markels see if
21 he has any questions.
22         MR. MARKELS:  I do.  Do you want to look

59

1  over your notes first before I ask my questions?
2          MR. BRAGDON:  I'll just wait for -- I'll
3  ask after you, if that's okay.
4      EXAMINATION BY COUNSEL FOR DEFENDANT,
   P.A.R.
5  BY MR. MARKELS:
6      Q   Good morning, Ms. Mahdavi.  My name is
7  James Markels.  I represent P.A.R. Services, Inc.
8  I just have a few questions just to make sure that
9  the record is clear.
10         You said that you did not fill out the
11 application for title for the BMW, correct?
12     A   Yes.
13     Q   Do you know who did?
14     A   I don't know.  I -- my husband, I assume.
15     Q   You assume your husband or somebody at BW
16 Auto Outlet?
17     A   Yes.
18     Q   Did you ever see the application for
19 title?
20     A   No.
21     Q   Have you ever seen any prior title to the
22 BMW?

60

1      A   No.
2      Q   You stated that what has been marked as
3  Mahdavi -- well, in Exhibit Number 3, what is the
4  very first page of Exhibit 3, that's your
5  Certificate of Title.  Is that the only evidence of
6  title that you've seen regarding the BMW to date?
7      A   Yes.
8      Q   Do you have any indication that NextGear
9  ever authorized the sale of the BMW to anybody?
10     A   Repeat your question.
11     Q   Do you have any evidence to indicate that
12 NextGear ever authorized the sale of the BMW to
13 anybody?
14         MR. LEVINE:  Objection to form.
15         THE WITNESS:  I don't know.  I don't --
16 not that I know of.  I don't know.
17 BY MR. MARKELS:
18     Q   All right.  Have you seen as part of the
19 document production in this case prior title held
20 by NextGear to the BMW?
21     A   No.  Have I seen it?
22     Q   Yes.

61

1      A   No.
2      Q   You've not seen any of the document
3  production that NextGear produced in this case?
4  It's not before you, but --
5      A   I may have.  I don't remember.  I don't
6  remember.
7      Q   Okay.  You do not remember seeing any
8  Certificate of Title to the BMW in NextGear's name?
9      A   No.
10     Q   Are you aware that in order to get a
11 Certificate of Title from the Maryland Vehicle
12 Administration you have to submit prior title?
13         MR. LEVINE:  Objection, speculation.
14 BY MR. MARKELS:
15     Q   Are you aware?
16     A   No.
17     Q   Okay.  Now, you say during your -- oh,
18 did you ever have a conversation with your husband
19 or anyone at BW Auto Outlet about who the prior
20 owner of the BMW was?
21     A   I didn't.
22     Q   You were aware that the BMW was a used

# Capital Reporting Company
## Mahdavi, Jodi C. 11-12-2014

---

**62**

1  car, right?
2      A   Yes.
3      Q   Was it your assumption when you purchased
4  it that BW Auto Outlet was the owner of the car?
5      A   Yes, I assumed BW was the owner of the
6  car.
7      Q   Okay.  Did you ever at any time ask them
8  to see title to the car in their name?
9      A   No.
10     Q   Was that ever provided to you?
11     A   No.
12     Q   Did they ever make that representation to
13  you?
14     A   No.
15     Q   Now, you said that the address on the
16  Maryland Certificate of Title for the BMW in your
17  name, that address is simply a prior address that
18  Maryland had on file for you?
19     A   Uh-huh.
20     Q   That's a yes?
21     A   Yes.
22     Q   And that was for which car?

---

**63**

1      A   The address?
2      Q   Yes.
3      A   It was for the GLK.
4      Q   Now, speaking of the GLK, you said that
5  originally your intention was to trade it in as
6  part of the purchase for the BMW, correct?
7      A   Yes.
8      Q   Could you look on Exhibit Number 3, what
9  is Mahdavi 19?  Do you see that?
10     A   Yes.
11     Q   Is that the Retail Purchase Agreement for
12  the BMW?
13     A   Yes.
14     Q   It was your understanding -- is that your
15  signature on the bottom left?
16     A   Yes.
17     Q   If you would turn it over to Mahdavi 20,
18  was the information on the back of this also part
19  of that retail sales agreement?
20     A   Yes.
21     Q   And is that your signature at the bottom
22  there?

---

**64**

1      A   Yes.
2      Q   Did you review this document before you
3  signed it?
4      A   Did I read all of it, no.
5      Q   Was it your understanding that the cash
6  price of the vehicle at $71,995 was the accurate
7  agreed-to sale price for the BMW?
8      A   Yes.
9      Q   Now, if you look down, you will see
10  various charges, including things like Dealer
11  Processing Charge, PDI Fee, Registration Fee, Title
12  Fee, and so forth, right?
13     A   Yes.
14     Q   Do you see where it says, "Less:
15  Trade-In Allowance"?  Do you see where it says
16  that?
17     A   Yes.
18     Q   Do you see where it says $22,500 next to
19  that, right?
20     A   Yes.
21     Q   Was it your understanding that that was a
22  credit to you for the trade-in of the GLK?

---

**65**

1      A   Yes.
2      Q   And, in fact, that GLK is the vehicle
3  described under where it says "Trade-In Vehicle
4  Information" to the left of that, correct?
5      A   Yes.
6      Q   And that shows the trade-in allowance
7  there and the balance owned and lienholder, right?
8      A   Yes.
9      Q   Now, if you look under where it says the
10  "Less:  Trade-In Allowance" of $22,500 right below
11  that on the right-hand side, it also says, "Plus:
12  Balance Owed on Trade-In," right?
13     A   Yes.
14     Q   And there it says $34,966, right?
15     A   Uh-huh.
16     Q   So in actuality to trade-in your car
17  would cost you an additional $12,466, right?
18     A   Yes.
19     Q   So in order to purchase the BMW, you put
20  in $23,000 as a down payment and then PenFed had to
21  put up an additional $64,941.70, which would
22  include having to make up the difference for the

---

## Capital Reporting Company
### Mahdavi, Jodi C. 11-12-2014

66

1 balance owed on your trade-in, right?
2     A   Yes.
3     Q   And, in fact, if we look at what is
4 Mahdavi 79, if you would take a look at that.
5     A   Uh-huh.
6     Q   That is the check you produced that was
7 issued by Pentagon Federal Credit Union in the
8 amount of $64,941.70, right?
9     A   Yes.
10    Q   So they paid the amount that is set forth
11 on Mahdavi 19, correct?
12    A   Yes.
13    Q   Now, you've said that in May of 2014,
14 some two months after this Retail Purchase
15 Agreement was signed, and two months -- a month
16 after the Pentagon Federal Credit Union check was
17 issued that the trade-in fell through, the GLK came
18 back to your house?
19    A   I don't remember exactly when the GLK
20 came back or when the trade-in didn't happen.  I
21 didn't know that the trade-in didn't happen.  My
22 husband is the one that knew that the trade-in

67

1 didn't happen.  So he brought the GLK came home.
2     Q   All right.  And you still have title to
3 the GLK, correct?
4     A   Yes.
5     Q   So I'm going to ask you, what happened to
6 the $12,466 that should have been refunded?
7     A   I am out that $12,000.
8     Q   And who has that money?
9     A   Baltimore Washington.
10    Q   BW Auto Outlet, right?
11    A   Yes.
12    Q   And have you requested that they refund
13 you that money?
14    A   Not yet.  I mean, I'm just trying to get
15 my car back is my first step, but, yes, I'm out
16 that $12,000.
17    Q   And you have not filed any suit to
18 recover that $12,466?
19    A   I just told you, I'm trying to get my car
20 back.  Yes, I -- yes, I would like to get that
21 $12,000 back, too.
22    Q   All right.  And you have not filed suit

68

1 against BW Outlet for failure to sell you good
2 title to the BMW?
3         MR. LEVINE:  Objection, foundation.
4 BY MR. MARKELS:
5     Q   Go ahead and answer.
6     A   No, I have not.  Not yet.
7     Q   Have you discussed with your husband why
8 BW Auto Outlet has not paid you the $12,466?
9     A   No.
10    Q   You have not?
11    A   No.
12    Q   Do you know if he still works there?
13    A   I don't know.  Not that I know of.  I
14 don't think it's there anymore.
15    Q   You don't think it's a going concern
16 anymore?
17    A   No, I don't -- I don't think BW is there
18 anymore.
19    Q   I'm sorry.  What do you mean by that?
20    A   I don't know.  I don't think my husband
21 works there anymore.
22    Q   You think it's out of business, closed up

69

1 shop?
2     A   I don't know anything about BW.  I don't
3 know if it's in business or if it's not in
4 business.
5     Q   Okay.  Did your husband ever tell you
6 that he was fired from BW Auto Outlet or that --
7     A   No, he did not say he was fired from BW
8 Auto Outlet.
9     Q   Okay.  Now, you say you don't know
10 anything about his income?
11    A   That's what I said, yes.
12    Q   And so you don't know whether he was ever
13 paid from BW Auto Outlet?
14    A   He was paid from BW.
15    Q   How much?
16    A   I have no idea.
17    Q   How do you know he was paid?
18    A   I've seen a W-2.
19    Q   So you've seen paperwork from BW Auto
20 Outlet indicating that they have paid monies to
21 Mr. Mahdavi?
22    A   It was years ago.  I've seen a W-2 for

# Capital Reporting Company
## Mahdavi, Jodi C. 11-12-2014

70

1   it, but I have no idea, like, how much it was.
2       Q   Have you ever seen his tax returns?
3       A   No, we don't file joint returns.
4       Q   How long have you been filing separately?
5       A   I don't think we've ever filed joint
6   returns.
7       Q   It's also true that the $12,466 that BW
8   Auto Outlet has has never been paid to PenFed,
9   right?
10          MR. LEVINE:  Objection, foundation, calls
11  for speculation.
12          THE WITNESS:  To my knowledge, it has not
13  been paid to PenFed.
14  BY MR. BRAGDON:
15      Q   You have produced as part of Exhibit
16  Number 3 your statements from PenFed, and if you'd
17  like to go through them again, that's fine, but
18  would you agree with me that none of those
19  statements reflect any payment of $12,466 to
20  PenFed?
21      A   They do not.
22      Q   Now, you did say that at one point your

71

1   Cartier watch was appraised for insurance purposes?
2       A   Uh-huh, yes.
3       Q   And that you do have a copy of something,
4   one of those insurance documents that has that
5   appraisal value on it?
6       A   The insurance value that it's insured
7   for.
8       Q   Okay.  Have you given that to your
9   counsel to be produced in this case as an indicator
10  of the Cartier watch's value?
11      A   Yes.
12          MR. MARKELS:  Has that been produced,
13  Counsel?
14          MR. LEVINE:  I don't know.  I'd have to
15  look and see what was produced.
16          MR. MARKELS:  James, do you recall that
17  being in here?
18          MR. BRAGDON:  We can address it, but I
19  haven't seen it.
20          MR. MARKELS:  Okay.
21          THE WITNESS:  There was never an
22  appraisal.  It was just an insurance, what it's

72

1   insured for.
2   BY MR. MARKELS:
3       Q   And that insurance was for a value,
4   correct?
5       A   Yes.
6       Q   And that value was pursuant to the
7   insurance company appraising the approximate value
8   of the Cartier watch?
9       A   Yes.
10      Q   Okay.  If you have not yet given that
11  document to your counsel, I ask that you do so,
12  that it be produced in this case.
13          Now, during the date of the repossession,
14  do you agree that that occurred in the early
15  morning hours of May 20th of 2014?
16      A   May 20th, yes.
17      Q   Okay.  Around, say, like 1:30 in the
18  morning or something like that?
19      A   Somewhere around in there, yes.
20      Q   You said that there were two gentlemen
21  who showed up?
22      A   Yes.

73

1       Q   Now, when did it become clear to you that
2   this was a repossession of your car as opposed to
3   just some people stealing it?
4       A   When they knocked on the door and asked
5   for the keys.
6       Q   Okay.  Did they have any indicia of who
7   they worked for on them, on their outfits?  Did
8   they give you a card, any other information?
9       A   No.
10      Q   All right.  Now, did you -- after they
11  left, did you chase them?
12      A   I have three kids, small kids inside.
13  No, I did not chase them.
14      Q   Do you know if your husband ever tried to
15  pursue them?
16      A   My husband was not at home.  I called him
17  on the phone.  I don't know.
18      Q   Where was he at the time?
19      A   I don't know.  He wasn't home.
20      Q   He wasn't at work?
21      A   It was 1:30 in the morning.  I don't
22  know.

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

74

1    Q   Okay.  He hadn't told you where he was?
2        MR. LEVINE:  Objection, asked and
3    answered.
4        THE WITNESS:  No.
5    BY MR. MARKELS:
6    Q   All right.  Now, to your knowledge,
7    nobody in any vehicle or on foot pursued the men
8    who repoed your car?
9    A   No, my husband met up with the police and
10   the men, the people who had the car.
11   Q   Now, you said as this was going on you
12   called the police, correct?
13   A   No, I told the men standing there to
14   leave, that I was going to call the police, and
15   that's when they left.
16   Q   Did you ever -- did you call the police
17   at that time?
18   A   No, I hung up the phone.  They left --
19   they were leaving.  I called my husband and said
20   that they left.  That's when he got on the phone
21   with the police and they tracked them down.
22   Q   To your knowledge, have the police taken

75

1    any action against P.A.R. Services or NextGear or
2    anybody else with regard to that car?
3    A   Not to my knowledge.
4    Q   Do you know whether your husband was a
5    salaried employee of BW Outlet or was on
6    commission?  Do you have any idea?
7    A   I don't know.
8    Q   Was he responsible for paying any of the
9    household obligations?
10   A   He pays the mortgage.
11   Q   That's the only thing he's in charge of?
12   A   Yes.
13   Q   Now, let's look at Exhibit Number 1, your
14   answer to Interrogatory No. 7, which is on Page 5.
15   Do you see that this is Interrogatory No. 7 about,
16   "Set forth all facts in support of the allegations
17   of Paragraph 31 of your complaint."  Looking at
18   Exhibit Number 1.
19       MR. LEVINE:  Exhibit Number 1.  You mean
20   Exhibit 2?
21       MR. MARKELS:  I'm looking for Jodi
22   Mahdavi's Supplemental Responses to P.A.R Services.

76

1        MR. BRAGDON:  The P.A.R. one.
2        THE WITNESS:  It's this one.
3        MR. LEVINE:  Exhibit 2 is how we have it.
4        MR. MARKELS:  Oh, you're on another
5    exhibit.  I thought it was switched around.  That's
6    fine.
7        THE WITNESS:  Which page are we on?
8        MR. LEVINE:  Page 5.
9    BY MR. MARKELS:
10   Q   Page 5.  Page 5 of Exhibit 2.  Now,
11   although the copies that we have before us are not
12   signed by you, you agree that you did sign these
13   particular answers to these supplemental
14   interrogatory answers, right?
15   A   Yes.
16   Q   Now, in your supplemental answer you
17   state that you received title for the BMW.  Do you
18   see that?
19   A   Yes.
20   Q   Now, when you say you received title for
21   the BMW, you mean that what was in Exhibit 3 as
22   Mahdavi 1 was received to you in the mail, correct?

77

1    A   Yes.
2    Q   And we already talked about you did not
3    file any application or receive prior title to the
4    BMW at any time, correct?
5    A   Yes.
6    Q   All right.  If you would turn to Page 6
7    of that same -- of Exhibit 2, you see where under
8    the supplemental answer it says, "Subject to and
9    without waiving the prior objections, on or about
10   May 21, 2014, I spoke to Deb McCloud on the
11   telephone about the BMW being repossessed and she
12   transferred my call to Kerry Howard."  Do you see
13   that?
14   A   Yes.
15   Q   Are you sure that was on the 21st and not
16   on the 20th?
17   A   Yes.  The 20th was the day the car was
18   taken.
19   Q   Right, the very early morning of the
20   20th, right.
21   A   Yes.
22   Q   So you did not contact PenFed the entire

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

78

1 day of the 20th and you waited until the 21st?
2     A   No, because I was waiting for my husband
3 to figure out what was going on.
4     Q   Okay.  So you did not alert PenFed in any
5 way about the repossession until the 21st?  That's
6 your position?
7     A   Yes.
8     Q   So if PenFed had, in fact, contacted
9 P.A.R. Services about the BMW on the 20th, it was
10 not due to any communication by you or your
11 husband?
12     A   It wasn't from me.
13     Q   Do you know if your husband contacted
14 PenFed?
15     A   I don't know.
16     Q   Did he tell you that he ever contacted
17 PenFed on the 20th?
18     A   He didn't tell me.
19     Q   All right.
20     A   But I know on the next day he was trying
21 to figure out what happened and how to get the car
22 back.

79

1     Q   Did he ever explain to you anything about
2 a loan with NextGear that BW Auto had?
3         MR. LEVINE:  Objection, asked and
4 answered.
5         THE WITNESS:  No.
6 BY MR. MARKELS:
7     Q   Did he ever explain to you anything about
8 a floor lease or a floor loan?
9     A   No.
10     Q   Did he ever tell you about how title to
11 cars that were held by BW Auto Outlet were handled?
12     A   No.
13     Q   Did he ever tell you the process by which
14 BW Auto Outlet obtained title to sell to
15 purchasers?
16     A   No.
17     Q   You're aware that your husband has pled
18 the Fifth with regard to BW Auto Outlet sales of
19 cars from its lot?
20     A   I don't know.
21     Q   You don't know if he's ever pled the
22 Fifth?

80

1     A   I don't -- in the other case?  I don't
2 know.
3     Q   At any time.
4     A   I don't know.
5     Q   Are you aware that your husband has been
6 asked questions about BW Auto Outlet's practices in
7 selling cars?
8     A   I don't -- I don't know.
9         MR. LEVINE:  I'm going to object to the
10 extent that any conversations that I may have had
11 with my client about what's going on with that
12 matter.
13 BY MR. MARKELS:
14     Q   Of course.  You're aware that there is
15 litigation pending in Maryland between NextGear and
16 BW Auto Outlet, correct?
17     A   Just what I've seen here, yes.
18     Q   Okay.  Are you aware that your husband's
19 deposition has been taken in that case?
20     A   I don't know.  I don't -- I don't know if
21 his deposition has been taken.
22     Q   Okay.  He's never indicated to you that

81

1 he was having his deposition taken or that a
2 deposition has happened?
3     A   No.
4     Q   You understand what the Fifth Amendment
5 of the US Constitution provides with regard to a
6 person giving testimony under -- or giving sworn
7 testimony?
8     A   Technically, no, not really.  I mean, no,
9 not really.
10     Q   All right.  Have you reviewed the
11 affidavit by Lisa Long that was attached by
12 NextGear Capital to their Opposition to Motion for
13 Preliminary Injunction filed in this case?
14     A   I vaguely remember seeing something, but
15 I don't -- without looking at it, I don't remember
16 exactly.
17     Q   Okay.  Is it your understanding that
18 NextGear Capital has taken the position in this
19 case that it had the original title to this BMW and
20 never authorized that it be sold to anybody?
21     A   That's their -- yes, that's their stance.
22     Q   Okay.  And are you aware of anyone at BW

# Capital Reporting Company
## Mahdavi, Jodi C. 11-12-2014

82

1  Auto Outlet who has given any testimony or evidence
2  that that is incorrect?
3      A   Not that I know of.
4      Q   You own several real properties, as we've
5  discussed before.  Are you familiar with the term
6  chain of title?
7      A   Chain of title?
8          MR. LEVINE:  Objection, calls for a legal
9  response.
10 BY MR. MARKELS:
11     Q   Are you familiar with the term?
12     A   No.
13     Q   If you look at Exhibit Number 1, that is
14 your interrogatory answers to NextGear's requests,
15 Page 4.  Do you see at the top it says,
16 Interrogatory No. 5?
17     A   Uh-huh.
18     Q   "State the substance of all discussions
19 concerning the occurrence that you had with any
20 party to the case," right?
21     A   Yes.
22     Q   Do you see under the answer it says,

83

1  "Subject to and without waiving the objections, on
2  or about May 21, 2014, around one in the morning, I
3  was at home and my doorbell rang."  Do you see
4  that?
5      A   Yes.
6      Q   It's your understanding now that it did
7  not happen on May 21st?  It actually happened on
8  May 20th?
9      A   May 20th is -- was it Tuesday?  I'd have
10 to look at a calendar.  Was May 21st a Tuesday?
11     Q   Let me just verify that really quickly if
12 that would help.  May 21st is a Wednesday, was a
13 Wednesday.
14     A   So then it is May 20th.
15     Q   Okay.  Now, since the repossession of
16 your car, what has your husband told you with
17 regard to -- regarding the title to the BMW?
18     A   He hasn't told me anything.
19     Q   Have you asked him whether or not you
20 have good title to the BMW?
21     A   He said it's my car.  I bought the car.
22     Q   Did he ever describe to you -- strike

84

1  that.
2          Have you had any discussions with
3  Mr. Molavi about the repossession of your car?
4      A   No.
5      Q   Or Ms. Nozary?
6      A   No, I have not had any discussions with
7  her.
8      Q   How about anyone else at BW Auto Outlet?
9      A   No.
10     Q   So the only person you've talked to since
11 the repossession of your car that was affiliated
12 with BW Auto Outlet at any time was your husband?
13     A   Yes.
14     Q   Did your husband advise you to file suit
15 to recover the BMW?
16         MR. LEVINE:  I'm going to object there on
17 spousal privilege and any conversations that would
18 have happened about what she should do.
19         MR. MARKELS:  Are you directing her not
20 to answer?
21         MR. LEVINE:  I'm making the objection.  I
22 don't know what her answer is.

85

1  BY MR. MARKELS:
2      Q   Okay.  Go ahead and answer.
3      A   I don't really know.  I mean, I think we
4  tried to get the car back, and when that didn't
5  happen, this was our next step, to legally try to
6  go get the car back.
7      Q   So he is aware of this lawsuit?
8      A   Yes, he's aware.
9      Q   Did he ever express any concerns to you
10 about this lawsuit?
11     A   Concerns, no.
12     Q   Okay.  What efforts did you and your
13 husband take in order to recover the BMW?
14     A   I mean, I know he contacted people to try
15 to get the car back.
16     Q   Who did he contact?
17     A   I don't know who his contacts are.  I
18 contacted Pentagon Federal.
19     Q   And that was on May 21st?
20     A   Yes, since the car was taken on the 20th;
21 although, I must have my days off by a day to try
22 to get the car back.  You know, she was trying

# Capital Reporting Company
## Mahdavi, Jodi C. 11-12-2014

86

1  to -- you know, Kerry Howard was trying to get the
2  car back for me.
3      Q   Who?
4      A   Kerry Howard at Pentagon Federal was
5  trying to get the car back.
6      Q   What did she tell you about those
7  efforts?
8      A   She said that she couldn't get NextGear
9  to respond to her, and then, you know, when she did
10 get NextGear to respond, they said that they
11 couldn't speak to her because, you know, of the
12 case.  So it just kind of spiraled to where we are
13 now.  I bought a car; I haven't seen my car in six
14 months; I want my car back.
15     Q   Did Pentagon Federal ever tell you that
16 NextGear did not have title to the car?
17     A   No.
18     Q   Did NextGear ever -- I mean, did Pentagon
19 Federal ever tell you that you were sold good title
20 to the car?
21     A   She never said that.
22     Q   All right.  Did you ever undertake to

87

1  investigate where your title was derived from, who
2  the prior owner of the BMW was before you owned it?
3      A   I don't even know how to do that.  I
4  don't know where to begin to do that.
5      Q   You never went to the MVA, the Maryland
6  Vehicle Administration, to find out who had filed
7  previously any title with regard to the BMW?
8      A   No, Kerry Howard did that.
9      Q   Okay.
10     A   She was doing that.
11     Q   And what did she tell you that she found?
12     A   She sent me everything that she had.  Is
13 her letter in here?
14     Q   Can you direct me to where her -- if you
15 could look through Exhibit 3, you say her letter is
16 in here.  If you could direct me to where that
17 letter is.
18     A   That's all she --
19     Q   You're looking at Mahdavi 78?
20     A   Yes.
21     Q   This is all that she sent you?
22     A   Yes.

88

1      Q   Did she ever send you any documentation
2  from MVA regarding the BMW?
3      A   No.
4      Q   Did you ever have any phone conversation
5  with Kerry Howard or anyone else over at PenFed
6  about tracking down prior owners -- who the prior
7  owners were for the BMW, either through the MVA or
8  other means?
9      A   No.
10     Q   To date, has PenFed ever indicated to you
11 that BW Auto Outlet ever had good title to the BMW?
12         MR. LEVINE:  Objection, foundation.
13 BY MR. MARKELS:
14     Q   Has PenFed ever told you that?
15     A   I haven't asked.
16     Q   Okay.  Are you aware that Mr. Molavi, the
17 owner of BW Auto Outlet, has also pled the Fifth
18 with regard to sales of vehicles by BW Auto Outlet?
19         MR. LEVINE:  Objection, foundation,
20 hearsay.
21 BY MR. MARKELS:
22     Q   Are you aware?

89

1      A   No.
2          MR. MARKELS:  I think that's all I have
3  at this time.  Did you review your notes?
4          MR. BRAGDON:  I don't have any other
5  questions.
6          MR. MARKELS:  All right.
7          EXAMINATION BY COUNSEL FOR PLAINTIFF
8  BY MR. LEVINE:
9      Q   Ms. Mahdavi, going back to the issue of
10 damages, did you do any -- did you purchase
11 anything for the BMW after -- any parts for the BMW
12 after you purchased it?
13     A   Two new tires.
14     Q   And what did you pay for those tires?
15     A   $725 roughly.
16     Q   Okay.  And do you have the receipt?
17     A   I do.
18     Q   Okay.  And when did you --
19     A   $745.
20     Q   And when did you purchase the tires?
21     A   The 22nd.
22     Q   Of what month?

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

90

1    A   April.
2    Q   In 2014?
3    A   Yes.
4    Q   Okay.  And are you including that in your
5    damages?
6    A   Yes.
7        MR. LEVINE:  That's the only question
8    I've got.
9        EXAMINATION BY COUNSEL FOR DEFENDANT,
     P.A.R.
10   BY MR. MARKELS:
11   Q   Just one more thing.  I'm sorry, but just
12   one more.  Approximately how much -- you've made a
13   request for attorney's fees in this case.  Can you
14   tell me approximately how much you've paid so far
15   in attorney's fees on this case?
16       MR. LEVINE:  Well, I'll object to the
17   extent that --
18   BY MR. MARKELS:
19   Q   I'm not asking for any specifics about
20   what was done or anything like that.  I'm just
21   trying to get the number, a ballpark.
22   A   I have paid -- I haven't paid all of my

91

1    bills.
2    Q   But how much have you incurred to date?
3    A   Incurred to date or how much I've paid to
4    date?
5    Q   Let's start with just incurred.
6    A   Incurred?  I don't want to guess because
7    I -- I don't know the exact number.
8    Q   More than $20,000?
9    A   Yes.
10   Q   More than $30,000?
11   A   Yes.
12   Q   More than $40,000?
13   A   I believe so.
14   Q   So not $50,000 -- less than $50,000?
15   A   I'd say close.
16   Q   So $40,000 to $60,000?
17   A   Yes.
18   Q   A fair ballpark.  And then how much have
19   you actually paid?
20   A   Ten.
21       MR. MARKELS:  Okay.  That's all I have.
22       MR. LEVINE:  She'll read.

92

1    (Signature not waived.)
2    (Whereupon, at 11:56 a.m., the deposition
3    of JODI C. MAHDAVI was concluded.)
4
5        * * * * *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

93

1        CERTIFICATE OF NOTARY PUBLIC
2        I, CHRISTY MCGEE, the officer before whom
3    the foregoing statement was taken, do hereby
4    certify that the statement was taken by me in
5    stenotype and thereafter reduced to typewriting
6    under my direction; that the said statement is a
7    true record of the proceedings; that I am neither
8    counsel for, related to, nor employed by any of the
9    parties to the action in which this statement was
10   taken; and, further, that I am not a relative or
11   employee of any counsel or attorney employed by the
12   parties hereto, nor financially or otherwise
13   interested in the outcome of this action.
14
15
16
17
18       CHRISTY MCGEE
         Notary Public in and for the
19       Commonwealth of Virginia
20   My commission expires:
21   September 30, 2016
22   Notary Registration No.: 7233765

## Capital Reporting Company
### Mahdavi, Jodi C. 11-12-2014

94

1  A C K N O W L E D G E M E N T   O F   D E P O N E N T

2

3

4  I, JODI C. MAHDAVI, do hereby acknowledge I have

5  read and examined the foregoing pages of testimony,

6  and the same is a true, correct and complete

7  transcription of the testimony given by me, and any

8  changes or corrections, if any, appear in the

9  attached errata sheet signed by me.

10

11

12

13

14

15

16

17  Date           JODI C. MAHDAVI

18

19

20

21

22

---

96

1  Capital Reporting Company
   1821 Jefferson Place, Northwest

2  3rd Floor
   Washington, D.C. 20006

3  (202) 857-3376

4  E R R A T A   S H E E T

5  Case Name:  JODI C. MAHDAVI vs. NEXTGEAR & P.A.R.

6  Witness Name:  JODI C. MAHDAVI

7  Deposition Date:  WEDNESDAY, NOVEMBER 12, 2014

8  Page No.    Line No.   Change/Reason for Change

9

10

11

12

13

14

15

16

17

18

19

20

21

22  Signature                    Date

---

95

1  Jonathan E. Levine, Esquire
   Levine, Daniels & Allnutt, PLLC

2  Heritage Square, 5311 Lee Highway
   Arlington, Virginia 22207

3

   IN RE:  Jodi C. Mahdavi vs. NextGear Capital & PAR

4

5  Dear Mr. Levine:

6        Enclosed please find your copy of the

7  deposition of JODI C. MAHDAVI, along with the

8  original signature page.  As agreed, you will be

9  responsible for contacting the witness regarding

10  signature.

11        Within 21 days of November 25, 2014,

12  please forward errata sheet and original signed

13  signature page to counsel for Defendants, James

14  Bragdon, Esq.

15        If you have any questions, please do not

16  hesitate to call.  Thank you.

17

18  Yours,

19  Christy McGee, CSR
   Reporter/Notary

20

21  cc:  James Bragdon, Esq.

22

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014
Page 1

_____ $ _____

**$12,000** 67:7,16,21

**$12,466** 65:17
  67:6,18 68:8
  70:7,19

**$2** 55:19

**$20,000** 91:8

**$22,500** 64:18 65:10

**$23,000** 23:10 65:20

**$30,000** 91:10

**$34,966** 65:14

**$40,000** 91:12,16

**$50,000** 91:14

**$60,000** 91:16

**$64,000** 39:16

**$64,941.70** 65:21
  66:8

**$71,995** 64:6

**$725** 89:15

**$745** 89:19

_____ 0 _____

**001** 30:2

_____ 1 _____

**1** 3:10 8:2,3,10
  75:13,18,19 76:22
  82:13

**1:14-cv-0648** 1:5

**1:30** 72:17 73:21

**10:00** 1:20

**10th** 55:8

**11** 20:20

**11:56** 92:2

**1120** 2:12

**11th** 22:7,8,17

**12** 1:11 96:7

**15** 38:9

**16th** 22:9,12,13

**1730** 6:17

**1821** 96:1

**19** 39:10 63:9 66:11

**1st** 20:10

_____ 2 _____

**2** 3:11 8:2,4,9 75:20
  76:3,10 77:7

**2,375** 53:20

**20** 63:17

**2000** 18:12

**20006** 96:2

**20036-3437** 2:12

**2005** 13:19

**2008** 15:9 17:2

**2009** 15:9 17:3

**2010** 14:14

**2011** 40:16

**2012** 19:13

**2013** 41:19

**2014** 1:11 19:20
  20:20 32:9,22 34:2
  42:8,10 66:13
  72:15 77:10 83:2
  90:2 95:11 96:7

**2016** 93:21

**202** 2:13 96:3

**20th** 72:15,16
  77:16,17,20
  78:1,9,17
  83:8,9,14 85:20

**21** 77:10 83:2 95:11

**21201** 2:8

**218** 2:8

**21st** 77:15 78:1,5
  83:7,10,12 85:19

**22** 41:13

**22207** 2:4 95:2

**22nd** 89:21

**25** 95:11

**25,000** 41:20

_____ 3 _____

**3** 3:12 8:11,12 29:15
  60:3,4 63:8 70:16
  76:21 87:15

**30** 93:21

**31** 75:17

**347-1275** 2:9

**3rd** 96:2

_____ 4 _____

**4** 3:4 82:15

**400** 2:8

**410** 2:9

**457-1610** 2:13

_____ 5 _____

**5** 75:14 76:8,10
  82:16

**525-2668** 2:5

**5311** 1:16 2:4 95:2

**59/90** 3:5

_____ 6 _____

**6** 77:6

**6i** 19:22

_____ 7 _____

**7** 75:14,15

**703** 2:5

**7233765** 93:22

**78** 87:19

**79** 66:4

_____ 8 _____

**8** 3:10,11,12

**857-3376** 96:3

**89** 3:6

_____ 9 _____

**915** 7:11

**9913** 18:7

_____ A _____

**a.m** 1:20 92:2

**account** 9:17,18
  10:7,11,12,18,20
  23:15,19
  24:9,13,18 25:5
  41:15,19,21 42:3,8

**accountants** 6:21

**Accounting** 6:5

**accounts** 23:13

**accurate** 8:15 64:6

**acknowledge** 94:4

**across** 4:19

**action** 57:2 75:1
  93:9,13

**actions** 17:16 47:6

**actual** 34:3

**actuality** 65:16

**actually** 40:2 56:10
  83:7 91:19

**additional** 65:17,21

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014
Page 2

**additions** 8:20

**address** 6:16 7:10
18:5 30:11,13,14
31:1,4,5,7,8,9,11
33:9,12,21,22
35:3,7,8,21
36:2,6,10,14,16,18
,20,21,22 37:9,13
38:10,17,19
62:15,17 63:1
71:18

**Administration**
61:12 87:6

**advise** 84:14

**affidavit** 81:11

**affiliated** 84:11

**against** 4:15 68:1
75:1

**agency** 6:8

**ago** 16:7 69:22

**agreed** 95:8

**agreed-to** 64:7

**agreement** 39:11,14
43:11 63:11,19
66:15

**ahead** 44:19 68:5
85:2

**alert** 78:4

**Alex** 13:16

**Alexandria** 1:2

**allegations** 75:16

**alleged** 48:19 51:13

**alleging** 56:14

**Allnutt** 1:16 2:3
95:1

**allowance** 43:13
64:15 65:6,10

**allowed** 41:11

**already** 37:13 42:12
45:22 77:2

**alternate** 40:6

**am** 31:21 67:7
93:7,10

**Amendment** 81:4

**America** 23:17,19

**amount** 19:14 39:19
43:3,7,17 66:8,10

**answer** 4:18,20 5:16
8:9 14:19 23:2
68:5 75:14 76:16
77:8 82:22
84:20,22 85:2

**answered** 30:12
74:3 79:4

**answers** 3:10,11
4:17 5:6,12,22
8:2,8 76:13,14
82:14

**anybody** 60:9,13
75:2 81:20

**anymore** 50:7
68:14,16,18,21

**anyone** 12:6
28:11,20 35:11
61:19 81:22 84:8
88:5

**anything** 8:18 12:7
22:11 28:15
29:5,10,14
46:8,11,17,20
47:4,22 48:10
56:11 58:7 69:2,10
79:1,7 83:18 89:11
90:20

**anywhere** 25:4

**apart** 15:6,13

**appear** 5:2 8:15
29:19 94:8

**application** 28:3
30:8 37:4 59:11,18
77:3

**appointments**
12:14,15,18,19,21

**appraisal** 50:5,6,9
71:5,22

**appraised** 50:1 71:1

**appraising** 72:7

**approach** 35:1

**approximate** 72:7

**approximately**
7:15,17 19:12
23:18 90:12,14

**April** 27:2 32:9,22
34:2 90:1

**Arlington** 1:10,17
2:4 95:2

**arrangement** 41:10

**aspect** 29:1

**assume** 41:20
59:14,15

**assumed** 62:5

**assumption** 62:3

**attached** 81:11 94:9

**attorney** 58:7,10
93:11

**attorney's** 90:13,15

**audio** 5:11

**authorized** 60:9,12
81:20

**auto**
14:2,10,13,16,22
15:1,16,19 16:19
20:12 21:21 28:6

46:17,20 47:6,20
48:6,8 59:16 61:19
62:4 67:10 68:8
69:6,8,13,19 70:8
79:2,11,14,18
80:6,16 82:1
84:8,12
88:11,17,18

**Avenue** 6:17 18:7
31:7 32:10,13
33:11 34:4,10 37:2
38:16,21 39:8

**aware** 17:1,4
61:10,15,22 79:17
80:5,14,18 81:22
85:7,8 88:16,22

_____

B

**babysitted** 16:12

**background** 7:1

**bad** 42:21

**bag** 52:5,14,17

**balance** 39:15 41:19
57:6 65:7,12 66:1

**ballpark** 90:21
91:18

**Baltimore** 2:8 67:9

**bank** 9:10 23:17,19
54:14,15 58:3

**become** 73:1

**begin** 87:4

**beginning** 1:19
19:19 20:21

**behalf** 1:20 2:2,6,10

**believe** 91:13

**Beltway**
14:2,10,13,16
16:19 44:3,5

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014
Page 3

**best** 35:1

**better** 5:15

**bezel** 49:7,10

**bills** 55:19 91:1

**bit** 44:22 48:18

**BMW** 18:21,22
19:21 21:8 25:21
29:5 35:3 37:14
39:11 40:18
41:7,16 42:13
43:10 45:1,16,18
50:19 52:6
59:11,22
60:6,9,12,20
61:8,20,22 62:16
63:6,12 64:7 65:19
68:2 76:17,21
77:4,11 78:9 81:19
83:17,20 84:15
85:13 87:2,7
88:2,7,11 89:11

**borrow** 41:11

**bosses** 15:21

**bottom** 63:15,21

**bought** 48:15 83:21
86:13

**boxing** 51:17 56:13

**bra** 52:19

**Bragdon** 2:7 3:18
4:7,9 5:19
8:1,5,11,14 13:5
14:18 18:4 34:13
37:19 44:13,18,21
49:14 58:18 59:2
70:14 71:18 76:1
89:4 95:14,21

**break** 5:3 44:15,16

**Brief** 44:20

**briefly** 6:18,22

45:12

**brought** 4:15 20:18
21:1,6 22:17 25:11
27:18 44:2,11 67:1

**building** 24:12

**built** 42:1

**business** 7:9
34:16,17 46:7
68:22 69:3,4

**BW** 15:16,19 19:5
20:12 21:21 28:6
46:17,20,22
47:2,6,20 48:1,6,7
59:15 61:19 62:4,5
67:10 68:1,8,17
69:2,6,7,13,14,19
70:7 75:5
79:2,11,14,18
80:6,16 81:22
84:8,12
88:11,17,18

---
**C**
---

**calendar**
12:9,11,16,17,22
83:10

**Campbell** 2:11

**Capital** 1:6,18
81:12,18 95:3 96:1

**car** 18:22 19:15 20:8
22:17 24:1 25:18
29:12 30:4 31:17
32:3 34:15,19
35:13,21 36:3,4,10
37:18,20 38:17
39:22 40:19,20
41:4 43:14,19
44:2,12 45:20,22
46:11,14,22
48:15,16,17,19,21
51:4,10,13,18,19,2
0 52:1,2,6,15,21

53:6,18
55:10,12,22
56:8,9,10,17,21
57:1,11,13,14,15,1
6,22 58:15
62:1,4,6,8,22
65:16 67:15,19
73:2 74:8,10 75:2
77:17 78:21
83:16,21 84:3,11
85:4,6,15,20,22
86:2,5,13,14,16,20

**card** 46:7 73:8

**carpool** 40:2,21

**cars** 14:11 79:11,19
80:7

**Cartier** 48:21 49:6
71:1,10 72:8

**case** 1:5 17:13 21:9
48:9,13,14 60:19
61:3 71:9 72:12
80:1,19 81:13,19
82:20 86:12
90:13,15 96:5

**cash** 53:1,7,10,14,17
54:9,12 64:5

**caused** 56:15

**cc** 95:21

**center** 51:11

**certain** 53:9

**Certificate** 30:22
35:4 60:5 61:8,11
62:16 93:1

**certify** 93:4

**chain** 82:6,7

**change** 52:12 96:8

**Change/Reason**
96:8

**changed** 43:21

**changes** 8:19 42:3
94:8

**charge** 64:11 75:11

**chargers** 56:11

**charges** 64:10

**Charles** 2:8

**chase** 73:11,13

**check** 31:10 35:9
53:12 66:6,16

**checks** 53:3

**choice** 35:2

**chose** 38:17

**Christy** 1:17 93:2,18
95:19

**civil** 17:11,12

**claim** 4:15

**clarification** 5:1

**clarify** 4:22

**clear** 57:10 59:9
73:1

**client** 30:16 80:11

**clients** 6:10

**client's** 36:14,15

**close** 40:4 91:15

**closed** 68:22

**closet** 50:17

**clothes** 52:8,10

**collect** 53:15

**collects** 53:17 54:13

**comes** 8:18

**commission** 75:6
93:20

**common** 55:21 56:1

**Commonwealth**

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014
Page 4

1:19 93:19

**communicating** 13:10

**communication** 9:21 78:10

**communications** 9:12,13

**company** 1:18 6:9 9:21 14:22 31:20,21,22 32:1,3,4,6,8 33:3,7,9 34:3,15,19 35:18 36:5,6,7,8 72:7 96:1

**complaint** 75:17

**complete** 26:10,16 27:21 39:1 94:6

**completed** 27:4 38:20 39:8

**computer** 11:1

**concern** 68:15

**concerned** 35:6,7

**concerning** 82:19

**concerns** 85:9,11

**concluded** 92:3

**confirm** 41:14

**consecutive** 57:19

**console** 51:11

**Constitution** 81:5

**construction** 32:1,11 38:20 39:4

**contact** 77:22 85:16

**contacted** 78:8,13,16 85:14,18

**contacting** 95:9

**contacts** 85:17

**contention** 48:20

**continue** 47:16

**continued** 11:7,13 12:3

**continuing** 56:20

**contract** 22:3,6,8 23:3,7 26:5

**conversation** 61:18 88:4

**conversations** 42:11 48:4 58:12 80:10 84:17

**convictions** 17:4,7

**copies** 8:15 76:11

**copy** 50:5,8 71:3 95:6

**corner** 30:2

**Corporation** 6:7

**correct** 8:22 10:14 11:1 15:10,19 19:7,15,22 30:9 32:19 34:2,7 36:11 38:11 39:12,16 59:11 63:6 65:4 66:11 67:3 72:4 74:12 76:22 77:4 80:16 94:6

**corrections** 94:8

**correspond** 10:14,17

**cost** 49:21 65:17

**counsel** 1:14 3:4,5,6,18 4:6 59:4 71:9,13 72:11 89:7 90:9 93:8,11 95:13

**couple** 30:20 50:14

**course** 58:6 80:14

**court** 1:1 5:4,10,16

13:2

**CPA** 7:2 32:5,6 34:22

**credit** 43:9,18 57:3,4 64:22 66:7,16

**criminal** 17:3,7

**CSR** 1:17 95:19

**currently** 6:2 13:22 38:6 40:1

———————
D
———————

**D.C** 2:12 6:15 96:2

**damages** 56:4,14,15,16 89:10 90:5

**Daniels** 1:16 2:3 95:1

**date** 22:19 60:6 72:13 88:10 91:2,3,4 94:17 96:7,22

**dates** 15:2

**daughter** 16:12

**Dave** 45:17,18 46:9

**Davis** 54:21

**day** 13:13 21:5 25:15,17,18 40:7 50:11,21 55:4 77:17 78:1,20 85:21

**days** 85:21 95:11

**deal** 26:20 43:14

**Dealer** 64:10

**Dear** 95:5

**Deb** 77:10

**decide** 19:21 20:2 21:14

**decided** 19:17 32:2

**deciding** 11:17

**decision** 31:17 35:12,16

**declared** 57:7

**default** 57:8

**Defendant** 1:15 2:6,10 3:4,5 4:6 59:4 90:9

**Defendants** 1:9 95:13

**deferred** 57:1,17 58:9

**degree** 7:4

**delete** 11:5,13,16,18 12:1

**deleting** 11:14

**depends** 40:10

**deponent** 17:6

**deposit** 22:7,8,16 23:10,11 26:6 41:16

**deposition** 1:12 3:9 4:10 8:3,12 80:19,21 81:1,2 92:2 95:7 96:7

**derived** 87:1

**describe** 6:18,22 9:4 45:12 49:5 83:22

**described** 45:11 65:3

**desk** 12:16

**details** 42:17,22 47:1

**diamonds** 49:6

**difference** 65:22

**different** 25:18

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014
Page 5

**direct** 87:14,16

**directing** 84:19

**direction** 93:6

**discuss** 13:12 35:19 36:1

**discussed** 42:12 68:7 82:5

**discussions** 82:18 84:2,6

**DISTRICT** 1:1

**Division** 1:2

**document** 3:12 38:11,13 60:19 61:2 64:2 72:11

**documentation** 88:1

**documents** 8:7 9:2,5,6,9 22:20 23:7 29:16,18,19 44:14 55:18 71:4

**domain** 10:3

**done** 37:5 44:6 90:20

**door** 73:4

**doorbell** 45:15 83:3

**drive** 7:11 21:11 25:15 26:1 40:1,6,9 56:2

**drives** 25:17 40:8

**driveway** 51:21

**driving** 19:1 38:7 40:6

**dropped** 57:4

**drove** 25:14

**due** 78:10

**duly** 4:4

**duplicate** 48:1

**during** 61:17 72:13

_____ E _____

**earlier** 30:7 37:21

**early** 25:11 42:8 72:14 77:19

**EASTERN** 1:1

**edge** 49:11

**educational** 7:1

**efforts** 85:12 86:7

**either** 88:7

**else** 25:4 28:16 35:11 46:11 56:12 75:2 84:8 88:5

**e-mail** 9:11,13,14,19 10:6,9,10,12,15,22

**e-mailed** 12:6

**e-mails** 10:3,6,8 11:5,8,11,13,18,22

**employed** 6:2 16:19 93:8,11

**employee** 75:5 93:11

**employer** 6:16

**employment** 15:2 24:19

**Enclosed** 95:6

**entire** 77:22

**errands** 40:21

**errata** 94:9 95:12

**Esq** 95:14,21

**Esquire** 2:3,7,11 95:1

**estimate** 41:18

**Evelius** 2:7

**eventual** 34:14

**eventually** 37:6

**everything** 87:12

**evidence** 60:5,11 82:1

**exact** 22:19 91:7

**exactly** 37:5 66:19 81:16

**examination** 1:14 3:3 4:6 59:4 89:7 90:9

**examined** 4:5 94:5

**example** 27:13

**exhibit** 8:3,12 29:15 60:3,4 63:8 70:15 75:13,18,19,20 76:3,5,10,21 77:7 82:13 87:15

**Exhibits** 3:9,18 8:2

**expecting** 57:22

**expires** 93:20

**explain** 79:1,7

**express** 85:9

**extent** 80:10 90:17

**extra** 52:10,14

**eye** 20:13

_____ F _____

**fact** 35:17 56:16 65:2 66:3 78:8

**facts** 75:16

**failure** 68:1

**fair** 5:7 11:21 27:18 39:7 41:9,21 42:6,16,20 51:22 91:18

**Fairway** 7:11

**familiar** 82:5,11

**family** 10:17 11:22

13:7,10

**Federal** 19:11 66:7,16 85:18 86:4,15,19

**Fee** 64:11,12

**feel** 22:11,18 23:1

**fees** 56:18 90:13,15

**fell** 66:17

**Fifth** 79:18,22 81:4 88:17

**figure** 32:6 34:22 78:3,21

**file** 31:2,8 32:7 36:19,21 37:13 62:18 70:3 77:3 84:14

**filed** 67:17,22 70:5 81:13 87:6

**files** 9:8

**filing** 70:4

**fill** 37:3,6 59:10

**filling** 27:8 28:3 30:8

**finalized** 43:22

**financed** 19:6

**financial** 6:20

**financially** 93:12

**financing** 27:5,9 28:21 39:19

**fine** 4:18 70:17 76:6

**finish** 5:5,6

**fired** 69:6,7

**first** 4:4 19:17 20:7,15 22:5 26:1,2,3,22 29:22 33:5 59:1 60:4 67:15

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014
Page 6

**flip** 29:17 38:9

**flipping** 44:14

**floor** 79:8 96:2

**folders** 11:10

**foot** 74:7

**foregoing** 93:3 94:5

**form** 27:15 37:3,6,10 60:14

**formation** 32:8

**formed** 34:3,6

**forming** 31:20,21 33:2

**forth** 25:14,15 64:12 66:10 75:16

**forward** 95:12

**forwarded** 33:20,22

**foundation** 68:3 70:10 88:12,19

**four-door** 20:3

**free** 22:11 23:1

**frequent** 13:9

**frequently** 30:18

**Friday** 21:7

**friends** 10:17 11:22 13:6,10

**full** 5:21

**funded** 24:3

**funds** 34:10

---
G
---

**Gallagher** 2:7

**general** 4:12 10:5 14:9 24:11

**generally** 8:6 29:18 49:5

**gentlemen** 72:20

**George** 7:7

**gets** 33:20,21

**given** 71:8 72:10 82:1 94:7

**gives** 54:14

**giving** 5:21 81:6

**GLK** 19:2 37:22 38:1 40:10,11,14 43:4,15 44:2,3 63:3,4 64:22 65:2 66:17,19 67:1,3

**gloves** 56:13

**grabbing** 51:20

**guess** 7:20 10:22 12:20 21:12 24:11 26:9 31:13 32:2 39:2 55:21 56:4 91:6

**guy** 45:15,21 46:1

**guys** 45:17 48:16

**gym** 51:1,5,8,16,17 52:5,8,10,14,16

---
H
---

**handle** 29:1 33:3

**handled** 28:6,8 79:11

**handling** 54:12

**happen** 42:18 66:20,21 67:1 83:7 85:5

**happened** 45:13 67:5 78:21 81:2 83:7 84:18

**haven't** 42:12 56:8 58:5,16 71:19 86:13 88:15 90:22

**having** 4:4 65:22 81:1

**Headshakes** 5:13

**hear** 58:6,8

**heard** 58:5

**hearsay** 88:20

**held** 60:19 79:11

**he'll** 14:21

**help** 5:14 23:2 83:12

**helps** 27:14

**hereby** 93:3 94:4

**hereto** 93:12

**Heritage** 2:4 95:2

**he's** 14:20 45:20 75:11 79:21 80:22 85:8

**hesitate** 95:16

**Hi** 4:8

**Highway** 1:16 2:4 95:2

**Hills** 30:13

**hired** 16:22

**home** 7:10 20:18 21:1,6 22:17 25:11 27:19 31:5 32:14,16 44:2,12 45:5,6,7 47:8 51:18 55:14,16,20 67:1 73:16,19 83:3

**honest** 55:19

**honestly** 26:4

**hooked** 45:22

**hours** 72:15

**house** 25:12 55:1 66:18

**household** 75:9

**Howard** 77:12 86:1,4 87:8 88:5

**hung** 74:18

**husband** 9:7 10:15 12:1 18:9 20:4 26:14,20 27:11 28:8,15 29:1,4 35:11 37:8 38:14 42:14 43:1 44:2,9 45:7,19 46:10,16,19 47:8,16,19,22 48:5 49:15 58:14 59:14,15 61:18 66:22 68:7,20 69:5 73:14,16 74:9,19 75:4 78:2,11,13 79:17 80:5 83:16 84:12,14 85:13

**husband's** 14:15 15:21 49:2 80:18

---
I
---

**I'd** 42:10 54:4 55:11 71:14 83:9 91:15

**idea** 26:15 47:21 69:16 70:1 75:6

**identification** 8:4,13

**identified** 20:8

**I'll** 4:12,14 5:5 11:19 22:18 29:22 58:13,18 59:2 90:16

**I'm** 4:13 8:1 13:4 17:1 22:10 24:12,16 32:5 42:20 44:13 46:8 52:2 56:16,17,18 57:1 67:5,14,15,19 68:19 75:21 80:9 84:16,21

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014
Page 7

90:11,19,20

**inbox** 11:11,12

**Inc** 1:6,8 59:7

**incarcerated** 15:9

**incarceration** 17:2

**incident** 47:9

**include** 65:22

**including** 64:10 90:4

**income** 24:13 69:10

**incorrect** 82:2

**incurred** 56:5
91:2,3,5,6

**indicate** 60:11

**indicated** 80:22
88:10

**indicating** 69:20

**indication** 60:8

**indicator** 71:9

**indicia** 73:6

**informal** 41:10

**information** 27:15
63:18 65:4 73:8

**Injunction** 81:13

**inside** 73:12

**instead** 5:14

**insurance** 38:10
50:3,6,8 57:1
71:1,4,6,22 72:3,7

**insured** 38:17 71:6
72:1

**intent** 38:21

**intention** 63:5

**interest** 7:16

**interested** 20:8
93:13

**interrogatories**
8:2,16 16:11 30:12
45:12

**interrogatory**
75:14,15 76:14
82:14,16

**investigate** 87:1

**involved** 8:22
17:10,15 28:16

**involving** 48:1

**Island** 6:17

**issue** 21:9 89:9

**issued** 66:7,17

**issues** 46:17 48:1

**it's** 4:18 6:9 10:14
11:19 32:2 34:8
39:1 40:16 41:9,10
48:16 61:4
68:14,15,22 69:3
70:7 71:6,22 76:2
83:6,21

**I've** 43:12 49:19
52:2 69:18,22
80:17 90:8 91:3

_____

**J**

**Jackson** 2:11

**James** 2:7,11 4:8
59:7 71:16
95:13,21

**January** 14:14

**Jefferson** 96:1

**jewelry** 55:17

**job** 6:4,18 14:4,7,15

**Jodi** 1:3,13 4:3
75:21 92:3 94:4,17
95:3,7 96:5,6

**joint** 70:3,5

**jointly** 18:9

**Jonathan** 2:3 95:1

**Jones** 2:7

_____

**K**

**Kerry** 77:12 86:1,4
87:8 88:5

**keys** 45:15,18,20
73:5

**kids** 45:6 73:12

**knew** 15:18 66:22

**knocked** 73:4

**knowledge** 57:7
70:12 74:6,22 75:3

_____

**L**

**laid** 4:13

**landlord/tenant**
17:16

**large** 42:3,7

**last** 11:14 47:19
49:19 54:3 57:3

**later** 26:17 44:7,8

**law** 1:15

**lawsuit** 17:11
85:7,10

**learn** 44:5

**lease** 79:8

**leave** 46:2,14 52:1
74:14

**leaving** 51:8 74:19

**Lee** 1:16 2:4 95:2

**legal** 56:18 82:8

**legally** 85:5

**lender** 39:20

**less** 64:14 65:10

91:14

**let's** 5:4 18:21 75:13
91:5

**letter** 87:13,15,17

**Levine** 1:16 2:3 4:13
13:2 14:17 18:1
34:11 37:15
44:16,19 60:14
61:13 68:3 70:10
71:14 74:2 75:19
76:3,8 79:3 80:9
82:8 84:16,21
88:12,19 89:8
90:7,16 91:22
95:1,5

**lienholder** 65:7

**Line** 96:8

**Lisa** 81:11

**listed** 50:9

**litigation** 12:4,7
48:11 80:15

**little** 18:21 44:22
48:18

**live** 13:20 16:9

**lived** 15:6,8,12

**lives** 40:4

**living** 39:8

**LLP** 2:7

**loan** 19:14 43:4
79:2,8

**loans** 18:16 57:8

**locate** 20:12

**located** 6:14 7:20,21

**locations** 6:12

**locker** 51:17 52:12

**long** 70:4 81:11

**lot** 25:19 79:19

**lower** 30:2

___

M

**Mahdavi** 1:3,13 3:9
4:3,8 8:3,12
13:15,16 15:6,8
16:18 17:3 18:18
22:18 25:7,11 30:2
41:13 44:22 59:6
60:3 63:9,17
66:4,11 69:21
76:22 87:19 89:9
92:3 94:4,17
95:3,7 96:5,6

**Mahdavi's** 15:15
75:22

**mail** 30:6 31:10,14
33:19,21 35:9
76:22

**mailbox** 33:16,18

**major** 7:8

**management** 6:7,9
10:1

**manager** 14:8 53:16
54:18

**March** 20:19,20,22
22:14,15 23:4,8
25:11 26:3,6,16

**mark** 8:1,11

**marked** 8:4,9,10,13
60:2

**Markels** 2:11 5:9
49:9,12 58:20,22
59:5,7 60:17 61:14
68:4 71:12,16,20
72:2 74:5 75:21
76:4,9 79:6 80:13
82:10 84:19 85:1
88:13,21 89:2,6
90:10,18 91:21

**married** 13:15,18
15:5 18:18,20

**Maryland** 2:8 7:22
15:1 17:21 18:2,6
31:2,7,17,21
33:6,10
35:3,7,13,21
36:2,3,5,6,7,9,10,1
8,20 37:1,12 48:11
61:11 62:16,18
80:15 87:5

**Mason** 7:7

**matter** 44:17 80:12

**may** 18:19,20 44:8
58:19 61:5 66:13
72:15,16 77:10
80:10
83:2,7,8,9,10,12,1
4 85:19

**maybe** 16:6 50:14

**McCloud** 77:10

**McGee** 1:17 93:2,18
95:19

**mean** 11:20 25:17
48:15 52:2 53:8
67:14 68:19 75:19
76:21 81:8 85:3,14
86:18

**means** 88:8

**medications** 5:20

**meet** 54:22

**members** 10:18

**men** 74:7,10,13

**mentioned** 56:8,11

**Mercedes** 40:13

**message** 13:6

**messages** 13:12

**met** 16:3 54:18 74:9

**method** 12:13

**mid-April** 27:3

**middle** 32:11 45:14
55:5

**mind** 8:19 44:18

**minor** 17:7

**minute** 44:13

**Mitzi** 54:21

**model** 40:15

**Molavi** 15:22
16:15,21 47:5 84:3
88:16

**Monday** 26:2,4 45:3
50:18

**monetary** 56:15,16

**money** 23:19,22
24:14 25:4,7 42:2
52:20 53:5,18
55:9,15,22 67:8,13

**monies** 69:20

**Montauk** 18:7 31:7
32:10,13 33:11
34:4,10 37:2
38:16,21 39:8

**month** 55:6 58:1,3
66:15 89:22

**months** 11:14 30:20
48:16 66:14,15
86:14

**month's** 53:21

**morning** 59:6
72:15,18 73:21
77:19 83:2

**mortgage** 75:10

**Motion** 81:12

**multiple** 6:10,12
53:22

**MVA** 87:5 88:2,7

___

N

**N.W** 2:12

**Navid** 13:15

**negative** 57:2

**neighborhood** 33:14

**neither** 93:7

**NextGear** 1:6 2:6
3:4,11 4:6,9,15 8:8
28:11 60:8,12,20
61:3 75:1 79:2
80:15 81:12,18
86:8,10,16,18 95:3
96:5

**NextGear's** 61:8
82:14

**night** 21:1
45:1,3,13,14 46:11
47:11 51:15

**nobody** 74:7

**nods** 5:13

**none** 70:18

**nor** 93:8,12

**normal** 55:4

**normally** 55:9,11,12

**North** 2:8

**Northwest** 96:1

**Notary** 1:18
93:1,18,22

**notes** 58:18 59:1
89:3

**notice** 1:15

**November** 1:11
95:11 96:7

**Nozary** 16:1,16,21
47:5 84:5

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014
Page 9

---
**O**

**object** 80:9 84:16 90:16

**objection** 14:17,20 18:1 34:11 37:15 60:14 61:13 68:3 70:10 74:2 79:3 82:8 84:21 88:12,19

**objections** 77:9 83:1

**obligations** 75:9

**obtained** 27:10 39:19 48:2 79:14

**occasions** 16:6

**occurred** 72:14

**occurrence** 82:19

**office** 6:14 30:15,16,19 31:14 36:15 39:3

**officer** 93:2

**offices** 1:15

**oh** 13:4 30:3 61:17 76:4

**okay** 4:12 5:18 12:20 17:15 22:21 30:3 44:3 59:3 61:7,17 62:7 69:5,9 71:8,20 72:10,17 73:6 74:1 78:4 80:18,22 81:17,22 83:15 85:2,12 87:9 88:16 89:16,18 90:4 91:21

**ones** 11:18 54:5

**opposed** 73:2

**Opposition** 81:12

**oral** 1:14

**order** 61:10 65:19 85:13

**original** 43:17 81:19 95:8,12

**originally** 38:2 63:5

**others** 18:3 53:12

**otherwise** 4:22 93:12

**outcome** 93:13

**outfits** 73:7

**Outlet** 59:16 61:19 62:4 67:10 68:1,8 69:6,8,13,20 70:8 75:5 79:11,14,18 80:16 82:1 84:8,12 88:11,17,18

**Outlet's** 80:6

**Outlook** 10:20,21 12:11

**outside** 45:16

**outstanding** 19:15 43:3

**overnight** 51:14 55:22

**owed** 65:12 66:1

**owned** 34:15 65:7 87:2

**owner** 18:8 61:20 62:4,5 87:2 88:17

**owners** 15:18 88:6,7

---
**P**

**P.A.R** 1:8 2:10 3:5,10 8:10 47:14 59:4,7 75:1,22 76:1 78:9 90:9 96:5

**page** 3:3,9 29:22

30:1 38:9 39:10 60:4 75:14 76:7,8,10 77:6 82:15 95:8,13 96:8

**pages** 94:5

**paid** 41:15 43:5,12 53:5 66:10 68:8 69:13,14,17,20 70:8,13 90:14,22 91:3,19

**pair** 52:18

**Palm** 6:7 9:20,22 10:1,4

**pants** 52:19

**paper** 12:16,17

**paperwork** 27:8,10,12,19,21 69:19

**PAR** 95:3

**Paragraph** 75:17

**participate** 35:12

**particular** 76:13

**parties** 1:21 93:9,12

**party** 82:20

**Pasha** 49:6

**pause** 44:20

**pay** 44:1,3 53:7,10,12,14 55:7 58:4 89:14

**paying** 34:9 43:7 56:17,18 57:1,10,13 75:8

**payment** 26:14,16 57:22 65:20 70:19

**payments** 22:1 54:12 56:21,22 57:1,16,20 58:9

**pays** 75:10

**PDI** 64:11

**pending** 12:4 80:15

**PenFed** 19:9 28:21 43:4 56:20 57:7 65:20 70:8,13,16,20 77:22 78:4,8,14,17 88:5,10,14

**Pentagon** 19:11 66:7,16 85:18 86:4,15,18

**people** 73:3 74:10 85:14

**period** 15:9

**person** 81:6 84:10

**personal** 9:8,16,18 10:8,10,12 12:14,21 34:10

**personally** 53:15

**phone** 11:3 56:11 73:17 74:18,20 88:4

**pick** 54:9

**picked** 31:14

**picking** 55:5

**Plaintiff** 1:4 2:2 3:6 89:7

**plan** 26:10,12 34:15,18 39:7 43:17,21

**planned** 39:2

**please** 4:22 5:3 41:13 95:6,12,15

**pled** 79:17,21 88:17

**PLLC** 2:3 95:1

**Plus** 65:11

---

# Capital Reporting Company
## Mahdavi, Jodi C. 11-12-2014
### Page 10

point 35:19 36:4
39:9 43:21 46:16
70:22

police 45:21,22
46:1,3,4,15
74:9,12,14,16,21,2
2

policy 38:11

Porsche 41:5 56:3

position 78:6 81:18

possession 25:13

practice 10:5 11:17
52:1,3,4 54:11

practices 80:6

Preliminary 81:13

present 1:20

preserving 14:20

pressure 22:19

pretty 42:5

previous 14:15

previously 87:7

price 64:6,7

principals 15:18

printed 30:1

prior 16:6 58:13
59:21 60:19
61:12,19 62:17
77:3,9 87:2 88:6

privilege 84:17

probably 41:20
42:21

procedure 58:15

proceedings 93:7

process 26:12 28:12
34:8,20 79:13

Processing 64:11

produced 9:6
29:16,20 61:3 66:6
70:15 71:9,12,15
72:12

production 3:12 9:1
38:10 60:19 61:3

professional 12:14

prohibit 5:21

project 32:12,21
39:4

properties 7:13,18
17:18,20 18:15
24:4 25:1,3 26:13
54:6,7 82:4

property 25:12
33:4,16 34:4 38:22
48:19 53:16 54:18
56:7

proposed 26:20

provided 62:10

provides 81:5

Public 1:18 93:1,18

purchase 18:14,17
19:6 21:15,17,21
23:4,7 24:1
26:11,16 27:9,22
28:16 29:2 30:5
37:14 39:11 41:22
42:8,13,17,22
43:10,22 58:14
63:6,11 65:19
66:14 89:10,20

purchased 18:11,22
19:3,12 29:6,11
62:3 89:12

purchaser 39:5

purchasers 79:15

purchasing 28:12,20
58:15

purposes 34:16,17
50:3 71:1

pursuant 1:15 72:6

pursue 73:15

pursued 74:7

─────────
Q
─────────

question 4:18,20,21
5:2 14:21 23:3
24:11 29:9 35:22
39:2 42:21 60:10
90:7

questions 4:14 5:6
58:19,21 59:1,8
80:6 89:5 95:15

quickly 83:11

quiz 22:10

─────────
R
─────────

rang 45:15 83:3

rather 31:5

RE 95:3

reading 11:5,8

real 82:4

really 12:19 24:16
36:8 81:8,9 83:11
85:3

rebuilding 32:16

recall 16:18 19:17
20:7,15 21:5 22:5
23:3,6,16 24:10
25:6 26:4,22 28:3
29:4,10 30:7 41:18
42:14 44:9 48:6
71:16

receipt 89:16

receive 33:19 43:9
77:3

received 76:17,20,22

record 14:21 59:9
93:7

recover 67:18 84:15
85:13

reduced 93:5

refer 29:22

referred 37:21

refinancing 26:13

reflect 70:19

refund 67:12

refunded 67:6

regard 75:2 79:18
81:5 83:17 87:7
88:18

regarding 27:22
28:21 48:9 60:6
83:17 88:2 95:9

regards 34:3

register 31:17
35:12,20 36:3,10

registered 37:18
38:2,3

registering 31:6

Registration 64:11
93:22

regular 52:1,3,4

regularly 31:10 35:8

related 12:7 93:8

relative 93:10

relevance 14:17 18:1
34:11

remained 25:12

remember 22:19
61:5,6,7 66:19
81:14,15

rent 52:20
53:5,18,21 54:6,12
55:5,9,15,22

rental 24:4 25:1,3
26:13

rented 41:6

Repeat 60:10

repoed 74:8

reporter 5:10,16
13:3

Reporter/Notary
95:19

reporter's 5:4

reporting 1:18 47:16
96:1

repossessed 41:7
46:12 48:20 50:19
53:19 77:11

repossession 40:18
45:1 47:14 48:5
54:18 56:5,15
58:13 72:13 73:2
78:5 83:15 84:3,11

represent 4:9 59:7

representation
62:12

request 9:1 90:13

requested 67:12

requests 82:14

require 56:20

residence 32:18

residential 7:18
32:14 33:4 38:22
39:4

respective 1:21

respond 86:9,10

response 29:20 82:9

responses 9:1 75:22

responsibilities 6:19
14:5,6

responsible 75:8
95:9

responsive 9:5

result 56:5

retail 63:11,19 66:14

retained 3:18

returns 70:2,3,6

review 6:20 8:6,19
9:11 64:2 89:3

reviewed 8:16 81:10

Rhode 6:17

right-hand 30:2
65:11

road 20:6

room 51:18 52:12

roughly 41:20 89:15

rules 4:12

_____

S

safe
55:14,16,17,18,20

sake 5:4

salaried 75:5

salary 15:15 24:4,21
25:3

sale 60:9,12 64:7

sales 63:19 79:18
88:18

saving 23:22

savings
24:2,3,5,6,9,12,17,
18,21 25:5,8

saw 16:11 20:3,6,7

schedule 13:13

score 57:4

seat 56:9,10

seeing 61:7 81:14

seen 59:21
60:6,18,21 61:2
69:18,19,22 70:2
71:19 80:17 86:13

sell 38:21 39:4,6
68:1 79:14

selling 80:7

send 13:9 88:1

sense 58:20

sent 30:21 31:9,15
33:21 36:19
87:12,21

separate 11:10

separately 70:4

September 13:19
93:21

Services 1:8 8:10
59:7 75:1,22 78:9

setting 33:14

several 16:6 82:4

sheet 94:9 95:12

She'll 91:22

shirt 52:19

shoes 52:19

shop 69:1

short 44:15

showed 72:21

shows 65:6

sign 22:3,5 27:19
76:12

signature 63:15,21
92:1 95:8,10,13

96:22

signed 8:16 26:5
39:11,14 64:3
66:15 76:12 94:9
95:12

signing 23:3,6

simply 62:17

sister 41:10 57:11

sister's 40:19,20
41:4

six 11:14 48:16
86:13

slight 42:2

small 73:12

social 12:21

socially 16:16

sold 14:11 81:20
86:19

somebody 59:15

someone 40:2,4 58:9

sometime 20:21 44:7

Somewhere 19:19
20:10 72:19

sorry 13:4 36:1
42:20 68:19 90:11

sort 5:13 39:3,20

sound 5:7

source 15:1 24:20

sources 24:6,13

South 2:12

speak 28:19,20
86:11

speaking 32:5 34:22
63:4

specific 8:18

specifically 24:10

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014
Page 12

**specifics** 90:19

**speculate** 4:16

**speculation** 37:16 61:13 70:11

**spend** 16:15

**spiraled** 86:12

**spoke** 77:10

**sports** 52:19

**spousal** 84:17

**Square** 2:4 95:2

**staff** 6:21

**staffing** 6:8

**stage** 32:8

**stance** 81:21

**standing** 74:13

**start** 49:18 91:5

**started** 14:12 27:5

**starting** 28:1

**state** 76:17 82:18

**stated** 60:2

**statement** 41:15 50:9 93:3,4,6,9

**statements** 6:20 9:10 70:16,19

**states** 1:1 7:21

**status** 32:21

**stayed** 42:5

**stealing** 73:3

**stenotype** 93:5

**step** 67:15 85:5

**stopped** 11:14

**store** 11:7

**stored** 11:1

**storing** 10:6

**Street** 2:8,12

**strike** 83:22

**structure** 26:20

**Subject** 77:8 83:1

**submit** 61:12

**substance** 82:18

**suit** 67:17,22 84:14

**Suite** 2:8

**Sunday** 54:19

**SunTrust** 54:16

**supervise** 6:21

**supplemental** 8:9 75:22 76:13,16 77:8

**support** 75:16

**supposed** 43:11,13

**sure** 4:13 18:13 22:10 24:11 52:2 59:8 77:15

**sweatshirt** 52:19

**switched** 76:5

**sworn** 4:5 81:6

———————

**T**

**taking** 5:11 56:18

**talk** 18:21 28:11 44:22 48:18

**talked** 46:10 48:15 58:16 77:2 84:10

**talking** 35:17

**tax** 32:5 70:2

**taxes** 34:22

**technical** 49:13

**technically** 43:12 81:8

**telephone** 77:11

**Temple** 30:13

**ten** 7:17 17:20 49:19 91:20

**tenant** 17:14

**tenants** 53:7,9,14,22 54:2 55:7

**tenant's** 53:8

**tennis** 52:18

**term** 49:13 82:5,11

**terms** 21:17,19

**test-drive** 21:3,12

**test-drove** 26:3

**testified** 4:5

**testimony** 81:6,7 82:1 94:5,7

**text** 13:6,12

**Thank** 95:16

**that's** 9:20 19:9 21:8 26:13 30:16 31:2 35:18 36:13,18,19,21 38:19 45:20 46:14 52:4 59:3 60:4 62:20 69:11 70:17 74:15,20 75:11 76:5 78:5 81:21 87:18 89:2 90:7 91:21

**thereafter** 93:5

**there's** 14:20 27:14 32:18 33:18 52:11

**tires** 89:13,14,20

**title** 14:7 28:4 30:4,8,22 31:2,8 34:18 35:4 36:19 37:4,7 59:11,19,21 60:5,6,19

61:8,11,12 62:8,16 64:11 67:2 68:2 76:17,20 77:3 79:10,14 81:19 82:6,7 83:17,20 86:16,19 87:1,7 88:11

**titles** 48:1

**today** 5:20 23:1 56:2 58:16

**top** 82:15

**tore** 32:15

**torn** 33:1

**tow** 46:1

**Tower** 2:12

**track** 12:13,18,20

**tracked** 74:21

**tracking** 88:6

**trade** 43:18 63:5

**trade-in** 43:9,13,18 64:15,22 65:3,6,10,12,16 66:1,17,20,21,22

**traffic** 17:8

**transcript** 5:12

**transcription** 94:7

**transfer** 22:7 42:7

**transferred** 22:16 77:12

**transferring** 34:18

**tried** 73:14 85:4

**truck** 46:1

**true** 25:10 70:7 93:7 94:6

**truthful** 5:21

**try** 5:5 13:2 20:12

85:5,14,21

**trying** 22:10
67:14,19 78:20
85:22 86:1,5 90:21

**Tuesday** 83:9,10

**turn** 39:10 41:13
63:17 77:6

**Twentieth** 2:12

**type** 18:22 32:6
33:14

**typewriting** 93:5

**typewritten**
27:14,16

---
U
---

**Uh-huh** 5:8 7:5 10:2
11:2 13:1 16:8
20:1 21:2 25:20
32:17 33:8 45:2
46:6 52:7 62:19
65:15 66:5 71:2
82:17

**uh-huhs** 5:10,15

**undergrad** 7:4,8

**understand** 4:19,21
5:2 81:4

**understanding** 14:9
39:18 63:14
64:5,21 81:17 83:6

**understood** 39:15

**undertake** 86:22

**Union** 66:7,16

**UNITED** 1:1

**unless** 14:19

**unpaid** 39:15

**usual** 54:11

**usually** 11:9

---
V
---

**vaguely** 81:14

**valuable** 55:18

**value** 71:5,6,10
72:3,6,7

**variations** 42:1,4

**various** 64:10

**vehicle** 19:3,12,18
20:2 21:15,21
25:11 26:7,11
27:1,5,6,9,22
28:1,13,17,20 31:6
38:4,6 40:9 41:7
42:9,13 46:5 48:5
56:2 58:14 61:11
64:6 65:2,3 74:7
87:6

**vehicles** 40:17 41:1
88:18

**verify** 8:7 83:11

**Vienna** 7:11 13:20
33:22

**violations** 17:8

**Virginia**
1:1,10,17,19 2:4
7:11,22 16:9 17:22
18:3 38:3 55:2,3
93:19 95:2

**vocalize** 5:12

**vs** 1:5 95:3 96:5

---
W
---

**W-2** 69:18,22

**wait** 59:2

**waited** 78:1

**waiting** 78:2

**waived** 92:1

**waiving** 77:9 83:1

**Washington** 2:12
6:15 67:9 96:2

**wasn't** 36:8 51:22
73:19,20 78:12

**watch** 48:21
49:1,2,3,16
51:4,7,12,13 71:1
72:8

**watch's** 71:10

**wear** 50:11,13,21

**wearing** 49:18,19
50:16,18

**We'd** 32:3

**Wednesday** 1:11
83:12,13 96:7

**week** 21:5

**weekend** 21:11 26:2
54:10,17

**weeks** 50:14

**we'll** 5:12 22:20

**we've** 48:15 70:5
82:4

**whatever** 24:8,16,18

**Whereupon** 4:2
92:2

**whether** 8:7 29:19
58:4 69:12 75:4
83:19

**white** 21:8 45:16

**whole** 34:20

**whom** 93:2

**who's** 5:11

**Winchester** 53:17
55:3

**witness** 4:4 5:18
13:4 18:2 34:12

37:17 44:17 49:10
60:15 70:12 71:21
74:4 76:2,7 79:5
95:9 96:6

**wore** 49:3

**work** 6:6,10,12
9:16,19
10:6,8,15,18 11:1
12:18,19,21 21:20
25:14,16 34:10
36:14 39:22 40:3
47:17,20 50:21
51:2 56:19 73:20

**worked** 14:22 73:7

**working** 13:22
14:2,12,16

**workout** 52:12

**work-related** 11:19

**works** 68:12,21

---
Y
---

**yet** 34:5,21 37:5
58:2,5 67:14 68:6
72:10

**Yours** 95:18

**you've** 4:15 17:15
48:4 60:6 61:2
66:13 69:19 84:10
90:12,14