

Transcript of **APRIL MARIE RECTOR**

**Date:** November 17, 2014

**Case:** MAHDAVI v. NEXTGEAR CAPITAL, INC., ET AL

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Court Reporting | Videography | Videoconferencing | Interpretation | Transcription

**1**

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE EASTERN DISTRICT OF VIRGINIA

3            Alexandria Division

4    - - - - - - - - - - - - - - - -x

5    JODI C. MAHDAVI,           :

6         Plaintiff,       :

7      v.         : Case No.:

8    NEXTGEAR CAPITAL, INC., et   : 1:14-cv-00648-TSE-TCB

9    al.,           :

10        Defendants.    :

11   - - - - - - - - - - - - - - - -x

12

13       Deposition of PAR SERVICES, INC.,

14     By and through its Corporate Designee,

15        APRIL MARIE RECTOR

16           Washington, DC

17        Monday, November 17, 2014

18              2:32 p.m.

19

20   Job No.: 70226

21   Pages: 1 - 55

22   Reported By: Lee Bursten, RMR, CRR

**2**

1       Deposition of PAR SERVICES, INC., By and

2    through its Corporate Designee, APRIL MARIE RECTOR,

3    held at the offices of:

4

5

6            JACKSON & CAMPBELL PC

7            1120 Twentieth Street, NW

8               South Tower

9             Washington, DC 20036

10             (202) 457-1600

11

12

13

14

15       Pursuant to agreement, before Lee Bursten,

16   Registered Merit Reporter, Certified Realtime

17   Reporter, and Notary Public in and for the District

18   of Columbia, who officiated in administering the oath

19   to the witness.

20

21

22

**3**

1           A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFF:

3       JONATHAN EDWARD LEVINE, ESQUIRE

4       LEVINE DANIELS & ALLNUTT PLLC

5       5311 Lee Highway

6       Arlington, Virginia 22207

7       (703) 525-2668

8

9    ON BEHALF OF DEFENDANT PAR SERVICES INC.:

10      JAMES N. MARKELS, ESQUIRE

11      JACKSON & CAMPBELL PC

12      1120 Twentieth Street, NW, South Tower

13      Washington, DC 20036

14      (202) 457-1600

15

16   ON BEHALF OF DEFENDANT NEXTGEAR CAPITAL INC.:

17      JAMES D. BRAGDON, ESQUIRE

18      GALLAGHER EVELIUS & JONES LLP

19      218 North Charles Street, Suite 400

20      Baltimore, Maryland 21201

21      (410) 727-7702

22

**4**

1            C O N T E N T S

2    EXAMINATION OF APRIL MARIE RECTOR         PAGE

3    By Mr. Levine              5

4

5

6            E X H I B I T S

7    (Attached to transcript. Exhibit 2 was not introduced.)

8    PAR DEPOSITION EXHIBITS              PAGE

9    Exhibit 1   Notice of Deposition       6

10   Exhibit 3   Defendant PAR Services Inc.'s    18

11         Answers to Plaintiff's First Set

12         of Interrogatories

13   Exhibit 4   Defendant PAR Services Inc.'s    19

14         Responses to Plaintiff's First

15         Request for Production of

16         Documents

17   Exhibit 5   PAR document production      20

18   Exhibit 6   Maryland Notice of Security    39

19         Interest Filing

20   Exhibit 7   Mahdavi letter to PAR, 5/23/14   43

21

22

DEPOSITION OF CORPORATE DESIGNEE, APRIL MARIE RECTOR
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

5

1          P R O C E E D I N G S
2              APRIL MARIE RECTOR
3     having been duly sworn/affirmed, testified as
4              follows:
5          EXAMINATION BY COUNSEL FOR PLAINTIFF
6     BY MR. LEVINE:
7          Q    Would you please state your name.
8          A    Sure, it's April Marie Rector.
9          Q    And who is your employer?
10         A    PAR Services.
11         Q    And where is PAR Services located?
12         A    We're in Clinton, Maryland.
13         Q    And do you work in Clinton, Maryland?
14         A    I do.
15         Q    And what's the address in Clinton?
16         A    6504 Yochelson Place.  And the zip code is
17    20735.
18         Q    And what's your job title?
19         A    Manager.
20         Q    And what are your day-to-day
21    responsibilities?
22         A    Day-to-day, just kind of watch over

6

1     everything, any problems that come in I take care of,
2     handle the insurance.  Just managing the office
3     employees, things of that nature.
4          Q    What kind of business is PAR Services?
5          A    It's a repossession company.
6          Q    Does it do general towing or just
7     repossessions?
8          A    Just repossessions.
9          Q    And how long have you been at PAR Services?
10         A    I've been there 15 years.
11         Q    And how long have you been a manager there?
12         A    About ten years.
13         Q    So you were a manager in May of 2014?
14         A    Yes.
15         Q    And are you familiar with the facts and
16    circumstances of this case?
17         A    Yes.
18         Q    Okay.  And I would like for you to take a
19    look at what's been marked as PAR 1.
20              (PAR Exhibit 1 was marked for
21    identification and attached to the deposition
22    transcript.)

7

1          MR. MARKELS:  Is there a question pending?
2     I'm sorry.
3              MR. LEVINE:  I just asked her if she could
4     review it.
5          A    Sure.
6              Okay.  Yes.
7     BY MR. LEVINE:
8          Q    Have you seen this document before?
9          A    I don't recall seeing this one before.
10         Q    Do you understand you're here as the
11    corporate representative for PAR Services?
12         A    Yes.
13         Q    And to give testimony on the subject
14    matters that are identified in this notice of
15    deposition?
16         A    Yes.  I've gotten so many documents on it,
17    so everything kind of looks the same; but I
18    understand why I'm here.
19         Q    Sure.  Now, the notice of deposition
20    identifies several subject matters that you're called
21    on to give testimony to.  And are you here to give
22    testimony on each of these items?

8

1          A    In this deposition here?
2              MR. MARKELS:  To the extent that PAR knows
3     them.
4          A    Yes, so whatever questions I can answer.
5              MR. LEVINE:  I'll just ask you, don't
6     instruct your witness.  You can give an objection.
7              MR. MARKELS:  I'm just saying, she can only
8     testify as PAR's representative as to what PAR knows
9     personally.
10             MR. LEVINE:  I understand.  That's a
11    direction telling your witness how to testify.  You
12    can object, that's fine.  I would appreciate it if
13    you would not give instructions like that.
14    BY MR. LEVINE:
15         Q    Are there any of the designations that you
16    are unable to testify to?
17             MR. MARKELS:  I'm going to object as to
18    form.  Go ahead and answer.
19         A    Can you repeat that question one more time?
20    I'm sorry.
21    BY MR. LEVINE:
22         Q    Sure.  Of the subject matters that are

**9**

1    identified in the notice, are there any of them that
2    you are unable to provide testimony to?
3        A    Yes.
4        Q    Okay.  Which one?
5        A    Okay.  So there's -- there's a few.  Okay.
6    So the chain of title of the BMW, I don't understand
7    that.
8        Q    Is that because you don't have any
9    information on that?
10       A    Right.  I just have information on what was
11   supplied to us by NextGear.
12       Q    Okay.  But there's nobody else at PAR
13   Services who would have information on the chain of
14   title?
15       A    No.
16       Q    So you are able to testify that PAR
17   Services has no information on the chain of title?
18       A    Correct.
19       Q    Okay.  That's fine.  So to me that would
20   be, you can testify on that, just you would testify
21   what information PAR Services has on that subject
22   matter.

**10**

1        A    Correct.
2        Q    Can we be in agreement on that?
3        A    Yes.
4        Q    Okay.
5        A    I mean, some of these questions I don't
6    really understand.  You may have to, you know, break
7    them down for me a little bit.  There may be some
8    things that I don't understand.  Do you want me to
9    look through each individual one and tell you which
10   ones I don't understand?
11       Q    You can do that, sure.
12       A    Okay.  Or are we going to go through these
13   one by one?
14       Q    Probably not one by one.
15       A    Okay.
16       Q    Not individually.
17       A    Okay.  Because there's some information on
18   here that -- or some of the questions that I think I
19   would have to refer to NextGear.
20       Q    Okay.  Which ones?
21       A    Well, like the chain of title, for example,
22   that would be one.  NextGear's interest in the

**11**

1    subject BMW.
2        Q    So PAR Services has no information on
3    NextGear's interest in the --
4        A    Well, no, I'm sorry.  No.
5            I can't answer question number 25, PAR
6    Services's allegation that plaintiff does not have
7    good title to the subject BMW.  That would be a
8    question that I would have to direct towards
9    NextGear.  I just know the information that was
10   provided to me.  So I don't know -- that's a question
11   that I don't think I would be able to answer.
12       Q    Okay.  Is there anyone at PAR Services who
13   would have any information on whether or not
14   Mrs. Mahdavi had good title to the BMW?
15       A    No.  I think that may be -- okay.  I think
16   that may be -- I mean, I should be able to provide
17   you with answers to the best of my knowledge on the
18   rest of the information that's here.
19       Q    Okay.  Thank you.  Have you ever given a
20   deposition before?
21       A    I have.
22       Q    And so you understand that if you don't

**12**

1    understand a question, please let me know.
2        A    Yes.
3        Q    Okay.  And if you don't say anything, I'm
4    going to assume that you understand my question.  Is
5    that fair?
6        A    That's fair.
7        Q    How many times have you been deposed?
8        A    One.
9        Q    And when was this?
10       A    That was approximately a year ago.
11       Q    And where was this?
12       A    Which state?
13       Q    Yes.
14       A    It was in Maryland.
15       Q    And do you recall what the case was about?
16       A    It was a driver that we had working for us
17   at the time, was involved in an accident, and then I
18   just had to give testimony as to what his pay was,
19   his yearly pay, year to date, things like that, if he
20   was full-time, part-time employee.
21       Q    Okay.  And was this in a lawsuit?
22       A    It was.

13

1    Q    And was PAR Services a defendant?
2    A    No.  The driver that worked for us was
3  suing the person that had hit him, was basically
4  suing that company, and that insurance company.
5    Q    It didn't involve a repossession?
6    A    No.  No.  It had nothing to do with a
7  repossession.  He was driving a rollback and got
8  rear-ended.
9    Q    Have there been any other lawsuits against
10  PAR Services or relating to an allegation that PAR
11  Services improperly repossessed a vehicle?
12        MR. MARKELS:  Objection, relevance.  Go
13  ahead.
14    A    Not that I can recall, like recently in the
15  past year.  No.  Not that I can recall at the moment.
16  BY MR. LEVINE:
17    Q    Other than your attorney, have you
18  discussed the facts of this case with anybody?
19    A    Not after the repossession took place.
20  Like as far as any -- as far as giving information
21  for attorneys and such, no.
22    Q    So in preparing for your deposition, you

14

1  only spoke with your attorney?
2    A    Correct.
3    Q    Did you review any documents in preparation
4  for the deposition?
5    A    Just the documents that had been mailed to
6  me I believe by your office, just the things -- you
7  guys sent like a big stack of -- I was always getting
8  something in the mail.  So just that was pretty much
9  it.  I mean, other than that, no.  There's not a
10  whole lot to review.
11    Q    Okay.  Did anyone from NextGear provide any
12  documents to you?
13    A    No, not that I recall.  No.
14    Q    So what's your basis for the knowledge of
15  the facts and circumstances of this case?
16    A    As far as how are we involved, or like...
17    Q    How are you personally aware of PAR
18  Services's involvement?
19    A    With the repossession or with the current
20  lawsuit that's going on?
21    Q    Let's start with the current lawsuit.
22    A    Okay.  Just notification through mail.  I

15

1  mean, originally we were notified by Ms. Mahdavi's
2  attorney's office, which I don't believe it was you,
3  it was a female I had spoken to once or twice before
4  from your office.  And that -- you know, and then we
5  did the repossession, and then there was obviously
6  some issues.
7        And that's how we got involved, after the
8  repossession.
9    Q    Other than yourself, is there anyone else
10  at PAR Services who would have firsthand knowledge of
11  the repossession?
12    A    The agent that repossessed the vehicle.
13    Q    Who is that?
14    A    Terrence Kelley.
15    Q    Is that K-E-L-L-Y?
16    A    K-E-L-L-E-Y.
17    Q    Is he a PAR Services employee?
18    A    He is.
19    Q    And he was employed by PAR Services on the
20  date the BMW was repossessed?
21    A    He was, yes.
22    Q    And he was acting within the scope of his

16

1  employment?
2    A    He was.
3    Q    Have you discussed the repossession of the
4  vehicle with Mr. Kelley?
5    A    Just what occurred the night of the
6  repossession.
7    Q    When did you discuss that with him?
8    A    When it happened.
9    Q    And subsequent to that, did you have any
10  discussions with Mr. Kelley about the repossession?
11    A    No.  Just after it happened, just getting,
12  you know, the information from him as far as what
13  occurred, you know, after that.  I mean, it was just
14  what happened the night of the repossession.
15    Q    And what did he tell you had happened the
16  night of the repossession?
17    A    He went out to the location that was
18  provided to us by NextGear Capital.  He attempted to
19  repossess the BMW, knocked on the door to try and
20  obtain the keys, and I believe it was Ms. Mahdavi
21  that had come to the door.  She contacted her
22  husband, who advised her not to turn the car over.

DEPOSITION OF CORPORATE DESIGNEE, APRIL MARIE RECTOR
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

5 (Pages 17 to 20)

17

1          And so once he -- you know, once
2    Ms. Mahdavi and her husband I guess spoke or whatnot,
3    that she was not giving the keys up. So he left. He
4    hooked up to the car, which actually the car was
5    already hooked up. He knocked on the door after he
6    hooked it up to get the keys, and he left.
7          At which time, when he left, he left, he
8    stopped at a 7-Eleven not far from her house, went
9    inside, got some things, and then he was leaving the
10   parking lot of the 7-Eleven and he was approached by
11   a male driving another vehicle who tried to block him
12   in. He assumed it was Ms. Mahdavi's husband, because
13   he knew she had been on the phone with her -- with
14   him. So he left. The guy tried to run him off the
15   road a couple of times.
16         He found there was some roadwork going on.
17   He pulled over to where the cops were. He got out,
18   advised them what was happening. The gentleman who
19   actually tried to run him off the road, which I
20   believe was Ms. Mahdavi's husband, he got out as
21   well. They all had to give their IDs or
22   identification to the police officers who were there.

18

1          And so the police officers made the
2    determination that we were within the law to take the
3    vehicle and allowed the driver to proceed.
4       Q   Do you know the name of that officer?
5       A   It's on the -- there was a copy, and I
6    believe everybody should have a copy of it. It has
7    my business card and also has a case number and I
8    believe also has the officer's number on there, or
9    name and badge number.
10      Q   And you know all this from what Mr. Kelley
11   told you?
12      A   Correct.
13      Q   Did you ever speak to the police officer?
14      A   I did not.
15      Q   Did you speak to Mr. Mahdavi?
16      A   I did not.
17      Q   Have you ever spoken to Mrs. Mahdavi?
18      A   I have not.
19         (PAR Exhibit 3 was marked for
20   identification and attached to the deposition
21   transcript.)
22   BY MR. LEVINE:

19

1       Q   Take a moment to review this document.
2       A   Okay.
3       Q   And the answer to question number 1 states
4    that you were the person who answered, assisted, or
5    provided the information for the interrogatories with
6    the assistance of counsel?
7       A   Correct.
8       Q   And that nobody else other than counsel
9    assisted?
10      A   Correct.
11      Q   And are all the answers true and accurate
12   to the best of your knowledge?
13      A   Yes. Yes. No, everything's correct. I
14   was just -- yes. Everything is accurate.
15         (PAR Exhibit 4 was marked for
16   identification and attached to the deposition
17   transcript.)
18   BY MR. LEVINE:
19      Q   Take a moment and review this document.
20      A   Okay.
21      Q   It's been marked as PAR 4.
22      A   Okay.

20

1       Q   Are you familiar with this document?
2       A   I mean, there was so much -- I mean, yeah.
3    Yes. It all seems the same to me.
4       Q   To the best of your knowledge, is
5    everything true and accurate?
6       A   Yes. Oh, okay. Yes, this is -- these are
7    the emails here. Let me just take a look at this.
8       Q   I've got a stack of documents marked as PAR
9    5.
10         (PAR Exhibit 5 was marked for
11   identification and attached to the deposition
12   transcript.)
13      A   Okay.
14   BY MR. LEVINE:
15      Q   Are you familiar with those documents?
16      A   Yes.
17      Q   Those documents were produced by PAR in
18   response to the request for production of documents?
19      A   Yes.
20      Q   Does PAR have anything to add in response
21   to the request for production of documents?
22         MR. MARKELS: I'll just note, counsel, I

DEPOSITION OF CORPORATE DESIGNEE, APRIL MARIE RECTOR
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

6  (Pages 21 to 24)

21

1  sent you an email Friday with three additional
2  documents that were attached to it, 77 to 79.
3          MR. LEVINE:  Oh, okay.
4          MR. MARKELS:  I mean, I did.
5          MR. LEVINE:  Okay.
6          MR. MARKELS:  But barring that, go ahead
7  and answer.
8  BY MR. LEVINE:
9      Q    Okay.  With what counsel has said, and if
10  he says he sent it, I will go and look.
11          MR. LEVINE:  Do you recall what they were?
12          MR. MARKELS:  There was one that was -- if
13  you want to, I can go get you copies.  One was sort
14  of a report, inspection report of the BMW that has a
15  stamp on it from Manheim showing it had been
16  received.  Another one was a -- it had like the
17  police officer's ID as well as Ms. Rector's ID, as
18  well as some notes about the police officer case.
19          And then the last one was a fax cover page
20  from PenFed to PAR Services.  Does that sound
21  familiar?
22          MR. LEVINE:  Is that it?

22

1          MR. MARKELS:  What does it say at the
2  bottom?
3          MR. LEVINE:  "Per Pentagon this is her
4  employer info."
5          MR. MARKELS:  We had it marked PAR
6  Services.
7          MR. LEVINE:  This looks like 75.  Here's
8  76.  So what were the pages?
9          MR. MARKELS:  77 through 79.
10          MR. LEVINE:  77 through 79.  I don't think
11  I have those.  Can we take a quick two-minute break,
12  you can run and get them.
13          (Recess.)
14          MR. LEVINE:  So we are adding to what's
15  been marked as PAR 5, we are adding to that Bates
16  stamped documents PAR Services 000077, 78, and 79.
17          MR. MARKELS:  Yes.
18  BY MR. LEVINE:
19      Q    So now this is everything that's been
20  produced by PAR Services in this matter?
21      A    Yes.
22      Q    And to your knowledge, there's no

23

1  additional responsive documents?
2      A    No, not to my knowledge.  It was very
3  limited.
4      Q    Now, what's the relationship between PAR
5  Services and NextGear?
6      A    NextGear is a client of ours.  A business
7  relationship.  We repossess vehicles for them.
8      Q    How long has there been a business
9  relationship between them?
10      A    For several years.  At least four, five.
11      Q    Is there a written contract between PAR
12  Services and NextGear?
13      A    Yes.  When we initially started doing
14  business for them, there was a contract with a fee
15  schedule that was signed with NextGear.  But I have
16  not located that contract yet, the original from day
17  one.  And it may be something that I can pull and
18  submit.  I just haven't been able to go through all
19  my records yet.
20      Q    Okay.  And are you usually the point of
21  contact for PAR Services, between PAR Services and
22  NextGear?

24

1      A    I have been recently.  Over the years,
2  though, it's changed.  There's been different people
3  that, you know, have worked with NextGear.
4      Q    Yes.  So how about in April/May of 2014?
5      A    I had direct contact with NextGear at that
6  time.
7      Q    How about Denny Par [sic]?
8      A    Yes.  He was originally sent the
9  information in reference to the vehicle driven by
10  Ms. Mahdavi.
11      Q    The BMW?
12      A    Correct.
13      Q    And --
14      A    And the other vehicles that were listed on
15  the -- there was a repossession log sheet that had
16  numerous vehicles listed on it.
17      Q    That log was sent to Denny Par [sic]?
18      A    Correct.  It was emailed to him.
19      Q    Okay.  And do you know who emailed it to
20  him?
21      A    That would have been Dave Freeman.  But
22  there were other -- it kind of was like an email

Case 1:14-cv-00648-TCB Document 59-2 Filed 12/16/14 Page 8 of 25 PageID# 702
DEPOSITION OF CORPORATE DESIGNEE, APRIL MARIE RECTOR
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

7 (Pages 25 to 28)

25

1  where several people were listed on it.  But it was
2  emailed to Denny from Dave Freeman.
3      Q    Okay.  And do you know if that email has
4  been produced?
5      A    That email is in PAR 5.  So the
6  initial email starts on page 69 and it goes to page
7  74.
8      Q    Okay.  And Dennis Rector, Denny Rector?
9      A    Yes.
10     Q    Now, during Mr. Freeman's deposition, he
11 called him Denny Par.  Is that incorrect?
12     A    Yes.
13     Q    It's Denny Rector?
14     A    Denny Rector, yes.
15     Q    And what's your relationship to Denny
16 Rector?
17     A    He's my brother.
18     Q    So is PAR Services a family business?
19     A    Yes.
20     Q    Now, what did PAR Services do in
21 determining the location of the BMW?
22     A    We did not determine the location.  Dave

26

1  Freeman contacted Denny and said he had spotted the
2  vehicle at the residence's address.  He gave us the
3  address and asked us to go there and repossess the
4  BMW.
5      Q    And other than providing a list of vehicles
6  in the email attachment -- is that PAR Services
7  000073?
8      A    Oh, I'm sorry.  What was the question?
9      Q    On 73, is that the list of vehicles that
10 Mr. Freeman provided?
11     A    Yes, that would be the list of vehicles.
12 73 and page 74.
13     Q    Okay.  And did Mr. Freeman provide any
14 title work for any of the vehicles?
15     A    No.  He did not.  And generally they do
16 not, because we repossess such a large number of
17 vehicles for them, they send us the list over because
18 they finance dealerships, and Dave typically goes out
19 to the dealership and will call us and tell us, okay,
20 I've spotted five out of ten cars, they're here at
21 this dealership, come pick them up.
22         And most of the time, he meets my driver

27

1  out there and, you know, pinpoints the vehicles that
2  need to be picked up, and then gives the drivers the
3  paperwork there.  They'll have a list.  And then
4  he'll give them some more paperwork.
5      Q    What kind of paperwork does he usually
6  give?
7      A    A list similar to this.  Or -- you know, a
8  list like this.  I would have to pull other files
9  that we've done for him to, you know, let you know
10 for sure exactly what the paperwork is, because I
11 don't know off the top of my head.
12     Q    Okay.  But in this instance, he did not --
13 Mr. Freeman did not meet your driver when the vehicle
14 was repossessed?
15     A    No.
16         MR. MARKELS:  Wait until he asks the
17 question.  We had this problem in the last
18 deposition.  It's common.  Wait until he asks his
19 question.
20         THE WITNESS:  Okay.
21         MR. MARKELS:  Go ahead.
22 BY MR. LEVINE:

28

1      Q    Mr. Freeman did not meet your driver when
2  the BMW was repossessed?
3      A    He did not.
4      Q    The BMW was on Mrs. Mahdavi's property when
5  it was repossessed?
6      A    It was at the address that Dave provided
7  for us.  I'm assuming that's Ms. Mahdavi's property.
8      Q    But it was in her driveway?
9      A    It was in the driveway of the address -- I
10 believe this is the address here, 915 Fairway Drive.
11 Yes, the vehicle was sitting in the driveway at the
12 address provided.
13     Q    Did Mr. Kelley tell you that?
14     A    He verified the vehicle was there, yes.
15 He -- because they can't take a vehicle unless they
16 check the VIN number to make sure it matches up with
17 the paperwork.
18     Q    Okay.  So he entered onto Mrs. Mahdavi's
19 property?
20     A    He did.
21     Q    And checked the VIN while on her property?
22     A    He did.

---

29

1    Q    Did he have permission to be on her
2    property?
3    A    He -- whenever we do a repossession, we can
4    go onto the address and pick up the car, as long as
5    we don't breach the peace, and leave.
6    Q    What time of day was this that the car was
7    repossessed?
8    A    I don't know the exact time, but in the
9    early morning hours.
10   Q    It was about 1:30 in the morning?
11   A    Possibly.
12   Q    And he rang the doorbell at 1:30 in the
13   morning?
14   A    He knocked on the door.
15   Q    Did he ascertain whether anyone was home at
16   the time?
17   A    No.
18   Q    Do you know, did he ascertain whether
19   people were sleeping at 1:30 in the morning?
20   A    No.
21   Q    Okay.  What did he tell you happened when
22   he rang the doorbell?

---

30

1    A    He told me he hooked up to the vehicle and
2    knocked on the door to see if he could get the keys,
3    that there was a light on, and he went to the door,
4    knocked on the door, rang the doorbell, whatever it
5    was, and Ms. Mahdavi came to the door.
6    Q    So he noticed a light on before he knocked
7    on the door?
8    A    He said there was a light on, and then he
9    knocked on the door, if I can recall from -- I don't
10   know exactly, you know, what order he did that in.
11   Q    Okay.  Do you know which light was on?
12   A    He said there was a light on, so I don't
13   know.  I'm not going to say, because I'm not going to
14   assume.
15   Q    Okay.  Did he say how long it took
16   Mrs. Mahdavi to come to the door after he knocked on
17   it?
18   A    He did not.
19   Q    Are you aware of how long it took?
20   A    I am not.
21   Q    Do you know whether she was awake or sleep
22   at the time he knocked?

---

31

1    A    I don't know.
2    Q    Other than checking the VIN number of the
3    vehicle, did PAR Services do anything to ascertain
4    who had title to the BMW?
5    A    No.
6    Q    Is that typical, when you're repossessing a
7    vehicle, that you don't check to see who has title to
8    the vehicle?
9         MR. MARKELS:  Objection, relevance.  Go
10   ahead.
11        THE WITNESS:  Am I supposed to answer that?
12        MR. MARKELS:  Yes.
13        THE WITNESS:  Okay.
14   A    The way it works, our client sends over a
15   repossession order.  We go out to pick the vehicle
16   up.  It's up to our client to produce that
17   information.  They don't generally send us a title to
18   a vehicle, no.
19   BY MR. LEVINE:
20   Q    Okay.  When you say it's up to the client
21   to send that information, do you mean information on
22   the title?

---

32

1    A    For example, you're asking me if we had a
2    title to the vehicle.  No, we did not.  We didn't
3    need a title to repossess it.  We rely on the client
4    to have that information on their end.
5    Q    So you just assume your client has good
6    title?
7    A    Correct.
8    Q    Where did Mr. Kelley take the BMW after he
9    left the scene with the police officer?
10   A    He took it back to our storage facility in
11   Clinton, Maryland.
12   Q    Okay.  And so about what time did he arrive
13   in Clinton?
14   A    I don't know.
15   Q    And do you know what he did with the
16   vehicle when he got to the storage facility?
17   A    It was put into our storage lot and
18   secured.
19   Q    Is that indoors, outdoors?
20   A    Outdoors, with a -- you know, we have a
21   locked gate.  We have an individual who manages the
22   lot who checks the individuals in.

---

Case 1:14-cv-00648-TCB   Document 59-2   Filed 12/16/14   Page 10 of 25 PageID# 704
DEPOSITION OF CORPORATE DESIGNEE, APRIL-MARIE RECTOR
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

9  (Pages 33 to 36)

33

1    Q    And who is that?
2    A    His name is Joseph Atchison.
3    Q    Did PAR Services perform any kind of
4    inventory of the contents of the vehicle?
5    A    When the vehicle initially came in, it was
6    locked, and it remained locked for several days,
7    until we received something in the mail stating -- it
8    was like a certified letter I think Ms. Mahdavi had
9    sent in stating that she had some money and jewelry
10   in the vehicle. And so it was at that time that we
11   had the vehicle -- because it's a very hard
12   vehicle -- when it's locked up, it's very hard to
13   gain access to.
14        So once we received the certified letter,
15   and I don't remember which one of our guys, a guy who
16   worked for us, I don't remember which one it was,
17   opened it up. I was out there when they opened it
18   up. And the only thing that was in that vehicle was
19   some paperwork and a pair of boxing gloves.
20        Now, we could not -- did not gain access to
21   the trunk.
22   Q    So you were present when the car was

34

1    opened?
2    A    I was.
3    Q    And how was it opened?
4    A    It's called a break-in kit. It's a wire,
5    and they have to -- there's a wedge that they use to
6    kind of get the vehicle -- they have to create like a
7    pocket so they can get a tool in that unlocks the
8    vehicle.
9    Q    And I'm sorry, did you say you don't
10   remember who --
11   A    I don't remember, no. I don't.
12   Q    Okay. Do you have multiple employees who
13   would use the kit?
14   A    Yes, we do.
15   Q    And what was done with the contents of the
16   vehicle?
17   A    The contents of the vehicle? They remained
18   in the vehicle. We didn't take the contents out.
19   They remained in the vehicle and the vehicle was sent
20   to Manheim Auction. We notified NextGear what was in
21   there and left it in there. We did not remove
22   anything.

35

1    Q    Who wrote down the inventory?
2    A    I did.
3    Q    Do you recall whether there was a child
4    seat in the car?
5    A    There was not.
6    Q    How long was the BMW on PAR Services's
7    property?
8    A    I'm going to revert back to the documents
9    here. Let's see. We repossessed it on I believe --
10   this is a fax copy. It looks like May 20th. Yes.
11   May 20th is the date it was repossessed and it was
12   delivered to the auction on May 30th. So 5/20, 2014,
13   until 5/30, 2014, is when it remained in PAR's
14   possession.
15   Q    Do you know why PAR Services had it for ten
16   days?
17   A    We generally -- whenever we repossess a
18   vehicle, it generally sits on our lot until our
19   client requests that we deliver it.
20   Q    So who made the request that it be
21   delivered?
22   A    Dave Freeman requested the delivery.

36

1    Q    And his request was to take it to BW --
2    Baltimore-Washington Manheim?
3    A    Correct. BW Manheim, I get it confused
4    too.
5    Q    And who did Mr. Freeman make that request
6    to?
7    A    He made that request to me directly.
8    Q    By telephone?
9    A    Yes. I never met with Mr. Freeman in
10   person during this whole process here.
11   Q    Okay. Did you speak to Mr. Freeman at all
12   about Mrs. Mahdavi's claim that she owned the
13   vehicle?
14   A    Yes. I contacted him, because Pentagon
15   Federal Credit Union contacted us. So I called him
16   and I said, "Dave, I have a credit union calling us
17   saying that they own the vehicle, and they have faxed
18   me over some information." And that's when Dave said
19   "No, there's an ongoing suit that we have with her
20   husband," and I didn't really get into it with him.
21        I said, "I'll fax you this paper." He
22   said, "Don't worry about it, you're fine on your end,

Case 1:14-cv-00648-TCB   Document 59-2   Filed 12/16/14   Page 11 of 25 PageID# 705
DEPOSITION OF CORPORATE DESIGNEE, APRIL-MARIE RECTOR
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

10 (Pages 37 to 40)

---

37

1   the vehicle belongs to us, there's just some other
2   issues going on with the dealership that we
3   financed."
4       Q    Other than Dave Freeman, did you ever speak
5   to anyone else at NextGear about Mrs. Mahdavi's claim
6   that she owns the vehicle?
7       A    I spoke to Mr. Bragdon like once or twice,
8   but just to kind of send him the information and find
9   out what was going on with it.  You know, just -- it
10  was briefly.  It wasn't -- you know, I was just
11  trying to find out what was going on, because we were
12  receiving -- this was prior to us retaining counsel.
13         We were receiving stuff from your office,
14  and then stuff from the courts; so I was just trying
15  to find out what was going on.
16      Q    So other than Mr. Bragdon, but no employee
17  of NextGear other than Dave Freeman?
18      A    Not that -- no, not that I can recall.
19      Q    Not Lisa Long?
20      A    No.  I don't -- I don't recall ever
21  speaking to her.
22      Q    All right.  After PAR Services delivered

---

38

1   the vehicle to Baltimore-Washington Manheim, has PAR
2   Services ever had any involvement with the BMW
3   outside of the litigation?
4       A    No.
5       Q    Now, does PAR Services have insurance to
6   cover a loss in the event it repossesses a car that
7   it's not authorized to do?
8       A    Yes.
9       Q    And did you make an insurance claim?
10      A    I made the insurance claim.  I contacted
11  our insurance company, because we were named in this
12  lawsuit.  I originally contacted Mr. Bragdon and
13  NextGear to find out what was going on.  And when I
14  wasn't getting anywhere there, and I kept receiving
15  stuff in the mail, that's when I contacted our
16  insurance company and advised them that we were being
17  named in a lawsuit.
18         And I sent them, you know, what information
19  I had.  And then that's when they retained counsel on
20  our behalf.
21      Q    If you can look at what's been marked as
22  PAR 6.

---

39

1          (PAR Exhibit 6 was marked for
2   identification and attached to the deposition
3   transcript.)
4   BY MR. LEVINE:
5       Q    That's part of responses to request for
6   production of documents.  Do you recognize this
7   document?
8       A    I do.
9       Q    And did you receive this document from
10  Pentagon Federal Credit Union?
11      A    I did.
12      Q    And do you recall when you received it?
13      A    I received it the day of the repossession.
14      Q    And did you provide this document to
15  NextGear?
16      A    I don't know if I sent this -- wait.  Yes,
17  I did.  I did.  I faxed this to Dave Freeman, along
18  with there was a fax cover sheet that Pentagon
19  Federal Credit Union sent to me along with this, and
20  I faxed that to Dave the same day.
21      Q    But the vehicle had already been
22  repossessed?

---

40

1       A    Correct.  Yes.  This all came about after
2   the day it was repossessed.
3       Q    And do you know who at Pentagon Federal
4   Credit Union sent this to you?
5       A    Can I look back here?  It's on the fax
6   cover sheet.  It was sent from George Davis.
7       Q    Okay.
8       A    That's whose name was on the fax cover
9   sheet.
10      Q    All right.  And whose notes are those at
11  the bottom of the -- if you look at PAR 6, at the
12  bottom.
13      A    Those are my notes.  They were given to me
14  by Pentagon Federal Credit Union.
15      Q    And the vehicle was still on your lot when
16  this was given to you?
17      A    Correct.
18      Q    Did NextGear ever show you the title that
19  they possessed to the BMW?
20      A    No, I never received a copy of that.
21      Q    So is this the only title that you ever saw
22  to the BMW?

Case 1:14-cv-00648-TCB   Document 59-2   Filed 12/16/14   Page 12 of 25 PageID# 706
DEPOSITION OF CORPORATE DESIGNEE, APRIL-MARIE RECTOR
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

11 (Pages 41 to 44)

41

1    A    It is.
2         MR. MARKELS:  Objection.  Not reflected
3    there, and irrelevant.  Go ahead and answer to the
4    extent you can.
5    A    I believe this is, yes, the only copy that
6    I saw.
7    BY MR. LEVINE:
8    Q    Okay.  Other than this document, did you
9    see any other documents that would have indicated
10   ownership of the BMW?
11        MR. MARKELS:  Again, objection.  That's not
12   what it states.  But go ahead and answer as best you
13   can.
14   A    Can you repeat the question?
15   BY MR. LEVINE:
16   Q    Other than this document, did you see any
17   other document that would indicate ownership of the
18   BMW?
19        MR. MARKELS:  Same objection.  Go ahead.
20   A    Nothing with Ms. Mahdavi's name on it.  No.
21   This is the only -- again, the only title that I
22   recall seeing with anybody's name on it.

42

1    BY MR. LEVINE:
2    Q    Okay.  So you didn't see any document that
3    had NextGear's name on it stating that it owned or
4    had an interest in the BMW?
5    A    The email that was forwarded to us.
6    Q    And nothing else besides the email?
7    A    No.
8    Q    Did Mr. Kelley ever tell you any statements
9    that Mrs. Mahdavi made to him?
10   A    No.
11   Q    Has PAR Services done any investigation on
12   whether or not Mrs. Mahdavi owns the BMW?
13   A    No.  We were always contacted by Pentagon
14   Federal Credit Union or your attorneys' office.
15   Q    So is it fair to say that what PAR Services
16   knows about Mrs. Mahdavi's interest in the vehicle,
17   it only knows what others have told it?
18   A    Correct.
19   Q    And does PAR Services have any information
20   that would show that Mrs. Mahdavi was involved in any
21   fraudulent activity with respect to the BMW?
22   A    We would have no knowledge of that.

43

1         (PAR Exhibit 7 was marked for
2    identification and attached to the deposition
3    transcript.)
4    BY MR. LEVINE:
5    Q    If you could look at what's been marked as
6    PAR 7.
7    A    Okay.
8    Q    Do you recognize this document?
9    A    I do.
10   Q    And had you seen this letter prior to
11   preparing for the deposition?
12   A    Yes.  This is the letter that I received or
13   that PAR had received via certified mail.  And this
14   is the letter that prompted us to go into the vehicle
15   to see if there were any belongings in there.  And
16   that's how we determined there was no money and no
17   jewelry.
18   Q    Now, if Pentagon Federal Credit Union sent
19   you information on the 20th, regarding its interest
20   in the vehicle, why did you wait until you received
21   this letter before going into the car to inventory
22   it?

44

1    A    Repeat that again.  I'm sorry.
2    Q    If you knew that Pentagon Federal Credit
3    Union was claiming interest in the vehicle, but you
4    didn't do an inventory at that time?
5    A    Well, the driver did a condition report and
6    indicated on the condition report that the vehicle
7    was locked.  We didn't have any need to go into the
8    vehicle at that time.  We didn't feel a need to go
9    into the vehicle until we received this letter.
10   Q    And why did you feel a need to do it
11   because of the letter?
12   A    Because the customer -- Ms. Mahdavi, was
13   insinuating that there was money and a Cartier watch
14   in the vehicle.  So at that time, we felt that it was
15   necessary to check into the vehicle, to get into the
16   vehicle to see if there was any of these items in
17   there.  You know, when somebody says there's money or
18   a watch, then -- other than that, we try to stay out
19   of the vehicle as much as possible unless we need to
20   go into the vehicle.
21   Q    The vehicle was on PAR Services's secured
22   lot?

45

1     A    Correct.
2     Q    So if the vehicle would have stayed locked,
3  nothing would have been removed from the vehicle?
4     A    Correct.
5     Q    So why did you feel the need to open the
6  vehicle, again?
7     A    Again, you know, when Ms. Mahdavi is
8  claiming there is $2500 and a Cartier watch in the
9  vehicle, before that vehicle leaves to go to auction,
10  we want to see if these items are actually in there,
11  because once it leaves our lot and goes to the
12  auctions, you know, at that point if these items were
13  in there and it went to the auction, the auction
14  could easily come back and say no, this vehicle was
15  delivered here, there was nothing in the vehicle.
16       So we needed to remove that liability from
17  us.
18     Q    Do you only inventory vehicles if a vehicle
19  owner makes an allegation that there's specific
20  contents in it?
21     A    No.  The vehicle is inventoried when it's
22  repossessed.  If they cannot get into the vehicle,

46

1  they have to put in that it's locked.  If they can
2  see items through the window, they'll write it on the
3  condition report.  Prior to a vehicle going into the
4  auction, we have to clean all the personal property
5  -- and that's another reason, we have to clean all
6  the personal property out of the vehicle prior to
7  sending it to the auction.
8       We have to make our best effort to get into
9  the vehicle if it's locked, because the vehicles
10  technically cannot be sent to the auction without the
11  property.  But with this particular vehicle, with
12  everything that was going on, you know, it was
13  unlocked, we did an inventory report, we told Dave
14  what was in it, he told us leave whatever is in there
15  in there, and send it to the auction.
16       Which there wasn't anything in there other
17  than a set of boxing gloves and some paperwork.
18     Q    But if the letter didn't come in and it was
19  going to auction, you would have opened the vehicle
20  and inventoried it?
21     A    Yes.  Yes.
22     Q    So you didn't need the letter to make the

47

1  determination?
2     A    No.  But when we received the letter, we
3  immediately went into the vehicle, so they didn't
4  unlock it the day before it was going to the auction.
5  We got the vehicle on the 20th.  And when did we
6  receive the letter?  The 23rd.  So -- or whatever
7  date the -- was it the 23rd?
8       She sent the letter -- I don't know if we
9  received it on the 23rd or if that's the date that
10  she wrote it.  Oh, the 23rd.  That's the day we went
11  into it.  The day that we received the letter.
12     Q    Do you have any knowledge of NextGear's
13  claims against BW Auto?
14     A    No.
15     Q    Has PAR Services had any involvement in the
16  litigation between NextGear services and BW Auto?
17     A    No.
18     Q    You haven't had to give any testimony in
19  that matter?
20     A    No.
21     Q    Provide any documents?
22     A    No.  The only documents that I've provided

48

1  have been to our attorney and the documents that I
2  had -- that are in here that were sent to Dave
3  Freeman.
4     Q    Do you know who PAR Services dealt with at
5  Manheim when the BMW was being delivered?
6     A    Not specifically.  They would have dropped
7  it off, and when they go to the gate, they check the
8  vehicle in, get their condition report stamped, and
9  then they are told where to put the vehicle at.
10     Q    So the document that's PAR Services 000079?
11     A    Yes.  I don't have a number on the bottom
12  here, but I'll take your word for it.
13     Q    This.
14     A    That's it, yes.
15     Q    What's Securitas Security?
16     A    That's just the Spanish and English.
17     Q    That's not a company name?
18     A    No.  It's security -- I'm assuming --
19  because they have Spanish speaking drivers, so I'm
20  almost certain -- does anybody know Spanish in the
21  room?  I think that's Spanish for "security."
22     Q    Where it says "Subject to inspection,"

DEPOSITION OF CORPORATE DESIGNEE, APRIL-MARIE RECTOR
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

49

1    "date, time, and security," there's no Spanish.
2        A    No, sir, I don't know, is that a Spanish
3    word? I'm just asking. I don't know. Is that
4    "security" in Spanish?
5        Q    I don't know.
6        A    This is the auction -- this is what they
7    stamped on here.
8        Q    Okay. And it says in handwriting above
9    that, "Deliv to BW," it looks like "AE."
10       A    Right.
11       Q    What's BWAE?
12       A    Baltimore-Washington Auto Exchange.
13       Q    And is that Manheim?
14       A    It is.
15       Q    Did you ever speak to George Davis at
16   Pentagon Federal?
17       A    Yes, I did. He's the one that initiated
18   the -- kind of got the ball rolling, I guess.
19       Q    And what was your conversation with him?
20       A    He contacted our office and stated that we
21   repossessed the vehicle and that they did not order
22   the repossession. And I pulled up Pentagon Federal

50

1    Credit Union in our system and I saw that we didn't
2    have any vehicles for them currently on our lot. And
3    so that's when I pulled up the last six of the VIN
4    number, and then saw that it was for NextGear.
5        Q    And you provided that information to him?
6        A    I did.
7        Q    Did you just have one --
8        A    Actually no. I did not provide that
9    information to him. I told him I would need to get
10   his number and contact him back. Because at that
11   point, I didn't know if it was him. We get people
12   that call in all the time and say they're this person
13   or that person.
14            So I needed to be able to identify that
15   that was actually Pentagon Federal Credit Union and
16   that it wasn't a bogus call. So I told him I would
17   call him back. So I found a number for Pentagon
18   Federal Credit Union that I knew was a good number.
19   I contacted that number. And that time I actually
20   got a woman on the phone who I spoke with.
21       Q    Do you recall who that person was?
22       A    I don't remember her name. She's the

51

1    person that gave me this information here.
2        Q    Why was she giving you information about
3    Mrs. Mahdavi's employer?
4        A    She was just giving me information on
5    Ms. Mahdavi. I explained to her we picked up the car
6    for NextGear. She was saying, "No, we have this loan
7    through somebody else," and she gave me the
8    information that she had. You know, it wasn't
9    something that I requested. She just said, "Here's
10   the information that I have, this is our vehicle that
11   we financed and this is what we have on file."
12       Q    When you say this is what we have financed,
13   did she give you information about the loan,
14   Mrs. Mahdavi's loan?
15       A    No. Well, they sent over the title. And I
16   don't know if the loan information is on the cover
17   sheet. But she just said that they had a -- that
18   that car was currently -- they held the note on that
19   car.
20       Q    Okay.
21       A    So repossession verification. Okay. So
22   they just sent the verification sheet. So no, they

52

1    didn't send me the terms of the contract or anything
2    like that.
3        Q    Okay. So they -- what number is that,
4    PAR...
5        A    6.
6        Q    6. That was sent to you as a followup to
7    your conversation with David George -- George Davis?
8        A    Correct. He faxed this information over.
9    He faxed it over and called. And that's when I
10   followed up and contacted Pentagon and spoke with the
11   woman there. And I don't remember her name.
12       Q    And did anyone at Pentagon Federal Credit
13   Union tell you -- give you any instructions on what
14   to do with the vehicle?
15       A    No.
16       Q    Did you ask for any instructions from them?
17       A    No. I gave them NextGear's information and
18   advised them to contact NextGear.
19       Q    And then you never heard back from Pentagon
20   Federal?
21       A    No.
22            MR. LEVINE: That's all I've got.

53

1    MR. BRAGDON: Nothing.

2    MR. MARKELS: Done. We'll read.

3    THE REPORTER: Mr. Markels, are you

4  ordering a copy of this transcript?

5    MR. MARKELS: Yes.

6    THE REPORTER: And Mr. Bragdon?

7    MR. BRAGDON: Yes.

8    (Signature having not been waived, the

9  deposition of PAR SERVICES, INC., By and through its

10  Corporate Designee, APRIL MARIE RECTOR, was concluded

11  at 3:39 p.m.)

54

1         ACKNOWLEDGEMENT OF DEPONENT

2       I, APRIL MARIE RECTOR, do hereby

3  acknowledge that I have read and examined the

4  foregoing testimony, and the same is a true, correct

5  and complete transcription of the testimony given by

6  me, and any corrections appear on the attached Errata

7  sheet signed by me.

8

9  _____  _____

10    (DATE)         (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22

55

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2       I, Lee Bursten, the officer before whom the

3  foregoing deposition was taken, do hereby certify

4  that the foregoing transcript is a true and correct

5  record of the testimony given; that said testimony

6  was taken by me stenographically and thereafter

7  reduced to typewriting under my direction; that

8  reading and signing was requested; and that I am

9  neither counsel for, related to, nor employed by any

10  of the parties to this case and have no interest,

11  financial or otherwise, in its outcome.

12       IN WITNESS WHEREOF, I have hereunto set my

13  hand and affixed my notarial seal this 27th day of

14  November, 2014.

15  My commission expires June 30, 2019.

16

17

18

19  _____

20  LEE BURSTEN

21  NOTARY PUBLIC IN AND FOR

22  THE DISTRICT OF COLUMBIA

**A**

**able**
9:16 11:11,16
  23:18 50:14
**access**
33:13,20
**accident**
12:17
**accurate**
19:11,14 20:5
**acknowledge**
54:3
**ACKNOWLE...**
54:1
**acting**
15:22
**activity**
42:21
**add**
20:20
**adding**
22:14,15
**additional**
21:1 23:1
**address**
5:15 26:2,3 28:6
  28:9,10,12 29:4
**administering**
2:18
**advised**
16:22 17:18
  38:16 52:18
**AE**
49:9
**affixed**
55:13
**agent**
15:12
**ago**
12:10
**agreement**
2:15 10:2
**ahead**
8:18 13:13 21:6
  27:21 31:10
  41:3,12,19
**al**

**1:9**
**Alexandria**
1:3
**allegation**
11:6 13:10 45:19
**ALLNUTT**
3:4
**allowed**
18:3
**answer**
8:4,18 11:5,11
  19:3 21:7 31:11
  41:3,12
**answered**
19:4
**answers**
4:11 11:17 19:11
**anybody**
13:18 48:20
**anybody's**
41:22
**appear**
54:6
**appreciate**
8:12
**approached**
17:10
**approximately**
12:10
**April**
1:15 2:2 4:2 5:2,8
  53:10 54:2
**April/May**
24:4
**Arlington**
3:6
**arrive**
32:12
**ascertain**
29:15,18 31:3
**asked**
7:3 26:3
**asking**
32:1 49:3
**asks**
27:16,18
**assistance**

**19:6**
**assisted**
19:4,9
**assume**
12:4 30:14 32:5
**assumed**
17:12
**assuming**
28:7 48:18
**Atchison**
33:2
**attached**
4:7 6:21 18:20
  19:16 20:11
  21:3 39:2 43:2
  54:6
**attachment**
26:6
**attempted**
16:18
**attorney**
13:17 14:1 48:1
**attorneys**
13:21 42:14
**attorney's**
15:2
**auction**
34:20 35:12 45:9
  45:13,13 46:4,7
  46:10,15,19
  47:4 49:6
**auctions**
45:12
**authorized**
38:7
**Auto**
47:13,16 49:12
**awake**
30:21
**aware**
14:17 30:19

**B**

**B**
4:6
**back**
32:10 35:8 40:5
  45:14 50:10,17

**52:19**
**badge**
18:9
**ball**
49:18
**Baltimore**
3:20
**Baltimore-Was...**
36:2 38:1 49:12
**barring**
21:6
**basically**
13:3
**basis**
14:14
**Bates**
22:15
**behalf**
3:2,9,16 38:20
**believe**
14:6 15:2 16:20
  17:20 18:6,8
  28:10 35:9 41:5
**belongings**
43:15
**belongs**
37:1
**best**
11:17 19:12 20:4
  41:12 46:8
**big**
14:7
**bit**
10:7
**block**
17:11
**BMW**
9:6 11:1,7,14
  15:20 16:19
  21:14 24:11
  25:21 26:4 28:2
  28:4 31:4 32:8
  35:6 38:2 40:19
  40:22 41:10,18
  42:4,12,21 48:5
**bogus**
50:16

**bottom**
22:2 40:11,12
  48:11
**boxing**
33:19 46:17
**Bragdon**
3:17 37:7,16
  38:12 53:1,6,7
**breach**
29:5
**break**
10:6 22:11
**break-in**
34:4
**briefly**
37:10
**brother**
25:17
**Bursten**
1:22 2:15 55:2,20
**business**
6:4 18:7 23:6,8
  23:14 25:18
**BW**
36:1,3 47:13,16
  49:9
**BWAE**
49:11

**C**

**C**
1:5 3:1 4:1 5:1
**call**
26:19 50:12,16,17
**called**
7:20 25:11 34:4
  36:15 52:9
**calling**
36:16
**CAMPBELL**
2:6 3:11
**Capital**
1:8 3:16 16:18
**car**
16:22 17:4,4 29:4
  29:6 33:22 35:4
  38:6 43:21 51:5
  51:18,19

card
18:7
care
6:1
cars
26:20
Cartier
44:13 45:8
case
1:7 6:16 12:15
 13:18 14:15
 18:7 21:18
 55:10
certain
48:20
CERTIFICATE
55:1
certified
2:16 33:8,14
 43:13
certify
55:3
chain
9:6,13,17 10:21
changed
24:2
Charles
3:19
check
28:16 31:7 44:15
 48:7
checked
28:21
checking
31:2
checks
32:22
child
35:3
circumstances
6:16 14:15
claim
36:12 37:5 38:9
 38:10
claiming
44:3 45:8
claims

47:13
clean
46:4,5
client
23:6 31:14,16,20
 32:3,5 35:19
Clinton
5:12,13,15 32:11
 32:13
code
5:16
Columbia
2:18 55:22
come
6:1 16:21 26:21
 30:16 45:14
 46:18
commission
55:15
common
27:18
company
6:5 13:4,4 38:11
 38:16 48:17
complete
54:5
concluded
53:10
condition
44:5,6 46:3 48:8
confused
36:3
contact
23:21 24:5 50:10
 52:18
contacted
16:21 26:1 36:14
 36:15 38:10,12
 38:15 42:13
 49:20 50:19
 52:10
contents
33:4 34:15,17,18
 45:20
contract
23:11,14,16 52:1
conversation

49:19 52:7
copies
21:13
cops
17:17
copy
18:5,6 35:10
 40:20 41:5 53:4
corporate
1:14 2:2 7:11
 53:10
correct
9:18 10:1 14:2
 18:12 19:7,10
 19:13 24:12,18
 32:7 36:3 40:1
 40:17 42:18
 45:1,4 52:8 54:4
 55:4
corrections
54:6
counsel
5:5 19:6,8 20:22
 21:9 37:12
 38:19 55:9
couple
17:15
COURT
1:1
courts
37:14
cover
21:19 38:6 39:18
 40:6,8 51:16
create
34:6
credit
36:15,16 39:10,19
 40:4,14 42:14
 43:18 44:2 50:1
 50:15,18 52:12
CRR
1:22
current
14:19,21
currently
50:2 51:18

customer
44:12

D

D
3:17 5:1
DANIELS
3:4
date
12:19 15:20
 35:11 47:7,9
 49:1 54:10
Dave
24:21 25:2,22
 26:18 28:6
 35:22 36:16,18
 37:4,17 39:17
 39:20 46:13
 48:2
David
52:7
Davis
40:6 49:15 52:7
day
23:16 29:6 39:13
 39:20 40:2 47:4
 47:10,11 55:13
days
33:6 35:16
day-to-day
5:20,22
DC
1:16 2:9 3:13
dealership
26:19,21 37:2
dealerships
26:18
dealt
48:4
defendant
3:9,16 4:10,13
 13:1
Defendants
1:10
Deliv
49:9
deliver
35:19

delivered
35:12,21 37:22
 45:15 48:5
delivery
35:22
Dennis
25:8
Denny
24:7,17 25:2,8,11
 25:13,14,15
 26:1
DEPONENT
54:1
deposed
12:7
deposition
1:13 2:1 4:8,9
 6:21 7:15,19 8:1
 11:20 13:22
 14:4 18:20
 19:16 20:11
 25:10 27:18
 39:2 43:2,11
 53:9 55:3
designations
8:15
Designee
1:14 2:2 53:10
determination
18:2 47:1
determine
25:22
determined
43:16
determining
25:21
different
24:2
direct
11:8 24:5
direction
8:11 55:7
directly
36:7
discuss
16:7
discussed

13:18 16:3
**discussions**
16:10
**District**
1:1,2 2:17 55:22
**Division**
1:3
**document**
4:17 7:8 19:1,19
20:1 39:7,9,14
41:8,16,17 42:2
43:8 48:10
**documents**
4:16 7:16 14:3,5
14:12 20:8,15
20:17,18,21
21:2 22:16 23:1
35:8 39:6 41:9
47:21,22 48:1
**doing**
23:13
**door**
16:19,21 17:5
29:14 30:2,3,4,5
30:7,9,16
**doorbell**
29:12,22 30:4
**Drive**
28:10
**driven**
24:9
**driver**
12:16 13:2 18:3
26:22 27:13
28:1 44:5
**drivers**
27:2 48:19
**driveway**
28:8,9,11
**driving**
13:7 17:11
**dropped**
48:6
**duly**
5:3

———————
E
———————
**E**

3:1,1 4:1,6 5:1,1
**early**
29:9
**easily**
45:14
**EASTERN**
1:2
**EDWARD**
3:3
**effort**
46:8
**email**
21:1 24:22 25:3,5
25:6 26:6 42:5,6
**emailed**
24:18,19 25:2
**emails**
20:7
**employed**
15:19 55:9
**employee**
12:20 15:17
37:16
**employees**
6:3 34:12
**employer**
5:9 22:4 51:3
**employment**
16:1
**English**
48:16
**entered**
28:18
**Errata**
54:6
**ESQUIRE**
3:3,10,17
**et**
1:8
**EVELIUS**
3:18
**event**
38:6
**everybody**
18:6
**everything's**
19:13

**exact**
29:8
**exactly**
27:10 30:10
**EXAMINATION**
4:2 5:5
**examined**
54:3
**example**
10:21 32:1
**Exchange**
49:12
**Exhibit**
4:7,9,10,13,17,18
4:20 6:20 18:19
19:15 20:10
39:1 43:1
**EXHIBITS**
4:8
**expires**
55:15
**explained**
51:5
**extent**
8:2 41:4

———————
F
———————
**facility**
32:10,16
**facts**
6:15 13:18 14:15
**fair**
12:5,6 42:15
**Fairway**
28:10
**familiar**
6:15 20:1,15
21:21
**family**
25:18
**far**
13:20,20 14:16
16:12 17:8
**fax**
21:19 35:10
36:21 39:18
40:5,8
**faxed**

36:17 39:17,20
52:8,9
**Federal**
36:15 39:10,19
40:3,14 42:14
43:18 44:2
49:16,22 50:15
50:18 52:12,20
**fee**
23:14
**feel**
44:8,10 45:5
**felt**
44:14
**female**
15:3
**file**
51:11
**files**
27:8
**Filing**
4:19
**finance**
26:18
**financed**
37:3 51:11,12
**financial**
55:11
**find**
37:8,11,15 38:13
**fine**
8:12 9:19 36:22
**First**
4:11,14
**firsthand**
15:10
**five**
23:10 26:20
**followed**
52:10
**follows**
5:4
**followup**
52:6
**foregoing**
54:4 55:3,4
**form**

8:18
**forwarded**
42:5
**found**
17:16 50:17
**four**
23:10
**fraudulent**
42:21
**Freeman**
24:21 25:2 26:1
26:10,13 27:13
28:1 35:22 36:5
36:9,11 37:4,17
39:17 48:3
**Freeman's**
25:10
**Friday**
21:1
**full-time**
12:20

———————
G
———————
**G**
5:1
**gain**
33:13,20
**GALLAGHER**
3:18
**gate**
32:21 48:7
**general**
6:6
**generally**
26:15 31:17
35:17,18
**gentleman**
17:18
**George**
40:6 49:15 52:7,7
**getting**
14:7 16:11 38:14
**give**
7:13,21,21 8:6,13
12:18 17:21
27:4,6 47:18
51:13 52:13
**given**

Case 1:14-cv-00648-TCB   Document 59-2   Filed 12/16/14   Page 19 of 25 PageID# 713
DEPOSITION OF CORPORATE DESIGNEE: APRIL MARIE RECTOR
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

59

11:19 40:13,16
54:5 55:5
**gives**
27:2
**giving**
13:20 17:3 51:2,4
**gloves**
33:19 46:17
**go**
8:18 10:12 13:12
21:6,10,13
23:18 26:3
27:21 29:4 31:9
31:15 41:3,12
41:19 43:14
44:7,8,20 45:9
48:7
**goes**
25:6 26:18 45:11
**going**
8:17 10:12 12:4
14:20 17:16
30:13,13 35:8
37:2,9,11,15
38:13 43:21
46:3,12,19 47:4
**good**
11:7,14 32:5
50:18
**gotten**
7:16
**guess**
17:2 49:18
**guy**
17:14 33:15
**guys**
14:7 33:15

---
**H**

**H**
4:6
**hand**
55:13
**handle**
6:2
**handwriting**
49:8
**happened**

16:8,11,14,15
29:21
**happening**
17:18
**hard**
33:11,12
**head**
27:11
**heard**
52:19
**held**
2:3 51:18
**hereunto**
55:12
**he'll**
27:4
**Highway**
3:5
**hit**
13:3
**home**
29:15
**hooked**
17:4,5,6 30:1
**hours**
29:9
**house**
17:8
**husband**
16:22 17:2,12,20
36:20

---
**I**

**ID**
21:17,17
**identification**
6:21 17:22 18:20
19:16 20:11
39:2 43:2
**identified**
7:14 9:1
**identifies**
7:20
**identify**
50:14
**IDs**
17:21
**immediately**

47:3
**improperly**
13:11
**incorrect**
25:11
**indicate**
41:17
**indicated**
41:9 44:6
**individual**
10:9 32:21
**individually**
10:16
**individuals**
32:22
**indoors**
32:19
**info**
22:4
**information**
9:9,10,13,17,21
10:17 11:2,9,13
11:18 13:20
16:12 19:5 24:9
31:17,21,21
32:4 36:18 37:8
38:18 42:19
43:19 50:5,9
51:1,2,4,8,10,13
51:16 52:8,17
**initial**
25:6
**initially**
23:13 33:5
**initiated**
49:17
**inside**
17:9
**insinuating**
44:13
**inspection**
21:14 48:22
**instance**
27:12
**instruct**
8:6
**instructions**

8:13 52:13,16
**insurance**
6:2 13:4 38:5,9
38:10,11,16
**interest**
4:19 10:22 11:3
42:4,16 43:19
44:3 55:10
**interrogatories**
4:12 19:5
**introduced**
4:7
**inventoried**
45:21 46:20
**inventory**
33:4 35:1 43:21
44:4 45:18
46:13
**investigation**
42:11
**involve**
13:5
**involved**
12:17 14:16 15:7
42:20
**involvement**
14:18 38:2 47:15
**irrelevant**
41:3
**issues**
15:6 37:2
**items**
7:22 44:16 45:10
45:12 46:2

---
**J**

**JACKSON**
2:6 3:11
**JAMES**
3:10,17
**jewelry**
33:9 43:17
**job**
1:20 5:18
**JODI**
1:5
**JONATHAN**
3:3

**JONES**
3:18
**Joseph**
33:2
**June**
55:15

---
**K**

**Kelley**
15:14 16:4,10
18:10 28:13
32:8 42:8
**kept**
38:14
**keys**
16:20 17:3,6 30:2
**kind**
5:22 6:4 7:17
24:22 27:5 33:3
34:6 37:8 49:18
**kit**
34:4,13
**knew**
17:13 44:2 50:18
**knocked**
16:19 17:5 29:14
30:2,4,6,9,16,22
**know**
10:6 11:9,10 12:1
15:4 16:12,13
17:1 18:4,10
24:3,19 25:3
27:1,7,9,9,11
29:8,18 30:10
30:10,11,13,21
31:1 32:14,15
32:20 35:15
37:9,10 38:18
39:16 40:3
44:17 45:7,12
46:12 47:8 48:4
48:20 49:2,3,5
50:11 51:8,16
**knowledge**
11:17 14:14
15:10 19:12
20:4 22:22 23:2
42:22 47:12

**knows**
8:2,15 42:16,17
**K-E-L-L-E-Y**
15:16
**K-E-L-L-Y**
15:15

**L**

**large**
26:16
**law**
18:2
**lawsuit**
12:21 14:20,21
38:12,17
**lawsuits**
13:9
**leave**
29:5 46:14
**leaves**
45:9,11
**leaving**
17:9
**Lee**
1:22 2:15 3:5
55:2,20
**left**
17:3,6,7,7,14 32:9
34:21
**letter**
4:20 33:8,14
43:10,12,14,21
44:9,11 46:18
46:22 47:2,6,8
47:11
**Let's**
14:21 35:9
**Levine**
3:3,4 4:3 5:6 7:3
7:7 8:5,10,14,21
13:16 18:22
19:18 20:14
21:3,5,8,11,22
22:3,7,10,14,18
27:22 31:19
39:4 41:7,15
42:1 43:4 52:22
**liability**

**45:16**
**light**
30:3,6,8,11,12
**limited**
23:3
**Lisa**
37:19
**list**
26:5,9,11,17 27:3
27:7,8
**listed**
24:14,16 25:1
**litigation**
38:3 47:16
**little**
10:7
**LLP**
3:18
**loan**
51:6,13,14,16
**located**
5:11 23:16
**location**
16:17 25:21,22
**locked**
32:21 33:6,6,12
44:7 45:2 46:1,9
**log**
24:15,17
**long**
6:9,11 23:8 29:4
30:15,19 35:6
37:19
**look**
6:19 10:9 20:7
21:10 38:21
40:5,11 43:5
**looks**
7:17 22:7 35:10
49:9
**loss**
38:6
**lot**
14:10 17:10
32:17,22 35:18
40:15 44:22
45:11 50:2

**M**

**Mahdavi**
1:5 4:20 11:14
16:20 17:2
18:15,17 24:10
30:5,16 33:8
42:9,12,20
44:12 45:7 51:5
**Mahdavi's**
15:1 17:12,20
28:4,7,18 36:12
37:5 41:20
42:16 51:3,14
**mail**
14:8,22 33:7
38:15 43:13
**mailed**
14:5
**male**
17:11
**manager**
5:19 6:11,13
**manages**
32:21
**managing**
6:2
**Manheim**
21:15 34:20 36:2
36:3 38:1 48:5
49:13
**Marie**
1:15 2:2 4:2 5:2,8
53:10 54:2
**marked**
6:19,20 18:19
19:15,21 20:8
20:10 22:5,15
38:21 39:1 43:1
43:5
**Markels**
3:10 7:1 8:2,7,17
13:12 20:22
21:4,6,12 22:1,5
22:9,17 27:16
27:21 31:9,12
41:2,11,19 53:2
53:3,5

**Maryland**
3:20 4:18 5:12,13
12:14 32:11
**matches**
28:16
**matter**
9:22 22:20 47:19
**matters**
7:14,20 8:22
**mean**
10:5 11:16 14:9
15:1 16:13 20:2
20:2 21:4 31:21
**meet**
27:13 28:1
**meets**
26:22
**Merit**
2:16
**met**
36:9
**moment**
13:15 19:1,19
**Monday**
1:17
**money**
33:9 43:16 44:13
44:17
**morning**
29:9,10,13,19
**multiple**
34:12

**N**

**N**
3:1,10 4:1,1 5:1
**name**
5:7 18:4,9 33:2
40:8 41:20,22
42:3 48:17
50:22 52:11
**named**
38:11,17
**nature**
6:3
**necessary**
44:15
**need**

**27:2 32:3 44:7,8**
44:10,19 45:5
46:22 50:9
**needed**
45:16 50:14
**neither**
55:9
**never**
36:9 40:20 52:19
**NextGear**
1:8 3:16 9:11
10:19 11:9
14:11 16:18
23:5,6,12,15,22
24:3,5 34:20
37:5,17 38:13
39:15 40:18
47:16 50:4 51:6
52:18
**NextGear's**
10:22 11:3 42:3
47:12 52:17
**night**
16:5,14,16
**North**
3:19
**notarial**
55:13
**Notary**
2:17 55:21
**note**
20:22 51:18
**notes**
21:18 40:10,13
**notice**
4:9,18 7:14,19
9:1
**noticed**
30:6
**notification**
14:22
**notified**
15:1 34:20
**November**
1:17 55:14
**number**
11:5 18:7,8,9

DEPOSITION OF CORPORATE DESIGNEE: APRIL MARIE RECTOR
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

61

19:3 26:16
28:16 31:2
48:11 50:4,10
50:17,18,19
52:3
**numerous**
24:16
**NW**
2:7 3:12

---

**O**

**O**
4:1 5:1
**oath**
2:18
**object**
8:12,17
**objection**
8:6 13:12 31:9
  41:2,11,19
**obtain**
16:20
**obviously**
15:5
**occurred**
16:5,13
**office**
6:2 14:6 15:2,4
  37:13 42:14
  49:20
**officer**
18:4,13 21:18
  32:9 55:2
**officers**
17:22 18:1
**officer's**
18:8 21:17
**offices**
2:3
**officiated**
2:18
**Oh**
20:6 21:3 26:8
  47:10
**okay**
6:18 7:6 9:4,5,5
  9:12,19 10:4,12
  10:15,17,20

11:12,15,19
12:3,21 14:11
14:22 19:2,20
19:22 20:6,13
21:3,5,9 23:20
24:19 25:3,8
26:13,19 27:12
27:20 28:18
29:21 30:11,15
31:13,20 32:12
34:12 36:11
40:7 41:8 42:2
43:7 49:8 51:20
51:21 52:3
**once**
15:3 17:1,1 33:14
  37:7 45:11
**ones**
10:10,20
**ongoing**
36:19
**open**
45:5
**opened**
33:17,17 34:1,3
  46:19
**order**
30:10 31:15
  49:21
**ordering**
53:4
**original**
23:16
**originally**
15:1 24:8 38:12
**outcome**
55:11
**outdoors**
32:19,20
**outside**
38:3
**owned**
36:12 42:3
**owner**
45:19
**ownership**
41:10,17

**owns**
37:6 42:12

---

**P**

**P**
3:1,1 5:1
**page**
4:2,8 21:19 25:6
  25:6 26:12
**pages**
1:21 22:8
**pair**
33:19
**paper**
36:21
**paperwork**
27:3,4,5,10 28:17
  33:19 46:17
**Par**
1:13 2:1 3:9 4:8
  4:10,13,17,20
  5:10,11 6:4,9,19
  6:20 7:11 8:2,8
  9:12,16,21 11:2
  11:5,12 13:1,10
  13:10 14:17
  15:10,17,19
  18:19 19:15,21
  20:8,10,17,20
  21:20 22:5,15
  22:16,20 23:4
  23:11,21,21
  24:7,17 25:5,11
  25:18,20 26:6
  31:3 33:3 35:6
  35:15 37:22
  38:1,5,22 39:1
  40:11 42:11,15
  42:19 43:1,6,13
  44:21 47:15
  48:4,10 52:4
  53:9
**parking**
17:10
**part**
39:5
**particular**
46:11

**parties**
55:10
**part-time**
12:20
**PAR's**
8:8 35:13
**pay**
12:18,19
**PC**
2:6 3:11
**peace**
29:5
**pending**
7:1
**PenFed**
21:20
**Pentagon**
22:3 36:14 39:10
  39:18 40:3,14
  42:13 43:18
  44:2 49:16,22
  50:15,17 52:10
  52:12,19
**people**
24:2 25:1 29:19
  50:11
**perform**
33:3
**permission**
29:1
**person**
13:3 19:4 36:10
  50:12,13,21
  51:1
**personal**
46:4,6
**personally**
8:9 14:17
**phone**
17:13 50:20
**pick**
26:21 29:4 31:15
**picked**
27:2 51:5
**pinpoints**
27:1
**place**

**parties**
5:16 13:19
**plaintiff**
1:6 3:2 5:5 11:6
**Plaintiff's**
4:11,14
**please**
5:7 12:1
**PLLC**
3:4
**pocket**
34:7
**point**
23:20 45:12
  50:11
**police**
17:22 18:1,13
  21:17,18 32:9
**possessed**
40:19
**possession**
35:14
**possible**
44:19
**Possibly**
29:11
**preparation**
14:3
**preparing**
13:22 43:11
**present**
33:22
**pretty**
14:8
**prior**
37:12 43:10 46:3
  46:6
**Probably**
10:14
**problem**
27:17
**problems**
6:1
**proceed**
18:3
**process**
36:10
**produce**

31:16
**produced**
20:17 22:20 25:4
**production**
4:15,17 20:18,21
39:6
**prompted**
43:14
**property**
28:4,7,19,21 29:2
35:7 46:4,6,11
**provide**
9:2 11:16 14:11
26:13 39:14
47:21 50:8
**provided**
11:10 16:18 19:5
26:10 28:6,12
47:22 50:5
**providing**
26:5
**Public**
2:17 55:1,21
**pull**
23:17 27:8
**pulled**
17:17 49:22 50:3
**Pursuant**
2:15
**put**
32:17 46:1 48:9

─────── **Q** ───────

**question**
7:1 8:19 11:5,8
11:10 12:1,4
19:3 26:8 27:17
27:19 41:14
**questions**
8:4 10:5,18
**quick**
22:11

─────── **R** ───────

**R**
3:1 5:1
**rang**
29:12,22 30:4

**read**
53:2 54:3
**reading**
55:8
**really**
10:6 36:20
**Realtime**
2:16
**rear-ended**
13:8
**reason**
46:5
**recall**
7:9 12:15 13:14
13:15 14:13
21:11 30:9 35:3
37:18,20 39:12
41:22 50:21
**receive**
39:9 47:6
**received**
21:16 33:7,14
39:12,13 40:20
43:12,13,20
44:9 47:2,9,11
**receiving**
37:12,13 38:14
**Recess**
22:13
**recognize**
39:6 43:8
**record**
55:5
**records**
23:19
**Rector**
1:15 2:2 4:2 5:2,8
25:8,8,13,14,16
53:10 54:2
**Rector's**
21:17
**reduced**
55:7
**refer**
10:19
**reference**
24:9

**reflected**
41:2
**regarding**
43:19
**Registered**
2:16
**related**
55:9
**relating**
13:10
**relationship**
23:4,7,9 25:15
**relevance**
13:12 31:9
**rely**
32:3
**remained**
33:6 34:17,19
35:13
**remember**
33:15,16 34:10,11
50:22 52:11
**remove**
34:21 45:16
**removed**
45:3
**repeat**
8:19 41:14 44:1
**report**
21:14,14 44:5,6
46:3,13 48:8
**Reported**
1:22
**Reporter**
2:16,17 53:3,6
**REPORTER-N...**
55:1
**repossess**
16:19 23:7 26:3
26:16 32:3
35:17
**repossessed**
13:11 15:12,20
27:14 28:2,5
29:7 35:9,11
39:22 40:2
45:22 49:21

**repossesses**
38:6
**repossessing**
31:6
**repossession**
6:5 13:5,7,19
14:19 15:5,8,11
16:3,6,10,14,16
24:15 29:3
31:15 39:13
49:22 51:21
**repossessions**
6:7,8
**representative**
7:11 8:8
**request**
4:15 20:18,21
35:20 36:1,5,7
39:5
**requested**
35:22 51:9 55:8
**requests**
35:19
**residence's**
26:2
**respect**
42:21
**response**
20:18,20
**responses**
4:14 39:5
**responsibilities**
5:21
**responsive**
23:1
**rest**
11:18
**retained**
38:19
**retaining**
37:12
**revert**
35:8
**review**
7:4 14:3,10 19:1
19:19
**right**
1:1

**repossesses**

**repossessing**

**repossession**

9:10 37:22 40:10
49:10
**RMR**
1:22
**road**
17:15,19
**roadwork**
17:16
**rollback**
13:7
**rolling**
49:18
**room**
48:21
**run**
17:14,19 22:12

─────── **S** ───────

**s**
3:1 4:1,6,10,13
5:1
**saw**
40:21 41:6 50:1,4
**saying**
8:7 36:17 51:6
**says**
21:10 44:17
48:22 49:8
**scene**
32:9
**schedule**
23:15
**scope**
15:22
**seal**
55:13
**seat**
35:4
**secured**
32:18 44:21
**Securitas**
48:15
**security**
4:18 48:15,18,21
49:1,4
**see**
30:2 31:7 35:9
41:9,16 42:2

41:9,16 42:2
43:15 44:16
45:10 46:2
**seeing**
7:9 41:22
**seen**
7:8 43:10
**send**
26:17 31:17,21
37:8 46:15 52:1
**sending**
46:7
**sends**
31:14
**sent**
14:7 21:1,10 24:8
24:17 33:9
34:19 38:18
39:16,19 40:4,6
43:18 46:10
47:8 48:2 51:15
51:22 52:6
**services**
1:13 2:1 3:9 4:10
4:13 5:10,11 6:4
6:9 7:11 9:13,17
9:21 11:2,12
13:1,10,11
15:10,17,19
21:20 22:6,16
22:20 23:5,12
23:21,21 25:18
25:20 26:6 31:3
33:3 35:15
37:22 38:2,5
42:11,15,19
47:15,16 48:4
48:10 53:9
**Services's**
11:6 14:18 35:6
44:21
**set**
4:11 46:17 55:12
**sheet**
24:15 39:18 40:6
40:9 51:17,22
54:7

**SHORTHAND**
55:1
**show**
40:18 42:20
**showing**
21:15
**sic**
24:7,17
**Signature**
53:8 54:10
**signed**
23:15 54:7
**signing**
55:8
**similar**
27:7
**sir**
49:2
**sits**
35:18
**sitting**
28:11
**six**
50:3
**sleep**
30:21
**sleeping**
29:19
**somebody**
44:17 51:7
**sorry**
7:2 8:20 11:4
26:8 34:9 44:1
**sort**
21:13
**sound**
21:20
**South**
2:8 3:12
**Spanish**
48:16,19,20,21
49:1,2,4
**speak**
18:13,15 36:11
37:4 49:15
**speaking**
37:21 48:19

**specific**
45:19
**specifically**
48:6
**spoke**
14:1 17:2 37:7
50:20 52:10
**spoken**
15:3 18:17
**spotted**
26:1,20
**stack**
14:7 20:8
**stamp**
21:15
**stamped**
22:16 48:8 49:7
**start**
14:21
**started**
23:13
**starts**
25:6
**state**
5:7 12:12
**stated**
49:20
**statements**
42:8
**states**
1:1 19:3 41:12
**stating**
33:7,9 42:3
**stay**
44:18
**stayed**
45:2
**stenographically**
55:6
**stopped**
17:8
**storage**
32:10,16,17
**Street**
2:7 3:12,19
**stuff**
37:13,14 38:15

**subject**
7:13,20 8:22 9:21
11:1,7 48:22
**submit**
23:18
**subsequent**
16:9
**suing**
13:3,4
**suit**
36:19
**Suite**
3:19
**supplied**
9:11
**supposed**
31:11
**sure**
5:8 7:5,19 8:22
10:11 27:10
28:16
**sworn/affirmed**
5:3
**system**
50:1

_____
**T**
_____
**T**
4:1,1,6
**take**
6:1,18 18:2 19:1
19:19 20:7
22:11 28:15
32:8 34:18 36:1
48:12
**taken**
55:3,6
**technically**
46:10
**telephone**
36:8
**tell**
10:9 16:15 26:19
28:13 29:21
42:8 52:13
**telling**
8:11
**ten**

6:12 26:20 35:15
**terms**
52:1
**Terrence**
15:14
**testified**
5:3
**testify**
8:8,11,16 9:16,20
9:20
**testimony**
7:13,21,22 9:2
12:18 47:18
54:4,5 55:5,5
**Thank**
11:19
**thing**
33:18
**things**
6:3 10:8 12:19
14:6 17:9
**think**
10:18 11:11,15,15
22:10 33:8
48:21
**three**
21:1
**time**
8:19 12:17 17:7
24:6 26:22 29:6
29:8,16 30:22
32:12 33:10
44:4,8,14 49:1
50:12,19
**times**
12:7 17:15
**title**
5:18 9:6,14,17
10:21 11:7,14
26:14 31:4,7,17
31:22 32:2,3,6
40:18,21 41:21
51:15
**told**
18:11 30:1 42:17
46:13,14 48:9
50:9,16

tool
34:7
top
27:11
Tower
2:8 3:12
towing
6:6
transcript
4:7 6:22 18:21
19:17 20:12
39:3 43:3 53:4
55:4
transcription
54:5
tried
17:11,14,19
true
19:11 20:5 54:4
55:4
trunk
33:21
try
16:19 44:18
trying
37:11,14
turn
16:22
Twentieth
2:7 3:12
twice
15:3 37:7
two-minute
22:11
typewriting
55:7
typical
31:6
typically
26:18

**U**

unable
8:16 9:2
understand
7:10,18 8:10 9:6
10:6,8,10 11:22
12:1,4

union
36:15,16 39:10,19
40:4,14 42:14
43:18 44:3 50:1
50:15,18 52:13
UNITED
1:1
unlock
47:4
unlocked
46:13
unlocks
34:7
use
34:5,13
usually
23:20 27:5

**V**

v
1:7
vehicle
13:11 15:12 16:4
17:11 18:3 24:9
26:2 27:13
28:11,14,15
30:1 31:3,7,8,15
31:18 32:2,16
33:4,5,10,11,12
33:18 34:6,8,16
34:17,18,19,19
35:18 36:13,17
37:1,6 38:1
39:21 40:15
42:16 43:14,20
44:3,6,8,9,14,15
44:16,19,20,21
45:2,3,6,9,9,14
45:15,18,21,22
46:3,6,9,11,19
47:3,5 48:8,9
49:21 51:10
52:14
vehicles
23:7 24:14,16
26:5,9,11,14,17
27:1 45:18 46:9
50:2

verification
51:21,22
verified
28:14
VIN
28:16,21 31:2
50:3
Virginia
1:2 3:6

**W**

wait
27:16,18 39:16
43:20
waived
53:8
want
10:8 21:13 45:10
Washington
1:16 2:9 3:13
wasn't
37:10 38:14
46:16 50:16
51:8
watch
5:22 44:13,18
45:8
way
31:14
wedge
34:5
went
16:17 17:8 30:3
45:13 47:3,10
We'll
53:2
We're
5:12
we've
27:9
whatnot
17:2
WHEREOF
55:12
window
46:2
wire
34:4

witness
2:19 8:6,11 27:20
31:11,13 55:12
woman
50:20 52:11
word
48:12 49:3
work
5:13 26:14
worked
13:2 24:3 33:16
working
12:16
works
31:14
worry
36:22
write
46:2
written
23:11
wrote
35:1 47:10

**X**

x
1:4,11 4:6

**Y**

yeah
20:2
year
12:10,19 13:15
yearly
12:19
years
6:10,12 23:10
24:1
Yochelson
5:16

**Z**

zip
5:16

**$**

$2500
45:8

**0**

000073
26:7
000077
22:16
000079
48:10

**1**

1
1:21 4:9 6:19,20
19:3
1:14-cv-00648-...
1:8
1:30
29:10,12,19
1120
2:7 3:12
15
6:10
17
1:17
18
4:10
19
4:13

**2**

2
4:7
2:32 p.m
1:18
20
4:17
20th
35:10,11 43:19
47:5
20036
2:9 3:13
2014
1:17 6:13 24:4
35:12,13 55:14
2019
55:15
202
2:10 3:14
20735
5:17

**21201**
3:20
**218**
3:19
**22207**
3:6
**23rd**
47:6,7,9,10
**25**
11:5
**27th**
55:13

---
**3**

**3**
4:10 18:19
**3:39 p.m**
53:11
**30**
55:15
**30th**
35:12
**39**
4:18

---
**4**

**4**
4:13 19:15,21
**400**
3:19
**410**
3:21
**43**
4:20
**457-1600**
2:10 3:14

---
**5**

**5**
4:3,17 20:9,10
22:15 25:5
**5/20**
35:12
**5/23/14**
4:20
**5/30**
35:13
**525-2668**

3:7
**5311**
3:5
**55**
1:21

---
**6**

**6**
4:9,18 38:22 39:1
40:11 52:5,6
**6504**
5:16
**69**
25:6

---
**7**

**7**
4:20 43:1,6
**7-Eleven**
17:8,10
**70226**
1:20
**703**
3:7
**727-7702**
3:21
**73**
26:9,12
**74**
25:7 26:12
**75**
22:7
**76**
22:8
**77**
21:2 22:9,10
**78**
22:16
**79**
21:2 22:9,10,16

---
**9**

**915**
28:10