**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | | |
|---|---|---|
| **JODI C. MAHDAVI,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **NEXTGEAR CAPITAL, INC.,** | ) | |
| | ) | Civil Action No. 1:14-cv-0648 |
| and | ) | |
| | ) | |
| **P.A.R. SERVICES, INC.** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF
NEXTGEAR'S MOTION FOR SUMMARY JUDGMENT**

NextGear Capital, Inc. respectfully moves for summary judgment on all counts of Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 56.  For the reasons described below, Mrs. Mahdavi was not a purchaser in the ordinary course.  Her husband controlled the transaction, and his assertion of the Fifth Amendment, which deprives NextGear of key evidence.  The negative inference from her husband's assertion of the Fifth Amendment is supported by other facts demonstrating fraud.  Thus, NextGear is entitled to judgment in its favor on all counts.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

**A.      Undisputed Facts Relevant to NextGear's Interest in the Vehicle at Issue.**

1.      NextGear financed the purchase of the BMW[1] by Beltway Auto Brokers, LLC ("Beltway Auto"), a used vehicle dealer, through its floor-plan financing agreement.  *See* September 30, 2013 Demand Promissory Note and Loan and Security Agreement, **Exhibit 1**.

2.      In the floor-plan financing arrangement, NextGear gave Beltway Auto a revolving line of credit of $1,400,000, which Beltway Auto used to purchase much of its used car inventory.  *Id*; Affidavit of Lisa Long ("Long Aff."), **Exhibit 2**, ¶ 2-3.[2]

3.      Each loan advance is made against a specific piece of collateral.  As each item of collateral is sold by the dealer to a third party, the loan advance for that specific piece of collateral is repaid.  Long Aff. (Ex. 2), ¶ 4.  *Id.*

4.      NextGear holds title to financed vehicles until it receives full repayment of the loan from Beltway Auto after a bona fide sale to a third party.  *Id.*

5.      NextGear keeps the titles of vehicles securing its loan in its title vault in Carmel, Indiana.  *See* November 17, 2014 Transcript of Deposition of David Freeman ("Freeman Dep."), **Exhibit 3**, at 55:9-16.

6.      At Beltway Auto, the financing and sale of vehicles were handled by Navid "Alex" Mahdavi, Mrs. Mahdavi's husband (hereinafter, "Mr. Mahdavi").  Mr. Mahdavi was the general manager of the lot and managed NextGear's inventory.  Long Aff. (Ex. 2), ¶ 2.

7.      Mr. Mahdavi was NextGear's primary contact for Beltway Auto, and was responsible for informing NextGear's account manager, David Freeman (hereinafter, "Mr. Freeman"), of sales of vehicles and arranging payment.  Freeman Dep. (Ex. 3) at 25:6-10.

---

[1]      "BMW" refers to the vehicle at issue in this case, a 2013 BMW 650i Gran Coupe with a vehicle identification number ("VIN") of WBA6B4C53DD097953.

[2]      Ms. Long's affidavit was previously attached to NextGear's opposition to Mrs. Mahdavi's Motion for Preliminary Injunction.  *See* Doc. No. 10-1.

8.      When a financed vehicle was sold, Mr. Mahdavi was required to send funds to NextGear within 48 hours.  *Id.* at 57:9-15.

9.      After receiving funds for a vehicle, NextGear went the title to Beltway Auto for transfer to the purchaser.  *Id.* at 58:14-19.

10.     NextGear still possesses the original, valid title to the BMW.  Freeman Dep. (Ex. 3) at 55:9-13; *see also* Copy of Title, attached as **Exhibit 4**.

11.     The BMW was financed by Beltway Auto in early April 2014, and was one of sixty vehicles Beltway Auto was supposed to hold as security for NextGear's loan at that time. *Id.*; Long Aff. (Ex. 2), ¶ 4.[3]

12.     NextGear has a perfected security interest in the BMW as part of Beltway Auto's inventory.  *See* UCC Financing Documents, Floored Vehicle History Report, and Receivable Statement, attached as **Exhibit 5**.[4]

**B.      Undisputed Facts Relevant to the Fraud Against NextGear.**

13.     On Friday, April 11, 2014, NextGear employee David Freeman went to Beltway Auto and verified that the inventory of vehicles was there.  Freeman Dep. (Ex. 3) at 50:17-21.

14.     On Monday, April 14, 2014, Mr. Freeman called Alex Mahdavi for a routine discussion regarding the financing.  Freeman Dep. (Ex. 3) at 21:2-5.

---

[3]     On April 1, 2014, Beltway Auto used NextGear's financing to add three motor vehicles to its inventory.  Long Aff. (Ex. 2), ¶ 5.  On April 2, 2014, Beltway Auto requested that NextGear increase the line of credit by $100,000 (from $1,400,000 to $1,500,000) for 30 days. *Id.*  On the same day and immediately after obtaining the additional credit, Beltway Auto obtained floor plan financing through NextGear for another five motor vehicles, including the subject BMW.  *Id.*

[4]     The loan documents and UCC financing statement establish a perfected interest in Beltway Auto's financed inventory and a receivable report identifying the BMW at issue in this case as part of the collateral.

15.     Mr. Mahdavi did not inform him of any problems at the lot.  *Id.* at 116:16-19.

16.     After that call, Mr. Freeman learned that Beltway Auto was having trouble with another creditor.  *Id.* at 22:10-12.[5]

17.     The next morning, on April 15, 2014, Mr. Freeman traveled to Beltway Auto and discovered that nearly 50 vehicles were missing.  Freeman Dep. (Ex. 3) at 22:12-23:1; 36:5-6.

18.     Mr. Freeman met with Alex Mahdavi over the course of a few hours on April 15, 2014 to discuss the missing inventory.  *Id.* at 35:2-12.

19.     Mr. Mahdavi informed Mr. Freeman for the first time that twenty vehicles had been sold that month, an unusually high number.  *Id.* at 84:12-16.

20.     Mr. Mahdavi provided unsigned copies of the sales orders, claiming the original agreements had been taken in a break-in.  *Id.* at 112:17-22.

21.     Mr. Mahdavi could not account for the other missing vehicles.  *Id.* at 24:22-25:1.

22.     Mr. Mahdavi did not mention any sale of the BMW or its location.  *Id.* at 43:10-17.

23.     In the aftermath of NextGear's discovery, NextGear learned that Beltway Auto's fraudulent scheme had involved obtaining duplicate titles from the Maryland Vehicle Administration and then selling cars without informing or paying NextGear.  *See* Freeman Dep. (Ex. 3) at 27:18 – 28:3; Long Aff. (Ex. 2), ¶ 7.

24.     Although NextGear possessed original titles to these vehicles, Beltway Auto obtained duplicate titles from the Maryland Motor Vehicle Administration and sold them to third party purchasers.  *Id.*

---

[5]     Beltway Auto also had been extended credit by Manheim, an auto auction company. Freeman Dep. (Ex. 3) at 22:4-8.  NextGear learned that Beltway Auto may have been in default with Manheim.  *Id.*

25.     Beltway Auto's principal, Khazeyer Molavi, admitted that he had multiple, unidentified people remove unsold vehicles from Beltway Auto's lot because he feared Beltway Auto's creditors, including NextGear, would repossess them.  Long Aff. (Ex. 2), ¶ 6.

26.     On April 18, 2014, NextGear informed Beltway Auto of an Event of Default under the applicable loan documents and demanded immediate possession of the collateral. Long Aff. ¶ 8.  NextGear attempted to locate the missing vehicles by searching property owned by affiliates of Beltway Auto and the company's owners and manager.  *Id.*, ¶ 10; Freeman Dep. (Ex. 3) at 37:13-20.

27.     NextGear located three missing vehicles in Mr. Mahdavi's driveway, including the BMW.  Freeman Dep. (Ex. 3) at 38:19-39:6.

28.     At the time of the repossession, NextGear was unaware of any purported sale of the BMW.  *Id.* at 43:10-17.

29.     Mr. Mahdavi had not mentioned it to David Freeman during the April 15, 2014 interview at the dealership.  *Id.*

30.     No copy of the purchase agreement had been provided to NextGear.  *Id.* at 45:10-16.

31.     No proceeds of the sale were paid to NextGear.  *Id.* at 117:17-18.

32.     Mr. Mahdavi has asserted his Fifth Amendment rights and has refused to testify regarding any aspect of the fraud or the sale of the BMW.  *See* Navid Mahdavi's Answers to NextGear's Written Deposition Questions ("Alex Mahdavi Answers"), attached as **Exhibit 6**.

33.     NextGear engaged P.A.R. Services, Inc. to repossess the three vehicles.  Freeman Dep. (Ex. 3) at 91:5-9.

34.     By the time P.A.R. Services got to Mr. Mahdavi's house, only the BMW was there.  *Id.* at 40:17-19.

35.     The BMW was repossessed by P.A.R. Services.  *Id.* at 91:5-9.

**C.     Undisputed Facts Regarding Plaintiff's Purported Purchase of the BMW.**

36.     After the repossession, NextGear learned for the first time that Mrs. Mahdavi claimed to have purchased the BMW from Beltway Auto.

37.     Throughout discovery, Mrs. Mahdavi provided no details regarding the purchase. She claims she was the one who decided to purchase the BMW, but she did not work out the details of the purchase. *See* November 12, 2014 Transcript of Deposition of Jodi C. Mahdavi ("Mahdavi Dep."), **Exhibit 8**, at 21:14-22.  *See also id.* at 28:11-14 ("Q: Did you talk to anyone at NextGear while you were going through the process of purchasing this vehicle? A: No.").

38.     She did not take any steps to arrange for the financing of the vehicle purchase with Pentagon Federal Credit Union at the time of purchase.  Mahdavi Dep. (Ex. 8) at 28:19-22.

39.     Mrs. Mahdavi did not participate in filling out the application for title.  *Id.* at 28:3-10.

40.     Mrs. Mahdavi delegated the handling of her purchase to her husband, who kept her in the dark.  Mahdavi Dep. (Ex. 8) at 29:4-14.  (Q: Do you recall if your husband told you anything about where the BMW came from or how it was purchased? A:   No. . . . He didn't -- he never said anything.").

41.     Mrs. Mahdavi did not visit Beltway Auto to view or purchase the BMW. Mahdavi Dep. (Ex. 8), at 20:2-14.

42.     Mr. Mahdavi refused to testify regarding the purchase of the BMW for fear of incriminating himself.  *See* Alex Mahdavi's Answers to Written Deposition Questions ("Alex Mahdavi Answers"), attached as **Exhibit 6**.

43.     He asserted Fifth Amendment rights to over seventy questions regarding the basic details of the transaction.  *Id.*

44.     The issues on which Mr. Mahdavi fears criminal prosecution include the process for obtaining title, the handling of the sale proceeds, his communication with his wife, and his timing of the purchase as it relates to the fraud at Beltway Auto.  *Id.*

45.     The purchase money for the BMW came from Pentagon Federal to Beltway Auto the day after the fraud was discovered, April 16, 2014.  *See* Copy of April 16, 2014 check, **Exhibit 11**.

46.     Mr. Mahdavi has refused to explain what he did with the money and whether he received any portion of it.  *See* Alex Mahdavi Answers (Ex. 6), *passim*.

**D.      Undisputed Facts Regarding Mrs. Mahdavi's Certificate of Title.**

47.     The Certificate of Title, attached as **Exhibit 9**, was issued to Mrs. Mahdavi at an address at 4726 D St. Barnabas Road, Temple Hills, MD 20748.

48.     At deposition, Mrs. Mahdavi testified that this address was a "client office" she visited "every couple months."[6]  Mahdavi Dep. (Ex. 8) at 30:16-20.

49.     She does not regularly check mail at that address.  *Id.* at 31:10-12.

---

[6]     This testimony directly contradicted Mrs. Mahdavi's earlier testimony that she did not have multiple clients or multiple office locations.  Mahdavi Dep. (Ex. 8) at 6:10-15.  ("Q: So do you work for multiple clients? / A: No. / Q: Do you work at multiple locations? A:  No. / Q: And where is your office located? / A: Washington, D.C.").

50.     Public records searches show that this is the address of an auto wholesaler that Mrs. Mahdavi used to own, which Mrs. Mahdavi failed to disclose at deposition.  *See* UCC and Charter Search for "Ultimate Auto Wholesalers," attached as **Exhibit 10**.

51.     Mrs. Mahdavi claims that the title was sent to the Temple Hills address, but she intended to use the address of 9913 Montauk Avenue for the vehicle.  The Montauk Avenue address is the address of a home renovation Mrs. Mahdavi is completing.  Mahdavi Dep. (Ex. 8) at 32:13-15.

52.     She claimed that she and her husband were intending to create a Maryland corporation and to use the BMW sedan as a company car for the construction company.  However, no company exists to this day.  Mahdavi Dep. (Ex. 8) at 32:3-12.

53.     Mrs. Mahdavi confirmed that no actual company had been formed at that address, and that there was no plan to transfer title of the BMW to the company.  *Id.* at 9-21.

54.     She also confirmed that she intended to flip the property to an end user on completion of the construction.  *Id.* at 39:2-6.  (Q: " . . .[I]is it planned that that will be some sort of office or that will be a construction project you sell to a residential purchaser? / A: Sell.").

### STANDARD OF REVIEW

NextGear is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court must assess the evidence in the light most favorable to the party opposing the motion.  *E.g. Chabornnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979).  However, the opposing party must submit "affirmative evidence" showing a dispute of material facts.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–67 (1986);

*Adickes v. S.H. Kress & Co.* 398 U.S. 144, 160 (1970).  An opposing party "may not rest upon the mere allegation or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986).

## ARGUMENT

Mrs. Mahdavi cannot defeat NextGear's valid interest in the vehicle because she is not a purchaser in the ordinary course.  Mrs. Mahdavi denied knowledge or involvement in many key aspects of the purchase, including the application for title and handling of the financing of the vehicle.  Instead, Mrs. Mahdavi's husband, the general manager of the dealer, arranged for the purchase during a time of rampant fraud at Beltway Auto, concealed the purchase from NextGear, and pleaded the Fifth Amendment on all details regarding the transaction.  NextGear is entitled to an adverse inference based on Mr. Mahdavi's assertion of the Fifth Amendment in these circumstances.  Mrs. Mahdavi's claim (if she has one) is against Beltway Auto and/or her husband, not NextGear, for failing to convey proper title to her.

## I.    Mrs. Mahdavi was not a buyer in the ordinary course under Virginia's Uniform Commercial Code.

The purchase of the BMW was conducted, by Mr. and Mrs. Mahdavi, under unusual circumstances and not in the ordinary course of business.  This evidence supports a grant of summary judgment to Defendants.

NextGear's valid security interest survives a sale and is effective against subsequent purchasers unless the sale was "in the ordinary course of business."  Va. Code Ann. § 8.1A-201. Mrs. Mahdavi bears the burden of showing that her purchase was in the ordinary course of business.  *In re Gary Aircraft Corp.*, 681 F.2d 365, 373 (5th Cir. 1982) (1983); *In re Air Vermont, Inc.*, 44 B.R. 433, 437 (D. Vt. 1984); *U.S. For & on Behalf of Mar. Admin. v. Cont'l*

*Illinois Nat. Bank & Trust Co. of Chicago*, 889 F.2d 1248, 1253 (2d Cir. 1989). The ordinary course of business standard is objective and is determinable as a matter of law. Virginia's UCC defines a sale in the ordinary course as one that "comports with the usual or customary practices" of sales of that kind. Va. Code Ann. § 8.1A-201.

Applying similar UCC provisions, other courts have rejected claims of a "good faith" purchase where it was attended by unusual facts. For example, in *Genesee Regional v. Palumbo*, a wife who purchased a vehicle from her husband's company claimed she was a bona fide purchaser to defeat the valid interest of the floor-plan financer. 799 N.Y.S.2d at 887-888. The wife dealt only with her spouse, the owner and director of the company. *Id.* She lived with her husband and owned other vehicles from her husband's company. *Id.* When she purportedly purchased the vehicle, the proceeds were not paid to the lienholder. *Id.* The wife could not get title in New York without supporting documentation, so she submitted an application to the State of Maryland to receive a certificate of title in her name. *Id.* The financer sought a declaration of superior title against the wife, who claimed she was a good faith purchaser. *Id.* The *Genesee* court held the wife was not a purchaser in the ordinary course. The court found that "the most relevant fact is that [the husband] admits that the necessary title document held by the lender . . . had never been turned over to [the dealer], or the buyer, or filed, and was still in the lender's possession." *Id.* at 888. The *Genesee* court further relied on the wife's registration of the vehicle in Maryland, which was not her state of residence. *Id.*

A Pennsylvania court held that a used vehicle purchase was not in the ordinary course of business where the sale was conducted offsite and the buyer failed to make any inquiry into the previous owners or documentation of the vehicle. *Al Maroone Ford, Inc. v. Manheim Auto Auction, Inc.*, 208 A.2d 290, 293 (Pa. Super. 1965). The court observed: "the facts that the car

was a substantially new car, purchased for resale many miles away from the place of business of the sellers, by an auctioneer who has had experience with foreign security interests in automobiles, without any inquiry, so far as the agreed facts show, as to existence of any such interest, all tell against the contention that the appellee was a buyer in ordinary course." *Id.*

Other courts rejecting "buyer in the ordinary course" claims have relied on unusual facts regarding the location of sale and the address listed on the title. A sale that occurs offsite from the dealer's lot may not be a sale in the ordinary course of business. *Rhode Island Hosp. Trust Co. v. Leo's Used Car Exch., Inc.*, 314 F. Supp. 254 (D. Mass. 1970) (sale not in the ordinary course of business when it occurred away from dealer's place of business); *Al Maroone Ford*, 208 A.2d at 293 (same). Courts have held that the listing of a non-residential address on the title weighs against the purchase being in the ordinary course. *First Nat. Bank & Trust Co. of El Dorado v. Ford Motor Credit Co.*, 646 P.2d 1057, 1062 (Kan. 1982) (evidence that address on title was not the home address of purported purchaser supported finding that purchase was not valid). Finally, it is relevant if the buyer registers the vehicle in a state other than their state of residence. *See Genesee Regional*, 799 N.Y.S.2d at 891.

Mrs. Mahdavi is not a buyer in the ordinary course of business because the sale of the BMW did not comport with the usual or customary practices of used auto sales. The transaction was completely distinct from a usual, arms-length used vehicle sale in which the purchaser goes to the dealership, completes paperwork, and purchases the vehicle. Mrs. Mahdavi "purchased" the vehicle without ever visiting the dealership and without any knowledge of the paperwork, financing application, title application, or other basic details of the sale. Mahdavi Dep. (Ex. 8) at 21:14-22, 28:3-22, 29:4-14. Instead of having a normal test drive, her husband brought the BMW home for her one weekend for her to use. *Id.* at 21:1-14. She did not have to leave

anything as security for the dealership. *Id.* She used the vehicle for the entire weekend, and then her husband used the vehicle intermittently as a personal vehicle for the next month before the transaction was finalized. *Id.* at 21:1-14; 25:10-22. This is far from a usual or customary test drive.

The purchase agreement itself is unusual because Mrs. Mahdavi used a shell address in Maryland rather than her home address in Virginia. *See Genesee Regional*, 799 N.Y.S.2d at 891 (registration of vehicle in a non-residential state was evidence that the purchase was not in the ordinary course of business). The Certificate of Title was issued to a Temple Hills address, which Mrs. Mahdavi claimed was a client's address. *See* Exhibit 9; Mahdavi Dep. (Ex. 8) at 30:16-20 (claiming Temple Hills address was a "client office" that Mrs. Mahdavi visited "every couple months."). However, public records searches demonstrated that it was the address of an auto-wholesaling company she owned. *See* Exhibit 10. Mrs. Mahdavi did not disclose her ownership of a business at deposition, nor did she explain why the address was used.

Mrs. Mahdavi claimed that she wanted to register the car at a different address in Maryland, at 9913 Montauk Avenue in Bethesda, but that the MVA incorrectly used her "client" address in Temple Hills. Mahdavi Dep. (Ex. 8) at 31:6-9. Further questioning demonstrated that the Bethesda address was not an active business address, but that of an empty home owned by Mahdavi. *Id.* at 32:13-15. There was no plan to run a business from that address, as Mrs. Mahdavi planned flip the property to an end user on completion of the construction. *Id.* at 39:2-6. No actual company had been formed at that address and there was no plan to transfer title of the BMW to any company. *Id.* at 34:14-22. Whatever her justification for using the property, it

is not "usual" or "customary" for a car purchaser to use a vacant, demolished property as the address for their vehicle purchase contract.[7]

Mrs. Mahdavi was at best willfully blind to the details and suspicious circumstances of the purchase of her BMW. To demonstrate the extent of her willful blindness of her husband's activities, she even denied knowledge at her deposition of whether her husband was even employed. Mahdavi Dep. (Ex. 8) at 13:22-14:1 ("Q: Is he currently working? / A: I don't know"). A purchaser cannot achieve good faith purchaser status in this way. *See Will Investments, Inc. v. Young*, 317 S.W.3d 157, 167 (Mo. Ct. App. 2010) ("A person cannot be willfully blind to the circumstances of the transaction and obtain good faith purchaser status."); *see also Graham v. White-Phillips Co.,* 296 U.S. 27, 32, 56 S. Ct. 21, 23 (1935) (holding that one who is willfully blind to notice of defect in title is not acting in good faith under holder in due course statute).

The *Genesee* Court, considering similar facts, recognized that the purchasing wife's interests were adequately protected by her claims against her husband's company:

> If [the purchasing wife] was duped by her husband into believing she would obtain good title she would have a cause of action against the dealer for breach of contract and warranty of title. . . and a defense against the retail installment contract assignment by the dealer to [the floorplan financer].

---

[7]      The Mahdavi's choice to register the BMW through a shell address in Maryland, as opposed to their state of residence in Virginia, allowed Mr. Mahdavi to simply print out the title without having to submit proof that the liens were satisfied. With a Maryland address, Mr. Mahdavi was able to simply print out title without having possession of the original title and, thus, without satisfying the lienholder. *See Genesee Regional*, 799 N.Y.S.2d at 890 (describing how wife registered the vehicle in Maryland despite the fact that she did not have "the title document necessary to transfer such title"). In contrast to Maryland's system, Virginia's would have required submission of evidence that previous creditors have been paid. *Toyota Motor Credit Corp. v. Hyman Auto Wholesale, Inc.*, 42 Va. Cir. 502 (1997) (describing how issuance of new title required submission of letter from former creditor stating lien had been released).

#513716
013438-0003

*Genesee Regional*, 799 N.Y.S.2d at 892.  If Mrs. Mahdavi was damaged, she was damaged by her husband and the company he managed.  Mrs. Mahdavi has a claim against Beltway Auto and Mr. Mahdavi, but she does not have a valid claim against NextGear.

## II.     Mr. Mahdavi's assertion of the Fifth Amendment is fatal to Plaintiff's claim.

Mr. Mahdavi, who controlled the purchase of the BMW, has refused to testify pursuant to his Fifth Amendment rights regarding the details of the purchase.  Mr. Mahdavi's refusal to testify prejudices NextGear's defense of the case (which is based in part on Mr. Mahdavi's fraud) and defeats Mrs. Mahdavi's claim due to the close relationship between them.

The Court has significant discretion to fashion a remedy for the assertion of the Fifth Amendment in a civil case.  *See Wehling v. Columbia Broadcasting System,* 608 F.2d 1084, 1089 (5th Cir.1979) (if assertion of Fifth Amendment is prejudicial, the Court is "free to fashion whatever remedy is required to prevent unfairness."); *United States v. $506,641.00 in U.S. Currency,* 1996 WL 78364, *3 (N.D.Ill.1996) ("[A] court has discretion in determining the appropriate means of dealing with a claimant's invocation of the privilege.").

Summary judgment is an appropriate sanction if the Fifth Amendment is used to conceal material facts.  *See* Wright, Miller, and Kane, Federal Practice & Procedure (3d Ed.), § 2018 at 288 ("In some cases if a party claims the privilege and does not give his or her own evidence there will be nothing to support his or her view of the case and an adverse finding or even a directed verdict or grant of summary judgment will be proper."); *SEC v. Colello,* 139 F.3d 674, 677–78 (9th Cir.1998) (proper for Court to apply negative inference at summary judgment stage); *SEC v. Lyttle,* 538 F.3d 601, 604 (7th Cir.2008); *Padilla v. City of Chicago*, 932 F. Supp. 2d 907, 919 (N.D. Ill. 2013) (Fifth Amendment assertion drove "another nail into their evidentiary coffin by eliminating any arguable contention that [the alleged wrongful acts did not

occur]"); *United States v. One Parcel of Real Property,* 780 F. Supp. 715, 722 (D.Or.1991) (striking counterclaim and affirmative defense in their entirety because of defendant's use of the privilege); *SEC v. Benson,* 657 F.Supp. 1122, 1129 (S.D.N.Y.1987) (granting summary judgment against the silent party).[8]  One court has explained that a negative inference can be appropriate at summary judgment because the courts are "required to draw only *reasonable* inferences in favor of a nonmovant." *Padilla*, 932 F. Supp. 2d at 919.[9]  The assertion of the Fifth Amendment removes any reasonable inference of proper action because it is predicated on a legitimate threat of criminal prosecution.  *Id.*

Here, Mrs. Mahdavi's husband has asserted his Fifth Amendment rights to conceal the most important details of the BMW purchase from NextGear.  Mr. Mahdavi's involvement in his wife's purchase of the vehicle was encompassing.  He completed the paperwork, located the car, financed the purchase, and controlled the flow of funds and communication with NextGear.  By asserting the Fifth, Plaintiff's husband is conceding that "honest answers would tend to subject the answerer to criminal liability."  *Padilla v. City of Chicago*, 932 F. Supp. 2d 907, 919 (N.D. Ill. 2013).  There is no reasonable inference to be drawn at this stage that Mrs. Mahdavi's title was obtained legally or in "the ordinary course of business."

Mr. Mahdavi's assertion of his Fifth Amendment rights leads to a negative inference in this case.  A non-party's assertion of the Fifth Amendment gives rise to a sanction against the

---

[8]     In contrast, some courts have said that summary judgment was not an appropriate remedy for a party's assertion of Fifth Amendment rights. *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber,* 407 F.3d 34, 55 (2d. Cir. 2005)).

[9]     Some courts have also held that burden shifting to the party asserting the Fifth Amendment is an appropriate remedy.  *See Colello*, 139 F.3d at 677; Robert Heidt, *The Conjurer's Circle—The Fifth Amendment Privilege in Civil Cases,* 91 Yale L. J. 1062, 1126–32 (1982) (recommending burden-shifting and barring testimony as appropriate responses to invocation of the Fifth Amendment).

#513716
013438-0003

party if the nonparty is inextricably involved in the party's claim. *See United States v. Dist. Council of New York City & Vicinity of United Bhd. of Carpenters & Joiners of Am.*, 832 F. Supp. 644, 652 (S.D.N.Y. 1993) (negative inference based on nonparty's assertion of Fifth Amendment rights is appropriate if party and nonparty "bear a sufficiently close relationship"); *LiButti v. United States,* 107 F.3d 110, 122, (2d Cir.1997) (invocation of Fifth Amendment by nonparty witness supports inference if there is a relationship of loyalty with a party); *Fed. Deposit Ins. Corp. v. Fid. & Deposit Co.,* 45 F.3d 969, 978 (5th Cir.1995) (adverse inference can be drawn from any relevant invocation of the Fifth Amendment by a nonparty witness).  Courts have held that a husband and wife's relationship is "of the strongest nature" and thus can give rise to an inference for a spouse's assertion of the Fifth Amendment.  *S.E.C. v. Durante*, 2013 WL 6800226, *10-11 (S.D.N.Y. Dec. 13, 2013).

In *Libutti*, a seminal Fifth Amendment civil case, the Second Circuit identified four factors to determine whether a non-party's Fifth Amendment assertion gave rise to an adverse inference against a party.  The four factors are: (1) the nature of the relevant relationships, (2) the degree of control of the party over the non-party witness, (3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation, and (4) the role of the non-party witness in the litigation.  *Id.* at 123-24.

Each of the *Libutti* factors favors application of a negative inference against Mrs. Mahdavi.  First, the Mahdavis' marriage is a strong factor in favor of applying the inference: "The closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship. . ." *Libutti*, 107

F.3d at 123.  The relationship is "the most significant circumstance."  *Id.*[10]  A marital

relationship is "of the strongest nature" and thus can give rise to an inference for a spouse's

assertion of the Fifth Amendment.  *Durante*, 2013 WL 6800226 at *10-11.  Other courts have

held that familial relationship supported application of a negative interest against family

members when the nonparty was involved in the transaction at issue.  *See Libutti* at 124 (holding

that father-daughter relationship supported application of negative inference from nonparty

father's assertion of the Fifth Amendment against his daughter, a party to the litigation); *In re*

*Adler, Coleman Clearing Corp.*, 1998 WL 182808, at *7 (Bankr. S.D.N.Y. Apr. 17, 1998)

(applying adverse inference based on "significant informal family, friendship and business

relationships").  *Cf. Cotton v. City of Eureka*, 2010 WL 2889498, at *4 (N.D. Cal. July 22, 2010)

(rejecting application of adverse inference where there was no "close or special relationship"

between party and nonparty witness, and the nonparty witness had actually assaulted the party).

The remaining three *Libutti* factors each support application of an adverse inference in this

case.  Mrs. Mahdavi's decision to empower her husband to control all aspects of the transaction

supports the inference, because it shows the "degree of control which [Mrs. Mahdavi] has vested

in the non-party witness . . ." *Libutti*, 107 F.3d at 123.  Mr. Mahdavi's supporting role in

controlling the transaction and trying to regain the BMW strongly supports an adverse interest,

because it shows his interests are compatible with his wife's and that he is a key figure in this

litigation.  *See Lentz v. Metro. Prop. & Cas. Ins. Co.*, 768 N.E.2d 538, 543 (Mass. 2002)

(applying *Libutti* factors and approving admission of nonparty's assertion of Fifth Amendment

because nonparty "played a key role in the underlying transaction"); *New Hampshire Ins. Co. v.*

---

[10]   In a later appeal of *Libutti*, the Second Circuit approved of the trial court's decision to give "considerable weight" to the adverse inference because the father "dominated the business dealings" of the family company. *LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999)

*Blue Water Off Shore, LLC*, 2009 WL 792530, at *9 (S.D. Ala. Mar. 23, 2009) (applying *Libutti* factors and holding that non-party had "financial and professional self-interest to deny" questions rather than plead the Fifth Amendment, thus supporting inference against party); *Garrish v. United Auto., Aerospace, & Agric. Implement Workers of Am.*, 284 F. Supp. 2d 782, 798 (E.D. Mich. 2003) (third and fourth *Libutti* factors met where witness's wrongful conduct was at issue and he was a "key figure in the underlying facts.").

As described above, the inference of wrongdoing by Mr. Mahdavi is supported by affirmative evidence of an unusual, non-customary purchase.  Summary judgment is especially appropriate when the adverse inference is supported by evidence presented in discovery.  *See Hoover v. Knight,* 678 F.2d 578, 582 (5th Cir.1982) (direct evidence in addition to negative inference confirmed appellee's involvement) *TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC*, 945 F. Supp. 2d 1331, 1339 (M.D. Fla. 2013) ("a party seeking summary judgment produces additional direct evidence above and beyond any negative inference to be drawn by the invocation of the Fifth Amendment, entry of summary judgment is appropriate").  "Courts repeatedly have held that an adverse evidentiary inference may be drawn against a party who refuses to testify . . . [and] summary judgment may be appropriate if supported by independent evidence." *Microsoft Corp. v. Silver Star Micro, Inc.*, 2008 WL 115006, at *3 (N.D. Ga. Jan. 9, 2008) (citing *Baxter v. Palmigiano,* 425 U.S. 308, 317-18 (1976); *Avirgan v. Hull,* 932 F.2d 1572, 1580 (11th Cir.1991); *S.E.C. v. Scherm,* 854 F.Supp. 900, 904-05 (N.D.Ga.1993).  In these cases, the courts granting summary judgment "rel[y] principally on th[e] independent factual record," and support their finding with the adverse inference.  *Microsoft*, 2008 WL 115006 at *3.  The assertion of the Fifth Amendment is fatal because it prevents the party from "refut[ing] any allegations of undisputed fact offered" by the moving party.  *Id.*

Here, Mr. Mahdavi's Fifth Amendment assertion supports a grant of summary judgment because there is independent evidence of wrongdoing that coincides with the inference from Mr. Mahdavi's fear of criminal prosecution.[11]  NextGear has submitted deposition, affidavit and documentary evidence that Mr. Mahdavi was involved on both sides of the transaction, and that the transaction occurred as part of a fraudulent scheme to take NextGear's collateral. Additionally, as described above, the purported purchase of the BMW was far from the usual and customary procedure for purchasing a used car.  This affirmative evidence supports a grant of summary judgment to NextGear.

For example, Mr. Mahdavi's assertion of the Fifth Amendment prevents NextGear from discovering the circumstances surrounding the handling of the purchase money for the BMW. Mr. and Mrs. Mahdavi received a $64,000 check from Pentagon Federal on April 16, 2014.  This was **one day after** the fraud was discovered at Beltway, and the vehicles were claimed by NextGear, on April 15, 2014.  By that date, Mr. Mahdavi had already met with NextGear, discussed the fraud, and concealed the purported purchase of his wife's vehicle from NextGear. NextGear does not know what Mr. Mahdavi did with the check because he refused to answer. *See* Mahdavi Answers (Ex. 6) at 13.[12]  There would be no basis for his refusal to answer if he properly deposited the check in Beltway's account or received no benefit from the check.

---

[11]      The fraud committed against NextGear is similar to Mr. Mahdavi's previous criminal scheme, which was docketed in this court in *United States v. Navid Mahdavi*, Case No. 1:08-CR-00426-GBL; *see also* Agreed Statement of Facts, attached hereto as **Exhibit 7**.  In 2008 and 2009, Mr. Mahdavi conspired to defraud lenders by obtaining multiple loans on his real property. *Id.*, ¶ 6-8.  To accomplish this fraud, Mr. Mahdavi "created fraudulent tax returns and bank statements." *Id.*, ¶ 8.  Mr. Mahdavi submitted fraudulent HUD-1s and other supporting documents to the creditors, and conspired to alter his tax return. *Id.*, ¶ 10-11.  For that scheme, Mr. Mahdavi was charged by the United States with conspiracy to commit bank fraud under 18 U.S.C. § 371, pleaded guilty, and was sentenced to one year and one day in prison.  *See* Case No. 1:08-cr-00426-GBL, Doc. No. 17.

[12]      The questions to which Mr. Mahdavi pleaded the Fifth Amendment included:  "Did you

#513716
013438-0003

### III.     Mrs. Mahdavi has failed to show any intentional wrongful act by NextGear.

At a minimum, Count III for trespass and conversion must be dismissed.  Mrs. Mahdavi's is not entitled to damages beyond the value of the vehicle under a theory of intentional tort. NextGear had no knowledge of the purported purchase of the vehicle because Mr. Mahdavi concealed it.

Under Virginia law, "trespass to chattels occurs when one party intentionally uses or intermeddles with personal property in rightful possession of another without authorization." *America Online, Inc. v. IMS,* 24 F.Supp.2d 548, 550 (E.D.Va.1998) (*citing Vines v. Branch,* 244 Va. 185, 190, 418 S.E.2d 890, 894 (1992) ("Where a person has illegally seized the personal property of another and converted it to his own use, the owner may bring an action in trespass[.]").  Similarly, conversion "is the intentional exercise of dominion or control over another's property that so seriously interferes with the right of another to control it that the actor may justly be required to pay the full value of the property."  *In re Twin B. Auto Parts, Inc.*, 271 B.R. 71, 82 (Bankr. E.D. Va. 2001)

In repossession cases, intentional tort claims fail where the repossesser does not engage in use of force, threats, violence, breaking and entering, or fraud.  *See Wallace v. Chrysler Credit Corp.*, 743 F. Supp. 1228, 1233 (W.D. Va. 1990).  *Wallace* applied Virginia law and held that a repossession of a truck in the middle of the evening "was calculated to avoid a breach of the peace because the prospect of a confrontation with the plaintiff was less at 2 a.m. than it would have been in the daylight hours or in the early evening."  *Id.* at *1233.  The court observed: "It has been held in almost all jurisdictions that the use of stealth in a self-help repossession is not a

---

receive any financial benefit, direct or indirect, from the sale of the BMW to your wife?" and a request that he "Identify all persons who received a financial benefit, direct or indirect, from the sale of the BMW to your wife, and describe the nature of that financial benefit." Mahdavi Answers, Ex. 6 to Motion, at pp. 4-5.

breach of the peace." *Id.* Where the creditor has a legitimate right to repossess the car, no tort lies. *Id.* (granting a motion to dismiss); *accord Collins*, 454 S.W.2d 469, 473 (Tex. Civ. App. 1970) ("The repossession was not a trespass or conversion. . . . All testimony shows that Ford thought it had a right to take the car.").

It is undisputed that neither Beltway Auto nor Mr. Mahdavi provided NextGear notice of the sale. Mr. Mahdavi's job responsibilities included informing NextGear of such a sale. NextGear did not learn of the purported purchase until after the repossession. NextGear had no knowledge of the purported interest in the vehicle and had a valid interest of its own. There is no evidence that the repossession itself was conducted in a violent, threatening, or fraudulent manner. Thus, neither intentional tort alleged by Mrs. Mahdavi can go forward, and NextGear respectfully asks for summary judgment in its favor on Count III.

## CONCLUSION

For the foregoing reasons, NextGear Capital, Inc. requests that the Court grant summary judgment to NextGear on all of Plaintiff's claims.

Respectfully Submitted,

NextGear Capital, Inc.

By  /s/  James D. Bragdon
James D. Bragdon (VSB #83681)
jbragdon@gejlaw.com
David G. Sommer
   *Admitted pro hac vice*
dsommer@gejlaw.com
Gallagher Evelius & Jones LLP
218 N. Charles St., Ste. 400
Baltimore, MD 21201
Telephone (410) 951-1416
Fax (410) 468-2786

Ashley W. Winsky (VSB #79224)
awinsky@mcguirewoods.com
McGuireWoods LLP
Court Square Building
310 Fourth Street N.E., Suite 300
Charlottesville, VA 22902-1288
434-980-2207 (Direct Line)
434-980-2269 (Fax)

*Counsel for NextGear Capital, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of February, 2015, I electronically filed a true and correct copy of the foregoing Memorandum in Support of NextGear's Motion for Summary Judgment, supporting exhibits, and proposed Order with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Jonathan E. Levine, Esq.
LEVINE, DANIELS & ALLNUTT, PLLC
Heritage Square
5311 Lee Highway
Arlington, VA 22207
Jonathan.levine@levinedaniels.com
*Counsel for Plaintiff*

James N. Markels
JACKSON & CAMPBELL, P.C.
1120 20th Street, N.W.
South Tower, Third Floor
Washington, D.C. 20036
jmarkels@jackscamp.com
*Counsel for P.A.R. Services*

And will send a copy by Federal Express to:

The Honorable Theresa C. Buchanan
Magistrate Judge
United States District Court
Eastern District of Virginia
Alexandria Division
401 Courthouse Squire
Alexandria, Virginia 22314-5798

To the best of my knowledge there are no other parties who require service by other means.

　　　　　　　　　　　　　    /s/  James D. Bragdon
James D. Bragdon (VSB #83681)
jbragdon@gejlaw.com
Gallagher Evelius & Jones LLP
218 N. Charles St., Ste. 400
Baltimore, MD 21201
Telephone (410) 951-1416
Fax (410) 468-2786

*Counsel for NextGear Capital, Inc*