

Transcript of **DAVID FREEMAN**

**Date:** November 17, 2014

**Case:** MAHDAVI v. NEXTGEAR CAPITAL, INC., ET AL

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Court Reporting | Videography | Videoconferencing | Interpretation | Transcription

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

1 (Pages 1 to 4)

**1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE EASTERN DISTRICT OF VIRGINIA
3         Alexandria Division
4    - - - - - - - - - - - - - - - - -x
5    JODI C. MAHDAVI,          :
6         Plaintiff,          :
7         v.          : Case No.:
8    NEXTGEAR CAPITAL, INC., et   : 1:14-cv-00648-TSE-TCB
9    al.,          :
10        Defendants.     :
11   - - - - - - - - - - - - - - - - -x
12
13        Deposition of NEXTGEAR CAPITAL, INC.,
14      By and through its Corporate Designee,
15           DAVID FREEMAN
16           Washington, DC
17         Monday, November 17, 2014
18           11:05 a.m.
19
20   Job No.: 70226
21   Pages: 1 - 124
22   Reported By: Lee Bursten, RMR, CRR

**2**

1        Deposition of NEXTGEAR CAPITAL, INC., By
2    and through its Corporate Designee, DAVID FREEMAN,
3    held at the offices of:
4
5
6           JACKSON & CAMPBELL PC
7           1120 Twentieth Street, NW
8           South Tower
9           Washington, DC 20036
10          (202) 457-1600
11
12
13
14
15        Pursuant to agreement, before Lee Bursten,
16   Registered Merit Reporter, Certified Realtime
17   Reporter, and Notary Public in and for the District
18   of Columbia, who officiated in administering the oath
19   to the witness.
20
21
22

**3**

1    A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFF:
3         JONATHAN EDWARD LEVINE, ESQUIRE
4         LEVINE DANIELS & ALLNUTT PLLC
5         5311 Lee Highway
6         Arlington, Virginia 22207
7         (703) 525-2668
8
9    ON BEHALF OF DEFENDANT PAR SERVICES INC.:
10        JAMES N. MARKELS, ESQUIRE
11        JACKSON & CAMPBELL PC
12        1120 Twentieth Street, NW, South Tower
13        Washington, DC 20036
14        (202) 457-1600
15
16   ON BEHALF OF DEFENDANT NEXTGEAR CAPITAL INC.:
17        JAMES D. BRAGDON, ESQUIRE
18        GALLAGHER EVELIUS & JONES LLP
19        218 North Charles Street, Suite 400
20        Baltimore, Maryland 21201
21        (410) 727-7702
22

**4**

1        C O N T E N T S
2    EXAMINATION OF DAVID FREEMAN          PAGE
3    By Mr. Levine          6
4    By Mr. Bragdon          114
5    By Mr. Levine          119
6
7
8        E X H I B I T S
9    (Attached to transcript. Exhibits 5, 6, 7, and 9 were
10            not introduced.)
11   NEXTGEAR DEPOSITION EXHIBITS          PAGE
12   Exhibit 1   Notice of Deposition          6
13   Exhibit 2   NextGear Capital Inc.'s Answer     18
14        to Complaint
15   Exhibit 3   NextGear Capital Inc.'s Answers     32
16        to Plaintiff's First Set of
17        Interrogatories
18   Exhibit 4   NextGear Capital Inc.'s          33
19        Responses to Plaintiff's First
20        Request for Production of
21        Documents
22

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

---

Page 5

E X H I B I T S   C O N T I N U E D

NEXTGEAR DEPOSITION EXHIBITS          PAGE

Exhibit 8    Demand Promissory Note and Loan    61
             and Security Agreement
Exhibit 10   Collections Management Record    65
Exhibit 11   Condition Report               108
Exhibit 12   Howard letter to Mahdavi,      102
             6/13/14

---

Page 6

P R O C E E D I N G S

DAVID FREEMAN

having been duly sworn/affirmed, testified as
follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. LEVINE:

Q   Would you please state your full name.

A   David Freeman, F-R-E-E-M-A-N.

Q   And Mr. Freeman, you understand you're here
as a corporate representative for NextGear?

A   That's correct.

Q   If you can take a look at what I've marked
as NextGear 1.

(NextGear Exhibit 1 was marked for
identification and attached to the deposition
transcript.)

BY MR. LEVINE:

Q   Have you seen this document before?

A   I had not.

Q   You've never seen it?  Okay.  This was the
notice of deposition for NextGear to designate a
corporate representative.  Do you understand that

---

Page 7

you've been chosen as the corporate representative
for NextGear?

A   Yes.

Q   And you're here voluntarily today?

A   Yes.

Q   And you're here to testify on each of the
items designated in the notice of deposition?

A   Yes.

Q   Okay.  Are there any of the items in the
designation that you're not prepared to testify to
today?

A   No.

Q   And who is your employer?

A   NextGear Capital.

Q   And what's your business address?

A   1320 City Center Drive.  It's Carmel,
Indiana.

Q   And where do you work?

A   My residence is 4320.  I work out of
Baltimore, Owings Mills, Maryland.

Q   And what's the full address?

A   4320 Holbrook, H-O-L-B-R-O-O-K.

---

Page 8

Q   That's in Baltimore?

A   Yes.

Q   Okay.  And what is your job title at
NextGear?

A   Account executive.

Q   Okay.  And what are your job
responsibilities?

A   Basically to grow my market and/or
retention, as far as collect the money.

Q   Okay.  What is your market?

A   Baltimore.  I cover Baltimore, a little bit
of Pennsylvania, and that's pretty much it.

Q   When you say "Baltimore," the city of
Baltimore?

A   Basically you can say the State of
Maryland.

Q   And how long have you been employed at
NextGear?

A   I started with NextGear in June of '08.

Q   And when you started with NextGear, what
was your position?

A   General manager.

---

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

9

1  Q    And how long were you a general manager for
2  NextGear?
3  A    I guess about three years.  And we
4  downsized and moved our offices to Indiana, so I
5  became an account executive in 2010.
6  Q    Have you had any other roles within the
7  company?
8  A    No.
9  Q    So you've been an account executive since
10 2010 to the present?
11 A    Correct.
12 Q    Have you ever given a deposition before?
13 A    No.  This will be my first.
14 Q    Okay.  Have you ever testified in court
15 before?
16 A    Yes.
17 Q    And was that on behalf of NextGear?
18 A    Yes.
19 Q    And where was that?
20 A    I've been -- this case, I guess about two
21 weeks ago.  And a couple of other cases.
22 Q    When you say "this case," do you mean --

10

1  A    I guess against Baltimore-Washington.
2  Q    NextGear against Baltimore-Washington?
3  A    Yes.
4  Q    So not Mrs. Mahdavi's case?
5  A    Correct.
6  Q    Was that a hearing that you testified in?
7  A    It was -- I want to say a -- I guess we
8  were putting claim against his assets at the time,
9  what do you call that?
10     MR. BRAGDON:  Preliminary injunction.
11 A    Preliminary injunction against Molavi,
12 Mr. Molavi.
13 BY MR. LEVINE:
14 Q    The owner of BWA?
15 A    The owner of Baltimore-Washington.
16 Q    And when was this?
17 A    I'm going to say about two to three weeks
18 ago.  I don't have the exact date.
19 Q    Okay.  And was a preliminary injunction
20 entered?
21 A    Yes.
22 Q    Since this is your first deposition, I'm

11

1  going to ask you questions.  Your attorney may have
2  an opportunity to object to some of those questions.
3  And do you understand that you're still required to
4  answer those questions even if your attorney objects?
5  A    Yes.
6  Q    So unless he instructs you not to answer,
7  you still need to provide an answer.
8  A    Okay.
9  Q    Are we in agreement on that?
10 A    Yes.
11 Q    Okay.  And please, if you don't understand
12 any of my questions, let me know, okay?  Is it fair
13 if you don't say anything to me, that I will assume
14 that you understand my question?
15 A    Yes.
16 Q    Okay.
17 A    Yes.
18 Q    And the central issue of this case is about
19 a 650i BMW; do you understand that?
20 A    Yes.
21 Q    So if I'm talking about the BMW, are we on
22 the same page that we're talking about the white BMW

12

1  650i?
2  A    Yes.
3  Q    You said you testified in NextGear's claim
4  against BW Auto.  Have you testified in any other
5  lawsuits on behalf of NextGear?
6  A    Yeah, about three other cases.
7  Q    Okay.  And when was that?
8  A    I would not have the dates for that.  Just
9  through the course of the years.
10 Q    Okay.  So since you became an account
11 executive, or when you were a general manager?
12 A    At one point, I think I was still a general
13 manager.  And as an account executive.  It's in both
14 positions.
15 Q    And were those also attempts to collect?
16 A    Collect debt, yes.
17 Q    Do you recall the most recent of the three?
18 Not the NextGear and BW Auto, but --
19 A    Somewhat.
20 Q    And who is the defendant in that case?
21 A    Who was the defendant?  No, I wouldn't have
22 that name.

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

13

1    Q    Do you recall whose loan it was that
2  NextGear was trying to collect?
3    A    **The name of the company?**
4    Q    Yes.
5    A    **They've since gone out of business. It's**
6  **been a couple of years. So no, I don't have the name**
7  **of -- it was actually down in Fredericksburg,**
8  **Virginia.**
9    Q    Okay. Other than your attorney, have you
10  discussed the facts of this case with anybody else?
11    A    **No.**
12    Q    Did you speak to Lisa Long about the case?
13    A    **That's my direct supervisor, so yes.**
14    Q    So you did speak to Lisa Long?
15    A    **Yes.**
16    Q    All right. Did you speak to --
17    A    **Outside of the company, NextGear, no. Of**
18  **course Lisa, and our attorneys.**
19    Q    Okay. So no one else besides Lisa Long at
20  NextGear did you speak to?
21    A    **No. No.**
22    Q    Okay.

14

1    A    **Besides our attorneys, correct?**
2    Q    Yes, besides your attorneys. Not including
3  your attorneys?
4    A    **Yes. Lisa and our attorneys.**
5    Q    Okay. Did you review any documents in
6  preparation for your deposition?
7    A    **Yes.**
8    Q    Okay. What documents did you review?
9    A    **Just the legal contracts. That was pretty**
10  **much it.**
11    Q    Okay. When you say "the legal contracts,"
12  which contracts?
13    A    **Our contracts with Baltimore-Washington.**
14    Q    Did you review any of the pleadings in the
15  case?
16    A    **Yes, somewhat.**
17    Q    Did you review Mrs. Mahdavi's complaint?
18    A    **Yes.**
19    Q    Did you review NextGear's answer to the
20  complaint?
21    A    **Yes.**
22    Q    Did you review any of the motions that have

15

1  been filed in the case?
2    A    **Yes.**
3    Q    All right. And how about NextGear's answer
4  to the --
5    A    **Yes.**
6    Q    NextGear's answer to the preliminary
7  injunction?
8    A    **Yes.**
9    Q    All right. And did you review Lisa Long's
10  affidavit?
11    A    **Yes.**
12    Q    Did you discuss Lisa Long's affidavit with
13  Lisa Long?
14    A    **No. I actually just read it this morning.**
15    Q    Okay. Did you do any investigation into
16  the facts and circumstances for Ms. Long's affidavit,
17  the facts and circumstances that form the basis of
18  her affidavit?
19        MR. BRAGDON: Objection, form.
20    A    **Rephrase the question, please.**
21  BY MR. LEVINE:
22    Q    Sure. Ms. Long submitted an affidavit in

16

1  this case.
2    A    **Okay.**
3    Q    Did you do any investigation on your own to
4  determine how she came up with the facts to put into
5  her affidavit?
6    A    **No.**
7    Q    So you're here to testify on the factual
8  issues in the subject matter of the complaint?
9    A    **Correct.**
10    Q    And the factual allegations supporting
11  NextGear's responses in its answer to the complaint?
12    A    **Correct.**
13    Q    And the issues and subject matter in
14  NextGear's answer to the complaint?
15        MR. BRAGDON: Objection, form. You can
16  answer.
17    A    **Correct.**
18  BY MR. LEVINE:
19    Q    And you're also here to testify to each
20  fact learned by NextGear subsequent to the filing of
21  its answer to the complaint?
22        MR. BRAGDON: Objection, form. You can

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

17

1   answer.
2      A   I guess we've already provided a response.
3   BY MR. LEVINE:
4      Q   Yes, but you've been designated, issue
5   number 3 on the notice of deposition says "Each fact
6   learned by NextGear subsequent to the filing of its
7   answer to the complaint that enables NextGear to
8   either admit or deny an allegation in the complaint
9   to which it previously answered that it lacks
10  sufficient knowledge or information with which to
11  admit or deny such allegation in the complaint."
12      In other words, NextGear's answer to
13  paragraph 9 of the complaint, you're here for that,
14  you've been designated on that, correct?
15      MR. BRAGDON:  Objection, asked and
16  answered.  I'll just point out NextGear's attorneys
17  are also investigating.  He won't be testifying about
18  any investigation the attorneys have done or what the
19  attorneys' trial strategy is.
20      MR. LEVINE:  He's testified that he's here
21  for all of these designations.
22      MR. BRAGDON:  Yes.

18

1      MR. LEVINE:  So I need to establish that he
2   actually knows something that he can testify on these
3   designations.  Otherwise, someone else is going to
4   have to be deposed and I'm going to keep the
5   deposition open until we get the right person.
6      MR. BRAGDON:  Ask him what he knows.
7      MR. LEVINE:  We're getting there, okay?
8      MR. BRAGDON:  I'm just making the point
9   that NextGear is being represented by attorneys who
10  are also -- the way that topic is worded I think is a
11  little broad.  That's all I'm saying.  So we object,
12  and we mention that.  He would not know the trial
13  strategy.
14      MR. LEVINE:  You didn't submit any written
15  objection to the designation.  So we're here today.
16  He's been designated.  He's your guy.
17      (NextGear Exhibit 2 was marked for
18  identification and attached to the deposition
19  transcript.)
20  BY MR. LEVINE:
21      Q   I would like you to take a look at what's
22  been marked NextGear Exhibit 2.

19

1      A   Okay.
2      Q   Have you seen this document before?
3      A   I have glanced at it, yes.
4      Q   Okay.  When did you glance at it?
5      A   This morning.
6      Q   And that was the first time?
7      A   Yes.
8      Q   Do you have any facts that would change any
9   of NextGear's answers?
10      A   No.
11      Q   In that answer to the complaint?
12      A   No.
13      Q   You're not aware of any facts that would
14  change NextGear's answer?
15      A   No.
16      Q   Have you ever done any investigation to
17  determine whether any answers need to be --
18      A   I was directly involved with everything, so
19  yes.
20      Q   Okay.  So just for the court reporter's
21  sake and for my sake, try to let me finish my
22  question.  Sometimes I'll pause before the end and

20

1   you'll want to give an answer, and that's fine, but
2   it will be easier if you wait until I finish my
3   question before you give your answer.
4      A   Okay.
5      Q   So you were directly involved in helping
6   prepare the answer?
7      A   No.
8      Q   Okay.  What were you directly involved in?
9      A   As far as looking for the collateral
10  inventory.
11      Q   And so what was your involvement?
12      A   So once we discovered that they had
13  defaulted and had moved the vehicles, we went to --
14  we keep a record of every audit.  So we went to every
15  place that we had conducted an audit and verified a
16  vehicle.  We actually have -- so we visited every --
17  every gas station, every dealership in the area,
18  basically, looking for inventory.
19      Q   Okay.  When you say "they defaulted," who
20  are you referring to?
21      A   Baltimore-Washington.
22      Q   Okay.  And when did you discover that they

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

6 (Pages 21 to 24)

21

1  had defaulted?
2      A   It was in April.  I don't have the exact
3  date.  I just know I was contacted on a Monday night.
4  I visited the lot on a Tuesday morning.  And there
5  were 13 cars on the lot out of 63.
6      Q   Okay.  Was this on or about April 16th or
7  17th?
8      A   Yes, I would say that.
9      Q   And did you personally go look for the
10  vehicles?
11      A   Yes.
12      Q   Did anyone go with you?
13      A   No.  A couple of times myself and Lisa rode
14  together.  She's actually from out of town, so she
15  would come into town.  We rode.  But basically I was
16  by myself.  We had some other people in the area by
17  themselves.
18      Q   Okay.  Anybody from Manheim go with you?
19      A   Yes.
20      Q   Who was that?
21      A   I can't even recall his name right now.
22  But yes, a representative did come.  I just can't

22

1  recall his name.
2      Q   And what was Manheim going with you to look
3  for the cars for?
4      A   Manheim actually had a lawsuit as well.  It
5  started with Manheim.  There were -- they extended a
6  line above our credit line about 300,000.  We had
7  what we called a 30-day float at the time.  And
8  within those 30 days, the vehicle was not paid or
9  that 300,000 was not paid.
10          So actually 60 days, Manheim contacted
11  them, let them know pretty much that they were going
12  to be defaulted and repo'd.
13      Q   How do you know Manheim contacted them?
14      A   I was told by Molavi.
15      Q   By who?
16      A   Molavi, the owner of Baltimore-Washington.
17      Q   Okay.  And when was that?
18      A   That Tuesday morning.  Actually Wednesday.
19      Q   When did Manheim contact BWA to inform them
20  of the default?
21      A   That was Monday night, the 15th of April or
22  16th.  Then I went there Tuesday morning and

23

1  discovered that the vehicles were missing.
2      Q   So it was April of 2014, not March of 2014?
3      A   April or March.  That's what I'm saying.  I
4  don't have the exact dates.  I don't recall.
5      Q   Okay.  Now, you said you spoke with Lisa
6  Long about this matter?
7      A   Correct.
8      Q   What conversations did you have with her?
9      A   So as soon as I discovered our vehicles
10  were missing, I called her and let her know how much
11  inventory we had missing at the time.  Continued to
12  attempt to contact Molavi, who was the owner.
13  Actually, it was sitting with Alex, who was the
14  general manager at the time.
15      Q   You went to --
16      A   I went to the dealership.
17      Q   -- visit him --
18          MR. BRAGDON:  Just let him finish his
19  question.
20  BY MR. LEVINE:
21      Q   So you went to BW Auto and spoke with
22  Mr. Molavi and Alex Mahdavi?

24

1      A   Can I answer now?
2      Q   Yes.
3          MR. BRAGDON:  Sorry.
4      A   So Molavi was not there.  I actually spoke
5  with Alex Mahdavi.
6  BY MR. LEVINE:
7      Q   Okay.
8      A   Alex -- Molavi did not respond via
9  telephone that day.  I actually went to the house the
10  next day.
11      Q   What's Mr. Molavi's first name?
12      A   Khazeyer Molavi.
13      Q   Does he go by another name?
14      A   I just call him Molavi.
15      Q   Okay.  And what did -- when you met with
16  Alex Mahdavi, what did he say to you?
17      A   He basically had his hands in the air.  He
18  acted like he didn't know what was going on.
19  Basically said, you know, get in contact with Molavi.
20  And he provided me at the time I guess about 20 bill
21  of sales, as I was doing my inventory.  And then I
22  guess the additional remaining vehicles, he said he

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

7 (Pages 25 to 28)

25

1   did not know where they were.

2       Q    Okay.  You say he acted like he didn't know

3   what was going on.

4       A    Mm-hmm.

5       Q    So you didn't believe him?

6       A    Alex ran day-to-day operations, so I

7   actually never spoke with Molavi.  Maybe occasionally

8   I would stop by, Molavi was there, we would shoot the

9   breeze a little bit.  But pretty much on the

10  business, I dealt with Alex daily.

11      Q    But my question is, you didn't believe him

12  when he was acting like he didn't know what was going

13  on?

14      A    Correct.  I did not.

15      Q    Okay.  And what information do you have

16  that would show that he did know what was going on,

17  other than the fact that his position as the

18  day-to-day -- running the day-to-day operations?

19      A    I wouldn't have any -- I didn't have

20  anything else besides that he was involved in the

21  day-to-day actions.

22      Q    Today, do you have any other information

26

1   that would show that he knew what was going on with

2   the -- what you claim is moving the vehicles around?

3           MR. BRAGDON:  I'm just going to object to

4   the extent that information has been provided

5   formally in this case.  He's reviewed those

6   submissions as well.

7       A    So at this time -- I'm not sure.  I don't

8   think -- I don't believe so.

9   BY MR. LEVINE:

10      Q    Okay.  So other than the fact that Alex ran

11  the day-to-day operations, you're not aware of any

12  facts that would show that he knew about any scheme

13  by BW Auto to defraud NextGear?

14          MR. BRAGDON:  Objection.  Same objection as

15  before.

16      A    I would say yes to that question, that --

17  yes, that I -- I definitely think that we have some

18  things that show that he was involved in the fraud.

19  BY MR. LEVINE:

20      Q    And what are those things?

21      A    I would assume that we have falsified

22  titles.

27

1       Q    You assume?

2       A    I mean, I'm sure that we have falsified

3   titles.  I'll say that.

4       Q    And how do you know the titles are

5   falsified?

6       A    Because we have the originals still in our

7   files.  The other part was I actually -- and again,

8   I'm not good with dates, I don't have the dates down,

9   but I actually went to the hearing with the MVA, who

10  they met with the head of investigations with the

11  MVA, who was Mr. Sherman.

12      Q    When was this?

13      A    This would have had to be in I would say

14  May, early May.  This happened in April.

15      Q    And you say it was a hearing?

16      A    Yes, a deposition for them as well.

17      Q    Who was deposed?

18      A    It was Molavi and Alex actually had to

19  appear.  I wasn't allowed to sit in on it, so I don't

20  have any particulars.  But when I met them there, I

21  talked to Mr. Sherman, and he had basically let us

22  know they had produced some titles.  They actually

28

1   was supposed to have been cut off from doing that.

2   But he wasn't sure at the time how they got activated

3   in the system.

4       Q    Okay.  So Mr. Sherman is an investigator

5   for the --

6       A    Yes, he's actually the head of

7   investigations for the MVA.

8       Q    And that would be the Maryland --

9       A    Maryland Vehicle Association.

10          MR. BRAGDON:  If it helps, I think what

11  he's referring to is the replevin hearing.

12  BY MR. LEVINE:

13      Q    And did Mr. Sherman provide documents to

14  NextGear on that issue of --

15      A    Not at that time.  I don't know if we

16  gathered anything since then, but not at that time,

17  no.  Like I said, I wasn't able to go into the

18  hearing.

19      Q    And was Mr. Sherman deposed, do you know?

20      A    No, I do not know.  When you say

21  "deposed" -- I'm sorry.  He was the one holding the

22  meetings.

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

8  (Pages 29 to 32)

29

1    Q    Mr. Sherman held the meeting?
2    A    Yes.
3    Q    Was this in court?
4    A    This was actually at the MVA, at their
5    office.
6    Q    At the MVA?
7    A    Yes.  Maryland Vehicle Association.
8    Q    And who at NextGear was involved in the
9    investigation with the MVA?
10   A    Myself just appeared.
11   Q    So you worked with Mr. Sherman?
12   A    On occasion.  He'll contact me in reference
13   to different dealers, or I'll contact him as well, if
14   dealers have some issues or some outstanding titles.
15   Q    Okay.  But you communicated directly with
16   Mr. Sherman --
17   A    Yes, I communicated with --
18   Q    -- regarding the BW Auto --
19   A    Yes.
20   Q    -- title issues?
21   A    Yes.
22   Q    And what did Mr. Sherman tell you about the

30

1    titles that you were questioning?
2    A    So at the time he had a number of
3    outstanding titles.  He was trying to get an idea of
4    what was legal buy or purchase versus what was
5    fraudulent that was outstanding.
6    Q    Okay.  And Mr. Sherman said that some of
7    the titles were fraudulent?
8    A    Yes.
9    Q    Did he identify which titles were
10   fraudulent?
11   A    No, he did not.  I provided him a list of
12   what we had on file, a list of our titles.
13   Q    Have you spoken with Mr. Sherman since this
14   meeting?
15   A    I have not, no.
16   Q    Has Mr. Sherman provided any documents to
17   NextGear subsequent to your meeting with him?
18   A    I do not believe so.
19   Q    Has Mr. Sherman stated what the results of
20   his investigation were?
21   A    No.  Like I said, I haven't had contact
22   with him.

31

1    Q    Has anyone at NextGear had contact with him
2    about the BW Auto titles?
3    A    Yes.  Yes.  I think that Lisa did speak
4    with him momentarily, but I know that she was saying
5    that he did not follow up.
6    Q    She told you that Mr. Sherman did not
7    follow up with her?
8    A    With her, yes.
9    Q    When did she tell you this?
10   A    I know there was a few emails outstanding.
11   I guess about three weeks ago.
12   Q    There are emails between NextGear and
13   Mr. Sherman at the MVA?
14   A    Yes.
15   Q    And these emails are about possible
16   fraudulent titles procured by BW Auto?
17   A    Correct.
18   Q    Has NextGear produced any of these emails
19   in this litigation that you're aware of?
20   A    I'm not sure, no.
21   Q    Do these emails still exist?
22   A    I would assume so.

32

1    Q    Were you copied on these emails?
2    A    No.
3    Q    So are these just between Lisa Long and
4    Mr. Sherman at the MVA?
5    A    I'm not sure who was copied on it.
6    Q    But that's who was communicating?
7    A    Yes.
8    Q    You don't know Mr. Sherman's first name?
9    A    I do.
10   Q    And what's his first name?
11   A    Actually, Sherman Schwartz is his name.
12   Q    Is that S-C-H-W-A-R-T-Z?
13   A    Yes.
14   Q    And what's Mr. Schwartz's phone number?
15   A    410-768-7536.
16   Q    And do you have a business address for
17   Mr. Sherman?
18   A    I do not.  He's at Glen Burnie, the MVA at
19   Glen Burnie.  I don't have the address, though.
20   Q    Do you know his title?
21   A    Investigations.
22          (NextGear Exhibit 3 was marked for

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

33

1 identification and attached to the deposition
2 transcript.)
3 BY MR. LEVINE:
4    Q    Take a look at that, please.  Do you
5 recognize that document?
6    A    Yes.
7    Q    Have you seen it before?
8    A    Yes.
9    Q    And are all the answers true and correct to
10 the best of your knowledge?
11    A    Yes.
12    Q    Did you participate in providing
13 information to respond to the interrogatories?
14    A    No.
15    (NextGear Exhibit 4 was marked for
16 identification and attached to the deposition
17 transcript.)
18 BY MR. LEVINE:
19    Q    Take a moment and review that document,
20 please, that's been marked as NextGear 4.
21       Have you had a chance to review that?
22    A    Yes.

34

1    Q    Okay.  Have you seen that document before?
2    A    Yes.
3    Q    And are all the responses true and accurate
4 to the best of your knowledge?
5    A    Yes.
6    Q    Did you see the documents that NextGear
7 produced in response to those requests for production
8 of documents?
9    A    Yes.
10    Q    Are there any additional documents that
11 NextGear needs to produce in response?
12       MR. BRAGDON:  Objection.  You can answer.
13    A    No.
14 BY MR. LEVINE:
15    Q    So you stated earlier that you had a
16 conversation with Lisa Long, that you informed her
17 that the vehicles were missing, you informed her of
18 the situation?
19    A    Yes.
20    Q    And what other conversations did you have
21 with Ms. Long about BW Auto and the --
22    A    So at that point, we were basically just

35

1 trying to get in contact with Molavi to find out
2 where the vehicles were.  As I said, I probably sat
3 in the office with Alex for probably about two or
4 three hours, waiting for a response from Molavi.  At
5 that time, I actually left and then I drove down to
6 Molavi's home the next morning.
7    Q    Okay.  When you sat with Alex for two to
8 three hours, what did you guys talk about?
9    A    How did he get in the situation.  At that
10 time, he disclosed that Molavi may have a gambling
11 problem.  And he was gathering up my bill of sales at
12 the time.
13    Q    Okay.  And he provided all the bills of
14 sale to you?
15    A    Well, 20 at the time.
16    Q    20?
17    A    20.
18    Q    Did that include the bill of sale for the
19 BMW?
20    A    No.
21    Q    What else did Alex tell you when you were
22 with him?

36

1    A    That was pretty much it.
2    Q    Did you ask him about the BMW during this
3 meeting?
4    A    Not specifically, no.  It was -- like I
5 said, we had, what, 63 units, 13, so we were missing
6 50-something units.  So no, I just asked where the
7 majority of the vehicles were.
8    Q    And what did he tell you?
9    A    He said, "I don't know, I'll have to speak
10 with Molavi."
11    Q    Are you aware of any facts as we sit here
12 today that would show that Alex knew where the
13 vehicles were located?
14       MR. BRAGDON:  Objection.  You can answer.
15    A    Well, we actually located the one at his
16 house so -- that he didn't know where one of the
17 vehicles were.
18 BY MR. LEVINE:
19    Q    But you said that you didn't ask him
20 specifically about the BMW.
21    A    No, I said vehicles in general.  So
22 rephrase the question.  If I understand --

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

37

1    Q    Are you aware of any facts that would show
2    that Alex did know where the vehicles were?
3        A    So the facts that say he did know?  So not
4    all of them, but in reference to that 645, like I
5    said, we actually were visiting their homes and prior
6    addresses where we had verified vehicles before.  And
7    that's when we discovered the 645 at his house.  So
8    he would have known where the vehicle was.
9        Q    When you say "the 645," you mean --
10       A    The BMW.
11       Q    What do you mean when you say you had
12   discovered vehicles at his home before?
13       A    So I didn't say at his home before.  I said
14   we visited every dealership or place where a vehicle
15   had been verified via our audit.  So gas stations,
16   prior dealerships.  We visited Molavi's home and his
17   home.  That's when we discovered the BMW at his
18   house.  So we visited the dealer's home.  Anybody
19   involved in that dealership, we actually visited
20   their place of residence.
21       Q    And that is just in relation to the current
22   loan default by BW Auto?

38

1        A    Correct.
2        Q    Not on prior occasions?
3        A    No.  Not on prior occasions.
4        Q    So this was the first time that NextGear
5    had gone to Alex's house?
6        A    Correct.
7        Q    Okay.  And at the time -- who went to
8    Alex's house?
9        A    Actually, I had gone there the day before,
10   a couple of days.  He and Molavi live like a block
11   from one another.  So actually that night we
12   discovered, he had I think John Goodyear, who is one
13   of our collectors, was in town helping, and he
14   actually went by the home and located that vehicle.
15       Q    And this is April of 2014?
16       A    Correct.
17       Q    And did you talk to Mr. Goodyear about what
18   he saw when he went to the home?
19       A    Basically that -- it was like, if I
20   remember correctly, it was probably three vehicles
21   that were there, that we thought were ours, but he
22   didn't get a chance to verify the VIN numbers.

39

1    That's when we had someone else go by to verify.
2        Q    And what were the other two vehicles
3    besides the BMW?
4        A    If I can remember correctly, there was a
5    truck that was receivable.  It was a pickup truck and
6    an Expedition.
7        Q    Were either of those vehicles what you
8    would consider to be NextGear's vehicles?
9        A    That's what I said, we didn't get a chance
10   to verify, there were some people out or something
11   like that, so he did not stop to verify the VIN
12   number at that time.
13       Q    And today do you know whether those other
14   two vehicles are considered NextGear vehicles?
15       A    No, we never confirmed that, no.
16       Q    So they've not been repossessed?
17       A    No.  They're still missing.
18       Q    How many vehicles has NextGear recovered of
19   the ones that were missing in this situation?
20       A    So at the time, we collected 13 vehicles.
21   Since the initial 13, I want to say three more.
22       Q    The 13 that were initially recovered, where

40

1    were they recovered from?
2        A    From the lot, from Baltimore Washington's
3    lot.
4        Q    And you've recovered three more?
5        A    Three more since then, yes.
6        Q    And which vehicles are those?
7        A    No idea.
8        Q    And where were they recovered?
9        A    He actually brought a couple of them back
10   to the lot for us to pick up.
11       Q    Who did?
12       A    I'm assuming Molavi.  I'm not sure who had
13   them brought back.
14       Q    Okay.  So he assisted in NextGear
15   recovering the vehicles?
16       A    Yes.
17       Q    Other than the BMW, were any other vehicles
18   repossessed at somebody's home?
19       A    No.  No other vehicles were located.
20       Q    No other vehicles were located?
21       A    No.
22       Q    Okay.  And the BMW at Mrs. Mahdavi's home,

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

41

1  at the time it was taken, was it parked in the
2  driveway?
3      A   I'm assuming so.  I wasn't there.
4      Q   It wasn't concealed in any way?
5      A   No.
6      Q   It was out in the open?
7      A   Yes.
8      Q   But on her property?
9      A   Yes.
10     Q   Did Mr. Mahdavi provide any assistance in
11  recovering any of the vehicles?
12     A   No.
13     Q   Are you aware of any steps that Mr. Mahdavi
14  took to conceal the location of the vehicles?
15     A   No.
16     Q   Was anyone at NextGear aware of any steps
17  Mr. Mahdavi took to conceal the location of any of
18  the vehicles?
19     A   Not that I'm aware of.
20     Q   Are you aware of what Mr. Mahdavi's
21  specific role would have been in obtaining what you
22  called fraudulent titles?

42

1          MR. BRAGDON:  Objection to form.  You can
2  answer.
3      A   He was in charge of financing.  So to
4  process a loan, pretty much he did all the paperwork.
5  BY MR. LEVINE:
6      Q   Okay.
7      A   So I would assume that he was the one who
8  was actually pulling those titles.  He would actually
9  pull them through the system.
10     Q   Okay.  But you don't actually know, you
11  don't have any facts?
12         MR. BRAGDON:  Objection.  He just provided
13  some facts.
14  BY MR. LEVINE:
15     Q   Other than his position, are you aware of
16  his direct involvement in obtaining fraudulent car
17  titles?
18     A   No.
19     Q   Is anyone at NextGear aware of
20  Mr. Mahdavi's direct involvement in obtaining
21  fraudulent car titles?
22     A   Not that I'm aware of.

43

1      Q   I'm going to ask you about Mrs. Mahdavi's
2  purchase of the BMW.
3      A   Okay.
4      Q   And tell me what you know about her
5  purchase of the BMW.
6      A   So we were not made aware that the vehicle
7  was supposed to have been purchased until after it
8  was repossessed.  Again, I spoke with Mahdavi during
9  the time of the default.
10         And he never made mention of that 645 being
11  purchased or the location of it.  Once the vehicle
12  was repossessed and we were made aware that it was
13  supposed to have been purchased, a couple of things
14  that we had noticed on the bill of sale, it was
15  actually purchased by Ms. Mahdavi prior to it being
16  floor planned, meaning before we actually did the
17  financing for it, which, again, is illegal.
18         I guess the second part of that, once we
19  saw the registration, it was actually registered to
20  not their address, but a wholesale office that he had
21  had in the past.
22     Q   Who is "he"?

44

1      A   Mr. Mahdavi.  It was actually under her
2  name.  I want to say it was in Temple Hills, but I
3  don't have the exact address.  Basically their
4  residence address was not used on the bill of sale.
5      Q   And what did that tell you?
6      A   That there was something being concealed.
7      Q   When did you learn of this?
8      A   After the car had been picked up, once they
9  disclosed that they had purchased the vehicle.  So
10  this was provided I'm assuming by them, by
11  Mr. Mahdavi.  They forwarded us I think the bill of
12  sale.
13     Q   What did NextGear do independently prior to
14  repossessing the BMW to determine whether it had been
15  transferred to Mrs. Mahdavi?
16         MR. BRAGDON:  Objection.  You can answer.
17     A   Like I said, we weren't aware of any
18  vehicles.  So when we take our receivable list, I had
19  marked off what was supposed to have been sold.
20  Anything on that inventory list, we can pick up, we
21  have UCC to those vehicles.
22  BY MR. LEVINE:

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

45

1    Q    So the BMW was on your inventory list?
2    **A    Correct.**
3    Q    And other than looking at the inventory
4  list, did you do anything to determine whether any of
5  the vehicles had been sold?
6    **A    No.**
7    Q    Do you know whether anyone at NextGear did
8  anything to see whether any of the vehicles on the
9  inventory list had been sold?
10    **A    Well, I guess when you say had they been**
11  **sold, again, I spoke with Mr. -- with Alex for two**
12  **hours.  He provided me 20 bill of sales at that time.**
13  **So that was not disclosed at that time.  So if it was**
14  **sold at that time, it actually was sold I want to say**
15  **in March, early March.  So it wasn't disclosed to us**
16  **at that time that it was sold.**
17    Q    Did you provide Alex with a list of cars --
18    **A    Yes.  Yes.**
19    Q    And the BMW was on the list of receivables?
20    **A    Yes.**
21    Q    And so you asked him to get bills of sale
22  for the BMW?

46

1    **A    I asked him to get whatever was sold.  So**
2  **any vehicle, out of the 63 units, provide us with a**
3  **bill of sale that whatever you have sold.  So go**
4  **through your records, give us a bill of sale on**
5  **whatever you have sold at that time.**
6    Q    Okay.
7    **A    So it was not disclosed at that time.**
8  **Again, it was not disclosed until after the car was**
9  **repossessed.**
10    Q    I understand that.  My question is, without
11  it being disclosed, is there any way NextGear could
12  have known independently?
13    **A    No, there's no way.**
14    Q    You can't check the MVA records on your
15  own?
16    **A    We don't have access to MVA records.**
17  **Again, that's when usually Sherman, he'll contact us**
18  **if there's a problem.  If he gets an MVA complaint,**
19  **it usually comes from a customer, is how he knows**
20  **there's trouble.**
21    Q    Were you the account executive for BW
22  Auto's loan with NextGear?

47

1    **A    Yes.**
2    Q    And when did you become the account
3  executive for them?
4    **A    I've been dealing with them since 2008, I**
5  **want to say.**
6    Q    Okay.  And other than the recent issues
7  with their default, have there be any other issues
8  with BW Auto?
9    **A    No other issues.**
10    Q    And the BW Auto's loan, Mr. Mahdavi is not
11  on that loan, is he?
12    **A    No.**
13    Q    Are you aware of what the relationship
14  between Mr. Mahdavi and Mr. Molavi is?
15    **A    I do not, no.**
16    Q    Mr. Mahdavi is not an owner of BW Auto, is
17  he?
18    **A    He's not on the contract.**
19    Q    When did BW Auto first notify -- excuse me.
20  Strike that.  When did NextGear first notify BW Auto
21  that it was in default on its loan?
22    **A    So that day, I guess the 16th or 17th,**

48

1  whatever that Tuesday was.
2    Q    Of April 2014?
3    **A    Yes.  So whenever -- whenever I was there**
4  **and there was only 13 vehicles on the lot, it was**
5  **either "Hey, where are our cars," or "You need to pay**
6  **us."  So at the time, Mr. Molavi said he didn't know**
7  **where the cars were, he sold them all, he hid them,**
8  **whatever he did.  He said that --**
9    Q    I'm sorry.  Mr. Molavi or Mr. Mahdavi said
10  that?
11    **A    Mr. Molavi.  When I visited him at his**
12  **house, he would not disclose where the vehicles were.**
13    Q    Okay.
14    **A    But he just asked for 30 days, and he would**
15  **try to make everything whole.**
16    Q    Okay.  And what did Mr. Molavi tell you
17  when you visited him at his house?
18    **A    In reference to?**
19    Q    The loan.
20    **A    Again, he just basically said he needed**
21  **some time, "Dave, can I get some time, about 30**
22  **days."**

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

13 (Pages 49 to 52)

---

49

1    Q    Did he say that he concealed the vehicles?
2    A    **He said he would not tell me where they**
3    **were.**
4    Q    Okay.  Did he --
5    A    **He said he did have the vehicles moved,**
6    **yes.**
7    Q    Mr. Molavi said he had them moved?
8    A    **He said he had the vehicles moved, but he**
9    **would not disclose where they were.**
10   Q    Okay.  Did he tell you who helped move
11   them?
12   A    **No.**
13   Q    Did he say that Mr. Mahdavi helped him?
14   A    **He didn't say anyone helped him.  But I do**
15   **know Mr. Mahdavi was there the night they got moved,**
16   **because I just spoke with him on the phone.**
17   Q    Where is "there"?
18   A    **So I called the office, and I was actually**
19   **on the phone with Alex that evening.**
20   Q    You called -- he was at BW Auto?
21   A    **Yes.  I talked to him on the phone at BW**
22   **Auto.**

---

50

1    Q    And you say the night that they were moved?
2    A    **So I got there Tuesday morning.**
3    Q    Yes.
4    A    **And that's where the cars -- I'm assuming**
5    **they were moved that night, between that evening and**
6    **that morning.**
7    Q    Okay.  Why do you assume that?
8    A    **Because I go by there all the time, so the**
9    **lot was full.**
10   Q    On what day?
11   A    **That Friday, as a matter of fact.**
12   Q    Okay.  And then on what day were they
13   moved?
14   A    **So between Monday and Tuesday morning.**
15   **Like I said, the conversation with Manheim took place**
16   **on Monday evening.**
17   Q    So I'm sorry, you had been by the lot the
18   Friday before?
19   A    **Yes.**
20   Q    And the lot was full?
21   A    **Yes.**
22   Q    And then did you go to the lot over the

---

51

1    weekend?
2    A    **No.**
3    Q    Did you go to the lot on Monday?
4    A    **No.**
5    Q    You went to the lot on Tuesday?
6    A    **Tuesday.**
7    Q    And the lot was completely empty on
8    Tuesday?
9    A    **It had 13 vehicles.**
10   Q    Only 13?
11   A    **Yes.**
12   Q    And how many vehicles were on the lot the
13   Friday before?
14   A    **I would say 65, 70.  70 vehicles.**
15   Q    Okay.  And what conversation was with
16   Manheim on Monday?
17   A    **So that's when I guess they were trying to**
18   **collect on the 300,000 that they were defaulted on.**
19   Q    Okay.  Who communicated with BW Auto, who
20   from Manheim communicated with BW Auto?
21   A    **I don't have his name.  Let me see if I**
22   **have that here.  Yeah, I don't have his name.**

---

52

1    Q    How do you know that Manheim communicated
2    with BW Auto?
3    A    **When I got to Molavi's home, he had**
4    **indicated he was on the phone, that he had spoke**
5    **with Manheim.**
6    Q    Okay.  What did Mr. Molavi tell you about
7    his communication with Manheim?
8    A    **He was a little bit upset and frustrated**
9    **with Manheim.  His exact words were "After 20 years**
10   **of doing business with them, they basically**
11   **threatened me."**
12   Q    Did he tell you who he was speaking with at
13   Manheim?
14   A    **He did.  Again, I can't recall name.**
15   Q    Okay.  And so Manheim had its own loan to
16   BW Auto?
17   A    **Correct.**
18   Q    And it had its own collateral?
19   A    **Correct.  The cars would be considered the**
20   **collateral.**
21   Q    Okay.  And is there overlap between the
22   cars, the collateral that's Manheim's collateral and

---

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

53

1  that's NextGear's collateral?
2      A   Is there overlap?  No.
3      Q   They're all different cars?
4      A   Yes.
5      Q   Manheim's cars are Manheim's cars?
6      A   Correct.
7      Q   And your cars are NextGear's cars?
8      A   Correct.
9      Q   Okay.  And the BMW was not Manheim's car?
10     A   No.  It's on our receivable.  You should
11  have actually got a copy of the receivable.
12     Q   Now, how did NextGear come to possess the
13  title to the BMW?
14     A   So any time the vehicle is purchased from
15  the auction, the title actually comes directly to
16  NextGear.  So we actually have a title center in
17  Indiana.  So once they make a purchase, they let them
18  know, I'm going to forward this with my NextGear
19  account.  The auction will send that to us.  We pay
20  the auction and they forward us the titles.
21     Q   So who was involved in the transaction for
22  the purchase of the BMW at auction?

54

1      A   I mean -- I'm not sure of your question.
2  Rephrase that, please.
3      Q   Well, somebody had to be at the auction to
4  purchase the BMW, correct?
5      A   So you're saying who actually purchased it,
6  as far as from Baltimore-Washington?
7      Q   Yes.
8      A   I'm assuming Molavi or Alex, whoever has
9  access to his account.
10     Q   Okay.  But you don't know specifically?
11     A   No.
12     Q   And do you know what date the BMW was
13  purchased at auction?
14     A   We should have provided that information.
15  It has exact dates on there.
16     Q   Okay.  But you don't have an independent
17  recollection?
18     A   No.  400 cars a day.
19     Q   And the auction where the BMW was purchased
20  was at Manheim?
21     A   Correct.  Manheim, Pennsylvania.
22     Q   Where in Pennsylvania is that?

55

1      A   In Manheim, Pennsylvania.
2      Q   Manheim, Pennsylvania.  And when did the
3  title arrive at NextGear?
4      A   So usually we get the title a day or two
5  after the car is purchased.  They overnight the
6  titles to us, to our headquarters.
7      Q   And did that happen in this case?
8      A   Yes.
9      Q   How do you know that?
10     A   Because we have the title on file.
11     Q   Who has the title now?
12     A   We still have our title that was sent from
13  the auction.
14     Q   And who has it?
15     A   It's in our -- like I said, we have a title
16  vault, so it's kept in the title vault.
17     Q   And that's in Indiana?
18     A   That's in Indiana.
19     Q   Now, you're aware -- or are you aware that
20  Mrs. Mahdavi took out a loan to purchase the BMW?
21     A   Yes.  After the car was repossessed and
22  this came about, yes.

56

1      Q   It's your understanding that she took out
2  the loan after the car was repossessed?
3      A   No, no, no.  I'm saying I was made aware
4  after the car was repossessed that she had a loan
5  out.
6      Q   And have you been made aware that she took
7  out the loan prior to the car being repossessed?
8      A   Yes.
9      Q   Okay.  And that loan is with Pentagon
10  Federal Credit Union?
11     A   Yes.
12     Q   And are you aware of any facts that would
13  show that that loan was not a legitimate loan?
14         MR. BRAGDON:  Objection.  Can I get a
15  continuing objection on these "any facts" questions?
16  He's not going to know counsel's trial strategy in
17  this case.  I'll just make the objection over again.
18         MR. LEVINE:  I mean, you can make the
19  objection.
20         MR. BRAGDON:  Okay.  To the extent you're
21  asking him to summarize what facts will be used
22  specifically at trial, he will not have that

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

57

1  knowledge.
2      MR. LEVINE: I'm pretty sure that's not my
3  question. I'm just trying to establish what facts he
4  knows. He's here as NextGear's representative, so...
5      A    I mean, I will say once I saw the paperwork
6  and after it was done, a couple of things I mentioned
7  already that we noticed. It was made prior to the
8  unit being floored.
9      So he had actually already purchased it
10  before we even put it on our floor plan, which again,
11  is falsifying, because one of the stipulations, the
12  vehicle cannot be sold. You have to pay the vehicle
13  off 48 hours after it's sold. Any time you buy a
14  vehicle from us, you sell it, it needs to be paid off
15  within 48 hours.
16      I just want to make sure that's clear. And
17  then -- so like I said, the dates showed that she had
18  actually purchased the vehicle before it having been
19  purchased by us. Secondly, once we verified, once I
20  saw a copy of the address, again, I noticed that
21  wasn't the residence that was listed on the bill of
22  sale in the title work.

58

1      So again, we had the original title. So we
2  knew it had to be a duplicate title even to be sent
3  to the funding company, PG, Pentagon Funding or what
4  have you.
5  BY MR. LEVINE:
6      Q    So how do you know it had to be a duplicate
7  title?
8      A    Because we still have the original title.
9      Q    Is it possible that a new title could be
10  issued without the first title being...
11      A    Well, the way --
12      MR. MARKELS: I'm going to object on
13  speculation. Go ahead.
14      A    The way it's supposed to work, you're
15  supposed to -- you should pay the vehicle off, and we
16  forward you the title, and then you get your title
17  work done. So we still have our title on file,
18  meaning, so yeah, if they have a duplicate title, it
19  was done under fraudulent circumstances.
20  BY MR. LEVINE:
21      Q    Is that the only way to obtain a duplicate
22  title, is through fraudulent circumstances?

59

1      MR. MARKELS: Same objection.
2      A    I wouldn't know any other way to do it,
3  sir.
4  BY MR. LEVINE:
5      Q    Is it part of your duties and
6  responsibilities to obtain titles for vehicles?
7      A    No.
8      Q    How about released titles for vehicles?
9      A    I can have them released. I'll take that
10  back. I mean, if I have to follow up on a title, we
11  didn't get it, I may give the auction a call or
12  something like that.
13      Q    But have you ever as part of your duties
14  and responsibilities for NextGear obtained a title to
15  a vehicle?
16      A    No.
17      Q    Tell me how NextGear knows that
18  Mrs. Mahdavi had any knowledge of what BW Auto may
19  have been doing with respect to these titles.
20      MR. BRAGDON: Objection to form. You can
21  answer.
22      A    I would not know.

60

1  BY MR. LEVINE:
2      Q    Does NextGear have any information to
3  indicate that Mrs. Mahdavi had knowledge of what BW
4  Auto may have been doing?
5      MR. BRAGDON: Objection. You can answer.
6      A    I would not know.
7  BY MR. LEVINE:
8      Q    Did you investigate whether she had any
9  direct involvement in what you're calling a
10  fraudulent scheme?
11      A    I have not myself, no.
12      Q    Would anyone else at NextGear possess that
13  information?
14      MR. BRAGDON: Objection. Besides the
15  attorneys?
16      A    I wouldn't know. I'm not sure of the
17  grounds they have been pursuing after this has come
18  to fruition, so I'm unaware.
19  BY MR. LEVINE:
20      Q    Would Lisa Long be involved in trying to
21  determine whether Mrs. Mahdavi has direct knowledge
22  of --

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

---

61

1      A    No.  I mean, again, this was -- our
2  attorneys are dealing with this now.
3      Q    So only your attorneys?
4      A    Yes.
5      Q    Okay.  Are you familiar with how much
6  Mrs. Mahdavi paid for the BMW?
7      A    I don't recall.  I did see the bill of
8  sale, but I don't recall.
9      Q    Do you recall whether that price was a fair
10  market value for the car?
11      A    I would say yes.
12      Q    And are you aware that she put a down
13  payment down on the vehicle?
14      A    Yes, I think so.  I think it was on the
15  bill of sale.
16      Q    Do you know whether Mrs. Mahdavi has ever
17  bought any other cars from BW Auto?
18      A    No.  I would not be aware of that.
19      Q    I'm going to skip ahead.  This has been
20  marked as NextGear Exhibit 8.
21          (NextGear Exhibit 8 was marked for
22  identification and attached to the deposition

---

62

1  transcript.)
2  BY MR. LEVINE:
3      Q    Take a minute to review this.
4      A    I'm familiar with it.
5      Q    Okay.  Can you identify this document,
6  please?
7      A    This is our demand and promissory note.
8      Q    Okay.
9      A    For NextGear.
10      Q    And does this evidence NextGear's loan to
11  BW Auto?
12      A    Yes.
13      Q    Were you involved in the negotiating of
14  this contract?
15      A    Yes.
16      Q    Were you involved at all in drafting the
17  contract?
18      A    No.
19      Q    Is this a standard contract for NextGear?
20      A    Yes.
21      Q    And Mr. Molavi signed this on behalf of BW
22  Auto?

---

63

1      A    Yes.
2      Q    Who signed it on behalf of NextGear?
3      A    Brian Geitner.
4      Q    Who is Brian Geitner?
5      A    He's our CEO.
6      Q    And you mentioned before that the BMW was
7  sold before NextGear financed it?
8      A    Correct.
9      Q    Okay.  And you said that that's against the
10  contract?
11      A    Correct.
12      Q    Okay.  And where in the contract does it
13  reference that?
14          MR. BRAGDON:  Objection to the extent that
15  you're asking him to interpret a legal document.
16      A    If you go to page 2 of 12, it will be G.
17  BY MR. LEVINE:
18      Q    2 of 12, G.  "To hold all amounts received
19  that relate to any receivable that is subject to a
20  recoverable advance in the form as received in trust
21  for the sole benefit of and for lender, and to remit
22  such funds satisfying all amounts due lender and

---

64

1  owing by borrower for and in connection with such
2  receivable, in each case within 24 hours of
3  borrower's receipt of such funds or receipt of such
4  funds by any affiliate of borrower."
5          MR. MARKELS:  You meant to say
6  "receivable" -- the document reflects "receivable
7  advance."
8          MR. LEVINE:  Yes, sorry.
9  BY MR. LEVINE:
10      Q    So BW is required to turn over the funds
11  that it receives for the purchase?
12      A    Correct.
13      Q    Okay.  Is it required to obtain NextGear's
14  authorization before it gives the buyer possession of
15  the vehicle?
16      A    Rephrase that.  Say that one more time.
17  I'm sorry.
18      Q    Does NextGear require that BW Auto obtain
19  NextGear's permission before it would give the buyer
20  possession of the vehicle?
21          MR. BRAGDON:  Objection to form.  You can
22  answer.

---

Case 1:14-cv-00648-TCB Document 66-3 Filed 02/04/15 Page 18 of 32 PageID# 842
DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

17 (Pages 65 to 68)

---

65

1      A    No.  Under our contract, like it said, you
2  have to pay.  You have a certain amount of time to
3  pay us once you sell the vehicle.
4  BY MR. LEVINE:
5      Q    So the contract allows them to sell the
6  vehicle?
7      A    Yes.
8      Q    BW Auto just has to give the money to
9  NextGear?
10     A    Correct.
11     Q    Okay.  So in essence, you're entrusting BW
12  with the vehicle, that they're going to provide the
13  money to NextGear?
14         MR. BRAGDON:  Objection to form.  You can
15  answer.
16     A    Correct.
17  BY MR. LEVINE:
18     Q    I'm sorry, your response was...
19     A    Correct.
20         (NextGear Exhibit 10 was marked for
21  identification and attached to the deposition
22  transcript.)

---

66

1  BY MR. LEVINE:
2      Q    I hand you what's been marked as NextGear
3  10.  Take a moment to review this document, please.
4      A    Okay.
5      Q    All right.  I'm going to follow up on that,
6  but let me turn back to the contract and NextGear's
7  interest in the BMW before I get too far off that
8  subject.  Now, how does NextGear establish that it
9  has a security interest in this BMW?
10         MR. BRAGDON:  Objection to form.  You can
11  answer.
12     A    So when you sign your contract, we file a
13  UCC, a Uniform Commercial Code, which gives us
14  interest in the property and all the assets.
15  BY MR. LEVINE:
16     Q    And NextGear's UCC for this BMW, was one
17  filed for this BMW specifically?
18     A    No.  General.  General filing.
19     Q    Okay.
20     A    So any inventory that's filed with us or
21  floored on our floor plan, we automatically have an
22  interest, because of the interest filing.

---

67

1      Q    Okay.  So as it relates to this BMW, it's
2  as inventory?
3      A    Correct.
4      Q    Okay.  And when was this security interest
5  perfected?
6         MR. BRAGDON:  Objection.  You can answer.
7      A    It should be in -- it should be already
8  provided to you.
9  BY MR. LEVINE:
10     Q    When did you first learn that NextGear had
11  financed the purchase of the BMW?
12     A    I guess once they filed suit against PAR.
13  When they first filed against PAR.
14     Q    When who filed suit?
15     A    I guess Ms. Mahdavi.
16     Q    When Mrs. Mahdavi filed suit in this case?
17     A    Yes.
18     Q    That was the first time that you became
19  aware that NextGear had financed the BMW?
20     A    No, no, no.  I'm sorry.  What's your
21  question again?  I'm sorry.
22     Q    When did you first become aware that

---

68

1  NextGear had financed the BMW?
2      A    As soon as it was floored.  Whatever day it
3  was floored.
4      Q    Okay.  And how did you become aware?
5      A    I have a receivable for every dealer so it
6  shows a list of the vehicles that we funded for them.
7      Q    Okay.  And do you know what day that is?
8      A    I do not.
9      Q    And has the list of receivables been
10  submitted?
11     A    Yes.
12     Q    And what's the process by which BW would
13  submit, what is it, an authorization to finance the
14  purchase?
15     A    So yes, they have to provide -- whatever
16  vehicles they would like floored, they let Manheim
17  know whatever vehicle they would like floored, they
18  would make the flooring clerk aware.
19     Q    So they don't go to NextGear?
20     A    No.  We can't -- they don't contact us.
21  They actually have to contact the auction.
22     Q    Okay.  Why don't they contact NextGear?

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

---

69

1    A    We can't give someone authorization to put
2  something on their floor plan.  They have to do it
3  themselves with the auction, how they're going to
4  pay, they make the auction aware of how they're going
5  to pay for the vehicle.
6    Q    Why can't you do that?
7    A    Because that would tell every one of my
8  dealers, hey, floor that vehicle with NextGear.
9    Q    Is there something illegal about that?
10   A    No.  I mean, it would be illegal.  It would
11 be a conflict of interest.
12   Q    Okay.  So then Manheim notifies NextGear
13 about BW's request?
14   A    So once they're made aware, they can do it
15 right through the system.  They have an internal
16 portal and they go right in and floor those vehicles.
17   Q    Okay.  So Manheim would have records of
18 when BW made the request to floor the vehicle?
19   A    Yes.  They should.
20   Q    And have you reviewed Manheim's records on
21 the flooring of the BMW?
22   A    No.

---

70

1    Q    Has anyone at NextGear reviewed Manheim's
2  records on the flooring of the BMW?
3    A    I'm not aware of that.
4    Q    Did you do anything to determine whether
5  NextGear reviewed Manheim's records on the flooring
6  of the vehicle?
7    A    No.
8        MR. BRAGDON:  Objection.  You can answer.
9    A    No.
10 BY MR. LEVINE:
11   Q    What communication has NextGear had with
12 Manheim about the BMW?
13   A    Since?  Since...
14   Q    Any communication.
15   A    There are two different Manheims.  I'm not
16 sure what you're asking me.
17   Q    Why don't you help me understand.  I'm not
18 clear on the difference between the Manheims.
19   A    Are you talking about before it was
20 repossessed?
21   Q    Starting with before it was repossessed,
22 yes.

---

71

1    A    So there was no contact with Manheim at
2  that time.  It was -- the auction that I had it
3  forwarded to, Baltimore-Washington, I just let them
4  know the vehicle was coming.
5    Q    This was after it was repossessed?
6    A    Correct.
7    Q    You contacted with Manheim?
8    A    Baltimore-Washington.
9    Q    And is that in Elkridge?
10   A    Yes, that's the one in Elkridge.
11   Q    And when did you do that?
12   A    The day I guess before it was delivered.
13   Q    So on or about May 20th, 2014?
14   A    We have the dates in there.  It's
15 consistent with whatever the dates are in the
16 paperwork.
17   Q    So you were aware that the BMW was on your
18 receivable list when you went and you met with Alex
19 Mahdavi on or about April 15th or 16th?
20   A    Correct.
21   Q    And the vehicle was repossessed on about
22 May 20th?

---

72

1    A    If that is what we have, then that would be
2  the date.
3    Q    Okay.  When did NextGear or anyone working
4  on behalf of NextGear first locate the BMW?
5    A    So whatever date that we had that was
6  picked up, we would have located it the day before.
7    Q    And so it was just located the day before
8  it was picked up?
9    A    Yes.
10   Q    And --
11   A    So once we had it located, we had a couple
12 of vehicles there, I contacted my repo team and let
13 them know, "Hey, if you could go by this address this
14 evening."  And they had a copy of the receivable list
15 as well, to see what vehicles they could locate
16 there.
17   Q    Okay.  So I want to turn back to NextGear
18 10.  Have you had a chance to review that?
19   A    Mm-hmm.
20   Q    What is that document?
21   A    It looks like our collection management
22 report.

---

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

73

1  Q   And on the first page, there's lots of
2  redactions.
3  **A   What are you calling it?**
4  Q   Redactions.  The black lines.
5  **A   Okay.**
6  Q   Are you familiar with what would have been
7  in those rows?
8  **A   It just looks like modified by just the**
9  **names, the initials.**
10 Q   Do you know who put those black marks on
11 that?
12 MR. BRAGDON:  Objection.  I think you have
13 to ask that to me.  I think it was done by their
14 attorneys.
15 MR. LEVINE:  Okay.
16 BY MR. LEVINE:
17 Q   Do you know why these would have been
18 redacted?
19 **A   No.**
20 MR. BRAGDON:  Same objection.
21 MR. LEVINE:  So there's a privilege here?
22 MR. BRAGDON:  The redacted ones, I think --

74

1  we'll have to look at specific ones.  I think some of
2  the redacted ones have been produced in full.  We've
3  also produced copies that were filed in Maryland
4  State Court in a different hearing.
5  MR. LEVINE:  That are unredacted?
6  MR. BRAGDON:  The ones in Maryland State
7  Court were redacted.  We'll have to look at any
8  specific redactions.  But it may be in the redacted
9  ones that were produced.  We certainly produced some
10 unredacted versions of redacted documents.
11 MR. LEVINE:  Okay.
12 MR. BRAGDON:  That we had already filed in
13 Maryland.  If we filed it in a redacted version, we
14 provided the filed redacted version.  And some of
15 those at least we provided an unredacted version.
16 MR. LEVINE:  Okay.
17 MR. BRAGDON:  If there are specific
18 redactions you have questions about, I can -- I would
19 have to provide that answer.
20 MR. LEVINE:  Okay.  So I'll ask that you do
21 that for everything that's redacted on what's been
22 identified as NextGear 10.

75

1  MR. BRAGDON:  To the extent we haven't
2  produced an unredacted version, yes.
3  BY MR. LEVINE:
4  Q   So hopefully you've got better eyes than I
5  do, because I have a real hard time looking at these
6  documents.  So what are these notes?
7  **A   These are our attempt to collect, where we**
8  **tracked what was done.**
9  Q   Okay.  And do you have access to this?  Is
10 this on a computer system?
11 **A   Yes.**
12 Q   Okay.  Does the computer system have a
13 name?
14 **A   The screen that it comes from is collection**
15 **management.**
16 Q   So you have access to this?
17 **A   Yes.**
18 Q   Who else has access to this?
19 **A   So any superior, so myself, my direct**
20 **supervisor Lisa, and any higher-ups on up the chain.**
21 Q   Anyone...
22 **A   Anybody involved in collections would have**

76

1  access.
2  Q   Okay.  And the second column -- so you have
3  "Modified On" as the first column, then "Modified
4  By," then "Method," then "Comment."  Are those the
5  only four columns?
6  **A   Yes.**
7  Q   So what does it mean -- I'm assuming, tell
8  me if I'm wrong, that "Modified On" means the date
9  that someone is putting a comment in?
10 **A   Correct.**
11 Q   And "Modified By" would be the person who
12 is putting the comment?
13 **A   Correct.**
14 Q   And what is "Method"?
15 **A   So where we are in the collection.  So**
16 **usually it's "Monitor," or it's been closed out.**
17 **It's basically our status codes.**
18 Q   Okay.  So "Monitor" is a status code?
19 **A   Yes.**
20 Q   "Closed out" is a status code?
21 **A   Yes.**
22 Q   Okay.  What are other status codes?

---

77

1      A    I can't even think of it. Come back to me
2   on that. I can't recall at this second.
3      Q    On the second page, page 2 of 7, it says
4   "Modified by Lisa Long."
5      A    Mm-hmm.
6      Q    Okay? Is this whole page a record from one
7   day?
8      A    Yes.
9      Q    And Lisa Long is the one who made this
10  comment?
11     A    Correct.
12     Q    Okay. So it says, first line, "5/21, LL,
13  recap of my visit, trying to locate inventory and
14  gather information"?
15     A    Mm-hmm.
16     Q    So is "LL" Lisa Long?
17     A    Correct.
18     Q    Okay. And so Lisa -- where does she work?
19     A    She is from Ohio. So she actually flew in.
20     Q    She flew in from Ohio? Where in Ohio?
21     A    I don't know.
22     Q    Does NextGear have an office there?

---

78

1      A    No. It's her physical address, her home.
2      Q    Does she work out of her home?
3      A    Yes.
4      Q    Okay. So she flew in to Maryland?
5      A    Correct.
6      Q    All right. And -- or I guess she went to
7   try to locate vehicles on her own?
8      A    Yes.
9      Q    Did you go with her?
10     A    Yes.
11     Q    So you were with her on 5/21?
12     A    Yes.
13     Q    Okay. Now, it says in the middle, it says
14  "Alex's dad house, 906 Westwood, Vienna."
15     A    Yes.
16     Q    Who is Alex's dad?
17     A    I'm not sure of his name.
18     Q    Okay. Does Alex's dad have anything to do
19  with BW Auto?
20     A    Not that we're aware of. It's one of the
21  places we had a location, under -- I think Alex had
22  an account with us as well, that had defaulted some

---

79

1   years back. So we just got some information out of
2   there.
3      Q    Okay. So it was just another location to
4   try to locate --
5      A    To locate inventory, yes.
6      Q    Inventory. Okay. And who is Emile?
7      A    Emile would be Molavi.
8      Q    Khazeyer Molavi?
9      A    Mm-hmm.
10     Q    So still on the page on 2 of 7, it's NG
11  000005, where it starts talking about Prestige
12  Imports.
13     A    Mm-hmm.
14     Q    Did you visit Prestige Imports?
15     A    Yes.
16     Q    So you were with Lisa and you both went to
17  Prestige Imports?
18     A    Yes.
19     Q    So tell me about what happened there.
20     A    Basically we went to Prestige. He was at
21  one of the -- again, so just to backtrack and
22  explain, every 30 days, our dealers get audited.

---

80

1   During that audit, we verify what's sold and what's
2   still there. So we collect bill of sales at that
3   time. If there's a car at a shop or anywhere else,
4   they give that address.
5          So what happens is whatever address we have
6   in our system from that audit, evidently Emile had
7   vehicles or Molavi had vehicles from before, and we
8   visited that dealership. That's one of the reasons
9   we went there.
10     Q    And what did you learn there?
11     A    That he actually had a Maserati there. We
12  verified the VIN number. It was not the Maserati
13  that Manheim was looking for. It was not on our
14  floor plan, but with Manheim, their credit line.
15     Q    So you're helping Manheim try to locate
16  their inventory?
17     A    Yes. If anything, we were aware of what
18  they were looking for as well, so yes.
19     Q    So this was not a NextGear collateral?
20     A    No. We were just trying to see if our
21  inventory -- any inventory we could find is what we
22  were looking for.

---

81

1    Q   Who is Omid?
2    A   **Omid is the owner there.**
3    Q   What did Omid tell you about what BW Auto
4    was doing with the vehicles?
5    **A   He is -- basically was not aware.  He said**
6    **he would contact Molavi to see what was going on.  He**
7    **was a good friend.  Molavi had helped him out in the**
8    **business and learning the business, so he would try**
9    **to find out what was going on.  But he didn't have**
10   **any information.**
11   Q   Did he ever provide you with any
12   information?
13   **A   No.**
14   Q   Did he say anything about Alex?
15   **A   No.**
16   Q   Okay.  So was the conversation centered on
17   Mr. Molavi?
18   **A   Yes.**
19   Q   Who is Lisa Stevens?
20   **A   Lisa Stevens is one of our collectors as**
21   **well.**
22   Q   Where does she work?

---

82

1    **A   She works out of NextGear in Indiana.**
2    Q   Okay.  Is she a supervisor?
3    **A   No.  I don't think so.**
4    Q   If you turn to page 5 of 7.  She's on the
5    modifier, modified by list.
6    **A   Yes.  So...**
7    Q   So how does she have access to the
8    collection management record, then?
9    **A   She's one of our collectors.**
10   Q   Okay.  So any collector has access?
11   **A   Yes.**
12   Q   And does she work for you?
13   **A   Kind of hand in hand.  Doesn't work for me,**
14   **but...**
15   Q   She didn't report to you?
16   **A   No.**
17   Q   Does she report to Lisa Long?
18   **A   No.**
19   Q   Do you know who she reports to?
20   **A   I do not.**
21   Q   And who is John Goodyear?
22   **A   John Goodyear is one of our collectors as**

---

83

1    well.
2    Q   Where does he work?
3    **A   Indiana.**
4    Q   And what information would Lisa Stevens
5    have about the BMW?
6    **A   She would not have any information that I'm**
7    **aware of.**
8    Q   All right.  What information would she have
9    about NextGear's trying to collect on BW's loan?
10   **A   So from the comment here, she was basically**
11   **running VIN checks.  So we have a system in place**
12   **where we can actually run VINs through the auctions**
13   **to see what's in the auctions.  And that's what we**
14   **were doing at that time, to see if there was anything**
15   **we could get a ping on.**
16   Q   And was that done for the BMW?
17   **A   That was done for all the vehicles.**
18   Q   What was learned about the BMW when that
19   task was performed?
20   **A   Nothing.  It wasn't at the auction, so it**
21   **wouldn't have showed up.**
22   Q   So this is just for if BW was to sell the

---

84

1    vehicle at auction?
2    **A   At auction, exactly.  It would chime into**
3    **all the auctions around the country.  If it was**
4    **registered, it would come up.  We were just asking to**
5    **lock it down.**
6    Q   Was NextGear able to locate any vehicles
7    using this method?
8    **A   We did not.**
9    Q   Do you know about how many vehicles, in
10   April of 2014, about how many vehicles sold that
11   month?
12   **A   I do not.  Like I said, I was given 20 bill**
13   **of sales at the time, which would be a little -- be a**
14   **little high.  Normally they sold about ten units of**
15   **floor plan when they would get an audit done, so 20**
16   **was on the extenuating side at that time.**
17   Q   Okay.  And do they finance all their
18   vehicles through NextGear?
19   **A   No.  They have some vehicles that they will**
20   **pay cash for.**
21   Q   Okay.  And --
22   **A   We had the majority of their inventory.**

---

85

1    Q    Do you know if they had a floor plan with
2    anyone else?
3    A    No.
4    Q    No, you don't know?
5    A    No, they did not, that I'm aware of.
6         MR. BRAGDON:  Do you want a break?
7         MR. LEVINE:  Do you need a break?
8         MR. BRAGDON:  Any time you want to take a
9    break, we can.
10        THE WITNESS:  How much longer do you have?
11   I could use the restroom.
12        MR. LEVINE:  We can take a break.
13        (Recess.)
14   BY MR. LEVINE:
15   Q    Who is John Goodyear?
16   A    John Goodyear is one of our collectors.
17   Q    So he was also involved in trying to
18   collect the --
19   A    Yes.  He was -- I'm sorry.  Go ahead.
20   Q    He was also involved in trying to collect
21   the BW loan?
22   A    Correct.

86

1    Q    And trying to recover the vehicles?
2    A    Correct.
3    Q    Okay.  So was he doing -- did he do any
4    surveillance?
5    A    Yes.
6    Q    Where does he work?
7    A    He works in Indiana.
8    Q    He also came--
9    A    Flew in, yes.
10   Q    Flew into Maryland?
11   A    Yes.
12   Q    Did Lisa Stevens fly into Maryland?
13   A    No.
14   Q    Do you know on what's marked as NG 000008
15   which vehicle VIN numbers are -- of which these
16   numbers would be for the BMW?
17   A    No.  You can match it up to the receivable.
18   Q    Who is Matt Easler?
19   A    Matt Easler would be the contact at
20   Manheim.
21   Q    What was his involvement in this matter?
22   A    So Matt actually came down and rode with us

87

1    as well.  He was looking for the three vehicles.  I
2    think it's mentioned in here.  The Maserati...
3    Q    He was looking for Manheim's vehicles?
4    A    Correct.
5    Q    Do you know whether he located them?
6    A    No.
7    Q    Was the Maserati Manheim's?
8    A    None of their vehicles have been located,
9    that I'm aware of.
10   Q    Now, the record references an informant?
11   A    We had a few people call stating that they
12   knew where the vehicles were; but nothing ever came
13   about, because we never located them.
14   Q    Okay.  Do you have the identities of these
15   people?
16   A    I do not.
17   Q    So --
18   A    Most of them were very vague.
19   Q    So the informant was not someone regularly
20   used by NextGear?
21   A    No.
22   Q    Okay.

88

1    A    Guys basically trying to get some money.
2    Q    Okay.  So how did this person contact
3    NextGear?
4    A    Via phone, I would assume.
5    Q    Okay.  Did he leave his name?
6    A    No.  That's what I'm saying, most of them
7    were very vague.
8    Q    What was --
9    A    I didn't talk to him myself, so...
10   Q    Who did?
11   A    I'm not sure.
12   Q    Would it have been John Goodyear?
13   A    He may have.
14   Q    So if you turn to NG 000009.  Do you know
15   who the task collections incident, who the individual
16   would have been who made the comment?
17   A    This is still Lisa, LL.
18   Q    All right.  So you're seeing where it says
19   "LL after 4/17"?
20   A    Mm-hmm.
21   Q    So above that, it says "LL 4/16."
22   A    Mm-hmm.

89

1     Q    For 4/18 there's no initials.  Do we know
2  if that's her?
3     A    No.  I'm not sure.
4     Q    Do you know who Scott Collier is?  It's at
5  the bottom of that page.  "Criminal invest."
6     A    Criminal investigator, but I don't know who
7  that is.
8     Q    Do you know -- it says "criminal invest."
9  Do you know what that means?
10     A    Criminal investigator.
11     Q    Is this law enforcement?
12     A    It could be.  Like I said, I don't know who
13  he is.
14     Q    Okay.  And so this was Lisa speaking to
15  that person?
16     A    There are no initials on there, so I'm not
17  sure who that actually was.  I would assume so.
18     Q    So other than when you went to visit Alex
19  at the dealership, did you have any other
20  communications with Alex about any of these cars?
21     A    No.
22     Q    How about Mr. Molavi?

90

1     A    I spoke to Mr. Molavi on a daily basis.
2     Q    Okay.  And did he provide any information
3  to you?
4     A    No.  No.
5     Q    Okay.  Did Lisa Long speak with Alex
6  Mahdavi?
7     A    Not that I'm aware of, no.
8     Q    Did she speak with Mr. Molavi?
9     A    Yes.
10     Q    And when did she speak with him?
11     A    She was probably communicating with him on
12  a daily basis as well.
13     Q    You would both speak to him on a daily
14  basis?
15     A    Yes.
16     Q    Independently or on a conference call?
17     A    Independently.  If she was in town, then it
18  would be together.  But yes.
19     Q    How many times did she come into town on
20  this matter?
21     A    Probably about two or three, three times.
22  I'm not sure.  Two times.

91

1     Q    Who made the decision to repossess the BMW?
2     A    Both of us.  Once we located it, I think
3  the notes say John sold the vehicle on 5/19.
4     Q    John Goodyear?
5     A    Yes.  So that same day, I contacted my repo
6  team to let them know to go by that address in the
7  evening.
8     Q    Who is your repo team?
9     A    PAR Services.
10     Q    Who did you contact there?
11     A    Denny.
12     Q    Denny?
13     A    Denny Par [sic], yes.
14     Q    His last name is Par?
15     A    Mm-hmm.
16     Q    Is that P-A-R-R?
17     A    P-A-R.
18     Q    Just P-A-R?
19     A    Yes.
20     Q    Is his last name.  Okay.  Does he own the
21  company?
22     A    No.  His father.

92

1     Q    Who is his father?
2     A    Mr. Par.
3     Q    Got you.  Did you speak with anyone else at
4  PAR Services about repossessing the BMW?
5     A    No.
6     Q    Did you call Denny?
7     A    Yes.
8     Q    And you called him on the 19th of May?
9     A    Yes.  Or the 20th.  It would have been that
10  morning.
11     Q    All right.  What did you tell him?
12     A    Basically that we thought we saw one of our
13  vehicles or a couple of our vehicles at that address,
14  at Mahdavi's address, and to go by there.
15     Q    Okay.  And then what was your next
16  communication with PAR Services about the BMW?
17     A    Well, there was -- the next day.  He got it
18  that night.  He let me know that he was able to get
19  the vehicle.
20     Q    Okay.  So after you instructed PAR Services
21  to obtain the vehicle, the next communication was
22  when they -- after they had obtained it?

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

93

1     A    Correct.
2     Q    Did you provide any information to PAR
3   Services about the vehicle besides describing the
4   make and models?
5        MR. BRAGDON:  Objection to form.  You can
6   answer.
7     A    Yes.  So we provided them with the
8   receivable which lists all the vehicles that they
9   have on their floor plan with the VIN numbers, so
10  they can verify it by the VIN.
11  BY MR. LEVINE:
12    Q    Okay.  Other than providing the receivable
13  to PAR Services, did you provide any other
14  information to PAR Services?
15    A    Just addresses of where to go look.
16    Q    Did you provide a copy of the title to the
17  vehicle?
18    A    No.
19    Q    Did you know whether or not you had the
20  title to the vehicle at this time?
21    A    Yes.
22    Q    Did you have the title to the vehicle at

94

1   this time?
2     A    Yes.
3     Q    So after the vehicle was repossessed, who
4   contacted you from PAR?
5     A    Denny.
6     Q    And did he call you?
7     A    Yes.
8     Q    And what day was it that he called you?
9     A    It would have been the 21st.
10    Q    And what did he say?
11    A    That they picked up the vehicle.  It was on
12  his lot, and where did I want him to take it.
13    Q    They took the vehicle back to his lot?
14    A    His storage lot.
15    Q    And where is that located?
16    A    I don't know.  They have a couple, but I'm
17  not sure exactly which lot he took it to.
18    Q    Do you know whether they conducted an
19  inventory of the vehicle?
20    A    They did not, because they did not have
21  keys to the vehicle.
22    Q    Do you know whether anyone at PAR Services

95

1   entered the inside of the vehicle?
2     A    Not that I'm aware of.
3     Q    Including the trunk?
4     A    Not that I'm aware of.  Like I said, they
5   didn't have keys, so...
6     Q    And did you instruct Denny where to take
7   the BMW?
8     A    Yes.
9     Q    And where did you --
10    A    Transport it to Baltimore-Washington
11  Manheim.
12    Q    And when was that done?
13    A    I guess a couple of days later.  I don't
14  have the exact date.
15    Q    Okay.  Do you know when Manheim obtained
16  possession of the vehicle?
17    A    It should have been provided.  But yes, we
18  have it on record, I don't recall the exact date.
19    Q    And how did you learn that the vehicle had
20  been taken to Manheim, BW Manheim?  Is that how it's
21  referred to, BW Manheim?
22    A    Baltimore-Washington, yes.

96

1     Q    How did you learn that it had been
2   delivered to BW Manheim?
3     A    So they let me know, once they take it
4   over, I do a report to let them know we'll get it
5   checked in, so our repossession team will verify that
6   it's been checked in over there.
7     Q    When you say "they," you mean PAR Services
8   will let you know?
9     A    They'll let me know when they take it in,
10  yes.
11    Q    Did they do that in this case?
12    A    Yes.
13    Q    Did Denny call and tell you that?
14    A    Yes.
15    Q    Any written communications with PAR
16  Services?
17    A    No.  I pretty much deal with them on the
18  phone.
19    Q    Okay.  So no emails with PAR Services?
20    A    No.
21    Q    No?
22    A    No.

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

25 (Pages 97 to 100)

97

1    Q   And do you have a contract with PAR
2  Services?
3    A   Yes.  Just a general contract.  Basically
4  they provide us with their license number and that
5  kind of stuff.  Just generally make sure they're
6  bonded.
7    Q   Now, when did NextGear first learn that
8  Mrs. Mahdavi might have had an interest in the BMW?
9    A   So I guess it was made aware like a day or
10  two later.  She actually contacted PAR, and in return
11  they contacted me.
12    Q   Okay.  Did you ever speak with
13  Mrs. Mahdavi?
14    A   No.
15    Q   Do you know if anyone at NextGear has
16  spoken with Mrs. Mahdavi?
17    A   No.
18    Q   No, you don't know, or no one has?
19    A   No, I'm not aware.  No.
20    Q   So when the vehicle was taken to Manheim,
21  did you talk to anyone at Manheim about the BMW?
22    A   Yes.

98

1    Q   And who did you speak with there?
2    A   Their repossession team.  Christian Taylor.
3    Q   Did he call you to tell you he had the
4  vehicle?
5    A   No.
6    Q   Did you call him?
7    A   Yes.  I wanted to confirm it was there.
8  Like I said, the way it happens, Denny would let me
9  know the vehicle is being taken over there.  I have
10  what they call a repossession form, so I submit that.
11  Our repo team verifies -- like I said, we have an
12  automatic connection with the auctions, they'll let
13  us know when a vehicle has been checked in.  So we
14  verified that the vehicle was there.
15    Q   Now, was the vehicle already at Manheim
16  when you learned that Mrs. Mahdavi was saying that
17  she owned the vehicle?
18    A   I am assuming so.  I think so.
19    Q   What instructions did you give to Manheim
20  about the BMW?
21    A   I let them know, I guess there was an
22  accusation that they had a watch in the vehicle, and

99

1  to do an inventory.
2    Q   Okay.  Did they do an inventory?
3    A   Yes.
4    Q   They didn't have keys?
5    A   Any time they get a car and it does not
6  have keys, they automatically have keys made so they
7  can move the vehicle around.
8    Q   All right.  And did they provide you with
9  an inventory?
10    A   Nothing written.  They said nothing was
11  found.
12    Q   There was nothing in the vehicle?
13    A   Nothing -- the only thing that was found I
14  think was some gloves that were put in the back.
15    Q   Okay.
16    A   Workout gloves.
17    Q   So no watch?
18    A   No watch.
19    Q   No cash?
20    A   No cash.
21    Q   And no jewelry?
22    A   (No verbal response.)

100

1    Q   Just bags of clothes?
2    A   Workout clothes, I think.
3    Q   Child car seat?
4    A   No.
5    Q   Have you had any communications with April
6  Rector about the BMW?
7    A   Just at the time when it happened.
8    Q   What was that communication?
9    A   To transport the vehicle.
10    Q   So you spoke to Denny and to April Rector?
11    A   Mm-hmm.
12    Q   What was your conversation with April
13  Rector?
14    A   Just to transport it.  I think when I
15  originally called, I was on the cellphone, I called
16  the office and got her, just to let her know, "Hey,
17  transport that for me."  Then Denny called me back.
18    Q   Did you find any other vehicles at homes of
19  any other BW Auto employee?
20    A   No.
21    Q   Where is the BMW now?
22    A   Still at Manheim, Baltimore-Washington.

101

1    Q    When was the last time you saw it?
2    A    I guess when it was originally repossessed,
3  say the 24th or something like that.
4    Q    Of May?
5    A    Uh-huh.
6    Q    Have you seen it since?
7    A    No.
8    Q    Okay.  Have you been given any reports on
9  its whereabouts?
10    A    No.  They were just keeping it in their
11  storage lot.
12    Q    Okay.  So as far as you know, it's still
13  sitting on their lot?
14    A    Yes.
15    Q    Do you know if anyone's been inside the BMW
16  since it was inventoried?
17    A    No, I wouldn't know that.
18    Q    Are you aware that Pentagon Federal Credit
19  Union contacted NextGear?
20    A    Yes.
21    Q    And what do you know about that?
22    A    That they contacted us, that's when we were

102

1  made aware about the loan.  And that's when they
2  faxed over their information.
3    Q    Okay.  And who is Stacy Miller Byrd?
4    A    She's one of the collectors.  Stacy Miller,
5  right?  Oh, she got married.
6        (NextGear Exhibit 12 was marked for
7  identification and attached to the deposition
8  transcript.)
9  BY MR. LEVINE:
10    Q    Have you seen this letter before?
11    A    I had not seen this, no.
12    Q    You've never seen that before?  Okay.  Are
13  you aware of NextGear's communication with Pentagon
14  Federal Credit Union?
15    A    No.
16    Q    Do you know if anyone else besides Stacy
17  Miller has been in contact with Federal Credit Union?
18    A    No, I'm not aware.
19    Q    Do you know, is there a file kept with
20  respect to this BMW at NextGear?
21    A    It would be our standard collections.  So
22  one of the things that you have here is our

103

1  collection management screen.  But it's just like any
2  other vehicle, nothing specific towards that 645.
3    Q    And so did you review, you know, what the
4  standard collection file would be for the BMW in
5  preparation for this deposition?
6    A    No.  I mean, there's not much done with it,
7  just to elaborate.  I mean, it's been repossessed,
8  because you have the legalities.  Most of the time we
9  sell the vehicles within ten days, so we run it back
10  to the auction.  So that hasn't been sold because of
11  the legal proceedings we're going through now.
12    Q    Okay.  Now, the letter from Pentagon
13  Federal Credit Union to Mrs. Mahdavi, it says that
14  NextGear authorized the repossession.  Do you agree
15  with that statement?
16    A    Correct.
17    Q    Okay.  And there's no dispute that PAR
18  Services was acting on behalf of NextGear?
19        MR. BRAGDON:  Objection.  You can answer.
20    A    No.
21  BY MR. LEVINE:
22    Q    Now, going back to NextGear's answer to the

104

1  complaint in this matter, several defenses are
2  asserted.  And one of the defenses that's asserted is
3  that Mrs. Mahdavi's claims are barred by fraud.  Are
4  you aware of any fraud that Mrs. Mahdavi has
5  committed?
6        MR. BRAGDON:  Objection.  You can answer.
7    A    Well, I think we touched upon it.  We have
8  the original title to the vehicle.  So to get any
9  financing, you have to provide the financing company
10  with a title.  So the question would be --
11  BY MR. LEVINE:
12    Q    You're talking about BW Auto --
13        MR. BRAGDON:  He was in the middle of his
14  answer.  Can he just finish his answer, please?
15    A    So, however the financing was conducted, it
16  was done by falsified title.  Then again, once we saw
17  the information that was on the bill of sale, there
18  was a falsified address.  So two of those factors,
19  that's how we kind of determined that it was
20  fraudulently done.
21  BY MR. LEVINE:
22    Q    How do you know --

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

105

1    A    And the third party -- I'm sorry.  The
2 third party, like I said, it was actually purchased
3 from Manheim prior to being financed in March or what
4 have you.  And I don't have the exact date.  But if
5 you look at the bill of sale, we actually have it in
6 some of the files here, the bill of sale says it was
7 purchased in March, and it was floored in April, and
8 they said it was sold in March as well.
9    Q    Now, you say that the address used on the
10 bill of sale was falsified?
11    A    Well, yes.  It was not their residence.
12    Q    And when did you learn that?
13    A    When we got a copy of the bill of sale from
14 Pentagon.  When we got a copy of the title work and
15 everything.
16    Q    And what led you to believe it was a false
17 address?
18    A    I actually went down to the address that
19 they had on there.  We realized it was a wholesale
20 address that they had on file with the MVA.  No -- it
21 was basically a garage that was there.
22    Q    Who is "they"?

106

1    A    Ms. Mahdavi.
2    Q    Okay.  And so what knowledge do you have
3 that she participated in the fraud?
4    MR. BRAGDON:  Objection.
5    A    I mean, I don't have -- who filed their
6 paperwork?  I mean, no, I don't have an answer for
7 you there.
8    MR. BRAGDON:  We've also answered these
9 exact questions in interrogatories.
10    MR. LEVINE:  I'm sorry.  Is there an
11 objection?
12    MR. BRAGDON:  Yes.
13    MR. LEVINE:  Can you state it concisely?
14    MR. BRAGDON:  Yes.  Asked and answered.
15 He's answered these --
16    MR. LEVINE:  I've heard your objection.
17 I'm going to ask my questions, okay?  I'll go through
18 every question I want and have him answer if I feel
19 like it, okay?
20    MR. BRAGDON:  If you're asking each
21 interrogatory after he's already provided
22 information, it just seems like a waste of time.  But

107

1 the information that was provided in answers to
2 interrogatories --
3    MR. LEVINE:  There's a lot of holes in the
4 answers to interrogatories.  And we're trying to
5 cover those right now, okay?  So I can go through
6 them one by one if I want.
7    MR. BRAGDON:  Of course you can.
8    MR. LEVINE:  And you can instruct him not
9 to answer if you want, okay?
10 BY MR. LEVINE:
11    Q    So you don't know who submitted the
12 paperwork for title?
13    A    No.
14    Q    You don't know what conversations
15 Mrs. Mahdavi had with Mr. Mahdavi about purchasing
16 the vehicle?
17    MR. BRAGDON:  Objection.
18    A    No.
19 BY MR. LEVINE:
20    Q    Do you know anything about conversations
21 that Mrs. Mahdavi had with anybody about purchasing
22 the vehicle?

108

1    MR. BRAGDON:  Objection to form.  You can
2 answer.
3    A    No.
4 BY MR. LEVINE:
5    Q    Are you aware of any facts to support a
6 contention that Mrs. Mahdavi didn't pay for the BMW?
7    MR. BRAGDON:  Objection.  Those facts have
8 been provided in the answers to interrogatories.  You
9 can answer.
10    A    I'm not aware.
11    (NextGear Exhibit 11 was marked for
12 identification and attached to the deposition
13 transcript.)
14 BY MR. LEVINE:
15    Q    I'll ask you to take a look at what's been
16 marked as NextGear 11.  Can you identify this
17 document?
18    A    Condition report.
19    Q    Whose record is this?
20    A    It looks like Manheim's.
21    Q    This is not a NextGear record?
22    A    No.  This would be their condition report

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

109

1    when they check the vehicles out.
2        Q    And is this something that NextGear would
3    send -- I mean, excuse me, that Manheim would send to
4    NextGear?
5        A    Yes, I'm sure we get a record of it.  Yes.
6        Q    Okay.  Do you know whether Manheim provided
7    this particular document to NextGear?
8        A    No.  I'm not aware if they did or not.
9        Q    Does NextGear have any policies and
10   procedures with respect to repossessing vehicles?
11       MR. BRAGDON:  Objection.  You can answer.
12       A    Our policy is normally if a dealer is
13   unable to pay the debt, we usually collect whatever
14   inventory that is left on the lot.
15   BY MR. LEVINE:
16       Q    Is this a written policy?
17       A    It's in the contract, yes.
18       Q    So the policy would be stated in the
19   document that's been marked as NextGear 8?
20       MR. BRAGDON:  Objection to form.  You can
21   answer.
22       A    Yes.

110

1    BY MR. LEVINE:
2        Q    Did you review this document prior to
3    repossessing the BMW?
4        A    Review it with whom?
5        Q    Did you personally review the document?
6        A    No.
7        Q    Did you refer to it at all prior to
8    repossessing the vehicle?
9        MR. BRAGDON:  Objection.  You can answer.
10   At any point prior?
11       MR. LEVINE:  I said, yes, "prior to."
12       A    So I did not -- I mean, I know the
13   contract.  We were out a million and a half dollars
14   or a million point four dollars, so we were trying to
15   collect anything we could at that time.
16   BY MR. LEVINE:
17       Q    But you didn't go back and refer to the
18   contract prior to repossession the BMW?
19       A    No, sir.
20       Q    So after you learned that Mrs. Mahdavi was
21   claiming she owned the BMW, what did you do about
22   that issue?

111

1        A    So again, our attorneys are handling that,
2    so everything is forwarded to the attorneys.
3        Q    Okay.  And did your involvement cease?
4        A    Correct.
5        Q    Okay.  Had BW Auto, other than the BMW, had
6    they ever floored a vehicle that it had previously
7    sold?
8        MR. BRAGDON:  Objection.  You can answer.
9        A    Not that we're aware of, not that they got
10   caught for, no.
11   BY MR. LEVINE:
12       Q    So the BMW is the only vehicle you're aware
13   of?
14       A    Yes.  Only because of the bill of sale
15   provided by -- by Pentagon.
16       Q    Okay.  Of the other vehicles that were on
17   the receivable list, had any of those vehicles been
18   sold?
19       A    Yes.  Again, at the time, I was given the
20   20 bill of sales, so he was saying that they were the
21   sold vehicles.  But if we have a record on file, we
22   should have a record of list of the bill of sales.

112

1    If you look, some of the names were questionable, to
2    say the least.
3        Q    In what way?
4        A    I think one of them said "incognito," and
5    one said "not me," "it wasn't me," that type of
6    thing.
7        Q    On the bill of sale?
8        A    On the actual bill of sales.
9        Q    Okay.  And do you still have copies of
10   those bills of sale?
11       A    We should have copies of the bill of sales.
12       Q    And who provided those to you?
13       A    Alex at the time.
14       Q    Alex did, okay.  Do you know whether or not
15   his signature was on any of those bills of sale?
16       A    No.
17       Q    Do you know whether his signature is on the
18   bill of sale to Mrs. Mahdavi?
19       A    No.  So we were just given printouts of the
20   bill of sale, so there were no signatures at all.
21   They stated they had a break-in and all the hard
22   files had been stolen.

113

1    Q    Who told you there was a break-in?
2    A    Molavi.
3    Q    Mr. Molavi?
4    A    Yes.
5    Q    I just want to make sure we're not getting
6    Mahdavi and Molavi --
7    A    Molavi.
8    Q    And when did he say this break-in occurred?
9    A    I think we should have this documented as
10   well.  Two weeks prior, I think, or a week prior.
11   Q    Did you ask Mr. Mahdavi about this
12   break-in?
13   A    It was after the fact, so I haven't spoken
14   with him since the day we went through the lot.
15   Q    Does BW Auto only sell used cars?
16   A    Yes, that I'm aware of.
17   Q    And are you aware about how many cars, what
18   percentage it typically would sell at auction versus
19   selling off the lot?
20   A    They didn't usually run vehicles back
21   through the auction.  They sold 100 percent, I would
22   say, to customers.

114

1    Q    Okay.  When did NextGear first inform BW
2    Auto that it was in default?
3    A    So we went to the lot that day, I guess the
4    April 20th or whatever it was.  And we didn't have
5    any of our inventory, and we didn't have any money.
6    He was in default at that time, so he was made aware
7    then.
8    Q    So prior to that, NextGear was not aware of
9    any default?
10   A    Yeah, no.
11   Q    And prior to that, NextGear had not
12   informed BW that it was in default?
13   A    No.
14       MR. BRAGDON:  Objection to form.  You can
15   answer.
16   A    No.
17       MR. LEVINE:  I don't have any further
18   questions.
19       MR. MARKELS:  No questions.
20       MR. BRAGDON:  Just a few questions.
21          EXAMINATION BY COUNSEL FOR
22          DEFENDANT NEXTGEAR CAPITAL INC.

115

1    BY MR. BRAGDON:
2    Q    When you said the "standard collection
3    file," were you referring to the computer system?
4        MR. LEVINE:  Objection, leading.
5    A    Correct.
6    BY MR. BRAGDON:
7    Q    Did you review the computer system at any
8    point since the repossession?
9    A    Have I?  No, not personally.
10   Q    Did you review it while the repossession
11   was going on?
12   A    Yes.
13   Q    And you reviewed the printout?
14       MR. LEVINE:  Objection, leading.
15   A    Yes.
16   BY MR. BRAGDON:
17   Q    Now, you spoke with --
18       MR. LEVINE:  Objection.
19       MR. BRAGDON:  Excuse me?
20       MR. LEVINE:  I'm anticipating another
21   leading question, so...
22   BY MR. BRAGDON:

116

1    Q    When did you speak with Alex Mahdavi?
2    A    So the day we have it, I guess it would
3    have been April the 20th or whatever it was, the day
4    we discovered that all the vehicles were missing.
5    Q    And what time was it?
6    A    I got there about 10, 10:30 in the morning.
7    Q    And you spoke to him before that?
8    A    I spoke with him that evening.
9    Q    The previous evening?
10   A    Mm-hmm.
11   Q    And what time was that?
12   A    It was about probably 6:30, 7.  He told me
13   he would give me a call back.
14   Q    Did he?
15   A    No, he never did.
16   Q    And what did you discuss?
17   A    I just asked him is everything okay.
18   Q    What did he tell you?
19   A    Yes.
20   Q    Did he tell you any cars were missing from
21   the lot?
22   A    No.

DEPOSITION OF CORPORATE DESIGNEE, DAVID FREEMAN
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

117

1    Q    From your experience, what were
2  Mr. Mahdavi's job responsibilities?
3       A    He was the general manager.  He was in
4  charge of all financing and managing the floor plan.
5       Q    Did he manage submission of funds to
6  NextGear?
7       A    Correct.
8       Q    And did he provide bills of sale when they
9  came in?
10      A    Yes.  He was -- our auditor would speak
11 with him and collect the bill of sales.
12      Q    Did he provide you a bill of sale for the
13 BMW when you saw him?
14      A    No.
15      Q    Did he tell you that it had been sold?
16      A    No.
17      Q    Did he submit any funds to NextGear?
18      A    No.
19           MR. LEVINE:  Objection, foundation.
20 BY MR. BRAGDON:
21      Q    And you testified earlier there was a
22 break-in?

118

1       A    Yes.
2       Q    And what did he tell you was gone from the
3  break-in?
4       A    The hard copies of files.  So their --
5  their original bill of sales and things like that.
6       Q    So what vehicles were those bills of sale
7  supposed to be for?
8       A    They are for --
9           MR. LEVINE:  Objection.
10      A    -- I guess the 20 that he gave me, what I
11 was trying to make him understand, there was no
12 signatures on them, because they said the hard files
13 had been stolen.
14 BY MR. BRAGDON:
15      Q    And the hard files, are you talking the
16 hard file bills of sale?
17      A    Correct.
18      Q    Now, Mr. Mahdavi did provide a hard file
19 bill of sale; is that correct?
20      A    No.
21      Q    Is there a copy of the bill of sale in the
22 documents you reviewed?

119

1       A    There is a copy of the bill of sales, but
2  there are no signatures.
3       Q    Got you.
4       A    So they would just be computer printouts,
5  is what he provided us with.
6       Q    And did you ever see a bill of sale for the
7  BMW?
8       A    No.  Not until Pentagon provided it.
9           MR. BRAGDON:  No further questions.
10 FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
11 BY MR. LEVINE:
12      Q    You said that when you called Mr. Mahdavi
13 the evening before you went to the lot --
14      A    Mm-hmm.
15      Q    -- you asked him if everything was okay?
16      A    Mm-hmm.
17      Q    Did you specify what you were talking
18 about?
19      A    I just said, "Is everything all right,
20 you had some payments due" or something like that,
21 "Are you okay to make those."  Just a regular call.
22 A lot of my dealers forget, they have a cutoff of

120

1  8:00.
2       Q    Had they missed any payments at that point?
3       A    No.  He said "No, I'll get right on it."
4       Q    And what time of night was that?
5       A    Probably about 7, 7:30.  Like I said, our
6  system cuts off at 8.  They will get a late fee.
7       Q    And what time did you arrive at the lot the
8  next day?
9       A    10:30.  Usually the lines open up at 10.
10 Usually between 10 and 10:30.
11      Q    And did Mr. Mahdavi do anything when you
12 arrived at the lot to try to, you know, conceal
13 himself?
14           MR. BRAGDON:  Objection.  You can answer.
15      A    No.
16 BY MR. LEVINE:
17      Q    Did he keep you waiting?
18      A    No.  It was status quo.
19      Q    Okay.
20      A    And that's the other answer in our
21 collection screen.  "Status quo."
22      Q    And what does it mean?

Case 1:14-cv-00648-TCB   Document 66-3   Filed 02/04/15   Page 32 of 32 PageID# 856

---

121

1     A     Basically status quo, we're just doing our
2  normal followup.  So nothing out of the ordinary.
3     Q     Who is the auditor that would speak to
4  Mr. Mahdavi?
5     A     Jeffrey White.
6     Q     And did Mr. White speak to Mr. Mahdavi
7  about the BMW?
8     A     I'm not aware, no.  We would have to look
9  at an audit.
10     Q     Is there an audit file?
11     A     Yes, we should have that.
12     Q     And would the BMW be referenced in the
13  audit file?
14     A     Yes, it should.  Depending on his last
15  audit and the purchase date.  Like I said, we give an
16  audit every 30 days.
17     Q     Okay.  And does the audit cover all the
18  vehicles that are submitted for floor plan within
19  that 30 days?
20     A     No.  Every vehicle on the receivable.
21     Q     Okay.
22     A     So any vehicle that has been financed and

---

122

1  not paid off is what we're inspecting.
2     Q     Okay.  Do you know whether an audit had
3  been run after the time the BMW would have appeared
4  on the receivable?
5     A     No, I do not.  Mine was the last audit that
6  day.
7     Q     Okay.  So you also perform audits?
8     A     Yes.  If there's an issue, I'll follow up
9  to see what's going on, and make a determination from
10  there.
11        MR. LEVINE:  Okay.  That's it.
12        MR. BRAGDON:  Thank you.  We'll read.
13        THE REPORTER:  Mr. Bragdon, are you
14  ordering a copy of the transcript?
15        MR. BRAGDON:  Yes, please.  E-Tran.
16        THE REPORTER:  And Mr. Markels?
17        MR. MARKELS:  Electronic, please.
18        (Signature having not been waived, the
19  deposition of NEXTGEAR CAPITAL, INC., By and through
20  its Corporate Designee, DAVID FREEMAN, was concluded
21  at 1:41 p.m.)
22

---

123

1              ACKNOWLEDGEMENT OF DEPONENT
2         I, DAVID FREEMAN, do hereby acknowledge
3  that I have read and examined the foregoing
4  testimony, and the same is a true, correct and
5  complete transcription of the testimony given by me,
6  and any corrections appear on the attached Errata
7  sheet signed by me.
8
9  _____    _____
10     (DATE)              (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

---

124

1     CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2         I, Lee Bursten, the officer before whom the
3  foregoing deposition was taken, do hereby certify
4  that the foregoing transcript is a true and correct
5  record of the testimony given; that said testimony
6  was taken by me stenographically and thereafter
7  reduced to typewriting under my direction; that
8  reading and signing was requested; and that I am
9  neither counsel for, related to, nor employed by any
10  of the parties to this case and have no interest,
11  financial or otherwise, in its outcome.
12         IN WITNESS WHEREOF, I have hereunto set my
13  hand and affixed my notarial seal this 27th day of
14  November, 2014.
15  My commission expires June 30, 2019.
16
17
18
19  _____
20  LEE BURSTEN
21  NOTARY PUBLIC IN AND FOR
22  THE DISTRICT OF COLUMBIA