IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JODI C. MAHDAVI, <br><br> Plaintiff, <br><br> v. <br><br> NEXTGEAR CAPITAL, INC., *et al.*, <br><br> Defendants. | Case No.: 1:14-cv-00648-TSE-TCB |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT P.A.R. SERVICES, INC.'S AMENDED MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant P.A.R. Services, Inc. ("PAR"), by undersigned counsel, under Fed. R. Civ. P. 56, and hereby requests that this Court enter an Order awarding it summary judgment as against all claims in Plaintiff Jodi C. Mahdavi's Complaint, and in support thereto states as follows:

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

1. PAR hereby adopts and incorporates by reference the Statement of Undisputed Material Facts contained in the Memorandum In Support of NextGear's Motion for Summary Judgment filed by Defendant NextGear Capital, Inc. ("NextGear") as Docket #66.

2. PAR is a repossession company. *See* Deposition of P.A.R. Services, Inc. ("PAR Dep."), pertinent portions attached hereto as **Exhibit One**, p. 6:4-5.

3. PAR repossessed the subject BMW at NextGear's direction, delivered the vehicle to BW Manheim at NextGear's direction, and has had no further involvement with the vehicle. *See id.* at pp. 35:6-38:4. Therefore, PAR does not have possession or control of the BMW and is not able to sell the vehicle.

4. PAR did not remove anything from the BMW, which now resides with BW Manheim. *See id.* at p. 34:15-22. There was only some paperwork and boxing gloves in the BMW of negligible value. *See id.* at p. 33:18-19.

5. There is no evidence that PAR's repossession ever breached the peace. *See* Transcript of Plaintiff's Deposition, pertinent portion attached hereto as **Exhibit Two**, at pp. 45:22-46:1, 72:13-74:21 (describing circumstances of the repossession).

## ARGUMENT

PAR hereby adopts and incorporates by reference the Argument set forth in NextGear's Memorandum In Support of its Motion for Summary Judgment [Docket #66]. As set forth therein, Plaintiff cannot show that she has good title to the BMW.

PAR is entitled to summary judgment as to Count I of Plaintiff's Complaint because PAR does not have possession or control of the BMW and is not able to sell the vehicle. Thus, it would be inappropriate to issue an injunction to prevent PAR from doing what it cannot do.

PAR is entitled to summary judgment as to Count II of Plaintiff's Complaint because PAR does not claim any right or title to the BMW. PAR merely repossessed the BMW at NextGear's direction, and NextGear has right and title to the BMW for the reasons stated in NextGear's Amended Motion for Summary Judgment.

PAR is entitled to summary judgment as to the trespass component of Count III of Plaintiff's Complaint because PAR lawfully entered upon Plaintiff's property and repossessed the BMW pursuant to NextGear's legal claim to that BMW, and was permitted under the law to thereby repossess it. *See* Va. Code §§ 6.2-2217(A) *and* 8.9A-609. Even under Plaintiff's own recollection, there is no evidence that PAR's repossession breached the peace or was otherwise inappropriately handled. PAR first hooked the BMW to its tow truck before initiating any

contact with the Plaintiff, establishing dominion over the car, and then knocked on the Plaintiff's door, asked for the keys, and left at the Plaintiff's request. *See* Statement of Material Facts Not In Dispute, ¶5. None of those actions can be considered a breach of the peace. *See Wallace v. Chrysler Credit Corp.*, 743 F. Supp. 1228, 1232-33 (W.D.Va. 1990) (no breach of peace once repossessor establishes dominion over the collateral, and no breach of peace unless repossessor engages in "conduct inciting to violence").

In addition, PAR is entitled to summary judgment as to the conversion component of Count III of Plaintiff's Complaint because Plaintiff cannot prove she has good title to the BMW, as set forth in NextGear's Amended Motion for Summary Judgment. As to the personal property Plaintiff claims was in the BMW at the time it was repossessed, Plaintiff's unsubstantiated allegations, without more, are insufficient to meet her burden of proving that there was any personal property in the BMW other than the paperwork and boxing gloves of negligible value. *Carter v. Ball*, 33 F.3d 450, 461-62 (4th Cir. 1994).

WHEREFORE, Defendant P.A.R. Services, Inc. respectfully requests that this Court enter an Order granting summary judgment in favor of P.A.R. Services, Inc. as to all counts of Plaintiff's Complaint, along with any other relief this Court deems just and necessary.

Dated: February 5, 2015.

Respectfully submitted,

P.A.R. SERVICES, INC.,
By counsel:

*/s/ James N. Markels*
James N. Markels (VA Bar No. 68399)
JACKSON & CAMPBELL, P.C.
1120 20th Street, N.W.
South Tower, Third Floor
Washington, D.C. 20036-3437
Telephone: (202) 457-1600
Facsimile: (202) 457-1678
Email: jmarkels@jackscamp.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of February, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECF System, which will then send a notification of such filing (NEF) to:

Jonathan E. Levine, Esquire (VA Bar No. 45572)
LEVINE, DANIELS & ALLNUTT, PLLC
5311 Lee Highway
Arlington, Virginia 22207
Telephone: (703) 525-2668
Facsimile: (703) 525-8393
jonathan.levine@levinedaniels.com
*Counsel for Plaintiff Jodi C. Mahdavi*

James D. Bragdon, Esquire
GALLAGHER, EVELIUS & JONES, LLP
218 North Charles Street, Suite 400
Baltimore, Maryland 21201
Telephone: (410) 727-7702
Facsimile: (410) 468-2786
jbragdon@gejlaw.com
*Counsel for Defendant NextGear Capital, Inc.*

/s/ James N. Markels
James N. Markels (VA Bar No. 68399)
JACKSON & CAMPBELL, P.C.
1120 20th Street, N.W.
South Tower, Third Floor
Washington, D.C. 20036-3437
Telephone: (202) 457-1600
Facsimile: (202) 457-1678
Email: jmarkels@jackscamp.com
*Counsel for Defendant P.A.R. Services, Inc.*

2955128v.1

# EXHIBIT ONE



# PLANET DEPOS
## We Make It Happen » Anywhere™

## Transcript of **APRIL MARIE RECTOR**

**Date:** November 17, 2014

**Case:** MAHDAVI v. NEXTGEAR CAPITAL, INC., ET AL

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Court Reporting | Videography | Videoconferencing | Interpretation | Transcription

DEPOSITION OF CORPORATE DESIGNEE, APRIL MARIE RECTOR
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

2 (Pages 5 to 8)

Page 5

```
 1              PROCEEDINGS
 2           APRIL MARIE RECTOR
 3   having been duly sworn/affirmed, testified as
 4              follows:
 5       EXAMINATION BY COUNSEL FOR PLAINTIFF
 6   BY MR. LEVINE:
 7       Q   Would you please state your name.
 8       A   Sure, it's April Marie Rector.
 9       Q   And who is your employer?
10       A   PAR Services.
11       Q   And where is PAR Services located?
12       A   We're in Clinton, Maryland.
13       Q   And do you work in Clinton, Maryland?
14       A   I do.
15       Q   And what's the address in Clinton?
16       A   6504 Yochelson Place. And the zip code is
17   20735.
18       Q   And what's your job title?
19       A   Manager.
20       Q   And what are your day-to-day
21   responsibilities?
22       A   Day-to-day, just kind of watch over
```

Page 6

```
 1   everything, any problems that come in I take care of,
 2   handle the insurance. Just managing the office
 3   employees, things of that nature.
 4       Q   What kind of business is PAR Services?
 5       A   It's a repossession company.
 6       Q   Does it do general towing or just
 7   repossessions?
 8       A   Just repossessions.
 9       Q   And how long have you been at PAR Services?
10       A   I've been there 15 years.
11       Q   And how long have you been a manager there?
12       A   About ten years.
13       Q   So you were a manager in May of 2014?
14       A   Yes.
15       Q   And are you familiar with the facts and
16   circumstances of this case?
17       A   Yes.
18       Q   Okay. And I would like for you to take a
19   look at what's been marked as PAR 1.
20           (PAR Exhibit 1 was marked for
21   identification and attached to the deposition
22   transcript.)
```

Page 7

```
 1           MR. MARKELS: Is there a question pending?
 2   I'm sorry.
 3           MR. LEVINE: I just asked her if she could
 4   review it.
 5       A   Sure.
 6           Okay. Yes.
 7   BY MR. LEVINE:
 8       Q   Have you seen this document before?
 9       A   I don't recall seeing this one before.
10       Q   Do you understand you're here as the
11   corporate representative for PAR Services?
12       A   Yes.
13       Q   And to give testimony on the subject
14   matters that are identified in this notice of
15   deposition?
16       A   Yes. I've gotten so many documents on it,
17   so everything kind of looks the same; but I
18   understand why I'm here.
19       Q   Sure. Now, the notice of deposition
20   identifies several subject matters that you're called
21   on to give testimony to. And are you here to give
22   testimony on each of these items?
```

Page 8

```
 1       A   In this deposition here?
 2           MR. MARKELS: To the extent that PAR knows
 3   them.
 4       A   Yes, so whatever questions I can answer.
 5           MR. LEVINE: I'll just ask you, don't
 6   instruct your witness. You can give an objection.
 7           MR. MARKELS: I'm just saying, she can only
 8   testify as PAR's representative as to what PAR knows
 9   personally.
10           MR. LEVINE: I understand. That's a
11   direction telling your witness how to testify. You
12   can object, that's fine. I would appreciate it if
13   you would not give instructions like that.
14   BY MR. LEVINE:
15       Q   Are there any of the designations that you
16   are unable to testify to?
17           MR. MARKELS: I'm going to object as to
18   form. Go ahead and answer.
19       A   Can you repeat that question one more time?
20   I'm sorry.
21   BY MR. LEVINE:
22       Q   Sure. Of the subject matters that are
```

DEPOSITION OF CORPORATE DESIGNEE, APRIL MARIE RECTOR
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

9 (Pages 33 to 36)

Page 33

1  Q  And who is that?
2  A  His name is Joseph Atchison.
3  Q  Did PAR Services perform any kind of
4  inventory of the contents of the vehicle?
5  A  When the vehicle initially came in, it was
6  locked, and it remained locked for several days,
7  until we received something in the mail stating -- it
8  was like a certified letter I think Ms. Mahdavi had
9  sent in stating that she had some money and jewelry
10 in the vehicle. And so it was at that time that we
11 had the vehicle -- because it's a very hard
12 vehicle -- when it's locked up, it's very hard to
13 gain access to.
14     So once we received the certified letter,
15 and I don't remember which one of our guys, a guy who
16 worked for us, I don't remember which one it was,
17 opened it up. I was out there when they opened it
18 up. And the only thing that was in that vehicle was
19 some paperwork and a pair of boxing gloves.
20     Now, we could not -- did not gain access to
21 the trunk.
22 Q  So you were present when the car was

Page 34

1  opened?
2  A  I was.
3  Q  And how was it opened?
4  A  It's called a break-in kit. It's a wire,
5  and they have to -- there's a wedge that they use to
6  kind of get the vehicle -- they have to create like a
7  pocket so they can get a tool in that unlocks the
8  vehicle.
9  Q  And I'm sorry, did you say you don't
10 remember who --
11 A  I don't remember, no. I don't.
12 Q  Okay. Do you have multiple employees who
13 would use the kit?
14 A  Yes, we do.
15 Q  And what was done with the contents of the
16 vehicle?
17 A  The contents of the vehicle? They remained
18 in the vehicle. We didn't take the contents out.
19 They remained in the vehicle and the vehicle was sent
20 to Manheim Auction. We notified NextGear what was in
21 there and left it in there. We did not remove
22 anything.

Page 35

1  Q  Who wrote down the inventory?
2  A  I did.
3  Q  Do you recall whether there was a child
4  seat in the car?
5  A  There was not.
6  Q  How long was the BMW on PAR Services's
7  property?
8  A  I'm going to revert back to the documents
9  here. Let's see. We repossessed it on I believe --
10 this is a fax copy. It looks like May 20th. Yes.
11 May 20th is the date it was repossessed and it was
12 delivered to the auction on May 30th. So 5/20, 2014,
13 until 5/30, 2014, is when it remained in PAR's
14 possession.
15 Q  Do you know why PAR Services had it for ten
16 days?
17 A  We generally -- whenever we repossess a
18 vehicle, it generally sits on our lot until our
19 client requests that we deliver it.
20 Q  So who made the request that it be
21 delivered?
22 A  Dave Freeman requested the delivery.

Page 36

1  Q  And his request was to take it to BW --
2  Baltimore-Washington Manheim?
3  A  Correct. BW Manheim, I get it confused
4  too.
5  Q  And who did Mr. Freeman make that request
6  to?
7  A  He made that request to me directly.
8  Q  By telephone?
9  A  Yes. I never met with Mr. Freeman in
10 person during this whole process here.
11 Q  Okay. Did you speak to Mr. Freeman at all
12 about Mrs. Mahdavi's claim that she owned the
13 vehicle?
14 A  Yes. I contacted him, because Pentagon
15 Federal Credit Union contacted us. So I called him
16 and I said, "Dave, I have a credit union calling us
17 saying that they own the vehicle, and they have faxed
18 me over some information." And that's when Dave said
19 "No, there's an ongoing suit that we have with her
20 husband," and I didn't really get into it with him.
21     I said, "I'll fax you this paper." He
22 said, "Don't worry about it, you're fine on your end,

DEPOSITION OF CORPORATE DESIGNEE, APRIL MARIE RECTOR
CONDUCTED ON MONDAY, NOVEMBER 17, 2014

10 (Pages 37 to 40)

Page 37

1  the vehicle belongs to us, there's just some other
2  issues going on with the dealership that we
3  financed."
4     Q   Other than Dave Freeman, did you ever speak
5  to anyone else at NextGear about Mrs. Mahdavi's claim
6  that she owns the vehicle?
7     A   I spoke to Mr. Bragdon like once or twice,
8  but just to kind of send him the information and find
9  out what was going on with it. You know, just -- it
10 was briefly. It wasn't -- you know, I was just
11 trying to find out what was going on, because we were
12 receiving -- this was prior to us retaining counsel.
13         We were receiving stuff from your office,
14 and then stuff from the courts; so I was just trying
15 to find out what was going on.
16    Q   So other than Mr. Bragdon, but no employee
17 of NextGear other than Dave Freeman?
18    A   Not that -- no, not that I can recall.
19    Q   Not Lisa Long?
20    A   No. I don't -- I don't recall ever
21 speaking to her.
22    Q   All right. After PAR Services delivered

Page 38

1  the vehicle to Baltimore-Washington Manheim, has PAR
2  Services ever had any involvement with the BMW
3  outside of the litigation?
4     A   No.
5     Q   Now, does PAR Services have insurance to
6  cover a loss in the event it repossesses a car that
7  it's not authorized to do?
8     A   Yes.
9     Q   And did you make an insurance claim?
10    A   I made the insurance claim. I contacted
11 our insurance company, because we were named in this
12 lawsuit. I originally contacted Mr. Bragdon and
13 NextGear to find out what was going on. And when I
14 wasn't getting anywhere there, and I kept receiving
15 stuff in the mail, that's when I contacted our
16 insurance company and advised them that we were being
17 named in a lawsuit.
18        And I sent them, you know, what information
19 I had. And then that's when they retained counsel on
20 our behalf.
21    Q   If you can look at what's been marked as
22 PAR 6.

Page 39

1         (PAR Exhibit 6 was marked for
2  identification and attached to the deposition
3  transcript.)
4  BY MR. LEVINE:
5     Q   That's part of responses to request for
6  production of documents. Do you recognize this
7  document?
8     A   I do.
9     Q   And did you receive this document from
10 Pentagon Federal Credit Union?
11    A   I did.
12    Q   And do you recall when you received it?
13    A   I received it the day of the repossession.
14    Q   And did you provide this document to
15 NextGear?
16    A   I don't know if I sent this -- wait. Yes,
17 I did. I did. I faxed this to Dave Freeman, along
18 with there was a fax cover sheet that Pentagon
19 Federal Credit Union sent to me along with this, and
20 I faxed that to Dave the same day.
21    Q   But the vehicle had already been
22 repossessed?

Page 40

1     A   Correct. Yes. This all came about after
2  the day it was repossessed.
3     Q   And do you know who at Pentagon Federal
4  Credit Union sent this to you?
5     A   Can I look back here? It's on the fax
6  cover sheet. It was sent from George Davis.
7     Q   Okay.
8     A   That's whose name was on the fax cover
9  sheet.
10    Q   All right. And whose notes are those at
11 the bottom of the -- if you look at PAR 6, at the
12 bottom.
13    A   Those are my notes. They were given to me
14 by Pentagon Federal Credit Union.
15    Q   And the vehicle was still on your lot when
16 this was given to you?
17    A   Correct.
18    Q   Did NextGear ever show you the title that
19 they possessed to the BMW?
20    A   No, I never received a copy of that.
21    Q   So is this the only title that you ever saw
22 to the BMW?

# EXHIBIT TWO

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

1

```
        IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF VIRGINIA
                (Alexandria Division)
-----------------------------------:
JODI C. MAHDAVI,                   :
                                   :
             Plaintiff,            :
                                   :
        vs.                        : Case No.
                                   : 1:14-cv-0648
NEXTGEAR CAPITAL, INC.             :
                                   :
and                                :
                                   :
P.A.R. SERVICES, INC.,             :
                                   :
             Defendants.           :
-----------------------------------:
```

Arlington, Virginia

Wednesday, November 12, 2014

Deposition of:

JODI C. MAHDAVI

called for oral examination by counsel for Defendant, pursuant to notice, at the law offices of Levine, Daniels & Allnutt, 5311 Lee Highway, Arlington, Virginia, before Christy McGee, CSR, of Capital Reporting Company, a Notary Public in and for the Commonwealth of Virginia, beginning at 10:00 a.m., when were present on behalf of the respective parties:

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

**Page 42**

1  that had built up in a very -- that the variations
2  were slight as you took money out and put money in
3  or was it an account that there were large changes
4  or variations in it?
5     A   No, it pretty much stayed the same.
6     Q   Were there any -- so there -- is it fair
7  to say there wouldn't have been any large transfer
8  into the account in early 2014 before purchase of
9  the vehicle?
10    A   2014? I'd have to go back and look.
11    Q   Were there any other conversations you
12 had that we haven't already discussed before
13 purchase of the vehicle about the BMW with your
14 husband that you can recall?
15    A   No.
16    Q   Is it fair to say that you didn't get
17 into the details of how the purchase was going to
18 happen?
19    A   No.
20    Q   Is that not fair to say? I'm sorry. I
21 asked the question in probably a bad way. Did you
22 get into the details before the purchase with your

**Page 43**

1  husband?
2     A   No, not at all.
3     Q   Has the amount -- the outstanding amount
4  on the loan for the GLK with PenFed, has that been
5  paid off?
6     A   No.
7     Q   Are you still paying that amount?
8     A   Yes.
9     Q   Did you receive a trade-in credit for
10 purchase of the BMW?
11    A   I was supposed to on the agreement. So
12 technically I've paid -- how do you say it? Yes, I
13 was supposed to get a trade-in allowance on the
14 deal, but I didn't get it. We took the car back.
15    Q   The GLK?
16    A   Right.
17    Q   So was the amount -- so the original plan
18 was that you would get a trade-in credit and trade
19 the car in?
20    A   Yes.
21    Q   And then that plan changed at some point
22 before the purchase was finalized?

**Page 44**

1     A   No, they didn't -- they didn't pay off
2  the GLK, so my husband brought the car back home.
3     Q   Okay. So Beltway didn't pay off the GLK?
4     A   Right.
5     Q   And when did you learn that Beltway
6  hadn't done that?
7     A   It was -- it was later. It was sometime
8  later in May.
9     Q   And do you recall what your husband told
10 you about that?
11    A   He just brought -- I -- he brought the
12 car back home.
13        MR. BRAGDON: Give me one minute. I'm
14 flipping through these documents. Do you want to
15 take a short break?
16        MR. LEVINE: Do you want to take a break?
17        THE WITNESS: It doesn't matter.
18        MR. BRAGDON: Do you mind if I do?
19        MR. LEVINE: No, go right ahead.
20        (Brief pause.)
21 BY MR. BRAGDON:
22    Q   Ms. Mahdavi, I want to talk a little bit

**Page 45**

1  about the night of the repossession of the BMW.
2     A   Uh-huh.
3     Q   Was it a Monday night?
4     A   Yes.
5     Q   Who was at home?
6     A   I was at home with my kids.
7     Q   Was your husband at home?
8     A   No.
9     Q   Do you know where he was?
10    A   I don't know.
11    Q   And I know you described this in your
12 interrogatories, but can you describe briefly what
13 happened or what you observed that night?
14    A   It was the middle of the night. The
15 doorbell rang. The guy said, Give me the keys to
16 the white BMW. I went outside. There were two
17 guys. He said he was there for Dave. I don't know
18 who Dave is. He said, Give me the keys to the BMW.
19 I called my husband. He said, No, don't give him
20 the keys. He goes, That's your car. He's like,
21 Call the police. I told the guy I was calling the
22 police, and he already had the car hooked up to the

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

**Page 46**

1  tow truck. When I went to call the police, the guy
2  left. I told him to leave, and then when I called
3  the police -- when I told him I was calling the
4  police, they left.
5      Q   And he left with the vehicle?
6      A   Uh-huh, yes. He didn't tell me his name.
7  He didn't give me a business card. He didn't -- he
8  didn't say anything. All he said was, I'm there
9  for Dave.
10     Q   And when you talked to your husband that
11 night, did he say anything else about why the car
12 might be being repossessed?
13     A   No, the only thing he said is, No. He
14 said, That's your car. He said, Tell him to leave,
15 that you're calling the police.
16     Q   Had your husband up to that point told
17 you anything about any issues at BW Auto?
18     A   No.
19     Q   And after that did your husband tell you
20 anything more about what was going on at BW Auto?
21     A   The only thing he told me was that the
22 car was taken because of BW.

**Page 47**

1      Q   Did he give you any details about what
2  was going on at BW with you?
3      A   No.
4      Q   Has he ever said anything to you about
5  Mr. Molavi or Ms. Nozary about what -- about any
6  actions they have taken at BW Auto?
7      A   No.
8      Q   Did your husband come home after that
9  incident?
10     A   After I called him?
11     Q   Yeah, that night.
12     A   Yes.
13     Q   He got there after -- did he get there
14 after the repossession, P.A.R. had left?
15     A   Yes.
16     Q   Did your husband continue reporting to
17 work after that.
18     A   I don't know.
19     Q   Do you know the last time your husband
20 went to BW Auto to work?
21     A   I have no idea.
22     Q   Has your husband told you anything about

**Page 48**

1  issues at BW involving duplicate titles being
2  obtained?
3      A   No.
4      Q   Are there any conversations you've had
5  with your husband after repossession of the vehicle
6  about BW Auto that you can recall?
7      A   About BW?
8      Q   Auto.
9      A   Only regarding my case.
10     Q   Has he told you anything about the
11 Maryland litigation?
12     A   No.
13     Q   And what has he told you about this case?
14     A   Just that -- told me about this case? I
15 mean, we've talked about, I mean, I bought a car,
16 you guys took my car, it's been six months, I want
17 my car back.
18     Q   Can we talk a little bit about the
19 property that you have alleged was in the car at
20 the time it was repossessed? Is it your contention
21 there was a Cartier watch in the car?
22     A   Yes.

**Page 49**

1      Q   When did you get the watch?
2      A   It was my husband's watch.
3      Q   Was it a watch that you wore?
4      A   Yes.
5      Q   Can you describe it generally?
6      A   It was a Cartier Pasha with diamonds
7  around the bezel.
8      Q   And --
9          MR. MARKELS: Around the what?
10         THE WITNESS: Around the bezel, around
11 the edge.
12         MR. MARKELS: I didn't know there was a
13 technical term for that.
14 BY MR. BRAGDON:
15     Q   And do you know when your husband got
16 that watch?
17     A   I don't know.
18     Q   And when did you start wearing it?
19     A   I've been wearing it the last ten years
20 on and off.
21     Q   Do you know how much it cost?
22     A   No.

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

Page 70

1  it, but I have no idea, like, how much it was.
2  Q   Have you ever seen his tax returns?
3  A   No, we don't file joint returns.
4  Q   How long have you been filing separately?
5  A   I don't think we've ever filed joint
6  returns.
7  Q   It's also true that the $12,466 that BW
8  Auto Outlet has has never been paid to PenFed,
9  right?
10     MR. LEVINE:  Objection, foundation, calls
11 for speculation.
12     THE WITNESS:  To my knowledge, it has not
13 been paid to PenFed.
14 BY MR. BRAGDON:
15 Q   You have produced as part of Exhibit
16 Number 3 your statements from PenFed, and if you'd
17 like to go through them again, that's fine, but
18 would you agree with me that none of those
19 statements reflect any payment of $12,466 to
20 PenFed?
21 A   They do not.
22 Q   Now, you did say that at one point your

Page 71

1  Cartier watch was appraised for insurance purposes?
2  A   Uh-huh, yes.
3  Q   And that you do have a copy of something,
4  one of those insurance documents that has that
5  appraisal value on it?
6  A   The insurance value that it's insured
7  for.
8  Q   Okay.  Have you given that to your
9  counsel to be produced in this case as an indicator
10 of the Cartier watch's value?
11 A   Yes.
12     MR. MARKELS:  Has that been produced,
13 Counsel?
14     MR. LEVINE:  I don't know.  I'd have to
15 look and see what was produced.
16     MR. MARKELS:  James, do you recall that
17 being in here?
18     MR. BRAGDON:  We can address it, but I
19 haven't seen it.
20     MR. MARKELS:  Okay.
21     THE WITNESS:  There was never an
22 appraisal.  It was just an insurance, what it's

Page 72

1  insured for.
2  BY MR. MARKELS:
3  Q   And that insurance was for a value,
4  correct?
5  A   Yes.
6  Q   And that value was pursuant to the
7  insurance company appraising the approximate value
8  of the Cartier watch?
9  A   Yes.
10 Q   Okay.  If you have not yet given that
11 document to your counsel, I ask that you do so,
12 that it be produced in this case.
13     Now, during the date of the repossession,
14 do you agree that that occurred in the early
15 morning hours of May 20th of 2014?
16 A   May 20th, yes.
17 Q   Okay.  Around, say, like 1:30 in the
18 morning or something like that?
19 A   Somewhere around in there, yes.
20 Q   You said that there were two gentlemen
21 who showed up?
22 A   Yes.

Page 73

1  Q   Now, when did it become clear to you that
2  this was a repossession of your car as opposed to
3  just some people stealing it?
4  A   When they knocked on the door and asked
5  for the keys.
6  Q   Okay.  Did they have any indicia of who
7  they worked for on them, on their outfits?  Did
8  they give you a card, any other information?
9  A   No.
10 Q   All right.  Now, did you -- after they
11 left, did you chase them?
12 A   I have three kids, small kids inside.
13 No, I did not chase them.
14 Q   Do you know if your husband ever tried to
15 pursue them?
16 A   My husband was not at home.  I called him
17 on the phone.  I don't know.
18 Q   Where was he at the time?
19 A   I don't know.  He wasn't home.
20 Q   He wasn't at work?
21 A   It was 1:30 in the morning.  I don't
22 know.

Capital Reporting Company
Mahdavi, Jodi C. 11-12-2014

**74**

1  Q   Okay. He hadn't told you where he was?
2      MR. LEVINE: Objection, asked and
3  answered.
4      THE WITNESS: No.
5  BY MR. MARKELS:
6  Q   All right. Now, to your knowledge,
7  nobody in any vehicle or on foot pursued the men
8  who repoed your car?
9  A   No, my husband met up with the police and
10 the men, the people who had the car.
11 Q   Now, you said as this was going on you
12 called the police, correct?
13 A   No, I told the men standing there to
14 leave, that I was going to call the police, and
15 that's when they left.
16 Q   Did you ever -- did you call the police
17 at that time?
18 A   No, I hung up the phone. They left --
19 they were leaving. I called my husband and said
20 that they left. That's when he got on the phone
21 with the police and they tracked them down.
22 Q   To your knowledge, have the police taken

**75**

1  any action against P.A.R. Services or NextGear or
2  anybody else with regard to that car?
3  A   Not to my knowledge.
4  Q   Do you know whether your husband was a
5  salaried employee of BW Outlet or was on
6  commission? Do you have any idea?
7  A   I don't know.
8  Q   Was he responsible for paying any of the
9  household obligations?
10 A   He pays the mortgage.
11 Q   That's the only thing he's in charge of?
12 A   Yes.
13 Q   Now, let's look at Exhibit Number 1, your
14 answer to Interrogatory No. 7, which is on Page 5.
15 Do you see that this is Interrogatory No. 7 about,
16 "Set forth all facts in support of the allegations
17 of Paragraph 31 of your complaint." Looking at
18 Exhibit Number 1.
19     MR. LEVINE: Exhibit Number 1. You mean
20 Exhibit 2?
21     MR. MARKELS: I'm looking for Jodi
22 Mahdavi's Supplemental Responses to P.A.R Services.

**76**

1      MR. BRAGDON: The P.A.R. one.
2      THE WITNESS: It's this one.
3      MR. LEVINE: Exhibit 2 is how we have it.
4      MR. MARKELS: Oh, you're on another
5  exhibit. I thought it was switched around. That's
6  fine.
7      THE WITNESS: Which page are we on?
8      MR. LEVINE: Page 5.
9  BY MR. MARKELS:
10 Q   Page 5. Page 5 of Exhibit 2. Now,
11 although the copies that we have before us are not
12 signed by you, you agree that you did sign these
13 particular answers to these supplemental
14 interrogatory answers, right?
15 A   Yes.
16 Q   Now, in your supplemental answer you
17 state that you received title for the BMW. Do you
18 see that?
19 A   Yes.
20 Q   Now, when you say you received title for
21 the BMW, you mean that what was in Exhibit 3 as
22 Mahdavi 1 was received to you in the mail, correct?

**77**

1  A   Yes.
2  Q   And we already talked about you did not
3  file any application or receive prior title to the
4  BMW at any time, correct?
5  A   Yes.
6  Q   All right. If you would turn to Page 6
7  of that same -- of Exhibit 2, you see where under
8  the supplemental answer it says, "Subject to and
9  without waiving the prior objections, on or about
10 May 21, 2014, I spoke to Deb McCloud on the
11 telephone about the BMW being repossessed and she
12 transferred my call to Kerry Howard." Do you see
13 that?
14 A   Yes.
15 Q   Are you sure that was on the 21st and not
16 on the 20th?
17 A   Yes. The 20th was the day the car was
18 taken.
19 Q   Right, the very early morning of the
20 20th, right.
21 A   Yes.
22 Q   So you did not contact PenFed the entire