```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                     EASTERN DISTRICT OF VIRGINIA
 2                        Alexandria Division

 3   JODI MAHDAVI,                    )
                                      )
 4                    Plaintiff,      )
                                      ) Civil No. 1:14cv648
 5      vs.                           )
                                      )
 6   NEXTGEAR CAPITAL, INC.           ) April 28, 2015
                                      )
 7                    Defendant.      )
     _____)

 8

 9

10                            JURY TRIAL

11   EXCERPTS - TESTIMONY OF:  JODI MAHDAVI
                               DAVID FREEMAN
12                             NAVID ALEX MAHDAVI

13

14   BEFORE:     THE HONORABLE THERESA CARROLL BUCHANAN
                 UNITED STATES MAGISTRATE JUDGE
15

16   APPEARANCES:

17   FOR PLAINTIFF:  JONATHAN LEVINE, ESQ.
                     NICOLE WINTERS-BROWN, ESQ.
18
     FOR DEFENDANT:  JAMES BRAGDON, ESQ.
19                   DAVID SUMMER, ESQ.

20
                              ---
21

22   OFFICIAL COURT REPORTER:

23                   RENECIA A. SMITH-WILSON, RMR, CRR
                     U.S. District Court
24                   401 Courthouse Square, 5th Floor
                     Alexandria, VA 22314
25                   (703)501-1580
```

```
 1                        INDEX
                    (Requested Excerpts)
 2

 3   WITNESS (Plaintiff)  DIRECT  CROSS   REDIRECT  RECROSS

 4   Jodi Mahdavi           4      19       39       ---

 5   WITNESS (Defendant)  DIRECT  CROSS   REDIRECT  RECROSS

 6   David Freeman          40     64       ---      ---

 7   Navid Alex Mahdavi     69     ---      ---      ---

 8
         (End of Requested Excerpts)
 9

10                        ---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                      PROCEEDINGS

 2                  (Requested Excerpts)

 3

 4            (Thereupon, the following was heard in open

 5   court:)

 6            THE CLERK:  Civil Action 2014-648, Jodi

 7   Mahdavi versus NextGear Capital, Incorporated.  This case

 8   comes on for trial by jury.

 9            Would counsel please note your appearances

10   for the record.

11            MR. LEVINE:  Good morning, Your Honor.

12   Jonathan Levine on behalf of Jodi Mahdavi.  And with me

13   is my associate, Nicole Winters-Brown.  And this is

14   Ms. Mahdavi to my right, immediately.

15            THE COURT:  Thank you.

16            MR. BRAGDON:  Good morning, Your Honor.

17   James Bragdon for NextGear Capital, Inc.  I'm here with

18   my colleague David Summer, and Lisa Long, the

19   representative of NextGear Capital.

20            THE COURT:  All right...

21                         ---

22            (Requested excerpts follow:)

23            ...THE COURT:  All right.  Would you like to

24   call your first witness?

25            MR. LEVINE:  Call Ms. Mahdavi.
</pre>

J. Mahdavi - Direct                                                4

```
 1                    (Witness sworn.)

 2                    THE WITNESS:  I do.

 3                    THEREUPON, JODI MAHDAVI, having been duly

 4    sworn, testified as follows:

 5                         DIRECT EXAMINATION

 6    BY MR. LEVINE:

 7        Q.   Please state your name for the record.

 8        A.   Jodi Mahdavi.

 9        Q.   And, if you could speak up, also, for the court

10    reporter and for the jury, please.

11        A.   Jodi Mahdavi.

12        Q.   Thank you.

13             And what's your residential address?

14        A.   915 ███████████, Vienna, Virginia.

15        Q.   And, are you married?

16        A.   I am.

17        Q.   And what's your husband's name?

18        A.   Navid Mahdavi.

19                    THE COURT:  Could you speak up a bit, ma'am.

20                    THE WITNESS:  Navid Mahdavi.

21    BY MR. LEVINE:

22        Q.   And, do you have any children?

23        A.   I do.  Three.

24        Q.   And, what are their ages?

25        A.   Nine, seven, and three.
```

1    Q.   Okay.  And, are you currently employed?

2    A.   Yes.

3    Q.   What's your employment?

4    A.   I work for Palm Management Corporation in DC, and

5    then I do consulting on the side.

6    Q.   And, what do you do for Palm Management

7    Corporation?

8    A.   The assistant controller.

9    Q.   And do you have any professional degrees?

10   A.   A bachelor of science and an undergrad in

11   accounting.

12   Q.   Okay.  And, what are your job responsibilities for

13   Palm Management?

14   A.   For Palm Management, I supervise a staff of

15   accountants.

16   Q.   Okay.  And, is that the Palm Restaurants?

17   A.   Yes.

18   Q.   Okay.  And, how long have you worked for Palm

19   Management?

20   A.   Sixteen years.

21   Q.   And are you an accountant?

22   A.   A CPA.

23   Q.   Okay.  And, how long have you been a CPA?

24   A.   Twenty years.

25   Q.   Okay.  And, where did you go to undergraduate

1   school?

2       A.   George Mason.

3       Q.   Okay.  And, did you -- and what about graduate

4   school?

5       A.   George Mason.

6       Q.   And, the consulting work that you say you do, can

7   you please describe that?

8       A.   I do accounting services for a government

9   contractor for the last 20 years, and, I do accounting

10  services for the auto dealership for the last five or

11  six years.

12      Q.   Okay.  And, are you familiar with Baltimore

13  Washington Auto --

14      A.   That's --

15      Q.   -- Dealership?

16      A.   That's my husband's employer.

17      Q.   Okay.  And, do you know what his role was at

18  Baltimore Washington Auto?

19      A.   He was a manager and a salesman.

20      Q.   Okay.  Do you know whether he was an owner?

21      A.   He is not an owner, no.

22      Q.   And, do you know who the owner of Baltimore

23  Washington Auto is?

24      A.   Mr. Molavi.

25      Q.   Did you ever have an occasion to buy any vehicles

1   from Baltimore Washington Auto?

2       A.   My husband started working for Baltimore

3   Washington in 2010, and I've bought five cars from BW

4   Auto since then.

5       Q.   And, what was the first car that you bought from

6   Baltimore --

7       A.   The first car I purchased from BW was in 2011, and

8   I bought a 2008 Cadillac Escalade.

9       Q.   Was your husband involved in that transaction?

10      A.   He sold me the car.

11      Q.   Okay.  And, did you finance that car?

12      A.   I financed it through Pentagon Federal, and it was

13  registered in Maryland.

14      Q.   Okay.  And, how long did you have that car?

15      A.   About a year.

16      Q.   And what did you do with it?

17      A.   I traded it in and I purchased another vehicle, a

18  2005 Mercedes E Class, also financed through Pentagon

19  Federal, registered in Maryland.

20      Q.   And, approximately what time period was this?

21      A.   It may have been six months later.

22           I traded that in and I purchased the 2011 Mercedes

23  GLK, also financed through Pentagon Federal, registered

24  in Maryland.  All the paperwork was done the exact same

25  way that the BMW had been done.

J. Mahdavi - Direct

1    Q.   What do you mean, when you say the paperwork had

2    been done in the same way?

3    A.   My husband would bring the paperwork home to me.

4    BW is about an hour, maybe an hour and a half from my

5    house.  He goes there to work.  He would bring the

6    paperwork home to me.  I would sign it.  He would take it

7    back to work with him.

8         I financed my car loans through Pentagon Federal.

9    All my cars were registered in Maryland.  I mean, it was

10   done the exact same way as the BMW.

11   Q.   For any of these prior vehicles, did you go to

12   Baltimore Washington to view the car or test drive the

13   cars?

14   A.   No.  He brought the cars home to me.

15   Q.   And, did there come a time when you saw the BMW at

16   issue in this -- in this case, the BMW 650?

17   A.   The white one?  When he brought it home in the

18   beginning of March.  He brought it home on a Friday.

19   Q.   Was that the first time you had ever seen a BMW

20   650?

21   A.   No.  I -- in the beginning, 2014, I saw that the

22   6 Series came in a four-door.  I had always liked the BMW

23   6 Series, but it came in a two-door.  I have kids.  It

24   wasn't a practical car for me.

25        So when I saw it in a four-door, I was excited.  I

1    told my husband that I wanted one.

2         He brought one home at the beginning of March.  I

3    test drove it over the weekend.  I told him I wanted it.

4    I bought it.

5         Q.  From the time period that you saw the -- where

6    were you when you saw the BMW?

7         A.  On 495.

8         Q.  And, from the time period where you saw the BMW on

9    495 and the time period that your husband brought the BMW

10   home, did you have any discussions with him about

11   purchasing the BMW?

12        A.  No.

13        Q.  What discussion, if any, did you have with him

14   about him going out and finding one?

15        A.  We didn't.  I just told him that I -- I liked the

16   BMW 6 Series four-door.

17        Q.  Okay.  Were you aware that he was going to bring

18   one home?

19        A.  No.  He just brought one home.

20        Q.  Okay.  And when did he bring it home?

21        A.  It was the first Friday in March.  It was the

22   Friday before I did the -- the deposit.

23        Q.  And how long was the car at your home?

24        A.  Over that weekend.

25        Q.  And what --

1      A.   From Friday until he took it back.

2      Q.   Okay.  And, he took it back to where?

3      A.   BW Auto.  And he did not drive it home every day.

4  He drives a different car home every day from work.  It

5  was not the BMW every day.

6      Q.   Did he ever drive the BMW 650?

7      A.   Occasionally, yes.

8      Q.   Did there come a time when you decided to purchase

9  the BMW?

10     A.   Yes.  When I test drove it that weekend, I knew

11 that I wanted to buy that car.  So along that following

12 Tuesday, which is the day that I worked from home, I went

13 to Bank of America, which is down the street from my

14 house in Vienna, and I did the transfer for the deposit

15 on the car.

16     Q.   Did you enter into a contract with BW Auto to

17 purchase the BMW?

18     A.   Yes, that day, March 11th.

19     Q.   Okay.  Do you see a binder of exhibits in front of

20 you?

21     A.   Yes.

22     Q.   Can you turn to tab two, please.

23          And, can you identify that document?

24     A.   This is the purchase agreement.

25     Q.   And, is this the agreement that you entered into

1    with BW Auto?

2        A.   Yes.

3        Q.   Okay.  And, what's the date of the agreement?

4        A.   March 11th, which is the Tuesday that I did the

5    deposit for the car.

6        Q.   Okay.

7             MR. LEVINE:  I would like this marked as

8    Plaintiff's Exhibit 1.

9             THE COURT:  Any objection?

10            MR. BRAGDON:  No, Your Honor.

11            THE COURT:  It's admitted into evidence.

12   BY MR. LEVINE:

13       Q.   And, if you could turn to tab two in your binder.

14            Now, are you able to identify this next document?

15       A.   That's my personal checking account at Bank of

16   America, that I transferred the funds from to make the

17   deposit on the car.

18       Q.   Okay.  And, where did you -- to whom did you

19   transfer the money?

20       A.   BW Auto.

21       Q.   And how did you transfer it?

22       A.   It was a wire transfer.  Well, I wrote a check,

23   but they did a wire transfer.

24            MR. LEVINE:  I'd offer this as Plaintiff's

25   Exhibit 2.

1         MR. BRAGDON:  No objection.

2         THE COURT:  It's admitted.

3   BY MR. LEVINE:

4     Q.  Did you complete the purchase of the vehicle at

5   that time?

6     A.  No.  I was in the process of refinancing rental

7   properties, so, at that time I could not add the auto

8   loan while they were trying to do the refinance.  So

9   that's why I had to do the deposit on the car.

10    Q.  Okay.  Did you -- when did you finalize the

11  purchase of the BMW?

12    A.  It was a month later.

13    Q.  Okay.  And, how did you accomplish that?

14    A.  With a loan to Pentagon Federal.

15    Q.  Okay.  And, if you could turn to tab three.

16        Do you recognize this document?

17    A.  It's my loan paper with Pentagon Federal.

18    Q.  Okay.  Is that your signature on there?

19    A.  Yes.

20    Q.  And did you receive a check from Pentagon Federal

21  Credit Union?

22    A.  Yes.

23    Q.  And, what did you -- how much was the check for?

24    A.  $64,941.

25    Q.  And, what did you do with the check?

1    A.   The check was made out to myself and to BW.  I

2    endorsed the back of the check.  I gave it to my husband

3    and he took it back to work.

4              MR. LEVINE:  Okay.  I'd offer what's been

5    marked as --

6              THE COURT:  Any objection to Exhibit 3?

7              MR. BRAGDON:  No objection.

8              THE COURT:  It's admitted.

9    BY MR. LEVINE:

10   Q.   Did you take possession of the BMW at that time?

11   A.   In April.  Yes.

12   Q.   And, did you ever -- did you receive a title for

13   the BMW?

14   A.   It came in the mail.

15   Q.   Okay.  Can you turn to tab four, please.

16        Can you identify this document?

17   A.   It's a copy of the check that I endorsed.

18   Q.   Okay.  The check to BW Auto Outlet and yourself?

19   A.   Yes, from Pentagon Federal.

20             MR. LEVINE:  Okay.  I'll offer this as

21   Plaintiff's Exhibit 4.

22             MR. BRAGDON:  No objection, Your Honor.

23             THE COURT:  It's admitted.

24   BY MR. LEVINE:

25   Q.   And is that your endorsement on the back of the

J. Mahdavi - Direct                                         14

1   check?

2       A.   Yes.

3       Q.   For the Pentagon Federal Credit Union loan, were

4   you required to make monthly payments?

5       A.   Yes.

6       Q.   And, how much were your monthly payments to be?

7       A.   1,155.

8       Q.   Have you been making those monthly payments?

9       A.   Yes.

10      Q.   Okay.  Could you turn to tab five.

11           Can you identify this document?

12      A.   It's my statement from Pentagon Federal for my two

13  car loans.

14           MR. LEVINE:  Okay.  I'll offer this as

15  Plaintiff's Exhibit 5.

16           MR. BRAGDON:  No objection.

17           THE COURT:  It's admitted.

18  BY MR. LEVINE:

19      Q.   And, you stated that you received a title from --

20  for the BMW?

21      A.   Yes.

22      Q.   Okay.  Can you turn to Exhibit 6 -- excuse me --

23  tab six.

24      A.   Uh-huh.

25      Q.   Do you recognize this document?

1      A.   Yes.  It's the title.

2      Q.   Okay.  And, how did you receive this?

3      A.   It came in the mail.

4      Q.   Okay.  And, the address on the title, what does it

5   state?

6      A.   It's the office that I have in Maryland.

7      Q.   And, do you know why that address was used?

8      A.   It's an office that I've had since 2008.

9           MR. LEVINE:  I'll offer this as Plaintiff's

10   Exhibit 6.

11          MR. BRAGDON:  No objection, Your Honor.

12          THE COURT:  It's admitted.

13   BY MR. LEVINE:

14     Q.   Have you had other cars titled at this address?

15     A.   All four of the other cars that I've bought from

16   BW have all been registered at the same address.

17     Q.   And, after you took possession of the BMW and

18   received title to it, did you drive the BMW?

19     A.   Yes.  I drove it as my personal car on April 22nd.

20   I got a flat tire on 495 and had to be towed off of 495.

21   I bought two new tires for my car.  And then three weeks

22   later, my car is, you know, taken from in front of my

23   house.

24     Q.   Before we get to that, could you turn to tab

25   seven, please.

1       And, can you identify this document?

2   A.  That's my receipt for the two new tires that I had

3   to buy for my car on April 22nd.

4       MR. LEVINE:  I offer this as Plaintiff's

5   Exhibit 7.

6       MR. BRAGDON:  No objection, Your Honor.

7       THE COURT:  It's admitted.

8   BY MR. LEVINE:

9   Q.  Can you describe the events of the night that the

10  car was taken?

11  A.  Around 1:30 in the morning, my doorbell rang.  A

12  man demanded the keys to the white BMW.  I was home alone

13  with my kids.  All he said was, "Give me the keys to the

14  white BMW.  I'm here for Dave."

15      My husband wasn't there.  I don't know who Dave

16  was.  I called my husband.

17      He said, "No.  That's your car.  Call the police."

18      So, I -- my car was already hooked up to a tow

19  truck.  I told the men that I was calling the police, and

20  to leave.

21      They left, dragging my car down the street.

22  Q.  Did you recognize the individual who came to your

23  house?

24  A.  No.  They -- they didn't give me a business card.

25  The only thing that they told me was, "I'm there for

J. Mahdavi - Direct                                          17

1  Dave."

2      Q.  Do you know who Dave --

3      A.  I don't know who Dave is.

4          And before my car was taken, I never heard the

5  name "NextGear" before.

6      Q.  Had you ever had any conversations with your

7  husband about NextGear?

8      A.  No.  I never heard the name NextGear before,

9  before that night.

10     Q.  Were you aware of any interest that NextGear may

11  have had in the BMW?

12     A.  No.

13     Q.  Did you make any attempts to try to get the BMW

14  back?

15     A.  Well, when I spoke to my husband the next day, he

16  told me that my car had been taken because of BW.  He was

17  going to get my car back.

18         When that didn't happen, I contacted Pentagon

19  Federal to try to get my car back.

20         When that didn't happen, I -- went to see a lawyer

21  about getting my car back.

22     Q.  And have you received the car back?

23     A.  No.  I haven't seen my car in a year.

24     Q.  Do you know who has your car?

25     A.  I've been told that it's at Manheim.  I don't -- I

1    don't know where my car is.  I don't know what my car

2    looks like.  I -- I don't know anything.

3        Q.  What is Manheim?

4        A.  Manheim is an auction.

5        Q.  You had talked about the prior cars that you had

6    bought from BW.  Was the purchase of the BMW 650

7    different in any way from the purchase of those prior

8    vehicles?

9        A.  Not at all.

10       Q.  And was your husband involved in the sale of those

11   prior vehicles?

12       A.  He sold me all of the prior vehicles the exact

13   same way he sold me the BMW.

14       Q.  Whose decision was it to buy the BMW?

15       A.  Mine.

16       Q.  Whose decision was it to take out a loan with

17   Pentagon Federal Credit Union?

18       A.  That's the way I always get my car loans through.

19       Q.  So it was your decision, then?

20       A.  I mean, they have the best rates.  It was -- I

21   mean...

22       Q.  The address -- the Maryland address where the car

23   is titled, what's the business that was at that address?

24       A.  It was a business that I had formed in 2008, that

25   didn't -- didn't pan out.  But I have an office at that

J. Mahdavi - Cross

1    location and I have a client that I do their books that
2    is right next door to that office.
3        Q.   What kind of business was it that you say didn't
4    pan out?
5        A.   It was going to be a wholesale.
6        Q.   Wholesale of what?
7        A.   Auto wholesale.
8        Q.   Do you know what the balance is of your loan with
9    Pentagon Federal Credit Union?
10       A.   Currently?  I think roughly 62,000.
11       Q.   Has Pentagon Federal Credit Union --
12            MR. LEVINE:  Strike that.
13            I have no further questions.
14            THE COURT:  Cross-examination?
15            MR. BRAGDON:  Your Honor, I have an easel.
16   Do you know where the best place to set that up would be?
17            THE COURT:  Sure.  Mr. Tucker can set it up.
18            MR. BRAGDON:  And, Your Honor, I have a
19   binder of Ms. Mahdavi's deposition and interrogatories.
20            THE COURT:  Okay.  Would you like to put it
21   up on the podium?
22                    CROSS-EXAMINATION
23   BY MR. BRAGDON:
24       Q.   Good morning -- good afternoon, Ms. Mahdavi?
25       A.   Good morning.

J. Mahdavi - Cross

1    Q.   Now, this car was a BMW 6 Series, four-door white

2  Sedan; is that correct?

3    A.   Yes.

4    Q.   Can I show you what I've marked as -- NextGear's

5  Exhibit 1.

6         This is a picture of a four-door 650i, white; is

7  that correct?

8    A.   Yes.

9         MR. BRAGDON:  Your Honor, may I publish the

10  picture of the vehicle to the jury?

11         THE COURT:  Are you admitting it into

12  evidence?  You have to admit --

13         MR. BRAGDON:  Can I move it into evidence?

14         THE COURT:  Any objection, Counsel?

15         MR. LEVINE:  Well, I haven't seen it before.

16  It doesn't say what it -- there's no markings on it, so

17  we don't know what it is.

18         THE COURT:  Well, wasn't it given to you at

19  the exchange of trial exhibits?

20         MR. LEVINE:  No, Your Honor.  I was not given

21  the trial exhibits until I arrived at court this morning.

22         MR. BRAGDON:  Your Honor, we provided all

23  trial exhibits -- this is a cross-examination exhibit,

24  Your Honor.

25         THE COURT:  Well, true.  Okay.  I'll allow

1   it.

2              MR. BRAGDON:  We provided all trial exhibits

3   at the pretrial, and produced --

4              THE COURT:  You're right.  This is for

5   cross-examination, and it's admitted.

6              MR. BRAGDON:  And again, Ms. Mahdavi just

7   testified that this is the car.

8              THE WITNESS:  This isn't my car.

9   BY MR. BRAGDON:

10    Q.  Right.  This is a BMW 650i, right?

11    A.  I mean, I think so.

12             MR. BRAGDON:  May I publish -- admit it into

13   evidence?

14             THE COURT:  Yes.

15             MR. BRAGDON:  Thank you.

16   BY MR. BRAGDON:

17    Q.  And, Ms. Mahdavi, you testified that your husband

18   structured this transaction?

19    A.  Structured?  I don't know what you mean by

20   "structured."

21    Q.  Ms. Mahdavi, I have -- the binder in front of you

22   has your deposition.

23    A.  Yes.

24    Q.  Can I turn you to page 20 of your deposition?

25        I apologize; page 26 of your deposition.

1    A.   Yes.

2    Q.   Do you recall testifying --

3    A.   Yes.

4    Q.   -- about that?

5    A.   Yes.

6    Q.   So your husband came up with a way to structure

7    the transaction.

8    A.   I had to put the $23,000 down because I was doing

9    the refinances of the rental properties.  The dealership

10   was not going to hold my car while I did my refinance of

11   the rental properties, if I didn't put a down payment on

12   the -- if that's what you mean by structuring the deal,

13   yes.

14   Q.   And your husband had you do that?

15   A.   Or they weren't going to sell me the car.

16   Q.   Did your husband have you do that?

17   A.   Yes.  He was the salesman, so, yes.

18   Q.   And, your husband, Mr. Mahdavi, spoke to the

19   sellers of the vehicle, right, on your behalf?

20   A.   To BW?

21   Q.   Yes.

22            MR. LEVINE:  Objection, hearsay.

23            THE COURT:  Objection overruled.

24            THE WITNESS:  I'm sorry?

25            THE COURT:  You can answer the question.

J. Mahdavi - Cross

```
 1              THE WITNESS:  Yes, he spoke to BW.
 2   BY MR. BRAGDON:
 3       Q.   And he arranged the paperwork with Pen Fed?
 4       A.   BW Auto arranged the loan with Pen Fed.
 5       Q.   Ms. Mahdavi, can you turn to page 29 of your
 6   deposition.
 7       A.   Yes.
 8       Q.   Now -- and, actually at 28, do you recall
 9   testifying about who handled the aspect of talking to Pen
10   Fed?
11              I point your attention to 28, 19 through 22, and
12   29, 1 through 3.
13       A.   I said I think so.
14       Q.   Can you read on page 28, lines 19 through 22,
15   please?
16       A.   "Did you speak -- when you were -- before
17   purchasing the vehicle, did you speak with anyone at
18   Pentagon Federal regarding the financing?"
19              "No."
20       Q.   And your husband handled that aspect of the
21   purchase, right?
22       A.   Someone at BW did, yes.
23       Q.   Can you read 29, lines 1 through 3?
24       A.   "Did your husband handle that aspect of the
25   purchase?"
```

1              "Yes."

2              "Do you recall if your husband told you anything

3      about the BW (sic) -- anything about where the BW (sic)

4      came from or how it was purchased?"

5              "No."

6          Q.  So, you knew that your husband was handling the

7      sellers and the financing company on your behalf?

8          A.  The car was purchased the same way all --

9              THE COURT:  Ma'am, you need to answer yes or

10     no, and then you can explain.

11             THE WITNESS:  Okay.

12     BY MR. BRAGDON:

13         Q.  Is that a yes?

14         A.  Was he handling the finance and the sale aspect?

15         Q.  Yes.

16         A.  I can't say yes, because I wasn't at the

17     dealership.

18             THE COURT:  Okay.  Move on, Counsel.

19     BY MR. BRAGDON:

20         Q.  And your husband never said anything about where

21     the BMW came from or how it was purchased, correct?

22         A.  No.

23         Q.  Now, did you trust your husband to get legitimate

24     title to this vehicle?

25         A.  Yes.  I never questioned where any of the previous

J. Mahdavi - Cross

 1    titles came from, and, I never had any problems.

 2        Q.   You were aware that your husband was -- served

 3    time in federal prison for creating fraudulent tax

 4    documents.

 5        A.   He didn't create them.  He actually turned himself

 6    in and took a plea.  Like, that was in 2008.

 7        Q.   You're aware that he pleaded guilty to conspiring

 8    to create these documents to defraud lenders, correct?

 9        A.   Yes.  He signed papers that were fraudulent, and

10    he turned himself in and took a plea.

11        Q.   Ms. Mahdavi, I'd like to talk a little bit about

12    the paperwork for your BMW.  The financing documents you

13    signed with Pentagon Federal, which we've already

14    discussed, you used your residential address in Virginia,

15    right?

16        A.   I'm sorry.  Say that one more time.

17        Q.   Sure.  You used your residential address in

18    Virginia on the financing paperwork?

19        A.   On the financing paperwork?

20        Q.   The application to Pentagon Federal.  Do you

21    recall using your address on Fairway Drive in Vienna?

22        A.   No, I don't -- I'd have to see the --

23        Q.   Sure.

24        A.   -- the paper.

25             THE COURT:  I think it's already been

1    admitted, Exhibit 3 for the plaintiff; is that correct?

2              MR. BRAGDON:  I have a couple pieces of

3    paperwork that Ms. Mahdavi produced.

4              THE COURT:  Okay.

5              MR. BRAGDON:  I'll just hand them to her for

6    recollection purposes at this time.

7    BY MR. BRAGDON:

8    Q.   Now, Ms. Mahdavi, the first document on that stack

9    should be the Pentagon Federal paperwork; is that

10   correct?

11   A.   Yes.  That's my Virginia address.

12   Q.   It's on Fairway Drive in Vienna?

13   A.   Yes.

14   Q.   And is that in the neighborhood of the Westwood

15   Country Club?

16   A.   Yes.

17   Q.   And, you used -- if you can go to the second page

18   in that stack, it should be -- is that your odometer

19   disclosure statement that you signed?

20   A.   Yes.

21   Q.   And you also used your Vienna, Virginia, address

22   on that document, correct?

23   A.   Yes.

24   Q.   And, you signed that document?

25   A.   Yes.

1    Q.   Now, the purchase agreement that you signed for

2    the BMW, you used an address in Bethesda, Maryland; is

3    that correct?

4    A.   Yes.

5    Q.   And, that address was on Montauk Drive.  And

6    that's a house that you were demolishing?

7    A.   Yes.

8    Q.   And, you testified that you don't receive mail

9    there; is that correct?

10   A.   It was forwarded.

11   Q.   And, you used that for your insurance registration

12   as well, which should be the next document on your stack.

13   A.   Yes.  The insurance rates were cheaper.

14   Q.   Cheaper in Maryland?

15   A.   No, cheaper in Bethesda.

16   Q.   Than in -- well, Vienna?

17   A.   Than in Temple Hills, Maryland.

18   Q.   The certificate of title, which you've already

19   discussed, that was issued to an address in Temple Hills,

20   Maryland; is that correct?

21   A.   Yes.

22   Q.   That's on St. Barnabas Road?

23   A.   Yes.

24   Q.   Ms. Mahdavi, is this the address of the

25   Temple Hills, Maryland?

J. Mahdavi - Cross                                              28

1      A.  Yes.

2           MR. BRAGDON:  I'd move for this picture to be

3   admitted into evidence, Your Honor.

4           THE COURT:  Any objection?

5           MR. LEVINE:  No objection.

6           THE COURT:  It's admitted.

7           MR. BRAGDON:  May I publish to the jury?

8           THE COURT:  Yes.

9   BY MR. BRAGDON:

10     Q.  So, was it -- at deposition, did you testify that

11  you wanted the car to be registered to this address?

12     A.  This is the address that all the other cars have

13  been registered, and that's the address that was on file

14  with Maryland.

15     Q.  Right.  And was it a mistake for it to be

16  registered there?

17     A.  No.

18     Q.  And, where in that picture, can you show, was the

19  business that you used to own?

20     A.  The business that I used to own?

21     Q.  Yes.

22     A.  My office is here (indicating).  Right here.

23     Q.  Okay.  And, is -- thank you.

24          And, that sign next to it, the little sign right

25  above where you pointed, do you know what that business

1    is?

2        A.   It's a service shop.

3        Q.   And who owns that business?

4        A.   NEA Services.

5        Q.   Does your husband own that business?

6        A.   No.

7        Q.   The name of that business is European Services

8    Center; is that correct?

9        A.   I think they do business as European Services

10   Centers.

11       Q.   I'm showing you a document that's a trade name

12   application filed with the Maryland Department of

13   Assessments and Taxation, called -- for European Service

14   Center.  Have you seen this document before?

15       A.   I think this is old.

16       Q.   This is your husband's handwriting?

17       A.   I -- I couldn't tell you.

18       Q.   Do you know what your husband's handwriting looks

19   like?

20       A.   That's his signature, but I don't know if that's

21   his handwriting.

22       Q.   On this document, who is listed as the full legal

23   name of owner or business or individual using the trade

24   name?

25       A.   Navid H. Mahdavi.

J. Mahdavi - Cross

1    Q.   And that's your husband, correct?

2    A.   Yes.

3    Q.   And that's 4726-C on St. Barnabas Road?

4    A.   Yes.

5    Q.   And that's next door to the business you used to

6    own?

7    A.   Yes.

8    Q.   And that's the same address where you're currently

9    doing accounting for an auto company?

10   A.   Yes.

11   Q.   Now, you also own a business at that same address

12   of your husband's business; is that correct?

13   A.   Say the question again.

14   Q.   You also own a business at the same address of

15   your European Service Center, the address we just

16   discussed.

17   A.   I have the business at 4726-D.  This is 4726-C.

18   Q.   You also have a business at 4726-C; is that

19   correct?

20   A.   No, I don't.

21        MR. BRAGDON:  And, Your Honor, we move for

22   the admission of the trade name application for European

23   Service Center.

24        THE COURT:  Objection?

25        MR. LEVINE:  I object on authenticity grounds

1   and hearsay grounds.

2               THE WITNESS:  This is from 2008.

3               MR. BRAGDON:  Your Honor, it's a Maryland

4   state document.  It's from a --

5               THE COURT:  Is it certified?

6               Could I see it, please?

7               MR. LEVINE:  Your Honor, it's not -- it's not

8   certified.  And --

9               THE COURT:  Let me take a look at it.

10              MR. BRAGDON:  Your Honor, also, as far as

11  authenticity goes, she testified that her husband signed

12  this exact document.

13              THE COURT:  She identified her husband's

14  signature is on it, but -- could I see counsel at the

15  bench, please.

16              (Thereupon, the following side-bar conference

17  was had:)

18              THE COURT:  Why are you objecting?

19              MR. LEVINE:  My objection was on authenticity

20  grounds and on hearsay -- and on hearsay grounds.

21              THE COURT:  Hearsay and what?

22              MR. LEVINE:  Authenticity.

23              THE COURT:  Uh-huh.

24              MR. LEVINE:  She identified the signature,

25  but that doesn't authenticate what the document is.  And,

1    it doesn't have -- I mean, under the Federal Rules, it's

2    not certified by the --

3              MR. BRAGDON:  I'll withdraw it.

4              THE COURT:  Objection sustained.

5              (Thereupon, the side-bar conference was

6    concluded.)

7    BY MR. BRAGDON:

8        Q.  Ms. Mahdavi, I'm showing you another trade name

9    application from the Maryland Department of Assessments

10   and Taxation.

11       A.  Yes.

12       Q.  Can you read what the trademark is for that

13   building?

14       A.  Select Builders.

15       Q.  And what is the full legal name of the owner of

16   the business?

17       A.  Jodi C. Mahdavi.

18       Q.  And that address is at 4726-C St. Barnabas Road,

19   correct?

20       A.  Yes.

21       Q.  And is that your signature at the bottom?

22       A.  Yes.

23             MR. BRAGDON:  I would move to admit this as

24   evidence -- as Exhibit 2 for defendant.

25             MR. BRAGDON:  We have no objection.

 1                    THE COURT:  It's admitted.

 2                    That's Exhibit 2, the new one?  And then the

 3    picture is One.

 4                    MR. BRAGDON:  The car is One, and --

 5                    THE COURT:  The car is One.

 6                    MR. BRAGDON:  And this is Two.

 7                    And I'll move to admit that.  I'd like to

 8    move to admit that picture, as well.

 9                    THE COURT:  All right.

10                    Three?

11                    MR. LEVINE:  No objection.

12                    THE COURT:  All right.

13    BY MR. BRAGDON:

14       Q.  So, Ms. Mahdavi, you agree that, even though you

15    testified just now that you didn't own a business at this

16    address, that you do own a business at this address?

17       A.  Yes.  This one I just did in January of 2015.

18       Q.  And it's the same address that your husband used

19    to use for his business?

20       A.  Yes.  I actually own the lease on both of those

21    locations, as well as this one.

22       Q.  Now, Ms. Mahdavi, you -- as part of your job, you

23    review financial statements; that's correct?

24       A.  Yes.

25       Q.  And you supervise a staff of accountants?

1      A.   At Palm Management.

2      Q.   And you also do books for Ultimate Auto; is that

3  correct?

4      A.   As well as a government contractor.

5      Q.   And so you do the books -- as Ultimate Auto in

6  that picture right there, Exhibit 3?

7      A.   Yes.

8           I'm also their landlord.

9      Q.   Now, can you just describe very briefly what it

10 means -- what you do when you do the books for Ultimate

11 Auto?

12     A.   Just bank statements, bank reconciliations.

13     Q.   And you would have knowledge of any significant

14 purchases from your review as their accountant?

15     A.   Significant purchases?  Like --

16     Q.   Well, I guess my question is:  Are you aware that

17 around the same time you were purchasing a vehicle from

18 Beltway Auto, that Ultimate Auto was also purchasing a

19 BMW from Beltway Auto?

20     A.   No.

21     Q.   Have you ever seen this agreement before?

22     A.   No.

23     Q.   Now, you testified -- and so you don't know about

24 this purchase that the document reflects, a purchase of

25 another vehicle on -- around the same time as your

J. Mahdavi - Cross                                            35

1   purchase?

2        A.   This is from BW.  This is --

3        Q.   You're just not aware of this purchase, right?

4        A.   This is a -- this is a Baltimore Washington

5   purchase.  Like, why would I know anything about a

6   Baltimore Washington purchase?

7        Q.   Who is the name of the purchaser on that document?

8        A.   Auto Source.

9        Q.   That's a company you are the accountant for,

10  correct?

11       A.   I don't do anything with Auto Source.  I do Auto

12  Select.  This is under Auto Source.

13       Q.   Well, and the address is 4740 St. Barnabas Road,

14  correct?

15       A.   Yes.

16       Q.   And that's the same address listed on that sheet,

17  correct?

18       A.   Yes.

19       Q.   Now, Ms. Mahdavi, I'm going to show you your

20  application for temporary registration.  This is a

21  document you produced in discovery, Ms. Mahdavi.

22            You signed this document under the penalties of

23  perjury; is that correct?

24       A.   Yes.

25       Q.   And, you list -- what did you list as your address

1   on this document?

2      A.   4726-D.

3      Q.   St. Barnabas Road?

4      A.   Yes.

5      Q.   In Temple Hills?

6      A.   Yes.

7      Q.   And that's the same complex that's in that

8   picture, correct?

9      A.   Yes.

10           MR. BRAGDON:  I'd move to admit this as

11   Exhibit 4.

12           MR. LEVINE:  I'm sorry, which of the

13   documents?

14           MR. BRAGDON:  Just this last one, the

15   registration certificate.

16           MR. LEVINE:  No objection.

17           THE COURT:  It's admitted.

18   BY MR. BRAGDON:

19      Q.   Now, Ms. Mahdavi, I'd like to talk about a couple

20   other documents that you produced in this case.

21           Ms. Mahdavi, do you recognize this document that

22   I've just shown you?

23      A.   Yes.  It's the check from Pentagon Federal.

24      Q.   It's the check -- it's, I guess, the cashed check

25   record from the check that you paid for the car with?

1       A.   Yes.

2       Q.   And, this printout that you got, it's from Bank of

3    American online banking; is that correct?

4       A.   Yes.

5       Q.   And you produced this during discovery in this

6    case?

7       A.   Yes.

8       Q.   Did you get this from your husband?

9       A.   Yes.

10       Q.   And, you don't have access to Bank of America's

11    online bank for Beltway Auto, do you?

12       A.   No.

13       Q.   And you didn't produce any other documents from

14    Bank of America's online bank, correct?

15       A.   No.

16            MR. BRAGDON:  I'd move to admit this as

17    Exhibit 5.

18            THE COURT:  Objection?

19            MR. LEVINE:  It's already in.

20    BY MR. BRAGDON:

21       Q.   Now, Ms. Mahdavi, I'm showing you another

22    document.  Ms. Mahdavi, I'm going to show you a blank

23    check from Beltway Auto that you produced as part of your

24    discovery in this case.

25            Do you recognize this document?

1    A.   Yes.

2    Q.   You got this document from your husband during

3    this case?

4    A.   Yes.

5    Q.   So, it's fair to say your husband had access to

6    Beltway Auto's checkbook, even after this case started?

7    A.   I guess.

8    Q.   You didn't have access to the checkbook, correct?

9    A.   No.

10   Q.   And, if we wanted more information about what

11   access your husband had to the bank account and to the

12   checkbook for the dealership, we would have to ask him;

13   is that correct?

14   A.   Yes.

15   Q.   And on the other aspects of the transaction -- so,

16   the application for title and NextGear's -- whether he

17   had knowledge of NextGear's interest, we would also ask

18   to -- have to ask him what he knew about it; is that

19   correct?

20   A.   Yes.

21        MR. BRAGDON:   No further questions, Your

22   Honor.

23        THE COURT:   Redirect?

24

25                   REDIRECT EXAMINATION

1   BY MR. LEVINE:

2       Q.  Ms. Mahdavi, regarding the loan from Pentagon

3   Federal Credit Union for the BMW, do you recall what

4   number loan this would have been for you with Pentagon

5   Federal Credit Union?

6       A.  The fifth.

7       Q.  And, with your other loans, was it -- did you

8   speak with anyone at Pentagon Federal Credit Union at the

9   time you were taking out those loans?

10      A.  No.

11              MR. BRAGDON:  I have no further questions.

12              THE COURT:  Great.

13              Thank you.  You may step down.

14              (Thereupon, the witness withdrew from the

15   stand.)...

16              (End of Requested Excerpt 1.)

17

18                          ---

19

20

21

22

23

24

25              (Court in session.)

1              ...THE COURT:  And who is your first witness?

2     You said --

3              MR. BRAGDON:  Our first witness will be David

4     Freeman.  You want to go with that now?

5              THE COURT:  Yes.

6              And we'll call the jury back, please.

7              MR. BRAGDON:  If -- Your Honor, if you're

8     ready, Defense NextGear Capital will call Mr. David

9     Freeman to the stand.

10             THE COURT:  Okay.

11             (Witness sworn.)

12             THE WITNESS:  I do.

13             THEREUPON, DAVID FREEMAN, having been duly

14    sworn, testified as follows:

15                       DIRECT EXAMINATION

16    BY MR. BRAGDON:

17       Q.   Good afternoon, Mr. Freeman.

18       A.   Good afternoon.

19       Q.   Can you identify yourself for the jury.

20       A.   Yes.  I am David Freeman.  I work for NextGear

21    Capital, and I've been there since 2008.

22       Q.   And, what's your title?

23       A.   Account executive.

24       Q.   And, can you describe briefly your

25    responsibilities?

1     A.  My responsibilities is basically to grow my market

2   and retain, retain what I grow, collect the money that

3   we -- that we lend out.

4            THE COURT:  Could you speak up a bit, sir?

5            THE WITNESS:  Collect the money that we lend

6   out.

7            THE COURT:  Thank you.

8   BY MR. BRAGDON:

9     Q.  And you oversee dealerships directly?

10    A.  Yes.

11    Q.  Is BW Auto one of those dealerships?

12    A.  They were, yes.

13    Q.  Now, from your experience, do you have knowledge

14  with how a used car transaction is carried out?

15    A.  Yes.

16    Q.  And, can you talk a little bit about what your

17  responsibilities were, specifically with supervising

18  Beltway Auto?

19    A.  So, I guess in reference to the sales?

20        Basically, we -- we conduct audits every 30 days.

21  We look for the vehicles to be paid within a three- to

22  five-day period, once that audit is conducted.

23    Q.  And, so, you supervised what cars were on

24  Beltway's lot?

25    A.  Yes.  So whichever cars were sold, we would

1   collect the bill of sale for and make sure that they were

2   paid.

3       Q.   Now, can you just describe for the jury a little

4   bit about what NextGear -- what NextGear's relationship

5   to the cars on the dealer's lot is?

6       A.   We are the financing for the dealers, not the

7   consumer.  So those -- we actually give them a line of

8   credit so that they're able to purchase their vehicles.

9       Q.   And the dealer sells it for a profit?

10      A.   Correct.

11      Q.   And they pay NextGear back?

12      A.   Correct.

13      Q.   And what happens after the dealer pays NextGear?

14      A.   Once the dealer pays us, we actually forward him

15   the title and the transaction is complete.

16      Q.   And what does the dealer do with the title when

17   they get it from you?

18      A.   Once they receive the title, they should either

19   take it to -- to get it liened through the DMVA.

20           MR. BRAGDON:  And, do you have the exhibit

21   binder for Mr. Freeman?  It's defense exhibit binder.

22   BY MR. BRAGDON:

23      Q.   And, before we get into the exhibits, Mr. Freeman,

24   can you talk a little bit about Navid Alex Mahdavi?

25           Do you know him?

1    A.  Yes.

2    Q.  And, how do you know him?

3    A.  He was the manager at the -- at BW.

4    Q.  And, what were his responsibilities?

5    A.  He pretty much --

6            MR. LEVINE:  Objection.

7            THE COURT:  Pardon me?

8            MR. LEVINE:  I'm objecting on foundation

9    grounds.

10           THE COURT:  All right.  Would you, please --

11   and, you know what?  I think we need to turn up his

12   microphone a little bit, or if you can speak a little

13   louder.

14           THE WITNESS:  Yes, no problem.

15   BY MR. BRAGDON:

16   Q.  Mr. Freeman, as part of your job, did you have

17   knowledge of what Mr. Mahdavi did at the dealership?

18   A.  Yes.

19   Q.  And, you saw that on a -- whenever you worked with

20   BW Auto?

21   A.  Correct.  He was my -- my contact.  Any time I

22   needed to collect a payment, resolve any issue, or if he

23   even had an issue, I was his contact.

24   Q.  So you had personal knowledge of what his

25   responsibilities were at the dealership?

D. Freeman - Direct

1     A.   Yes.

2     Q.   And, what were they?

3     A.   He was the, again, office manager, which was in

4   charge of the financing of the vehicles, getting the

5   vehicles' financing.  He pretty much controlled the line

6   of credit.  When I say "controlled," meaning he was the

7   one who managed it, made the payments, that type of

8   thing.

9     Q.   And, can you tell -- talk about how Mr. Mahdavi

10  would obtain NextGear financing for a specific vehicle,

11  if they wanted to purchase one?

12    A.   So, usually the vehicles are purchased at the

13  auction.  And they would basically just let the auction

14  know, "Hey, I want to put this on my floor plan."  They

15  have an account number.  They would give the account

16  number and the vehicle would be floored.

17    Q.   And that's what -- that was one of Mr. Mahdavi's

18  responsibilities?

19    A.   As far as flooring --

20              MR. LEVINE:  Your Honor?

21              THE COURT:  Pardon me?

22              MR. LEVINE:  I'm going to object on

23  foundation grounds.

24              THE COURT:  You need to lay a foundation how

25  he knows that.

1    BY MR. BRAGDON:

2        Q.    That process you just described, can you just --

3    how did you -- who did you work with at Beltway Auto

4    regarding the process for arranging financing?

5        A.    So, I'm not directly involved with the financing.

6    They would actually contact the auction to -- to give

7    that.

8        Q.    Okay.   And, what would they -- they would have a

9    car and they would call NextGear and say, "We want

10   $70,000," for example?

11              MR. LEVINE:   I'm going to object to leading,

12   the question.

13              MR. BRAGDON:   I'll withdraw.

14              THE WITNESS:   So --

15              THE COURT:   I'm sorry.   Don't answer that,

16   sir.

17              MR. LEVINE:   And again, on foundational

18   grounds.

19              THE COURT:   I don't think there was a

20   foundation issue with that.   He just needs to make it a

21   nonleading question.

22              THE WITNESS:   So, the way it would work --

23              THE COURT:   Sir, you need to hold on until --

24              THE WITNESS:   Oh, I'm sorry.

25              THE COURT:   -- he asks you a question.

1          MR. BRAGDON:  I asked a leading question.  I

2    have to ask a regular one.

3    BY MR. BRAGDON:

4      Q.  So, Mr. Freeman, when -- describe how the money is

5    transferred from NextGear to a dealer.

6      A.  So, our systems are all electronic.  So normally

7    what happens once they floor the vehicle, they would let

8    the auction know, "Hey, I want to put this on my line."

9    The auction would go into the account and floor that

10   vehicle.

11     Q.  And that would mean a transfer of money, when you

12   say --

13     A.  Correct.  Once they say "floor," yes, we pay the

14   auction for that car.

15     Q.  And, Mr. Freeman, can you turn to, in that binder

16   in front of you, Exhibit 1?

17     A.  Okay.

18     Q.  Let me know when you're ready.

19          But can you identify this document, once you've

20   had a chance to look at it?

21     A.  Yes.  This is NextGear's capital contract.

22     Q.  And this is a contract with who?

23     A.  With Beltway Auto Brokers and NextGear Capital.

24     Q.  And have you seen this document before?

25     A.  Yes.

1      Q.   Is it true that you're actually a notary on one of

2   the signature blocks in this document?

3      A.   Yes, sir.

4           MR. BRAGDON:   We would move for admission of

5   NextGear 1.

6           MR. LEVINE:   Your Honor, I would object on

7   authenticity grounds, foundational grounds and hearsay

8   grounds.

9           THE COURT:   Now, this was submitted to you as

10  part of the pretrial exchange of exhibits.

11          MR. LEVINE:   And the pretrial, yes, months

12  ago --

13          THE COURT:   Right.  Did you object?

14          MR. LEVINE:   -- not yesterday.

15          Yes, I did object, Your Honor.

16          THE COURT:   And what basis was your

17  objection?

18          MR. LEVINE:   The ones that I just stated.

19          It was two at the time, and our -- relevance,

20  hearsay, lacks proper authentication, and best evidence

21  at the time, Your Honor.

22          THE COURT:   Okay.  I don't think any of those

23  apply when he's got the witness here today to identify

24  it.

25          MR. LEVINE:   But, Your Honor, if I may,

1    Mr. -- Mr. Freeman has notarized a document that is a

2    completely different date than the rest of the document.

3              THE COURT:  All right.  Let's -- okay.

4    Counsel is going to have to lay a foundation for this

5    exhibit and have it identified properly.

6    BY MR. BRAGDON:

7      Q.  Mr. Freeman, are you familiar with this exhibit?

8      A.  Yes.

9      Q.  Is it a document you work with on a regular basis?

10     A.  Yes, it is.

11     Q.  And is it a business -- is it a document that

12   NextGear keeps in the regular course of business?

13     A.  Yes.

14     Q.  Is it the type of document that's ordinarily kept

15   in the regular course of business?

16             MR. LEVINE:  Again, I believe --

17             THE WITNESS:  Yes.

18             MR. LEVINE:  The objection is overruled.

19   BY MR. BRAGDON:

20     Q.  And, is this a true and accurate copy of the

21   contract between Beltway Auto and NextGear Capital?

22     A.  Yes.

23             MR. BRAGDON:  We move for admission of

24   Defense Exhibit 1.

25             THE COURT:  Any other objection?

1          MR. LEVINE:  Yes.  Again, Your Honor, the

2  foundational grounds, we don't -- this is a two-party

3  document.  We don't have anybody from BW Auto.  We don't

4  know --

5          THE COURT:  That's not necessary.

6          MR. LEVINE:  That's my objection, Your Honor.

7          THE COURT:  It's admitted.

8          This is Defendant's Exhibit -- we've already

9  got a One.  I know you marked these --

10         MR. BRAGDON:  I think we're at Seven, Your

11 Honor.

12         THE COURT:  Six, I think, was --

13         MR. BRAGDON:  Six was the blank check from

14 Beltway's account.

15         THE COURT:  Okay.  So that was admitted.  So

16 this is Exhibit 7.  It's admitted.

17 BY MR. BRAGDON:

18    Q.  And, can you describe what this document -- what

19 interest this document gives NextGear in a financed

20 vehicle?

21    A.  So, this is our security interest filing.  We are

22 allowed to file that once we get the contract signed.  So

23 it gives us the interest into the inventory.

24    Q.  Are you still looking at Exhibit 1, Mr. Freeman?

25    A.  Yes.

D. Freeman - Direct                                                    50

1      Q.   Okay.  So this is a contract that -- when NextGear

2   has a security interest, what can they do if a car

3   isn't -- if the dealership doesn't pay for the car?

4      A.   Okay.  So, that gives us interest in all assets

5   for that -- for that dealership, whether vehicles, office

6   equipment, or what have you.

7      Q.   Now, what interest does -- what right does

8   NextGear have under this contract if a dealer doesn't

9   pay?

10     A.   If a dealer does not pay, we are able to pick up

11  our vehicles, again, any office -- any office items, to

12  make sure that we are made whole or to collect our, you

13  know, complete balance.

14     Q.   And, I'll turn you to Exhibit 2, Mr. Freeman.

15          THE COURT:  Tab two.

16          MR. BRAGDON:  Tab two, I apologize.  Tab two.

17  BY MR. BRAGDON:

18     Q.   Have you seen this document before?

19     A.   Yes.

20     Q.   Can you identify what this document is?

21     A.   This is the UCC, Uniform Commercial Code.

22  Basically, it gives us our lien on the property.  It

23  works kind of like a mortgage.  It gives us access to the

24  inventory and to the office equipment.

25     Q.   And what's the second page?

D. Freeman – Direct                                               51

 1     A.   Where it's recorded with the state.

 2     Q.   And, this is a document that NextGear keeps in the

 3   regular course of business?

 4     A.   Correct.

 5     Q.   And the information in there is entered by someone

 6   with knowledge of that information, at the time of the

 7   trans- -- at the time of the entry of the information?

 8     A.   Correct.

 9     Q.   And it's the type of document that NextGear

10   regularly keeps in the course of business?

11     A.   Yes.

12          MR. BRAGDON:  I would move for admission of

13   Defense Exhibit 8.

14          MR. LEVINE:  And, Your Honor, I would object

15   again on authenticity and hearsay grounds.  These were my

16   objections stated at the pretrial exchange.

17          And the document on its face is not a

18   NextGear document.

19          THE COURT:  Objection overruled.  It's

20   admitted as Exhibit 8.

21          THE WITNESS:  If I could just comment, it's

22   actually filed with the state.

23   BY MR. BRAGDON:

24     Q.   And, by filing with the state, is it -- is it fair

25   to say that NextGear perfects its interest?

1    A.   Correct.  Exactly.

2    Q.   Can you turn to tab three, Mr. Freeman.

3         And can you describe what this document is?

4    A.   This is a floored vehicle history report for

5    NextGear.

6    Q.   And, just describe what a floored vehicle is for

7    the jury.

8    A.   So, this is a vehicle that has been financed with

9    NextGear, meaning that we paid the seller or the auction,

10   and it's now one of their floor plan on the account.

11   Q.   And this is a record that keeps track what is

12   going on with that vehicle?

13   A.   Correct.

14   Q.   And, what vehicle is this document for?

15   A.   This is for a 6 Series, 650 BMW coupe.

16   Q.   And is this in the system, on the computer?

17   A.   Yes, it is.

18   Q.   So, this is a printout from that system?

19   A.   Correct.

20   Q.   And, you are familiar with this exact entry for

21   the BMW.  You've seen that before?

22   A.   Yes.

23   Q.   And, this is the -- the computer system that

24   NextGear uses, it keeps these records in the regular

25   course of business; is that correct?

1      A.   Yes.

2      Q.   And, the information that's entered in is entered

3  into the system by someone with knowledge of that

4  information?

5      A.   Yes.

6      Q.   At or near the time of the events described in

7  there?

8      A.   Yes.

9      Q.   And this is the type of record that NextGear

10 regularly keeps in the course of business?

11     A.   Yes.

12          MR. BRAGDON:  We move for admission of

13 Exhibit 10, Defense Exhibit 10.

14          MR. LEVINE:  No objection.

15          THE COURT:  It's admitted.

16          I think we've missed Nine.

17          MR. BRAGDON:  Nine.  I apologize.

18          THE COURT:  It's okay.

19 BY MR. BRAGDON:

20     Q.   So, how much money was given to the dealership for

21 this BMW?

22     A.   We floored this at 70,835.

23     Q.   And when was that money transferred to Beltway, if

24 you can tell?

25     A.   Purchase date was -- let me see.  It looks like

D. Freeman - Direct                                        54

1    April.

2        Q.   And, can I turn you to the next exhibit,

3    Mr. Freeman, number -- tab four, which I've marked for

4    identification purposes.

5            Do you recall this document?

6        A.   Yes.

7        Q.   And, can you describe for the jury what this

8    document is?

9        A.   This is a receipt of a detail report.  Again, this

10   gives a list of vehicles that have been floored on the --

11   on their account.

12       Q.   And what -- what window of time is this showing

13   the vehicle as being floored at, at Beltway?

14           And let me withdraw that, Mr. Freeman.

15           What's the date of this document?

16       A.   This was run on 4-24.

17       Q.   April 24, 2014?

18       A.   Yes.

19       Q.   So does this document show all outstanding

20   loans --

21       A.   Yes.

22       Q.   -- at that time?

23       A.   At that time, yes.

24       Q.   Was the BMW one of those?

25       A.   Yes, it was.

D. Freeman - Direct                                              55

1     Q.   And, do you have the total amount of vehicles

2     which had been floored or financed by Beltway Auto at

3     that time?

4         If you need, Mr. Freeman, you can look at the last

5     page.

6     A.   Okay.  Here we go.  65 units.

7     Q.   And how much was the value of those units?

8     A.   1.3 million.

9     Q.   Now, was part of your --

10        MR. BRAGDON:  We'd move for admission of --

11    is this Defense Exhibit 11?  Ten.

12        THE COURT:  Ten.

13        Do you have any objection?

14        MR. LEVINE:  No objection.

15        THE COURT:  It's been admitted.

16   BY MR. BRAGDON:

17    Q.   Now, you testified earlier that part of your job

18   was to keep track of the inventory.  Did you see, at any

19   time in April, this inventory?

20    A.   Yes.  They had just had an audit recently.

21    Q.   And when I said April, I meant April 2014, right?

22    A.   Yes.

23    Q.   Now, around -- did these vehicles disappear from

24   BMW Auto?

25    A.   Yes.  It would be around the time.  I don't have

1     the exact dates.

2        Q.  Well, can you describe for the jury how you

3     discovered that they had -- most of the vehicles had

4     disappeared?

5        A.  Okay.  So, it was a Monday night, I had actually

6     received a call from Manheim.  Evidently, they had had

7     some issues going on with the auction --

8               THE COURT:  Sir, don't say what anybody from

9     Manheim told you.

10              THE WITNESS:  Okay.

11              I was -- my job was to go over to verify

12    inventory.  So I went over actually that Tuesday morning.

13    So out of 65 vehicles, there were 13 cars on the lot.

14    BY MR. BRAGDON:

15       Q.  And did you meet with anyone at Beltway at that

16    time?

17       A.  Yes.  I met with Mr. Alex Mahdavi.

18       Q.  And, did he tell you anything about what happened

19    to those cars?

20              MR. LEVINE:  Objection, hearsay.

21              THE COURT:  Objection -- sorry.

22              MR. BRAGDON:  Your Honor, can I respond?

23              It's a hearsay of an unavailable declarant.

24    Mr. Mahdavi is taking the Fifth.  So under

25    Federal Rule 804, it's admissible as an exception to

D. Freeman - Direct

1    hearsay.

2              THE COURT:  Is he, in fact, going to not

3    appear, not testify?

4              MR. BRAGDON:  We expect to have him testify

5    and take the Fifth to every question we have.

6              THE COURT:  Is there any reason to think he's

7    not going to do that?

8              MR. LEVINE:  No, I have no reason to think

9    that he's not going to do that.

10             THE COURT:  Okay.  Then I'm going to go ahead

11   and allow the question now.

12   BY MR. BRAGDON:

13      Q.  What did Mr. Mahdavi tell you?

14      A.  Mr. Mahdavi told me that the cars were sold, and

15   basically provided me at that time with 20 bills of

16   sales.  And the rest of the vehicles, he said he was not

17   aware where the vehicles were.

18      Q.  So, 20 vehicles he said were sold at some point?

19      A.  Correct.

20      Q.  Had you heard about those sales before?

21      A.  No.

22      Q.  Was the BMW one of the ones that he said was sold?

23      A.  No.

24      Q.  Did he provide you a purchase contract for

25   Ms. Mahdavi?

D. Freeman - Direct

1    A.   No.

2    Q.   And, did he tell you anything about where the BMW

3 was?

4    A.   No.   The BMW was never mentioned.

5    Q.   Now, what happened after these cars disappeared?

6         Did you attempt to find them?

7    A.   So, I actually hung around for about four hours,

8 five hours, with Alex.   Again, we collected the bill of

9 sales.   I was calling the owner.   He never responded.   So

10 I actually had to drive to his house the next morning.

11   Q.   And where -- did NextGear attempt to find these

12 missing vehicles?

13   A.   Yes.   A number of people -- myself, my supervisor

14 and some people from our collections department --

15 actually came down, we actually made rounds, driving

16 around different dealerships, storage lots.

17   Q.   And did you find any vehicles at the storage lots?

18   A.   We did find a few that they turned over to us.   I

19 think one lot was an empty lot.   I think I may have found

20 two vehicles.

21   Q.   And, did you look for -- when you say the owner,

22 are you talking about Mr. Molavi?

23   A.   Yes.

24   Q.   And, Mr. Molavi, where does he live?

25   A.   In Virginia.   I'm not sure exactly what, what

1    part.

2        Q.   You've been to his address?

3        A.   Yes, I have been to his home.

4        Q.   Is it close by Mr. Mahdavi's address?

5        A.   Yes.  They are probably about a block, block and a

6    half away from each other.

7             MR. BRAGDON:  I'm going to show him just a

8    map of the area, if there's no objection.

9             MR. LEVINE:  Objection on relevance grounds.

10            THE COURT:  Objection overruled.

11   BY MR. BRAGDON:

12       Q.   Mr. Freeman, are you able to identify what this

13   map is showing?

14       A.   Yes.

15       Q.   And what is it?

16       A.   This is a -- it looks like a map of the area where

17   Mr. Molavi and Mr. Mahdavi lived.

18       Q.   And can you point to Mr. Mahdavi's address?

19       A.   You said Mahdavi, correct?

20       Q.   Yes.

21       A.   Mahdavi would be here.

22       Q.   And is the other address, Mr. Molavi's address?

23       A.   Correct.

24       Q.   And, when you were looking for vehicles, did you

25   ever find any vehicles in Mr. Molavi's -- at Mr. Molavi's

 1   address?

 2       A.   Yes.  Actually, one of our collectors came down

 3   and located a couple of vehicles at Mr. Mahdavi's house.

 4       Q.   Okay.  So, those were at Mr. Mahdavi's house.  Did

 5   you find any at Mr. Molavi's house?

 6       A.   No.

 7       Q.   And, what vehicles did you see at Mr. Mahdavi's

 8   house, if you can recall?

 9       A.   The -- it was a few cars.  It was a couple of

10   trucks -- it was a truck, the BMW, of course, and

11   something else.  So, basically, we had to verify those

12   VIN numbers.

13       Q.   And were you able to repossess all three?

14       A.   No.

15       Q.   What did you repossess?

16       A.   We ended up repossessing the BMW.

17       Q.   Was that the only one left when you got --

18       A.   When we got there -- the repo team that we sent

19   there, they verified the VIN numbers of what we had.

20   They actually carried the same receivables, the list of

21   vehicles.  So when they get there, the VINs did not match

22   up with anything we had, so they were only able to pick

23   up the BMW.

24       Q.   Now, can you turn to Exhibit 5, please.

25            THE COURT:  Tab five?

1           MR. BRAGDON:  I apologize -- what I have

2    marked for identification purposes as tab five.

3           THE WITNESS:  Yes.

4    BY MR. BRAGDON:

5       Q.  Can you identify this document?

6       A.  Yes.  It looks like a copy of a title.

7       Q.  And, for what car?

8       A.  The 2013 BMW.

9       Q.  That's the BMW at issue in this case?

10      A.  Correct.

11      Q.  And, who has this copy of title?

12      A.  It looks like this would belong to the creditor

13   and the customer.

14      Q.  And does NextGear have a copy of this title?

15      A.  No.

16      Q.  Does NextGear keep a copy for the BMW?

17      A.  Yes.  As part of that transaction, I think I

18   mentioned when they actually purchase the vehicle and we

19   fund the auction, it's actually -- the titles are

20   forwarded to us.  We actually hold the titles again until

21   they're paid off.

22      Q.  And, is this copy -- who has the original title

23   for the BMW?

24      A.  We still have the original title in our -- in our

25   vault.

1     Q.   And, is this a copy of that?

2     A.   No.

3     Q.   And, is the title held during the -- for while the

4   car is outstanding, the loan is outstanding?

5     A.   Correct.

6     Q.   And, why is the title held by NextGear in its

7   vault?

8     A.   That goes with part of our security.  So,

9   basically, if the dealer has the car, we have the title.

10   Supposed to cut down on the -- the-- I guess fraud or

11   theft.

12    Q.   And, should the dealer be able to issue new title

13   to a purchaser while NextGear holds on to a copy of that

14   title?

15    A.   No.

16              MR. LEVINE:  Objection, foundation and

17   relevancy.

18              THE COURT:  Objection overruled.

19              MR. LEVINE:  What dealer?

20              THE COURT:  I think it's obvious, the dealer

21   who has the loan.

22              Objection overruled.

23              MR. BRAGDON:  You can answer the question.

24              THE WITNESS:  One more time?  Ask it.

25   BY MR. BRAGDON:

1     Q.   While NextGear has a title, should the dealer or

2   should Beltway Auto be able to issue new title to

3   anybody?

4     A.   No, they should not.

5     Q.   Now, from your personal experience, was there

6   anything different about Beltway Auto's ability to get

7   title?

8     A.   Yes.  It looks like they were able to log right

9   into the MVA system and actually print out the actual

10  titles.

11              MR. LEVINE:  Objection, foundation.

12              THE COURT:  Objection sustained.

13  BY MR. BRAGDON:

14    Q.   Just to summarize, Mr. Freeman, should a -- should

15  a dealership be able to print out new title while

16  NextGear holds the title to the BMW?

17    A.   No.

18              MR. LEVINE:  I have to object.  He's giving

19  an opinion now.

20              THE COURT:  Objection overruled as to this.

21              You can answer the question.

22              THE WITNESS:  No.

23              MR. BRAGDON:  No further questions, Your

24  Honor.

25              THE COURT:  Cross-examination?

1                          CROSS-EXAMINATION

2    BY MR. LEVINE:

3       Q.  Mr. Freeman, do you recall being deposed in this

4    matter?

5       A.  Yes.

6       Q.  And do you recall during your deposition that you

7    admitted that Ms. Mahdavi paid fair market value for the

8    BMW?

9                  MR. BRAGDON:  Objection.

10                 THE WITNESS:  I do not --

11                 MR. BRAGDON:  We have an objection at the

12   time, Your Honor.  It just calls for a legal conclusion.

13   He can testify about what facts he knows about

14   Ms. Mahdavi.

15   BY MR. LEVINE:

16      Q.  Do you recall that being your testimony?

17      A.  Not offhand, no, I do not.

18                 THE COURT:  I think you have to lay a basis

19   for what is fair market value, how he would know what the

20   fair market value is of the vehicle.

21                 MR. LEVINE:  I'll move on.

22   BY MR. LEVINE:

23      Q.  Do you recall during your deposition that you

24   testified that Ms. Mahdavi bought the vehicle before

25   NextGear financed it?

1          MR. BRAGDON:  Your Honor, we're just going to

2     object.  Mr. Levine isn't asking him to talk about facts.

3     He's asking him to talk about testimony that hasn't

4     even -- there is no point of impeaching or --

5          THE COURT:  You are correct.  This is

6     improper to use the deposition, unless you ask him the

7     question first.

8          MR. LEVINE:  Okay.

9     BY MR. LEVINE:

10    Q.  Okay.  What date did NextGear allegedly finance

11    the vehicle?

12    A.  It's kind of broken up on here, so I'm going to

13    say 4 -- 4-2, it looks like, 4-2-14.

14    Q.  And are you aware of the date that Ms. Mahdavi

15    bought the vehicle?

16    A.  Was I aware of the date?

17    Q.  Yeah --

18    A.  Only through the receivable.

19    Q.  Okay.  And is that date prior to when NextGear

20    floored the vehicle?

21    A.  This on the receivable?

22         It doesn't show up on the receivable until we

23    floor it.

24    Q.  You don't have knowledge when she bought the

25    vehicle?

1      A.  No.

2              MR. LEVINE:  I'd like to turn to what has

3      been introduced as Defendant's Exhibit 10, the receivable

4      detail report.

5      BY MR. LEVINE:

6      Q.  If you look at page two, and you have the list of

7      vehicles?

8              THE COURT:  Can you locate that, sir?

9              THE WITNESS:  Yes, I have it here.

10     BY MR. LEVINE:

11     Q.  Tell me when you're there.

12     A.  I'm here.

13     Q.  And, there is a -- on the top, there is a row that

14     has headings for the various columns?

15     A.  Right.

16     Q.  Okay.  So, it says, "Floor Date" is the first?

17     A.  Correct.

18     Q.  And then "Days"?

19     A.  Correct.

20     Q.  "Last Paid"?

21     A.  Correct.

22     Q.  And then the fourth column says "VS."

23     A.  Correct.

24     Q.  Do you know what "VS" means?

25     A.  Vehicle status.

1     Q.   Okay.  And, there are various codes under vehicle

2   status.

3     A.   Correct.

4     Q.   And, what does CUV mean?

5     A.   Collateral unverified.

6     Q.   Okay.  And how about RHD?

7     A.   RHD is repo'ed.

8     Q.   Okay.  And how about SOT?

9     A.   Sold out of trust.

10    Q.   Sold out of trust.  Okay.

11         And, if you look at the third page of this report,

12   it has a Bates Stamp number of NG 000317.  The fourth

13   vehicle from the bottom, that's the BMW that's in

14   question in this case, correct?

15    A.   Yes.

16    Q.   And, that has -- it says --

17    A.   Sold out of trust.

18    Q.   -- sold out of trust on that.

19         And this report was run on 4-24-2014?

20    A.   Correct.

21    Q.   So, at least as of that date, NextGear's records

22   showed that the vehicle was sold out of trust?

23    A.   Correct.

24    Q.   Thank you.

25         And the BMW was repossessed on what date?

1        A.    I have no idea.

2              MR. LEVINE:  I have no further questions.

3              THE COURT:  Redirect?

4              MR. BRAGDON:  No, Your Honor.

5              THE COURT:  And is this witness excused?

6              MR. BRAGDON:  Yes, Your Honor.

7              THE COURT:  Thank you, sir.  You're free to

8    go.  Please do not discuss your testimony with anyone

9    else.

10             (Thereupon, the witness withdrew from the

11   stand.)

12             (End of Requested Excerpt 2.)

13

14                          ---

15

16

17

18

19

20

21

22

23

24

25

1                    (Requested Excerpt 3 follows:)

2                    ...THE COURT:  All right.  Would you bring in

3     the jury.

4                    (Jury present.)

5                    THE COURT:  Who is your next witness?

6                    MR. BRAGDON:  NextGear calls Navid Alex

7     Mahdavi.

8                    (Witness sworn.)

9                    THE WITNESS:  I do.

10                    THEREUPON, NAVID ALEX MAHDAVI, having been

11     duly sworn, testified as follows:

12                         DIRECT EXAMINATION

13     BY MR. BRAGDON:

14       Q.  Good afternoon, Mr. Mahdavi.  Can you please state

15     your name for the record.

16       A.  Navid Mahdavi.

17       Q.  Can you please describe your job title at BW Auto,

18     your job description, and any involvement you had

19     pertaining to obtaining copies of title for vehicles to

20     be sold?

21                    THE WITNESS:  Your Honor, my -- I don't have

22     a Virginia attorney, and I've been advised by my Maryland

23     attorney to respectfully exercise my Fifth Amendment

24     right and plead the Fifth to all questions.

25

1   BY MR. BRAGDON:

2       Q.  Mr. Mahdavi, could you please describe your role

3   in your wife's alleged purchase of the BMW?

4       A.  I plead the Fifth.

5       Q.  Did you have access to a system at BW Auto for

6   submitting requests to MVA for duplicate titles?

7       A.  I've been advised by my counsel to plead the Fifth

8   on all questions.

9       Q.  Can you describe your knowledge of NextGear's

10  interest in the collateral, including the BMW?

11      A.  Again, I don't have an attorney and I've been

12  advised by my Maryland attorney to plead the Fifth on all

13  questions.

14      Q.  Were you aware that fraudulent practices were

15  occurring at BMW Auto?

16      A.  Again, I don't have a Virginia attorney, and I've

17  been advised by my Maryland attorney to plead the Fifth

18  on all questions.

19      Q.  Did you receive any financial benefit, direct or

20  indirect, from the sale of the BMW to your wife?

21      A.  Again, I don't have a Virginia attorney to advise

22  me, so I've been advised by my Maryland attorney to plead

23  the Fifth on all questions.

24      Q.  And you had access to Beltway Auto's online bank

25  account and checkbook; is that correct?

1      A.   I don't have an attorney to advise me, and I plead
2    the Fifth.
3      Q.   Can you describe your involvement in completing
4    the paperwork for your purchase --
5               THE COURT:  I really don't think we need to
6    go through every question, do we?
7               MR. BRAGDON:  No, Your Honor.
8               THE COURT:  Mr. Mahdavi, I take it that you
9    don't plan to answer any of the questions, and intend
10   to -- plan to assert your Fifth Amendment rights to not
11   testify as to any question put to you today?
12              THE WITNESS:  Yes, Your Honor.  I don't have
13   an attorney to advise me.  Yes.
14              MR. BRAGDON:  Your Honor, can we, just to
15   avoid the time, can we just submit a list of the -- he's
16   already answered these, so I agree --
17              THE COURT:  During deposition.
18              MR. BRAGDON:  If we can just submit this as
19   an exhibit.
20              THE COURT:  Any objection to the questions
21   that they were going to ask Mr. Mahdavi, to which he's
22   going to plead the Fifth Amendment?
23              Do you have the list for counsel?
24              MR. BRAGDON:  Yes.  I have three copies.
25              THE COURT:  These are all questions that were

1    asked Mr. Mahdavi at his deposition?

2              MR. BRAGDON:  These are written deposition,

3    Your Honor, yes.

4              THE COURT:  And did he assert his Fifth

5    Amendment rights against self-incrimination as to every

6    one of those?

7              MR. BRAGDON:  Yes.

8              So we would move for admission of this as our

9    Exhibit 12 --

10             THE COURT:  Thirteen.

11             MR. BRAGDON:  Thirteen.

12             MR. LEVINE:  No objection, Your Honor.

13             THE COURT:  Submitted.

14             All right, Mr. Mahdavi, you're excused.

15             THE WITNESS:  Thank you.

16             (Thereupon, the witness withdrew from the

17   stand.)

18             (End of requested excerpts.)

19

20                              ---

21

22

23

24

25

```
1
2                    CERTIFICATE OF REPORTER
3
4          I, Renecia Wilson, an official court
5    reporter for the United States District Court of
6    Virginia, Alexandria Division, do hereby certify that I
7    reported by machine shorthand, in my official capacity,
8    the proceedings had upon the jury trial in the case of
9    JODI MAHDAVI v. NEXTGEAR CAPITAL, INC.
10             I further certify that I was authorized and
11   did report by stenotype the proceedings in said jury
12   trial, and that the foregoing pages, numbered 1 to 73,
13   inclusive, constitute the official transcript of said
14   proceedings, REQUESTED EXCERPTS, as taken from my
15   shorthand notes.
16
17             IN WITNESS WHEREOF, I have hereto subscribed
18   my name this  19th  day of  July , 2016.
19
20                          /s/
                              Renecia Wilson, RMR, CRR
21                            Official Court Reporter
22
23
24
25
```